No. 23-50668

# In the United States Court of Appeals for the Fifth Circuit

Book People, Inc., VBK, Inc. d/b/a Blue Willow Bookshop, American Booksellers Association, Association of American Publishers, Authors Guild, Inc., Comic Book Legal Defense Fund,

*Plaintiffs-Appellees*

*v.*

Martha Wong in her official capacity as chair of the Texas State Library and Archives Commission, Keven Ellis in his official capacity as chair of the Texas Board of Education, Mike Morath in his official capacity as Commissioner of Education,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## Exhibits

Tab

Order Denying Defendant's Motion to Dismiss and Granting Plaintiff's Motion for Preliminary Injunction (ECF 43) ................................................... A
Complaint (ECF 1) ......................................................................................... B
Transcript of August 31, 2023 Status Conference ................................. C
Defendant's Motion to Stay of Proceedings Pending Appeal (ECF 37) ................. D
Transcript of September 11, 2023 Motions Hearing ............................... E

# Exhibit A: Order Denying Defendant's Motion to Dismiss and Granting Plaintiff's Motion for Preliminary Injunction (ECF 43)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

**AUSTIN DIVISION**

|  |  |
|---|---|
| BOOK PEOPLE, INC., VBK, INC. d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND,<br><br>           **Plaintiffs,**<br><br>*v.*<br><br>MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education,<br><br>           **Defendants.** | 1:23-cv-00858-ADA |

# ORDER

Texas faces the important issue of what books should be provided and accessible to students in public school libraries in grades K-12. One of the many issues it considers is the sexual content of the hundreds, if not thousands, of books that are available. Depending on the level of sexual content in each book—a subjective issue reasonable people can disagree about—the state must weigh the appropriateness of purchasing those books and making them available to students.

To address this important issue, the Texas Legislature passed HB900, also known as READER, earlier this year. If the law were to go into effect, it would require:

- The Texas State Library and Archives to create standards for "sexually explicit" and "sexually relevant" materials.

- Booksellers to categorize any books they sell or have ever sold to schools according to those standards and issue a recall for any "sexually explicit" materials that they sold to schools.

- Schools to refrain from purchasing any "sexually explicit" materials and to remove "sexually explicit" existing materials from their libraries.

- Librarians to obtain parental consent for students to read or check out any books rated "sexually relevant."

- The Texas Education Agency to oversee the ratings, which includes the power to overrule a vendor's rating.

- Booksellers who do not comply with the rating system (or the overruled ratings) to not sell any books at all to the schools.

The intent of the law is clearly an attempt by the State of Texas to categorize and restrict books based on the level of sexual content in each book. By doing that, the State will determine which books are to be allowed to be purchased by public school libraries and their accessibility by the students with or without parental permission. The issue before this Court is whether the State of Texas is allowed to delegate the categorization to Third Parties like these Plaintiffs. This Court holds that it may not, at least in the manner employed here.

For whatever reason, Texas chose not to have anyone employed by the state at any level make the initial evaluation of the sexual content. It chose instead to impose this extraordinarily

2

difficult and prohibitively expensive burden solely on third parties with totally insufficient guidance. And worse still, no matter how much time and expense the third parties invest in complying, the State (through the Texas Education Agency) retained the power to unilaterally alter any decision made by the third party.

The TEA has the total, unilateral power to alter any rating with which they disagree. The posting of the assessment made by TEA—not the third party—would then appear on TEA's website as if the third party had made the assessment. Finally, the state denied the third parties the ability to appeal if they disagree with the State's ratings of any book. Therefore, this Court holds that the State of Texas impermissibly seeks to compel an individual or a corporation to create speech that it does not wish to make, and in addition, in which it does not agree with. The question faced by this Court is whether this law violates the Free Speech Clause of the First Amendment. For this and other reasons, the Court finds that this law violates the Free Speech Clause of the First Amendment.

# I. BACKGROUND

Before the Court is Defendants Martha Wong, Keven Ellis, and Mike Morath's ("Defendants") Motion to Dismiss (ECF No. 19), and Plaintiffs Book People, Inc. ("BookPeople"), VBK, Inc. d/b/a Blue Willow Bookshop ("Blue Willow Bookshop"), American Booksellers Association ("ABA"), Association of American Publishers ("AAP"), Authors Guild, Inc. ("Guild"), and Comic Book Legal Defense Fund's ("Plaintiffs") Motion for Preliminary Injunction (ECF No. 6). Having considered the parties' briefs, the record, and the relevant law, the Court finds that the motion to dismiss, (ECF No. 19), is **DENIED**, and the motion for preliminary injunction (ECF No. 6), is **GRANTED** to the extent set out below.

The Texas Legislature passed, and Governor Greg Abbot signed into law, House Bill 900, known as the Restricting Explicit and Adult-Designated Educational Resources Act (hereinafter, "READER"), which was to go into effect on September 1, 2023. The Act purportedly attempts to regulate access to school library books that are deemed "sexually explicit" or "sexually relevant." ECF No. 19 at 2. READER has a multitude of requirements regarding the rating of content in school libraries, many specifically targeted at "[l]ibrary material vendor[s]," which includes "any entity that sells library material to a public primary or secondary school in this state." *See* Tex. Educ. Code § 35.001(1).

Plaintiffs are a collection of book sellers, publishers, and authors who are suing officials from the Texas State Library and Archives Commission ("TSLAC"), Texas State Board of Education ("TSBE"), and Texas Education Agency ("TEA") for violations of their constitutional rights under the First and Fourteenth Amendments. *See* ECF No. 1 at 4–7, 19. Specifically, they allege that READER compels speech, is unconstitutionally vague, acts as a prior restraint, is unconstitutional facially and as applied, is overbroad, and is an unconstitutional delegation of government authority. *Id.* at 19–26. Plaintiffs request an injunction enjoining the Defendants from enforcing READER. *Id.* at 27; ECF No. 27 at 7.  Defendants allege that Plaintiffs' challenge should be dismissed under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). ECF No. 19. Defendants also argue that a preliminary injunction is not proper based on the merits. *Id.*

The rating scheme itself has a complicated web of requirements. READER has three categories that library materials are to be sorted into: "sexually explicit" material, "sexually relevant" material, and material receiving "no rating". Tex. Educ. Code 35.001, 35.003. "Sexually relevant material" is defined as "any communication, language, or material, including a written description, illustration, photographic image, video image, or audio file, other than library material

directly related to the curriculum required under Section 28.002(a), that describes, depicts, or portrays sexual conduct, as defined by Section 43.25, Penal Code." § 35.001(3).[1]

However, to determine whether materials should be categorized as "sexually explicit", a vendor must determine if the "sexually relevant material" is described or portrayed in a way that is "patently offensive" as defined by Penal Code Section 43.21. Tex. Educ. Code §§ 33.021(a); 35.001(2). While this is a decision that hundreds, if not thousands, of attorneys who work as prosecutors wrestle with (with a judicial officer being the final potential arbiter of any decision), the statute provides no bright line that any of the Plaintiffs could be certain about when making this assessment for each book it reviews and rates. This definition requires Plaintiffs to determine, for each book, whether it is "so offensive on its face as to affront current community standards of decency." Tex. Penal Code § 43.21(a)(4). One wonders how many times appellate courts have been asked to step in to resolve both the meaning of these words, as well as to determine whether an action taken by a defendant had sufficiently met this standard.

In addition, READER fails to inform the public or any Plaintiff whose community standard it is referencing. It is an open question whether this community standard is based on Austin, Texas, or Onalaska, Texas—or any of the more than 1,200 incorporated municipalities across Texas. The lack of any blueprint for the Plaintiffs to follow creates a blunt reality that under this scheme it is guaranteed that different book distributors and sellers will arrive at different assessments with respect to hundreds if not thousands of books. While the TEA has the authority to resolve conflicts over what the correct assessment is—for potentially hundreds of books—there is no requirement

---

[1] The definition of "sexual conduct" seemingly encompasses any sexual-related topic. It is reproduced as follows: "Sexual conduct" means sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola."
Tex. Penal Code § 43.25(a)(2).

in the statute that they do so, and it is unclear from the provisions of the statute what the Plaintiffs (or school districts in Texas) would do in the interim. Thus, school districts across the state of Texas would be able to purchase a book of the exact same content from one provider but not another. Or, if they bought a book from one provider, they might be allowed to make it available to students without parental approval, but if they bought it from a different vendor, parental consent would be required.

The vendor must perform a "contextual analysis" to determine if a book is patently offensive, and must consider (for each of thousands of books) multiple factors, including: "(1) the explicitness or graphic nature of a description or depiction of sexual conduct contained in the material; (2) whether the material consists predominantly of or contains multiple repetitions of depictions of sexual or excretory organs or activities; and (3) whether a reasonable person would find that the material intentionally panders to, titillates, or shocks the reader." Tex. Educ. Code § 35.0021(b). READER asks more though, requiring vendors to "weigh and balance each factor and conclude whether the library material is patently offensive, recognizing that because each instance of a description, depiction, or portrayal of sexual conduct contained in a material may present a unique mix of factors." *Id.* § 35.0021(c). READER further exacerbates the confusion in applying the balancing test by requiring vendors to "consider the full context in which the description, depiction, or portrayal of sexual conduct appears, to the extent possible, recognizing that contextual determinations are necessarily highly fact-specific and require the consideration of contextual characteristics that may exacerbate or mitigate the offensiveness of the material." *Id.* § 35.0021(d). Notably, this definition of "sexually explicit" material does not follow the definition

of obscenity approved by the Supreme Court in *Miller v. California*, <u>413 U.S. 15, 24</u> (1973).[2] Because of this, there is the potential that the designation of a book as "sexually explicit" would violate the First Amendment.

While the law indicates that there is an exception for the requirement to rate or list material "directly related to the curriculum" based on § 28.002(a) of the Education Code, *see* <u>Tex. Educ. Code §§ 33.021(a)</u>; <u>35.001(3)</u>, closer inspection of the Code provides no clarity to what books would qualify as directly related to the curriculum and be excluded from ratings. The Education Code only provides a general list of subjects that curriculum must cover. *See id.* § 28.002(a). But there is no statewide curriculum in Texas. Therefore, there is no way to for the Plaintiffs to determine what material is "related to the curriculum" across all 1,025 Texas school districts. *See* Aug. 18 Mot. Hr'g Tr. 58:9-59:1. In fact, curricula vary from <u>classroom-to-classroom</u> within a district as well as from day-to-day or year-to-year within a single classroom, requiring consistent reevaluation. But reevaluation by who? The TEA? The schools? The Plaintiffs? Multiple affidavits filed explain that vendors have no insight into what the curriculum entails, or further what "directly related" to the curriculum covers. *See* ECF No. 6-3 at 5; ECF No. 6-4 at 5. Simply put, it is impossible for vendors to ascertain what content falls within this exception, or how to determine its scope on a statewide basis.

READER's requirements for vendors are so numerous and onerous as to call into question whether the legislature believed any third party could possibly comply. The law prohibits "library

---

[2] The *Miller* test requires the following elements: "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." <u>413 U.S. at 24</u> (citation omitted).

material vendor[s]"[3] from selling "library materials" to any school district or open-enrollment charter school ("public schools") unless the vendors issue ratings for any library material "previously sold" to public schools. Tex. Educ. Code § 35.002(a). There is also a complete prohibition on sales of material rated "sexually explicit" to public schools. Tex. Educ. Code § 35.002(b). But the rating of "sexually explicit" is not one made by the State such that the vendor and school districts could simply comply according to a statewide, uniform guideline. Again, it is an assessment that the state is requiring each vendor to separately make. After a vendor issues ratings for all material previously sold to public schools, the Texas Education Agency must post each list submitted by vendors "in a conspicuous place on the agency's Internet website as soon as practicable." Tex. Educ. Code § 35.002(e). READER requires vendors to submit initial lists "[n]ot later than April 1, 2024" and update the list no later than September 1 each year. Tex. Educ. Code § 35.002(c)–(d).

This concern only increases with the power that the statute gives the TEA. After submission of the lists, the TEA can review the ratings and notify the vendor if any library material the vendor sells is not rated or, in the sole opinion of the TEA, is incorrectly rated. Tex. Educ. Code § 35.003. What instructions do the statute provide for the TEA to employ when deciding to substitute their assessment for the good faith assessment of the vendors? None. Does the TEA have a deadline by which it must provide these assessments to the vendor? No. Is the TEA required to apply any standard of good faith? If so, it is implicit at best. There is no good faith requirement imposed on the TEA in the statute. Does the TEA have to perform its assessment in one step and provide it to the vendor, or may the TEA engage in a seriatim process where it identifies one "incorrect"

---

[3] A "library material vendor" is defined as "any entity that sells library material to a public primary or secondary school in this state." Tex. Educ. Code § 35.001(1). This definition could apply broadly to wholesalers, distributors, independent bookstores, online retailers, e-book sellers, publishers, authors, and others.

8

assessment at a time? The statute provides no answer. In other words, the statute provides the TEA unlimited authority to undermine every minute of the work that the vendors put into rating books without providing any blueprint for the standard that will be employed for this review.

So, let's assume that one of these Plaintiffs makes a good faith effort and works from now through April 1, 2024, to perform the evaluation on thousands of books and proffers a rating of the sexual content of each. The TEA then determines that they have incorrectly rated some number of the books, from 1 to infinity, and places a different sexual rating on those books. Having already invested thousands, if not hundreds of thousands, if not millions of dollars to comply with the mandates of the statute and performing an assessment of each book, the vendor is then given just 60 days to adopt the TEA's rating (with the updated list being published on the TEA's website in a "conspicuous place") or be censured and placed on a list (also in a "conspicuous place" on the TEA's website) showing failure to comply with the TEA's requirements. Tex. Educ. Code § 35.003(b)–(c). Public schools are prohibited from purchasing library materials from vendors on the latter list. *Id.* § 35.003(d). There is precious little if any language in the statute to ensure that any decision made by the TEA with respect to the rating of any book will be any more "accurate" (whatever that means) allowing for the enormous possibility if not probability that it will be entirely arbitrary and capricious (at best). In other words, vendors must decide between either accepting the state administrative agency substituted speech as their own or being effectively blacklisted. There is no mechanism to appeal the TEA's ratings with respect to any book. There is no dispute that the only way to regain the ability to sell library material to public schools is to submit a list of ratings compliant with the TEA's ratings. Tex. Educ. Code § 35.003(e); *see* Aug. 18 Mot. Hr'g Tr at 71:1.

9

Additionally, after submitting ratings, vendors are required to issue a recall for "all copies" of material rated sexually explicit that were previously sold to public schools and are currently "in active use by the district or school." Tex. Educ. Code § 35.002(b). However, the statute lacks clarity regarding what "active use" is, and the government, when pressed at the August 18th, 2023, hearing, even admitted, "there's no mechanism for tracing every prior book sold." *See* Aug. 18 Mot. Hr'g Tr. 76:24–25. Plaintiffs confirmed this statement through the multitude of declarations indicating that they do not have records for every book they have ever sold to a public school, and furthermore that they would not know which books are "in active use." *See* ECF No. 6-5 ¶¶ 9–11; ECF No. 6-3 ¶¶ 7–9; ECF No. 6-6 ¶ 6; ECF No. 6-4 ¶¶ 5–6.

The effects of these few short provisions have put Plaintiffs in an impossible position. First, the costs of compliance with issuing ratings are sky high. In addition, Plaintiffs do not believe their members or employees have the time or the training to properly make these assessments, which could lead to banning classic works of literature. *See* ECF No. 6-5 ¶ 17; ECF No. 6-3 ¶¶ 13, 18; ECF No. 6-6 ¶¶ 7, 11.; ECF No. 6-4 ¶ 9; ECF No. 6-7 ¶¶ 8–9. The process of providing a contextual rating is incredibly expensive. Blue Willow estimates that the cost to rate each book would be between $200 and $1,000 per book, and the cost to read and rate books already sold to schools between $4 million and $500 million dollars—Blue Willow's annual sales are only $1,000,000 per year. *See* ECF No. 6-3 ¶¶ 14–16; ECF No. 6-4 ¶¶ 8–9. To put the scale of the number of books that would need to be rated in perspective, a librarian in San Antonio for Northside ISD testified that six school districts alone had library collections totaling over six million items. Hearing on Tex. H.B. 900 before the Senate Comm. on Educ., 88th Leg., R.S. (May 11, 2023) (statement of Lucy Podmore) (available at https://tlcsenate.granicus.com/MediaPlayer.php?view_id=53& clip_id=17930, from 1:12:30 - 1:14:41). To demonstrate how long it takes to review books for

objectionable content, it took Spring Branch ISD more than 220 hours, $30,000, and 16 employees to review *one book* to try to comply with a book removal request that was unrelated to the law at hand. *See* Shannon Ryan, *More than $30K of taxpayers' money, 220 hours spent on single Spring Branch ISD book ban, docs show*, ABC 13 (Mar. 28, 2023), https://abc13.com/spring-branch-isd-book-ban-school-library-books-student-resources-texas-schoolbook-restrictions/13037457/.

Plaintiffs are concerned that the state's coerced revised ratings will be interpreted by the public as Plaintiffs' own independent rating when they are, in fact, speech compelled by the State. *See* ECF No. 6-5 ¶¶ 19–21; ECF No. 6-3 ¶¶ 17, 21–22; ECF No. 6-6 ¶ 15; ECF No. 6-7 ¶¶ 14–16. The requirement acts as a Hobson's Choice requiring booksellers to accept the state's compelled speech as their own or sacrifice their ability to conduct business with Texas school districts. Plaintiffs stand to suffer significant financial—and reputational—damages from their loss of business with Texas school districts. *See* ECF No. 6-5 ¶¶ 20–22; ECF No. 6-3 ¶¶ 14–16, 21–25; ECF No. 6-6 ¶¶ 19–20; ECF No. 6-2 ¶ 7; ECF No. 6-7 ¶ 12.

There is a substantial factual dispute over the operation of many aspects of the law due to the statute's lack of clarity.[4] Generally, the government was confused and unaware of how the law would actually function in practice, even though the hearing was mere days before it would go into effect. There were approximately 40 instances during the August 18th hearing ("Hearing 1") where the government either did not know how the law would function or did not have an answer as to what the effects of certain provisions were. *See generally* Aug. 18 Mot. Hr'g Tr. The Court includes a few examples of this lack of clarity below.

---

[4] "[W]hile disputed facts and law as to the ultimate issue will be considered by the Court on a Motion for Preliminary Injunction, the fact that there are disputed facts and law does not in itself prevent issuance of a preliminary injunction." *United States v. Aluminum Co. of Am.*, 247 F. Supp. 308, 314 (E.D. Mo. 1962), *aff'd per curiam*, 382 U.S. 12 (1965); *see also* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.3 (3d ed. 2023) (stating that "it is unacceptable as a general rule" to not grant preliminary injunctions when there is a factual conflict).

The Court addresses first the question of who the statute identifies as having the power to enforce the law (or if the law has any enforcement mechanism). At the hearing, when asked about enforcement and who would enforce the law, Defendants' counsel stated: "That's a good question. A good question that I don't know that anybody has thought that through yet." *Id.* at 66:9–11. Next, the question of what event would trigger the TEA to review and revise Plaintiffs' ratings of one or more books. In response, Defendants' counsel stated: "I haven't thought that through yet. I think this is still being worked out because this is a new [bill.]" *Id.* at 33:3–5. When asked if there is no appeal from the TEA's review and revision of vendors' ratings, the government responded: "I believe that's correct, your Honor. I haven't thought that through, but I do believe that is correct." *Id.* at 12:17–19. Asked how Plaintiffs may seek relief under the law if vendors were harmed, Defendants' counsel stated: "Well, your Honor, maybe the answer is they can't." *Id.* at 10:9–10.

A large point of contention between the parties, for the purposes of the injunctive relief requested, is when the law's provisions actually go into effect. Schools and the Plaintiffs believe, absent an injunction, that they will be unable to sell books as of the date the law goes into effect, September 1, 2023. At least one school district has already stopped buying books completely (including from a Plaintiff) in anticipation of the law coming into effect. *See* ECF No. 6-3 ¶ 24; Claire Goodman, *Katy ISD halts all library book purchases, new books stored*, Houston Chronicle (June 27, 2023), https://www.houstonchronicle.com/neighborhood/katy/article/katy-isd-halts-library-book-purchases-18172597.php. The government stated at the hearing and in its briefing that since rating lists were not due until April 1, 2024, nothing in the status quo would change in the interim. Aug. 18 Mot. Hr'g Tr. 14:12–14, 65:14–23; ECF No. 19 at 8. READER went into effect on September 1, 2023, and by its plain text specifies that its changes apply to the 2023-2024 school year. 2023 Tex. Sess. Law Serv. 808 §§ 6–7 (West). The provisions described above

prohibit vendors from selling to public schools "unless the vendor has issued appropriate ratings." Tex. Educ. Code § 35.002(a). So, a plain reading of the legislation reveals that vendors are prohibited from selling books in the interim, between September 1, 2023, and April 1, 2024, or, at best, creates sufficient ambiguity about providers' ability to sell books to schools.

Plaintiffs filed their complaint on July 25, 2023, (ECF No. 1), and moved for a preliminary injunction on the same date, (ECF No. 6). Defendants jointly responded to the motion for preliminary injunction and moved to dismiss on August 16, 2023 (ECF No. 19). Plaintiffs replied to the motion to dismiss on August 17, 2023 (ECF No. 25). In addition, an amicus brief in support of the preliminary injunction was submitted by American Association of School Librarians, Association of University Presses, Barnes & Noble, Inc., Freedom to Learn Advocates, and Freedom to Read Foundation on August 17, 2023 (ECF No. 26). After the parties submitted their briefing, the Court held an initial hearing on the preliminary injunction and motion to dismiss on August 18, 2023, (Minute entry, ECF No. 27). The parties submitted post hearing briefing on the preliminary injunction. (Pls.' Response in Opposition to Motion, ECF No. 30; Defs.' Response in Support, ECF No. 31). The Court held a second hearing on the preliminary injunction and motion to dismiss on August 28, 2023, (Minute entry, ECF No. 32). Finally, an amicus brief in support of the preliminary injunction was submitted by the Educational Book & Media Association was filed on August 30, 2023 (ECF No. 35).

## II. LEGAL STANDARD

### A. Motion to Dismiss 12(b)(1)

Rule 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. "Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998).

Accordingly, "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming*, 281 F.3d at 161. "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Id.* "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### B. Motion to Dismiss 12(b)(6)

Rule 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief can be granted. "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

14

Although a court accepts all well-pleaded facts as true, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A plaintiff's obligation to demonstrate his entitlement to relief requires more than mere conclusory statements. *Twombly*, 550 U.S. at 555. Rather, a plaintiff must plead facts with enough specificity "to raise a right to relief above the speculative level." *Id.* A plaintiff must allege more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Where the facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that the pleader is plausibly entitled to relief." *Howe v. Yellowbook, USA*, 840 F. Supp. 2d 970, 975 (N.D. Tex. 2011).

## C. Preliminary Injunction

A preliminary injunction is appropriate if a movant establishes: "(1) they are likely to succeed on the merits, (2) there is a substantial threat they will suffer an irreparable injury otherwise, (3) the potential injury outweighs any harm that will result to the other side, and (4) an injunction will not disserve the public interest.." *State v. Biden*, No. 23-30445, 2023 WL 5821788, at *12 (5th Cir. Sept. 8, 2023), *administrative stay granted sub nom. Murthy v. Missouri*, No. 23A243 (U.S. Sept. 14, 2023) (Alito, J., in chambers); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 288 (5th Cir. 2012). These elements are not examined in isolation but balanced in consideration of each other. *State of Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).

# III. DISCUSSION

**A. The Court has subject matter jurisdiction over Plaintiffs' constitutional claims for injunctive relief.**

Defendants argue that this case should be dismissed for lack of subject matter jurisdiction because Plaintiffs' claims are non-justiciable and barred by Sovereign Immunity. ECF No. 19. Plaintiffs, however, oppose Defendants' Motion to Dismiss, arguing that they sufficiently allege standing and that the claims at issue are ripe. ECF No. 30 at 4–13. Plaintiffs also assert that Defendants are not entitled to sovereign immunity because of the *Ex parte Young* exception. *Id.* at 13; *see also* 209 U.S. 123, 160 (1908). The Court agrees with Plaintiffs and addresses each argument in turn.

## 1. Plaintiffs sufficiently allege Article III standing to challenge READER.

Article III standing requires Plaintiffs to have suffered an injury-in-fact that is: 1) "concrete and particularized" and "actual or imminent;" (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

### a. Plaintiffs sufficiently plead an injury-in-fact under the First Amendment.

Standing rules are unique in First Amendment challenges because of the issues at stake. *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215 (5th Cir. 2023) ("In pre-enforcement free speech challenges, 'chilled speech or self-censorship is an injury sufficient to confer standing.'") (quoting *Barilla v. City of Houston*, 13 F.4th 427, 421 (5th Cir. 2021)). Plaintiffs "need not have experienced 'an actual arrest, prosecution, or other enforcement action' to establish standing." *Id.*

at 215–16 (quoting *Susan B. Anthony List v. Driehaus*, <u>573 U.S. 149, 158</u> (2014)). Instead, Plaintiffs need only show that "(1) [they] intend[] to engage in a course of conduct arguably affected with a constitutional interest; (2) that the course of action is arguably proscribed by statute; and (3) that there exists a credible threat of prosecution under the statute." *Id*. (citing *Driehaus*, <u>573 U.S. at 159</u>). Plaintiffs can satisfy all three conditions.

First, Plaintiffs have alleged that they will be subject to READER, which regulates book sales to public schools, because Plaintiffs or their members[5] have sold books to Texas public schools and intend to continue selling books to Texas public schools. ECF No. 1-2 ¶¶ 3–7; ECF No. 1-3 ¶¶ 3–5, 27; ECF No. 1-4 ¶ 5; ECF No. 1-5 ¶ 4; ECF No. 1-6 ¶¶ 5–6; ECF No. 1-7 ¶ 5. When READER takes effect on September 1, 2023, injury is "imminent" because Plaintiffs will need to comply with the law's book rating requirement or else be prohibited from selling any books to public schools, regardless of their ratings. *See* <u>Tex. Educ. Code § 35.002(a)</u>; ECF No. 1 ¶ 48 ("Booksellers that do not issue ratings are prohibited from selling *any* books to school districts or open-enrollment charter schools.") (footnote omitted).

From both a logistical and substantive standpoint, Plaintiffs have proffered substantial evidence and argument that they cannot comply with § 35.002(a). If Plaintiffs and other companies in their shoes do not have complete records of all books "previously sold to a district or school," then they do not know what books are in "active use," and they do not understand how to apply

---

[5] Some of the plaintiffs, namely ABA, AAP, Authors Guild, and CBLDF, are organizations that do not sell any books. ECF No. 30 at 5 n.1. Plaintiffs claim that these four organizations nevertheless have standing to sue on behalf of their members. *Id.* Yet neither Plaintiffs nor Defendants seriously grapple with the three-factor test necessary to establish such standing. *See Students for Fair Admissions v. President & Fellows of Harvard Coll.*, <u>143 S. Ct. 2141, 2157</u> (2023); ECF No. 19 at 5–10; ECF No. 25 at 2–5; ECF No. 30 at 3–12; ECF No. 31 at 2–7. However, because the Court concludes that the bookseller plaintiffs have standing to pursue all their claims and requested forms of relief, it is unnecessary to decide this question. *See State v. Biden*, No. 23-30445, <u>2023 WL 5821788</u>, at *7 (5th Cir. Sept. 8, 2023) ("The presence of any *one* plaintiff with standing to pursue injunctive relief as to the Plaintiffs' First-Amendment claim satisfies Article III's case-or-controversy requirement."), *administrative stay granted sub nom. Murthy v. Missouri*, No. 23A243 (U.S. Sept. 14, 2023) (Alito, J., in chambers).

the vague criteria in the statute for issuing the ratings. *See* ECF No. 6-3 ¶¶ 8–10; ECF No. 1-3 ¶¶ 7–9; ECF No. 1-4 ¶¶ 6–7, 13–14; ECF No. 1-5 ¶¶ 5–8, 11; ECF No. 1-2 ¶ 11, 17–18; ECF No. 1-7 ¶ 7. If they are banned, because of the statute, from selling any books to public schools on September 1, 2023 (which as discussed above is a reasonable interpretation of the statute's plain text), they will suffer financial harm, satisfying the injury-in-fact requirement. ECF No. 30 at 6 (citing *All. for Hippocratic Med*. *v. U.S. Food & Drug Admin*., No. 23-10362, 2023 WL 5266026, at *14 (5th Cir. Aug. 16, 2023) ("[E]conomic harm—like damage to one's business interest—is a quintessential Article III injury.")).

The Court has analyzed Defendants' contention that Plaintiffs' alleged injury is "speculative," because Plaintiffs only assert ways in which they could "hypothetically be injured." ECF No. 31 at 4. The Court finds that this argument lacks merit. The book vendor Plaintiffs intend to sell books to school districts, and in Defendants' own words, "Texas Education Code §35.002 clearly provides that a schoolbook vendor may not sell to a school district without submitting the required ratings." *Id*. Based on the language in the statute, Plaintiffs' ability to sell books is arguably proscribed by READER unless and until they comply with requirements that are burdensome and costly and will cause them to divert extensive resources and time from their normal operations. *See* ECF No. 30 at 6 (citing *All. for Hippocratic Med*., 2023 WL 5266026, at *14, for the proposition that plaintiffs "sustain a concrete injury when they are forced to divert time and resources away from their regular" jobs);[6] ECF No. 1-5 ¶ 9. Though the ratings are not

---

[6] Plaintiff Blue Willow Bookshop estimates that it will cost between $200 and $1,000 per book and between $4 million and $500 million total to read and rate books already sold to public schools according to the READER's multi-layered criteria. ECF No. 1-3 ¶¶ 14–16. These estimates do not account for the cost of reviewing future books or the cost of obtaining previously sold books that are no longer stocked by Blue Willow. *Id*. ¶ 15. Lucy Podmore, a San Antonio librarian for Northside ISD, testified during a Texas Senate hearing that her students have read more than 14,000 books from their school library during the 2022-23 school year and that six school districts alone have library collections totaling over six million items. *See* Hearing on Tex. H.B. 900 before the Senate Comm. on Educ., 88th Leg., R.S. (May 11, 2023). Plaintiffs also assert that it took Spring Branch ISD more than 220 hours, $30,000, and 16 employees to review one book in an effort to comply with a book removal request. *See* ECF No. 30 at 7 n.13.

due until April 1, 2024,[7] the injury caused to Plaintiffs by attempting to comply with READER became imminent on September 1, 2023. This confers standing.

Yet even setting aside the burdensome and costly aspects of requiring book vendor plaintiffs to apply ratings, Plaintiffs also satisfy the conditions for injury-in-fact by showing that READER seeks to compel Plaintiffs' speech in at least two ways. The first is compelling the venders to provide ratings. The second is that if Plaintiffs comply with the statute and issue a rating with which the TEA disagrees, TEA still reserves the authority to overrule Plaintiffs' ratings and require Plaintiffs to list the State's rating as their own to sell any books to public schools. *See* Tex. Educ. Code §§ 35.002(e); 35.003(c). If—and almost certainly *when*—the TEA disagrees with a rating, Plaintiffs must re-rate the book consistent with TEA's "corrected" rating, which the TEA will post publicly on its website. *Id*. §§ 35.003(b)(1); 35.002(e); 35.003(c). Any state-issued ratings then adopted by vendors are not confined for viewing by only public schools or Texas residents, but are accessible and viewable by anyone who accesses the TEA website.

In opposition, Defendants insist that this argument is speculative, asserting that there is a "lack of certainty as to whether the Agency will even review Plaintiffs' ratings or require them to be changed." ECF No. 31 at 5. But the fact that the Agency might not review ratings or require them to be changed is vastly different from arguing that the Agency does not have the power to do either or both, or guarantee that the TEA will not sue. Moreover, counsel for Defendants was certainly unable at the hearing to even intimate that the Agency taking this action was not more

---

[7] In their Motion for Stay Pending Appeal, Defendants note that READER also "requires TSLAC, in consultation with SBOE, to devise and adopt standards for school library services in regard to the implementation of READER," a task that must be accomplished "by January 1, 2024." ECF No. 37 at 6. Defendants then contend that this "requires *immediate* action" and that "[m]eeting that *future* deadline is an arduous task that requires significant *present* action." *Id*. *a*t 6–7 (emphases in original). Thus, Defendants claim, failure to stay the injunction won't just cause injury to Defendants—it will cause *irreparable* injury to Defendants. *See id*. These statements also happen to perfectly describe READER's initial ratings list requirements. Thus, Defendants' own briefing shows why the April 1, 2024 deadline to comply with Tex. Educ. Code § 35.002(c) does not render its injury to Plaintiffs speculative or non-imminent.

likely than not. *See* Aug. 18 Mot. Hr'g Tr at 16:4-17; 20:22-23:12; 71:10-72:1; 72:14-22; 73:11-15. In addition, the Court notes that Plaintiffs disagree with the State's compelling of any rating criteria and do not want to be forced to issue any ratings. Regardless, the Court is hard pressed to rely on Defendants' line of argument.

First, if the Court accepts Defendants' arguments as true, why would the Legislature impose such costly and burdensome requirements on Plaintiffs to comply with a law which it did not intend for Defendants to enforce? Second, and along those same lines, the Court is skeptical as to how Defendants can argue that there is no "credible threat" of compelled speech, a claim that requires TEA and Plaintiffs to align on every single rating as to every single book. ECF No. 31 at 5; *see Driehaus*, 573 U.S. at 159 ("[W]e have held that a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.") (internal quotations omitted). Again, given that multiple vendors will be providing ratings for thousands of books, it is beyond question that they will be conflicting rating that the TEA will have to resolve. If the Court accepts Defendants' arguments that the certainty of the TEA reviewing Plaintiffs' ratings or requiring any changes is so lacking that there is no "credible threat" sufficient to confer standing, then apart from the requirements it imposes on vendors, READER is essentially pointless. Defendants cannot have it both ways—either 1) READER, which was enacted by the State to discharge its obligation "to protect children from obscene material in school," ECF No. 19 at 35, will be enforced by Defendants to carry out those obligations, consequently conferring standing; or 2) it will not, instead requiring Plaintiffs to expend upwards

of millions of dollars on the review and rating process[8] to comply with a law which may never be enforced. The bottom line is relatively simple to the Court. There is an existential threat to each of the Plaintiffs of enforcement that the State is unwilling or unable to disavow.

Defendants' next assertion, that there can be no "compelled speech" issue here, is without merit for several reasons. Defendants argue that the "speech" in question is that of the government, not Plaintiffs. ECF No. 31 at 5. But this ignores the fact that the State is compelling the Plaintiffs to engage in speech they do not want to engage in, *i.e.* the publication of ratings of books. In addition, because the government seeks to issue its own speech regarding the appropriate ratings for books, and attribute it publicly on a state agency website to the individual Plaintiffs, the government is clearly compelling that speech as well. The compelled speech point is underscored by READER's plain statutory text, which states that within sixty days after receiving TEA's corrected rating, *"the vendor **shall** (1) rate the library material according to the agency's corrected rating."* Tex. Educ. Code § 35.003(b) (emphases added). Again, to make absolutely clear, the Court is not holding that the State has no interest in assessing and evaluating the content of books that will be in public school libraries. That is not the issue that is before the Court. The issue that is before the Court is the State requiring third parties to rate books and to accept any rating that the TEA elects to assign to any book. By requiring Plaintiffs to undergo the extensive process of reviewing and rating books according to the standards outlined in READER, and then to re-rate

---

[8] The Court also notes that when Plaintiffs presented unrebutted evidence during oral argument, in its initial motion, and in multiple declarations indicating the expected cost of compliance with the rating requirements, Defendants did not object or otherwise contend that Plaintiffs' estimates were incorrect. *See* ECF No. 6-5 ¶ 17; ECF No. 6-3 ¶¶ 13, 14–16, 18; ECF No. 6-6 ¶¶ 7, 11; ECF No. 6-4 ¶ 9; ECF No. 6-7 ¶¶ 8–9; Hearing on Tex. H.B. 900 before the Senate Comm. on Educ., 88th Leg., R.S. (May 11, 2023) (statement of Lucy Podmore) (available at https://tlcsenate.granicus.com/MediaPlayer.php?view_id=53&clip_id= 17930, from 1:12:30 - 1:14:41); Shannon Ryan, *More than $30K of taxpayers' money, 220 hours spent on single Spring Branch ISD book ban, docs show*, ABC 13 (Mar. 28, 2023), https://abc13.com/spring-branch-isd-book-ban-school-library-books-student-resources-texas-schoolbook-restrictions/13037457/.

any books in accordance with TEA's "corrected" ratings with which Plaintiffs disagree, Defendants cannot persuasively maintain that there is no imminent injury.

Plaintiffs accordingly satisfy the injury requirement for First Amendment challenges. *See Turtle Island Foods*, 65 F.4th at 215.

### b. Plaintiffs' injuries are fairly traceable to Defendants.

Plaintiffs' injuries are fairly traceable to Defendants, who are tasked with enforcing READER. Plaintiffs are "[l]ibrary material vendor[s]," and are thus subject to READER, even if they take no action. Tex. Educ. Code § 35.001(1). When there is a First Amendment pre-enforcement challenge to a newly enacted law, the Court "will assume a credible threat of prosecution in the absence of compelling contrary evidence." *See Turtle Island Foods*, 65 F.4th at 218 (quoting *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020)). Defendants have not provided such compelling contrary evidence. Defendants suggest that they *might* not override Plaintiffs' ratings, but this mere assertion is not "compelling contrary evidence" that would allow the Court to dismiss the imminent threat of enforcement contained in the law. *Id.* Obviously counsel for the State had the opportunity to be unequivocal to avoid the potential of harm to the Plaintiffs by stating that the TEA would not override any ratings made by publishers. But counsel could not do and be faithful to the text of the statute. READER requires Plaintiffs to provide book ratings should they wish to sell books to school districts. If they do not submit ratings, or if they do not adopt the TEA's changed ratings, the TEA will post on its website the list of noncompliant vendors, who are then unable to sell any books to public schools. Tex. Educ. Code §§ 33.021(c), 35.002(e), 35.003(a), (c). What's more, if a vendor rates library material as sexually explicit (either as a result of the TEA compelling them to or as an initial matter), library material vendors are prohibited from selling it and must recall it. *Id.* § 35.002(b). There is a direct causal connection

between the book-buying decisions of school districts and the impending application of the law, which restricts school districts' abilities to purchase certain books.

### c. Plaintiffs' injuries will be redressed by enjoining READER.

The Court finds that Plaintiffs satisfy the redressability requirement of standing. Redressability requires a plaintiff to show "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). If READER is enjoined, Plaintiffs will no longer need to review and rate any books and will not undergo any issues of compelled speech. Accordingly, their First Amendment injuries will be redressed.

The Court acknowledges Defendants' argument that a favorable ruling would not force school districts to purchase books, given the school district's existing discretion to choose the vendors from which it buys books. But to meet the redressability requirement, a favorable ruling need only lessen the harm. *See Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) ("When 'establishing redressability, [a plaintiff] need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm.'") (quoting *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012)).[9] In this case, an injunction would significantly lessen Plaintiffs' injury by eliminating the substantial costs they would incur to comply with READER's rating system and any potential for compelled speech.

Defendants' argument is further undercut by the Supreme Court's opinion in *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993). In that case, the Supreme Court held that contractors had standing to challenge

---

[9] Of course, this is a distinct issue that is distinct from the issue of whether the statute causes a constitutional harm in terms of Plaintiffs' right under the First Amendment.

an ordinance preventing them from bidding on contracts set aside for minority business owners. *See id.* at 669. The Court held that the injury in fact is the "inability to compete on an equal footing," not the failure to obtain the benefit. *Id.* at 666. From this definition, the Court also held that the injury was redressable. *Id.* at 666 n.5; *see also State v. Biden*, No. 23-30445, 2023 WL 5821788, at \*9 n.5 (5th Cir. Sept. 8, 2023) ("When plaintiffs seek injunctive relief, the injury-in-fact and redressability requirements intersect."), *administrative stay granted sub nom. Murthy v. Missouri*, No. 23A243 (U.S. Sept. 14, 2023) (Alito, J., in chambers). That case applies here. Before READER, library material vendors had an equal opportunity to market their books to Texas public schools. But READER totally forecloses vendors who won't rate, or who won't accept TEA's ratings, from having that opportunity to market. *See* Tex. Educ. Code §§ 35.002(a); 35.003(d). An injunction against READER's enforcement will provide those vendors their opportunity to market back. Plaintiffs thus show their injuries are redressable.

### 2. Plaintiffs' claims are ripe.

A claim is ripe, *i.e.*, fit for judicial decision, if it presents a pure legal question requiring no further factual development. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586–87 (5thCir. 1987); *see also Opulent Life Church*, 697 F.3d at 287. Determining whether a claim is ripe for judicial review requires the evaluation of (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Opulent Life Church*, 697 F.3d at 286.

Plaintiffs' claims are ripe because they raise constitutional questions under the First and Fourteenth Amendment, which are pure questions of law. *See generally* ECF No. 1. Though ratings are not due until April 1, 2024, Plaintiffs present a compelling argument that vendors will be unable to sell books to public schools without issuing ratings once READER goes into effect on

September 1, 2024. *See* <u>Tex. Educ. Code § 35.002(a)</u>. ("A library material vendor may not sell library materials to a school district or open-enrollment charter school unless the vendor has issued appropriate ratings regarding sexually explicit material and sexually relevant material previously sold to a district or school."). In any case, there can be no question that to meet the April 1, 2024, deadline, Plaintiffs must begin the costly review and rating process much sooner, most likely immediately. Thus, Plaintiffs' claims are not "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," as Defendants argue, because READER is effective as of September 1, 2023. *See* ECF No. 19 at 10 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, <u>473 U.S. 568, 580</u>–81 (1985)).

### 3. Defendants are not entitled to sovereign immunity.

The Eleventh Amendment deprives a federal court of jurisdiction to hear a suit against the State of Texas, which includes a suit against a state official in his or her official capacity, unless sovereign immunity is expressly waived. *See Edelman v. Jordan*, <u>415 U.S. 651, 662</u>–63 (1974); *Will v. Mich. Dep't of State Police*, <u>491 U.S. 58, 71</u> (1989). Under the *Ex parte Young* exception, sovereign immunity may be overcome when a suit "seeks prospective, injunctive relief from a state actor, in [his] official capacity, based on an alleged ongoing violation of the federal constitution." *K.P. v. LeBlanc*, <u>729 F.3d 427, 439</u> (5th Cir. 2013). There is significant overlap between the Article III standing analysis and the *Ex parte Young* analysis; thus, a finding of standing tends toward a finding that the *Ex parte Young* exception applies. *See City of Austin v. Paxton*, <u>943 F.3d 993, 1001</u> (5th Cir. 2019); *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, <u>851 F.3d 507, 520</u> (5th Cir. 2017). Plaintiffs seek injunctive relief from Defendants in their official capacity based on alleged ongoing constitutional violations. ECF No. 1 ¶¶ 13–16. Accordingly, *Ex parte Young* applies.

The *Ex parte Young* exception turns on whether "'the state officer, by virtue of his office, has some connection with the enforcement of the act.'" *Air Evac EMS*, 851 F.3d at 519 (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). And "enforcement means compulsion or constraint." *Tex. All. For Retired Ams. V. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (cleaned up). Defendants do not contest that Defendant Morath, as commissioner of the TEA, is ultimately responsible for collecting lists of ratings, reviewing booksellers' ratings, notifying booksellers when their ratings are overridden, and posting lists of ratings and recalcitrant vendors on TEA's website. *See* Aug. 18 Mot. Hr'g Tr. At 8:7–21; ECF No. 1 ¶¶ 15, 48, 50. Booksellers that fail to comply with TEA's requirements are barred from doing business with public schools. Tex. Educ. Code § 35.003(d). Similarly, Defendant Wong, as the chair of TSLAC, and Defendant Ellis, as chair of BOE, are responsible for formulating and promulgating mandatory library standards for public schools, which will impact how books ratings are applied. *Id.* § 33.021(b); ECF No. 1 ¶¶ 13, 14, 52–54.

**4. Injunctive relief under the Declaratory Judgement Act is proper.**

The Declaratory Judgement Act ("DJA") is "not an independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960) (citation omitted); *see also Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd.*, 99 F.3d 746, 752 n.3 (5th Cir. 1996). While the DJA does not create an independent cause of action, the act does provide for declaratory and injunctive relief. *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000) (noting that the DJA "provides the statutory mechanism for seeking pre-enforcement review of a statute"). Here, Plaintiffs assert claims under 42 U.S.C. § 1983 and the First and Fourteenth Amendments. *See generally* ECF No. 1. Rather than attempting to assert a standalone cause of action under the

DJA, Plaintiffs invoke the DJA solely to request injunctive relief. ECF No. 1 ¶ 20. Accordingly, Plaintiffs' request for injunctive relief under the DJA is proper.

**5. Plaintiffs' 1983 claims are proper.**

Plaintiffs have brought a claim under 42 U.S.C. § 1983. *See generally* ECF No. 1. "Section 1983 provides a federal remedy for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989). "To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)).

Defendants argue that the 1983 claim should be dismissed for failure to state a claim. ECF No. 19 at 16. If Plaintiffs fail to raise a claim that implicates a deprivation of rights, Plaintiffs' 1983 claims should be dismissed. *Id.* According to Defendants, Plaintiffs' First and Fourteenth Amendment rights are not implicated by READER. *Id.*

Plaintiffs disagree. ECF No. 30 at 18–19. Plaintiffs assert that the new law violates Plaintiffs' First and Fourteenth Amendment rights by compelling Plaintiffs' speech under the color of state law. *See generally* ECF No. 1. Plaintiffs allege that READER is a state law that provides the TEA the authority to compel Plaintiffs' speech. *Id.* As discussed below, compelling Plaintiffs' speech violates their First Amendment rights. Plaintiffs have alleged also that Defendants violated these rights while acting under the color of state law. *See generally* ECF No. 1. Accordingly, the 1983 claims are proper claims for relief.

**B. Plaintiffs have shown that they are likely to succeed on the merits of their claims.**

    **1. Government speech doctrine**

The Court finds that the speech at issue is not government speech, so First Amendment protections apply. "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Moreover, when "the State is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply." *Id.* At 215.

Defendants argue at the outset that because READER concerns government speech, First Amendment protections do not apply. They also argue that public education is historically in the purview of the government, including curriculum requirements and library service standards. ECF No. 19 at 17. Under these mandates, Defendants argue that they have the discretion to promote their own policies and values without being subject to forum analysis or viewpoint neutrality, even if private speakers are transmitting the government's message. *Id.* For precedent, Defendants rely primarily on the Fifth Circuit's decision in *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005). Finally, Defendants argue that a First Amendment right to receive information, if it exists, does not apply, because it belongs to students, who are not barred from receiving the information elsewhere and whose rights third-party vendors cannot assert. ECF No. 19 at 18–19.

Plaintiffs respond first that READER is subject to the First Amendment because it authorizes the removal of books. ECF No. 25 at 9. Plaintiffs further argue that the initial ratings READER requires are pure speech of the private entities submitting them, not government speech. ECF No. 30 at 19. Plaintiffs note that both initial seller and final TEA ratings are displayed as if

the seller themselves made the rating. *Id.* at 19–20. Plaintiffs distinguish *Chiras* by arguing that it covers textbooks but not non-curricular library books. *Id.* at 20 n.36.

In *Chiras*, the Fifth Circuit affirmed that a textbook author and a student failed to state a First Amendment claim regarding the government's refusal to approve the textbook for state funding, because the selection of textbooks was government speech and was not covered by the student's right to receive information. 432 F.3d at 607. *Chiras* read Supreme Court precedent to hold that educational institutions are not subject to forum analysis or viewpoint neutrality when promoting their own policies and values while establishing and implementing certain government functions. *See id.* at 613. This held true even if the government chose to use private speakers to transmit its message. *Id.* Because "[d]esigning the curriculum and selecting textbooks is a core function of the SBOE," and "it is the state speaking, [] not the textbook author," forum analysis and viewpoint neutrality did not apply. *Id.* at 614–15. As for the right to receive information, *Chiras* refused to apply the Supreme Court's decision in *Board of Education v. Pico*, 457 U.S. 853 (1982) (plurality), because that case revolved around school libraries, not textbooks. *Id.* at 619.

Here, however, the Court concludes that READER is at least in one or more substantial and integral parts not government speech. The statute requires that library material vendors submit initial ratings to the State. Tex. Educ. Code § 35.0021. As Plaintiffs contend, these ratings "will be publicly posted as Plaintiffs' own views"—because that's what they are. ECF No. 30 at 19. Section 35.0021 requires "library material vendor[s]" to "perform a contextual analysis" for patent offensiveness; it requires library material vendors to "consider . . . three principal factors with respect to the material;" it requires library material vendors to "weigh and balance each factor and conclude whether the library material is patently offensive;" it requires library material vendors to "consider the full context in which the . . . sexual conduct appears." Tex. Educ. Code § 35.0021(a)–

29

(d). Nowhere in this section is there a role for the government to perform. *See generally id.* Indeed, at the August 18th hearing, the government argued that the ratings Plaintiffs provide are actually the government speaking because "the state has final say and ha[s] oversight on that so it's not their speech," but ultimately acknowledged that at least "[a]t first, the vendor" makes the "call" about a book's rating. *See* Aug. 18 Mot. Hr'g. Tr. 21:4–12. The government's role is instead prescribed elsewhere: the posting of vendor-submitted lists "as soon as practicable." Tex. Educ. Code § 35.002(e). And while the government "may" review ratings, there is no obligation to do so. Tex. Educ. Code § 35.003.[10] There is no deadline for it do so. *Id.* So if TEA were to elect not to review a list at all, the only government action involved would be limited to placing an unedited list, prepared exclusively by the vendors, online. And a reviewed and corrected rating performed by the TEA does not undo the fact that Plaintiffs were forced to speak an initial rating.

The Court further concludes that the required recall of library material rated "sexually explicit" and in active use is not government speech. *Chiras* does not compel this Court to reach a different result. This is because *Chiras* was about mandatory, curricular textbooks. *See* 432 F.3d at 614–15. The Supreme Court has drawn a sharp distinction between cases involving textbooks and library books. *Pico*, 457 U.S. at 861–62.[11] *Chiras* itself made this distinction. 432 F.3d at 619 ("Because *Pico* addressed the removal of an optional book from the school library, not the selection of a textbook for use in the classroom, we decline to apply *Pico* to the facts before us."). The more appropriate precedent to apply, then, is *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995). That case, which involved the removal of a book about voodoo from a public

---

[10] The government does have a stronger case that its own corrected ratings are government speech, but then compelled speech issues arise, as discussed further *infra*.

[11] The Court notes that *Pico* is a fractured plurality opinion, and the Fifth Circuit has had to address its value as a citation multiple times. On one hand, *Muir v. Alabama Educational Television Commission*, 688 F.2d 1033, 1045 n.30 (5th Cir. 1982) (en banc), concludes that "*Pico* is of no precedential value." On the other hand, *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184, 189 (5th Cir. 1995), "disagree[s] . . . that we are bound to reject the guidance found in *Pico*" because of *Muir*. *Campbell* treated *Pico* as "useful guidance," and so shall the Court.

school library, turned to *Pico* for guidance and noted that "the School Board's decision to remove the Book must withstand greater scrutiny within the context of the First Amendment than would a decision involving a curricular matter." *Id.* at 189. This holding confirms that a book removal decision *is* subject to First Amendment scrutiny, which does not square with the principle that "government statements . . . do not normally trigger the First Amendment rules designed to protect the marketplace of ideas." *See Walker*, 576 U.S. at 207; *see also Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 WL 2731089, at *7–8 (W.D. Tex. Mar. 30, 2023) (rejecting the argument that the government speech doctrine applied to the removal of allegedly obscene books from a general public library), *appeal docketed*, No. 23-50224 (5th Cir.).

## 2. Applicability of forum doctrine

Defendants argue this case should be guided by a non-public forum analysis. ECF No. 19 at 19. The Court disagrees. For a First Amendment claim to be subject to forum analysis, the claim must seek access to speech in a government owned or controlled space. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). "[P]ublic schools do not possess all of the attributes of streets, parks, and other traditional public forums that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Hazelwood Sch. Dist. V. Kuhlmeier*, 484 U.S. 260, 267 (1988) (citation omitted). While the ultimate objective of READER is to ensure school library materials are age appropriate or appropriate for all students regardless of age, Plaintiffs' cause of action is only tangentially related to which books enter those libraries. ECF No. 30 at 21.

Defendants are correct to note that "First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit, and the audience may include children." *Bethel Sch. Dist.*

*No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). Further, Defendants have the right, if not the duty, to ensure Texas school children are not exposed to library materials that are inappropriate because of explicit sexual conduct and receive an education that prepares them for the future. Plaintiffs, however, are not asserting an absolute right to having all or even any of their books reach shelves of public-school libraries in Texas—nor would this Court accept such an argument. Instead, Plaintiffs assert a right to be free from compelled speech and a right to offer and distribute books without unconstitutionally vague censorship. ECF No. 6 at 9, 13.

Cases cited by Defendants in support of their argument concern regulated student speech at school or teachers' union's speech. ECF No. 19 at 19–22; *Kuhlmeier*, 484 U.S. at 260 (finding a student newspaper was not a public forum); *Fraser*, 478 U.S. at 675 (finding a school assembly was not a public forum); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) (finding a school's mail system was not a public forum). While those cases are on-point with respect to the right of schools to limit speech in school related activities, they are not instructive on the State's ability to compel speech from third-party book publishers and distributors using imprecise standards. The space where Plaintiff's speech is at issue is not in the school libraries, but in their private activities as book sellers or distributors outside of a school setting. Also, as Plaintiffs note, *Kuhlmeier* and *Fraser* both involved curricular activities (a school newspaper and graduation, respectively), not the non-mandatory, non-curricular school library. *See* ECF No. 30 at 22. The speech at issue here, therefore, is not subject to the forum analysis in the student speech cases advanced by Defendants.

### 3. Compelled speech

As a general matter, the government is not permitted to compel a person or a corporation to speak its own preferred messages. *See 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023);

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06 (1969); *see also, e.g.*, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) ("NIFLA"). Nor may the government compel a person to speak the message the government desires if the speaker chooses to remain silent. Nor may the government compel an individual to adopt or include additional speech with his own if the speaker would rather not include it. *See 303 Creative*, 143 S. Ct. at 2312; *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. Of Boston*, 515 U.S. 557, 568–70, 576 (1995); *see also Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 63–64 (2006) ("FAIR") (discussing cases). The Court finds that READER violates the First Amendment for both of these reasons.

Plaintiff argues that READER compels speech in at least two ways. First, it coerces Plaintiffs to express "pure speech" which communicates ideas of whether a book is "sexually explicit" or "sexually relevant" (or neither) based on relatively vague standards adopted by the State. Plaintiffs have not agreed to perform this analysis of the level of sexual explicitness, it is required by statute. ECF No. 6 at 9–10; ECF No. 30 at 23–24. In addition, because of the contextual analysis required by the law, it is unlikely that any two vendors would conduct the same subjective analysis, focus on the same parts of the books, or weigh factors, similarly, thus creating an "'original, customized' creation" subject to First Amendment protection. ECF No. 30 at 24 (quoting *303 Creative*, 143 S. Ct. at 2312). Second, READER requires Plaintiffs to revise their independent assessments of the categorization of the content to conform with the government's revised ratings. *Id.*

The government responds that first, the speech that Plaintiffs are being "requested" to engage in is not "compelled" in the relevant sense because Plaintiffs have no protected contrary

message to that which the government is requesting they speak. ECF No. 19 at 7–8. In addition, there are two other exceptions to compelled speech that the defendants argue apply, the commercial speech exception and the essential operation of government exception. Both will be addressed in turn below, *infra* Section III.B.3.a and section III.B.3.b. *See* ECF No. 19 at 24–27; ECF No. 31 at 8.

The Supreme Court has a rich and illustrious history, including as recently as the last term, of strongly protecting First Amendment rights. Compelled speech is one of those doctrines, long being both recognized and protected in a wide variety of situations. The original compelled speech case is *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943)**.** *Barnette* involved whether students had to recite the Pledge of Allegiance and salute the flag or whether they could remain silent and/or seated at their desks. *Id.* at 624–30. If the children would have had the option, they would have remained silent at their desks. *Id.* The Court held that it was impermissible to compel the students to recite the Pledge and salute the flag. *Id.* at 641–43. The Supreme Court would deal with the same issues again in *Wooley v. Maynard*, 430 U.S. at 705. There, New Hampshire placed the phrase "Live Free or Die" on all state license plates and required plaintiffs to not obscure the motto on pain of criminal sanctions. *Id.* at 706–07. The Court must also determine whether any compelled speech is meaningful. The Supreme Court would have to address this issue again in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995). The organizers of the St. Patrick's Day parade in Boston refused to include a group who wished to represent gay, lesbian, and bisexual individuals in the parade. *Id.* at 559–62. The Supreme Court held that since the parade was constitutionally protected speech, it would be unconstitutional to require the veterans to include speech they wished to exclude. *Id.* at 572– 73. Here, not unlike the veterans in *Hurley*, the Plaintiffs have a constitutional right to choose

what they want to express or say, and also what they choose not to. Indeed, this case may be an even stronger one since in *Hurley*, the point was that the veterans had a First Amendment right to present their message in a manner that was undiluted by views that they disagreed with. *Id.* at 573–75. Here, the Plaintiffs have the right to remain silent and not provide public assessments of the sexual content of various books. In addition, the power given to the TEA to alter any opinion that the Plaintiffs make and substitute their own creates an additional and substantial conflict with the mandate of the First Amendment.

While this case involves certain companies rating the content of speech rather than the creation and administration of websites, the Court agrees with the Plaintiffs that *303 Creative* (as well as *Hurley* and its progeny) compels a conclusion that the statute is unconstitutional. The Supreme Court has continuously affirmed the right of individuals to be free of compelled speech by the government this year in *303 Creative*. The Court in *303 Creative* addressed the issue of whether a state may compel websites to communicate messages that the authors of the speech on the website would rather not make. 143 S. Ct. at 2307–09. Ultimately, the Supreme Court held that the government may not "coopt an individual's voice for its own purposes" by forcing a business to provide an "outlet for speech." *Id.* at 2315. While the issues in this case do not concern the content of speech on the Plaintiffs' own websites, Plaintiffs are certainly the functional equivalent. Plaintiffs publish and sell books to the public, including, but not limited to, public schools in the State of Texas. Additionally, Plaintiffs allow the Public Schools and the State to select which books they choose to purchase based on the criteria determined by the appropriate state agency and school districts.

This case might give the appearance at first blush of being a dispute over the First Amendment because the legislation concerns the content of the books being sold or published by

the Plaintiffs and bought by Texas public school libraries (as argued by Defendants in the hearings and their briefing). The Court's analysis does not focus on that issue. The focus of the Court here is on whether the State of Texas, by requiring the Plaintiffs to perform a rating they would rather not perform and give ratings to books when they would wish to remain silent, has violated the First Amendment, which protects the rights of an individual to speak, or not speak, his mind without interference from the government. *See 303 Creative*, 143 S. Ct. at 2312. Very recently, Justice Gorsuch wrote for the majority in *303 Creative* that the First Amendment does not depend on whether the government considers one's speech sensible and well intentioned, deeply "misguided," or likely to cause "anguish" or "incalculable grief." 143 S. Ct. at 2312 (quoting *Hurley*, 515 U.S. at 574, and *Snyder v. Phelps*, 562 U.S. 443, 456 (2011)). The law requires the Plaintiffs to perform ratings (which they have alleged multiple times that they do not agree with), thereby compelling speech.[12] However, READER goes even further because if the TEA determines that the rating is "incorrect" (or even just misguided) then the TEA has the unilateral ability (but not the obligation) to alter the rating, and force Plaintiffs to allow the TEA to publish the rating as if the revised rating were Plaintiffs' own. *See* Tex. Educ. Code § 35.003. The speech

---

[12] The Fifth Circuit's very recent decision in *State v. Biden*, No. 23-30445, 2023 WL 5821788 (5th Cir. Sept. 8, 2023), *administrative stay granted sub nom. Murthy v. Missouri*, No. 23A243 (U.S. Sept. 14, 2023) (Alito, J., in chambers), is an interesting point of comparison to this case. *Biden* involved First Amendment claims by social media users that various federal government entities had violated their First Amendment rights by coercing social media platforms into censoring them. *See id.* at *1. The Fifth Circuit affirmed that at least some of the entities had engaged in unlawful coercion. *Id. State* is not directly applicable, because the merits of that case focused on whether the actions of private parties (the social media platforms) were effectively state action. *See id.* at *12. But the interesting comparison comes from the fact that private action can become state action "when a private party is coerced or significantly encouraged by the government to such a degree that its choice . . . must in law be deemed to be that of the State." *See id.* (cleaned up). In *State*, the Fifth Circuit clarified that significant encouragement requires "active, meaningful control over the private party's decision" (which includes "entanglement in a party's independent decision-making"), and coercion occurs when government compels the decision "by, through threats or otherwise, intimating that some form of punishment will follow a failure to comply." *Id. at* *18. Here, when TEA determines that a library material vendor rated a book incorrectly and provides the vendor with a corrected rating, it is overriding the vendor's independent judgment. *See* Tex. Educ. Code § 35.003(a), (b)(1) (requiring the vendor to then "rate the library material according to the agency's corrected rating"). And instead of offering veiled, subtle threats, READER directly states that a vendor who refuses to comply will be punished by being barred from selling books to public school libraries. *See id.* § 35.003(d). This comparison illuminates how READER's revised rating scheme gives rise to Plaintiffs' compelled speech harms.

is further compelled because the State prevents sale of those books to Public Schools, creating substantial financial harm, if Plaintiffs either (1) do not provide ratings at all or (2) do not update their initial ratings with the State's ratings. Further, Plaintiffs filed multiple affidavits expressing concern that the initial and revised ratings will be interpreted as their own independent rating. *See* ECF No. 6-5 ¶¶ 19–21; ECF No. 6-3 ¶¶ 17, 21–22; ECF No. 6-6 ¶ 15; ECF No. 6-7 ¶¶ 14–16. Indeed, there is also a risk of reputational harm that ratings put on the internet for all to see will be held against vendors by potential buyers in and outside of the state. The government provided no argument to the contrary. This is textbook compelled speech.

The government argues that the speech here is not "compelled" in the relevant sense because Plaintiffs have no protected contrary message to what the government is requesting they speak. This is patently false and incorrect. Plaintiffs have submitted compelling evidence that (1) they do not wish to speak at all regarding their opinions on the explicit nature of the books that they are rating, and that (2) the government is compelling the vendors to speak the government's preferred message by retaining the unilateral and non-appealable ability to force Plaintiffs to revise their ratings with no other option and publish them online for the world to see. Here, the government has failed to articulate any legitimate reason for requiring the vendors speak at all. The government has the power to do the contextual ratings for the books itself. The government has the power to restrict the ability of its school district as to which books it may purchase. The exercise of these powers must, of course, comply with the requirements of the constitution, but these are powers that should be exercised by the state directly. Not by compelling third parties to perform it or risk losing any opportunity to engage in commerce with the school districts. This Court deeply respects the ability of the state to curate educational content for children. The Court cannot permit private companies to be compelled to become the state's agents and speak, and, if

they do speak, to speak messages that the government prefers. Accordingly, this Court holds that READER compels speech by the Plaintiffs.

### a. The commercial speech exception does not apply to READER.

The Court believes that the speech engaged in by the vendors is not commercial in nature, so the commercial speech exception does not apply. "Commercial speech is defined as 'expression related solely to the economic interests of the speaker and its audience,'" *Houston Balloons & Promotions, LLC v. City of Houston*, 589 F. Supp. 2d 834, 847 (S.D. Tex. 2008) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) and citing *Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)), and is "speech that does no more than propose a commercial transaction." *Id*. (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 385 (1973)) (internal quotations omitted). The Court in *303 Creative* even held that the government may "sometimes require the dissemination of purely factual and uncontroversial information, particularly in the context of commercial advertising." 143 S. Ct. at 2317–18 (citing *Hurley*, 515 U.S. at 573 (internal quotation marks omitted)); *see also NIFLA*, 138 S. Ct. at 2373; *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795–96 (1988)) (cleaned up).

The government argues that here, the compelled speech of performing ratings is related solely to the economic interests of the Plaintiffs and their audience (the Agency) by describing books that they seek to sell to the potential buyer. ECF No. 19 at 25–26. Obviously, the vendors wish to sell books to the State of Texas. That does not allow the State to require the vendors to engage in "'pure speech' protected under the First Amendment." ECF No. 30 at 24. It does not immunize the State from complying with the First Amendment because the vendors "communicate ideas," specifically whether a book contains sexually explicit or relevant content. *Id.* Plaintiffs

argue that in addition, because the ratings are subjective, and based on contextual analysis, no two booksellers are likely to conduct the same analysis, which would make each rating a "original, customized" creation subject to First Amendment protection. *Id.* (quoting *303 Creative*, <u>143 S. Ct. at 2312</u>). The Court agrees with Plaintiffs that the fact that they have economic interests in selling books does not render the speech commercial in and of itself. *Id.* at 25.

*303 Creative* provides a useful roadmap on what speech can be considered commercial versus not commercial. First, as many courts before had indicated, the fact that an economic interest exists does not automatically render the ratings commercial speech. *See 303 Creative*, <u>143 S. Ct. at 2316</u> (stating that the creation of websites for profit was entitled to full First Amendment protection; speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech"); *Joseph Burstyn, Inc. v. Wilson*, <u>343 U.S. 495, 501</u> (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."); *Va. State Bd. of Pharmacy*, <u>425 U.S. at 761</u> ("Speech likewise is protected even though it is carried in a form that is 'sold' for profit, and even though it may involve a solicitation to purchase or otherwise pay or contribute money.") (citations omitted). The cases relied on by Defendants do not require a different conclusion because most relate to advertising. *See Houston Balloons & Promotions*, <u>589 F. Supp. 2d at 847</u> (relating to restrictions on advertising balloons); *Pittsburgh Press Co.*, <u>413 U.S. at 385</u> (relating to government restrictions on the content of advertisements); *Cent. Hudson Gas & Elec. Corp.*, <u>447 U.S. at 561</u> (relating to the ability of public utilities to publicly advertise).

This case has nothing to do with advertising. To the extent that the ratings involve commercial activity at all, the ratings are only required as a *quid pro quo* for the ability of the vendors to sell books to public schools. As discussed above, this alone does not make the speech

engaged in commercial. The Court believes that this case is controlled by the holding in *303 Creative*, where the Supreme Court found that the creation of websites for profit had a right to full First Amendment protection and specifically stated that speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech." *See* <u>143 S. Ct. at 2316</u>. There the Supreme Court found that the websites at issue were "pure speech" under the First Amendment because they "communicate ideas." *Id.* at 2312. Here, like *303 Creative*, although book sales are implicated, the ratings required by READER do much more than propose a commercial transaction because they are an expression of a bookseller's views about a book and convey ideas. Indeed, the content of the ratings themselves and the message that they convey are what is not commercial, and "communicate ideas," specifically whether a book contains sexually explicit or relevant content. *See id.* That different vendors can submit different ratings supports this understanding and is a strong indicium that each rating is an "original, customized" creation subject to First Amendment protection. *See id.* These differences also show that READER's ratings are neither "purely factual" nor "uncontroversial." *See 303 Creative*, <u>143 S. Ct. at 2317</u>. Therefore, this Court finds that the commercial speech exception does not apply.

**b. The essential operation of government exception does not apply to READER.**

In addition, the speech is protected because it does not concern an essential operation of government. "There is no right to refrain from speaking when 'essential operations of government require it for the preservation of an orderly society.'" *United States v. Arnold*, <u>740 F.3d 1032, 1035</u> (5th Cir. 2014) (quoting *United States v. Sindel*, <u>53 F.3d 874, 878</u> (8th Cir. 1995) (quoting *W. Va. State Bd. of Educ. v. Barnette*, <u>319 U.S. 624, 645</u> (1943) (Murphy, J., concurring))).

The Defendants argue that the "compelled speech" here is simply "information" that is being sought by the TEA, and the vendors are not being asked to "disseminate publicly a message

with which [they] disagree." *See Sindel*, <u>53 F.3d at 878</u>; *Morales v. Daley*, <u>116 F. Supp. 2d 801, 816</u> (S.D. Tex. 2000); ECF No. 19 at 26–27. They argue that education is the essential operation of government and that the Plaintiffs are invoking rights which do not belong to them. ECF No. 31 at 8.

Plaintiffs question whether a rating system designed in 2023 but not yet implemented could be considered to be an essential operation of government, especially because the Texas Public school system has operated without substantial issues for 170 years without mandating ratings. ECF No. 30 at 26. Second, Plaintiffs argue that the government overstates activities that the "essential operation of government" exception covers, and that the exception does not reach the speech being compelled here. *Id.* Further, Plaintiffs here are being asked for much more than just information. They are required to perform a highly contextual, multi-step, fact-intensive analysis of sexual content, balanced against contemporary standards, to render a sexual rating for thousands of books which will then be posted online by the State, as Plaintiffs' speech. *Id.*

The Court agrees with Plaintiffs. First, the cases cited by the government are distinguishable. Other courts have recognized only a tiny sliver of government operations as "essential," for example, the registration of sex offenders, the filing of taxes, and the completion of the federal census. *See Arnold*, <u>740 F.3d at 1035</u> (finding that requiring a sex offender to register with the government was an essential operation of government); *Sindel*, <u>53 F.3d at 878</u> (finding that requiring information on an IRS tax form constituted an essential operation of government); *Morales*, <u>116 F. Supp. 2d at 816</u> (finding that the Census Bureau's compulsion of demographic information was an essential operation of government). In each of those cases, individuals were only being asked to provide simple factual or demographic information to the government and were not being asked to disseminate publicly a message with which they disagree. Here, the speech

being compelled is not simply related to education in the same way that something like curriculum setting is. This is about requesting that vendors perform contextual analysis regarding the content of books and make judgments about the sexual nature and value of literature generally.

Even though the speech being requested is indirectly related to education, Plaintiffs (by the plain text of the statute) are being asked to "disseminate publicly a message with which [they] disagree[]," and not just provide information to the TEA. *See Sindel*, 53 F.3d at 878. The ratings will be posted on a government website for the world to see in a "conspicuous place." Tex. Educ. Code § 35.002(e). Further, the government can force ratings on the Plaintiffs by disagreeing with their initial ratings and requiring the Plaintiffs to submit the updated ratings for placement on the TEA's website in a "conspicuous place" for the world to see, without any indication that they are the government's updated ratings. Tex. Educ. Code § 35.003(b)–(c). While it is clear that Plaintiffs would disagree with the government's updated rating, they have alleged that they also do not agree with the rating schemes and categorizations on their face. ECF No. 1-2 ¶ 19; ECF No. 1-3 ¶ 17; ECF No. 1-4 ¶ 15. Plaintiffs are being asked to "disseminate publicly a message with which [they] disagree[]." *Sindel*, 53 F.3d at 878. This Court finds that the "essential operation of government" exception does not apply.

### 4. Vagueness

Plaintiffs claim that READER is unconstitutional for the independent reason that it is void for vagueness. They argue three different aspects of the law which they claim make the law unconstitutionally vague. Each will be discussed in turn. For the reasons below, the Court finds that certain provisions of READER are unconstitutionally vague.

A more stringent vagueness test applies when a law "interferes with the right of free speech." *Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

Such laws may be constitutionally infirm where they "encourage arbitrary and discriminatory enforcement," *Kolender v. Lawson*, 461 U.S. 352, 357 (1983), or "have the capacity 'to chill constitutionally protected conduct, especially conduct protected by the First Amendment.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008) (quoting *United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir. 1988)). A law is unconstitutionally vague when it (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" or (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *Roark & Hardee LP*, 522 F.3d at 551. Under most circumstances, "'[p]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). However, when a law is "capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *see also Roark & Hardee LP*, 522 F.3d at 552.

a. **The definitions of "sexually explicit material" and "sexually relevant material" are unconstitutionally vague.**

Plaintiffs argue first that the definitions of "sexually explicit material" and "sexually relevant material" are inherently vague because they are created out of whole cloth by the Legislature, are confusing, and have no basis in existing law. ECF No. 6 at 11–12; Tex. Educ. Code §§ 33.021, 35.001(3). They argue that the definition of "sexually relevant material" is particularly vague because it refers to Tex. Penal Code § 43.21, which defines "obscene" consistent with *Miller*, 413 U.S. at 24. ECF No. 6 at 11–12. But READER cherry-picks the definition of "patently offensive" from that test, noticeably excluding the third prong of the *Miller* test—

43

whether the material "taken as a whole, lacks serious literary, artistic, political, and scientific value." *Id*. Plaintiff explains that the definition of "sexually explicit" does not resolve this conundrum and compounds the confusion through the consideration of three vague factors not found elsewhere in the law. *Id*. READER also seemingly contradicts itself, by requiring each instance of a "description, depiction, or portrayal of sexual conduct" be considered and that "contextual determinations are necessarily highly fact-specific." *Id*. Indeed, evidence of the confusion and issues with the vague term is included in a plethora of declarations from vendors. *See* ECF No. 6-5 ¶ 17; ECF No. 6-3 ¶ 18; ECF No. 6-6 ¶¶ 9, 12, 13, 17; ECF No. 6-4 ¶ 11; ECF No. 6-2 ¶¶ 7–11. It is unavoidable that the personal and highly subjective test will yield disparate ratings for the same books by different vendors. Plaintiffs argue that taken together, these arguments render the statute unconstitutionally vague.

Defendants respond first that Plaintiffs apply the incorrect standard for vagueness and that perfect clarity and precise guidance are not required, even of regulations that restrict expressive activity. ECF No. 19 at 28; ECF No. 31 at 9–10. And further, the fact that READER includes factors to consider, instructions on how to weigh those factors, and directions to Plaintiffs to consider the full context, means that READER meets the *Miller* test. *Id*.

The Court rejects the arguments made by the Defendants as meritless. Defendants assert that READER is not vague because it meets the *Miller* test. Indeed, Defendants have been shifting their opinion on the matter throughout their briefing. At first, in their response to the initial vagueness argument, the Defendants stated that the language of READER "attempts" to mirror the test in *Miller*, not that it actually does. ECF No. 19 at 23. They even identify the three prongs of the *Miller* test and go on to admit in briefing that "'[i]f a state law that regulates obscene material is thus limited, as written or construed, the First Amendment values applicable to the States

through the Fourteenth Amendment are adequately protected…" *Id.* (quoting *Miller*, 413 U.S. at 25). While they identify *some* language in the statute that parallels the *Miller* test, puzzlingly, they initially did not identify any portion that deals with the third prong of *Miller*. ECF No. 19 at 23–24. After being pressed at the first hearing, in further briefing Defendants made the argument that being asked to "consider the full context of the material when determining a rating" undermines the allegation that READER fails to meet the third prong of the *Miller* test. ECF No. 31 at 9–10. However, the statute only states that the vendor must "consider the full context" of the sexual conduct and "recogniz[e] that contextual determinations are necessarily high fact-specific and require the consideration of contextual characteristics" that mitigate the offensiveness of the material. Tex. Educ. Code § 35.0021(d). Parsing out the text of the statute only highlights its vagueness. "Context" can include (or exclude) many things, is not defined anywhere in the statute, and totally fails to provide the public or Plaintiffs notice of what outside factors must be considered when determining a book's rating. Without knowing what constitutes context, and by not including or evaluating the third prong of the *Miller* test, READER results in nothing more than a highly personal and subjective test and is unconstitutionally vague. The Supreme Court has recognized that the third prong of the *Miller* test "critically limits the uncertain sweep of the obscenity definition." *Reno v. ACLU*, 521 U.S. 844, 873–74 (1997).

Further, there is a substantial question of what (or which) "community standards" the vendors are required to apply. First, READER applies to every public school in Texas. This includes schools in urban areas such as Houston, El Paso, Dallas, San Antonio, and Austin. This also includes schools in less urban areas including Caldwell, Llano, San Saba, and Fredericksburg. All of those locations have vastly different community standards that apply to the acceptability of library materials and concepts contained within those library materials. The State failed to consider

a myriad of factors that complicate the implementation of this statute. For example, take Windham School District, which is a non-geographic public school district that is a part of the Texas Department of Criminal Justice that provides educational services to inmates. Left totally unanswered by the language of the statute is guidance as to how a vendor or even the State are supposed to determine the "correct" single rating for a book that applies to all of the communities in Texas (including the prisoner community writ large that is non-geographic). The simple answer is that whoever is rating the book cannot. At least they certainly cannot by using the text of the statute as a blueprint. This will undoubtedly lead to arbitrary and discriminatory applications of the law to come up with ratings.

Finally, how can someone account for "community standards" and "contextual characteristics" when such a wide range of grades and ages of potential readers are potential consumers for the materials exists? The general Public School system includes students aged from kindergarten through 12th grade. The Windham School District includes adults who may be participating in the public school system. It is common sense that what may be considered sexually explicit or relevant to an adult would substantially vary compared to something considered sexually relevant to a child. For example, the book entitled *It's Perfectly Normal* is a picture book considered by many to be a children's book and is widely debated regarding its sexual content (many consider it to be actual pornography). However, some adults view the book differently, as being related to sexual education and informative regarding sensitive topics. Clearly there are a substantial number of books that might receive one rating if they are going to be in a library for high school seniors who might be adults or kindergarten children who might only be five years olds. This is the difficulty in requiring a single rating for such a book, which may be sexually explicit for children, but would likely receive a different rating for adults. By requiring a single

rating for all books included throughout the public school system which includes a variety of ages and backgrounds, this leads to arbitrary and discriminatory applications of the law to come up with a single example.

Again, the Court expresses no opinion on the scope of the power of a state to create a system where a state agency rates the sexual content of books that will be purchased by public school libraries. Nor does the Court express an opinion on the scope of the power of a state to utilize a rating system in determining whether to purchase a book or not for its libraries, as long as the rating is being performed by the state and not imposed on non-state actors. Those are questions for another day and a different statute. The Court expressly determines that a statute that requires private third parties to perform the scrutiny and review for this content for every book it has sold or intends to sell is beyond the power that is authorized by the Constitution. The Court notes the extraordinary onerous burden of requiring third parties to provide a single rating for each book regardless of the age of the potential student in a particular library is simply an additional basis for this Court to determine that the statue cannot withstand even the most gossamer of scrutinies.

Without the critical backstop of the third step of the *Miller* test and the unworkability of determining what community standards should apply to the ratings themselves, the law fails for its unconstitutional vagueness.

### b. The curriculum exception is unconstitutionally vague.

The "curriculum exception" described in the law is another point of unconstitutional vagueness. READER exempts "library material directly related to the curriculum" from the definitions of "sexually explicit material" and "sexually relevant material." Tex. Educ. Code §§ 33.021(a); 35.001(3). The ability to be able to accurately determine what is included in the school curriculum is thus critical in determining what books need to be rated to ensure that vendors

comply with the law. The exception gives the impression of a straightforward rule that books used as a part of curriculum would not need to be rated. READER even specifies that the exception includes material "related to the curriculum required under Section 28.002(a)" of the Education Code. Tex Educ. Code § 33.021(a). But as discussed above, § 28.002(a) provides only a general list of subjects that curriculum must cover. And, even more importantly, curricula vary from day-to-day, year-to-year, and district-to-district—and are consistently being reevaluated. Importantly, the Defendants disputed none of the assertions that Plaintiffs made about the amount of variance of curriculum from class to class and school to school and school district to school district. In fact, Defendants did not address it in any briefing or at either hearing. Further, when considering what constitutes curricula, many important questions are left unanswered and unaddressed by the statute. For example, would that include a book that a teacher brings from home for a lesson? Would a book be presumed to "relate[] to the curriculum" when it enters the classroom? *See* Tex. Educ. Code § 33.021(a). There is virtually no way that any of the Plaintiffs would or even could be aware of a book's specific use in a classroom…or which grade it is being used in. In addition, a vendor would have to determine if a book was considered "related to the curriculum" when attempting to perform their rating obligations. The statute provides no guidance of any kind for vendors to use to determine what content falls under the curriculum exception. This will necessarily lead to substantial confusion on the part of any vendor who seeks to participate in the sale of books to the state, and there is nothing in the statute that might resolve this confusion. This confusion is not imaginary, the Plaintiffs proffered numerous affidavits outlining just how READER's vagueness affects vendors. *See* ECF No. 6-3 ¶ 19; ECF No. 6-4 ¶ 11.a-b.

Not having any way to determine whether or not an exception applies so that a vendor needs to rate a book to maintain compliance with the statute fails to provide a "person of ordinary

intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Roark & Hardee LP*, 522 F.3d at 551. For this separate, independent reason, this Court finds READER unconstitutionally vague.

**5. READER is an unconstitutional prior restraint.**

 Ordinances regulating speech contingent on the will of an official—such as the requirement of a license or permit that may be withheld or granted in the discretion of an official— are unconstitutional burdens on speech classified as prior restraints. *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003). The prohibition of distributing literature is a classic form of a prior restraint. *Id.* More generally, "[t]he term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting MELVILLE NIMMER, NIMMER ON FREEDOM OF SPEECH § 4.03 (1984)). A prior restraint, while not per se unconstitutional, bears a heavy presumption against its constitutional validity. *Chiu*, 339 F.3d at 280–81.

Once a system has been deemed to be a prior restraint, it is a "settled rule" that the system must include certain procedural protections to be constitutional. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) (citing *Freedman v. Maryland*, 380 U.S. 51, 58 (1965)). Thus, a lawful prior restraint "first, must fit within one of the narrowly defined exceptions to the prohibition against prior restraints, *and*, second, must have been accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Id.* (emphasis added). A system of prior restraint without at least the three safeguards below is unconstitutional:

> First, the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. Second, any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of

preserving the status quo. Third, a prompt final judicial determination must be assured.

*Id.* at 560; *see also Alexander*, 509 U.S. at 551 ("The constitutional infirmity in nearly all of our prior restraint cases involving obscene material . . . was that the Government had seized or otherwise restrained materials suspected of being obscene without a prior judicial determination that they were in fact so.").

Plaintiffs contend that READER is an unconstitutional prior restraint for the following reasons. First, because it does not consider whether books have literary, artistic, political or scientific value, as required by the *Miller* test, it "sweeps a wide swath of constitutionally protected works within its definition of 'sexually explicit material.'" ECF No. 6 at 14. Second, it prevents booksellers from distributing constitutionally protected books in the future based on unrelated past government determinations. *Id.* Third, it provides no due process or ability to challenge the State's final determinations of the ratings required by the TEA. *Id.* at 15.

Defendants respond that READER is not an unconstitutional prior restraint primarily because "READER does not prohibit communication of any kind." ECF No. 19 at 29. According to Defendants, Plaintiffs provide no precedent as to why a prior restraint on a student's right to access information in the form of a particular school-library book would violate the First Amendment. *Id.* at 29–30. Defendants also contend they "are not forbidding any book from being published, nor are they forbidding the sale of the books containing obscene material in any forum or to any audience outside of Texas schools." *Id.* at 29. To the extent READER is a prior restraint, Defendants note that prior restraints in public schools "are not always unconstitutional" and suggest that a lower standard of review applies here. *Id.* at 30. Defendants did not respond to the applicability of *Bantam Books v. Sullivan*, 372 U.S. 58 (1963), to this case, nor do they discuss *Southeastern Promotions*. *See generally id.* at 29–30.

In *Bantam Books, Inc. v. Sullivan*, [372 U.S. 58, 61](#), [66](#) (1963), the U.S. Supreme Court struck down a Rhode Island law that established a Commission that reviewed and rated certain books as "objectionable for sale, distribution or display to youths under 18 years of age." The Court found that this scheme, in which distributors stopped selling the suspect publications in response, was an unconstitutional "system of prior administrative restraints" because it (1) suppressed the distribution of non-obscene, constitutionally protected books (2) without a judicial determination that the content could lawfully be banned. *Id.* at 70–72.

Similarly, in *Southeastern Promotions, Ltd. v. Conrad*, [420 U.S. 546](#) (1975), the Supreme Court held that a city's denial of usage of a public auditorium to stage a possibly obscene musical was an unconstitutional prior restraint. The Court first held that the denial of usage was a prior restraint that "gave public officials the power to deny use of a forum in advance of actual expression." *Id.* at 553. No exceptions to the rule against prior restraints applied. *Id.* at 555–56. Importantly, the Court held that even if the plaintiff could use an alternate theater, that "alone would not justify an otherwise impermissible prior restraint." *Id.* at 556.

Next, the Court held that the prior restraint was unconstitutional, as the board's denial had not been "accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Id.* at 559. The board's system "did not provide a procedure for prompt judicial review," required plaintiff to institute proceedings and bear the burden of persuasion and altered the status quo. *Id.* at 561–62.

The case law discussed above demonstrates that the prior restraint issue is not one question, but two related sub-questions: first, is READER a prior restraint at all? If the answer is no, then Defendants carry the day. But if the answer is yes, the second question arises: is READER a

constitutionally impermissible prior restraint? Because the Court concludes that both questions must be answered affirmatively, it finds for Plaintiffs on this issue.

First, the Court holds that READER is a prior restraint. Defendants' claims that "READER does not prohibit communication of any kind" and "Defendants are not forbidding anyone from any speech," ECF No. 19 at 29, cannot be squared with TEX. EDUC. CODE § 35.002(b), which states, "A library material vendor may not sell library material rated sexually explicit material . . . ." Once TEA has confirmed that a book's proper content rating is sexually explicit, all future attempts to sell that book to school districts are prohibited by law. This suffices as an "administrative . . . order[] *forbidding* certain communications when issued in advance of the time that such communications are to occur." *See Alexander*, 509 U.S. at 550. Defendants similarly get things backwards by claiming that this issue revolves around "an amorphous right of students to receive information." ECF No. 19 at 29. *But see Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) ("The right of freedom of speech and press has broad scope. . . . This freedom embraces the right to distribute literature *and necessarily protects the right to receive it*.") (citation omitted) (emphasis added). For students to receive information, someone must be communicating it— namely, library material vendors such as Plaintiffs. READER's prior restraint is on this communication. And it is no defense that books with sexually explicit or sexually relevant material can still be published and sold elsewhere, for the Supreme Court in *Southeastern Promotions* reminds us that "[e]ven if a privately owned forum had been available, that fact alone would not justify an otherwise impermissible prior restraint." *See* 420 U.S. at 556; *see also Schneider v. State of New Jersey*, 308 U.S. 147, 163 (1939) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."). It is therefore clear that READER is a prior restraint.

Answering the second question, like in *Bantam Books* and *Southeastern Promotions*, READER is an unconstitutional prior restraint. Because it does not consider whether books have literary, artistic, political or scientific value, as required by the *Miller* test, it sweeps a wide swath of constitutionally protected works within its definition of "sexually explicit material." *See Miller*, 413 U.S. at 24. All books sold to a school district, even unquestionably non-obscene ones, are subject to READER's rating regime. All books sold (or that have been sold) to a school district, even ones without a prior judicial determination of obscenity, are at risk of being labelled sexually explicit, either by the vendor or by the TEA. And, as explained *supra* Section III.B.4.a, READER nowhere mandates that either library material vendors or TEA evaluate books under *Miller*'s third prong. Such a regime is far too broad to fit within obscenity as a "narrowly defined exception[]" to the rule against prior restraints. *See Se. Promotions*, 420 U.S. at 559. And also like in *Bantam Books* and *Southeastern Promotions*, READER provides no opportunity for judicial review of the State's final determinations. Indeed, booksellers have no opportunity to challenge the State's "corrected" ratings or decision to ban them from selling books to public schools before the TEA, let alone a judicial body. In such circumstances, READER effectively makes TEA's ratings final, and unappealable, which is unconstitutional. *See Freedman*, 380 U.S. at 58 ("[T]he requirement [of advance submission of films] cannot be administered in a manner which would lend an effect of finality to the censor's determination whether a film constitutes protected expression.").

Most important, however, is that READER is a prior restraint that acts as a prohibition of distributing literature—giving it a heavy presumption against its constitutional validity. *See Chiu*, 339 F.3d at 280–81. The Defendants' arguments here in support of READER's constitutional validity are insufficient to overcome this heavy burden. Although Defendants contend that "prior restraints on speech are not always unconstitutional in a public school setting," ECF No. 19 at 30,

the Fifth Circuit has found prior restraints on speech in the school setting to be unconstitutional. *See Chiu*, 339 F.3d at 280. Furthermore, showing that some public-school prior restraints are constitutional does not show that READER in particular is constitutional. Defendants fail to even respond to the fact that booksellers have no opportunity to challenge the State's "corrected" ratings or decision to ban them from selling books to public schools before the TEA, let alone a judicial body. This utter lack of procedural safeguards renders READER unconstitutional under *Southeastern Promotions*, even if READER would otherwise fit within an exception to the prohibition against prior restraints. *See* 420 U.S. at 559–60. Finally, Defendants suggest that the standard of review for prior restraints in non-public school fora is "reasonably related to legitimate pedagogical goals," ECF No. 19 at 30 (quoting *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999)), but the only support they offer is non-binding out-of-circuit dicta that the Court finds unconvincing and inapplicable.[13]

Given the heavy presumption against READER's constitutional validity and the Defendants' failure to overcome that burden, the Court finds that READER is an unconstitutional prior restraint.

## C. The Plaintiffs will be irreparably harmed if READER is allowed to go into effect.

Plaintiffs here will be irreparably harmed in the absence of an injunction. The first and most clear instance of irreparable harm is through violations of Plaintiffs' First Amendment rights. The Supreme Court has recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S.

---

[13] Specifically, *Jones* cites only *Kuhlmeier* as support for the proposition that "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." 192 F.3d at 749. But, as explained *supra*, *Kuhlmeier* was about a *curricular* student newspaper, which is distinguishable from the *non-curricular* and non-mandatory library books here, and the Court disagrees that the non-public forum analysis applies to this case. Therefore, the Court will not accept Defendants' invitation to apply *Jones* to this case.

347, 373 (1976). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church*, 697 F.3d at 295 (quoting 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)). In addition, reputational harm can be considered. 11A Charles Alan Wright et al., Federal Practice and Procedure (Wright & Miller) § 2948.1 (3d ed. 2023) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.").

Plaintiffs argue first that because their First Amendment rights will be violated unless READER is enjoined, they will be irreparably harmed. ECF No. 6 at 19–20. The Court agrees, and as stated above, found that READER likely violates the First Amendment by containing an unconstitutional prior restraint, compelled speech, and unconstitutional vagueness. In addition, Plaintiffs argue (and Defendants do not dispute) that they will suffer reputational damage both if they are forced to comply or end up being unable to comply with READER. *See* ECF No. 6-5 ¶¶ 20–22; ECF No. 6-3 ¶¶ 14–16, 21–25; ECF No. 6-6 ¶¶ 5, 19–20; ECF No. 6-4 ¶ 5; ECF No. 6-2 ¶¶ 7, 11; ECF No. 6-7 ¶ 12. This irreparable harm of the violation of Plaintiffs' First Amendment rights alone is enough for the Court to weigh this factor in favor of Plaintiffs.

In addition, here, ongoing, non-recoverable compliance costs constitute irreparable harm. "[N]onrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023). "[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Id.* (quoting *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022)). A court should emphasize compliance costs' recoverability, rather than their magnitude. *Id.* (citing *Texas v. EPA*, 829 F.3d 405, 433–34 (5th Cir. 2016)).

Here, there are many ongoing, non-recoverable compliance costs in complying with READER. As averred by Plaintiffs (and undisputed by Defendants), the compliance costs are astronomical. Just for completing the initial book ratings, Blue Willow estimates that the cost to rate each book would be between $200 and $1,000 per book, and that to read and rate books already sold to schools would cost between $4 million and $500 million dollars, while Blue Willow's annual sales are only $1,000,000 per year. *See* ECF No. 6-3 ¶¶ 14–16; ECF No. 6-4 ¶¶ 8–9. This is a reasonable estimate, given it took Spring Branch ISD more than 220 hours, $30,000, and 16 employees to review *one book* in an effort to comply with a book removal request (unrelated to the law at hand). *See* Shannon Ryan, *More than $30K of taxpayers' money, 220 hours spent on single Spring Branch ISD book ban, docs show*, ABC 13 (Mar. 28, 2023), https://abc13.com/spring-branch-isd-book-ban-school-library-books-student-resources-texas-schoolbook-restrictions/13037457. In addition, there are ongoing compliance costs because READER requires vendors to submit an updated list to the TEA on September 1st every year after the law goes into effect, and Plaintiffs will continue to incur costs rating books. Tex. Educ. Code § 35.002(d). Further, vendors have costs related to their duty to determine what library material is in "active use" and which (if any) books have become subject to the curriculum exception to be able to determine what books they need to rate. *Id.* Finally, vendors must issue recalls for books rated "sexually explicit" that were sold to public schools. *Id.* § 35.002(b).

All of these compliance costs are non-recoverable. The state provides no monetary assistance with compliance for vendors. In addition, READER explicitly (and seemingly) exempts public schools from claims or damages. Tex. Educ. Code § 35.004. Finally, at the August 18th hearing, when asked by the Court if vendors could get relief from harm from anyone, the government answered, "Well, your Honor, maybe the answer is they can't." Aug. 18 Mot. Hr'g

Tr. 10:6–10. Therefore, Plaintiff also suffers irreparable harm via the non-recoverable costs of compliance.

Defendants' arguments that there is no irreparable harm are without merit. First, they argue that the Plaintiffs will suffer no irreparable harm because Plaintiffs are not required by the statute to submit ratings until April 1, 2024, and nothing happens in the interim. ECF No. 19 at 34. However, the compelled speech and irreparable harm of compliance costs will be incurred starting September 1st (as discussed above). They also argue that the state and children will suffer harm because TSLAC and the SBOE would not be allowed to create and develop standards for public schools to use in their application of READER. *Id.* First, the Court notes that this injunction maintains the status quo because the law has not gone into effect. Second, balancing the harm is properly considered under other factors (*i.e.*, balancing the harms and considering the public interest) in determining whether an injunction should be granted. Therefore, the Court finds that Plaintiffs have shown irreparable harm.

### D. The balance of harms and public interest favor an injunction.

The Court finds that the balance of harms and public interest favor an injunction. The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Further, "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church*, 697 F.3d at 298 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). The Court also recognizes that the Fifth Circuit recently reaffirmed this principle, explicitly noting that although the government "suffers a form of irreparable injury" when it is enjoined from enforcing its statutes, it likewise has no "interest in enforcing a regulation that violates federal law." *All. for Hippocratic Med.*, 2023 WL 5266026, at *28 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)).

Defendants primarily argue that states have responsibility for the education of their citizens and the injunction would prevent that from occurring. ECF No. 19 at 35. In addition, they claim that granting the injunction will disserve the public interest to protect children in schools. *Id.* This is not the case. The State still has control over what is included in the curriculum, and further, it has substantial latitude in determining what should be allowed in public schools and school libraries. Indeed, children will continue to be educated even if the injunction is granted. Further, children will continue to be protected, as they have been since the start of public education in Texas, even as the injunction goes into effect.

But still, both complaints would not change the outcome. Here, this Court has found that READER likely violates the First Amendment by containing an unconstitutional prior restraint, compelled speech, and unconstitutional vagueness. Protecting First Amendment rights is always in the public interest. As the Fifth Circuit noted in *Alliance for Hippocratic Medicine*, when assessing the state's interest in a law that conflicts with federal statutes or the Constitution, the "government/public-interest analysis collapses with the merits." 2023 WL 5266026, at *28.

## IV. CONCLUSION

The Court does not dispute that the state has a strong interest in what children are able to learn and access in schools. And the Court surely agrees that children should be protected from obscene content in the school setting. That said, READER misses the mark on obscenity with a web of unconstitutionally vague requirements. And the state, in abdicating its responsibility to protect children, forces private individuals and corporations into compliance with an unconstitutional law that violates the First Amendment. Nothing in the injunction granted here prevents the state from using viable and constitutional means to achieve the state's goals. Therefore, the Court **ORDERS** that Defendants' Motion to Dismiss Pursuant to Federal Rules of

Civil Procedure 12(b)(1) and 12(b)(6) (ECF No. 19) is **DENIED**. Plaintiffs' Motion for Preliminary Injunction (ECF No. 6) is **GRANTED.**

      **IT IS FURTHER ORDERED** that the chair of the Texas State Library Martha Wong, chair of the Texas Board of Education Keven Ellis, and Commissioner of Education Mike Morath and all of their officers, agents, employees, attorneys, and other persons in active concert with them ("Defendants") are **ENJOINED** from applying, enforcing, or attempting to enforce, either criminally or civilly, §§ 35.001, 35.002, 35.0021, and 35.003 of HB 900, the Restricting Explicit and Adult-Designated Educational Resources (READER) Act.

**SIGNED** this 18th day of September, 2023.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

**Exhibit B: Complaint (ECF 1)**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **BOOK PEOPLE, INC., VBK, INC. d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND,** | § § § § § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **CASE NO. 1:23-cv-858** |
| **MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education,** | § § § § § § § § § | |
| **Defendants.** | § § | |

---

## ORIGINAL COMPLAINT

---

Plaintiffs Book People, Inc., VBK, Inc. d/b/a Blue Willow Bookshop, American Booksellers Association, Association of American Publishers, Authors Guild, Inc., and Comic Book Legal Defense Fund ("Plaintiffs") bring these claims against Defendants Martha Wong, in her official capacity as Chair of the Texas State Library and Archives Commission, Keven Ellis in his official capacity as Chair of the Texas Board of Education, and Mike Morath in his official capacity as Commissioner of Education ("Defendants") and request relief from this Court based on the following:

## I.        INTRODUCTION

1.        Plaintiffs, a coalition of booksellers, publishers, and authors, bring this action to enjoin the enforcement of H.B. 900,[1] a recently enacted law that bans books deemed "sexually explicit" and restricts access to books deemed "sexually relevant" in public schools (the "Book Ban"). The Book Ban, which is scheduled to take effect on September 1, 2023, violates the First and Fourteenth Amendments to the U.S. Constitution because it is an overbroad and vague content-based law that targets protected speech and is not narrowly tailored to serve a compelling state interest. The Book Ban compels Plaintiffs to express the government's views, even if they do not agree, and operates as a prior restraint, two of the most egregious constitutional infringements.

2.        If allowed to take effect, the Book Ban would (1) require Plaintiffs to rate books based on subjective and vague standards; (2) punish Plaintiffs in retaliation for refusing to rate books or adopt the government's own ratings; and (3) establish a licensing regime that blocks the distribution of and access to books deemed "sexually explicit" or "sexually relevant" in public schools. Indeed, the Book Ban's passage has already led to school districts halting the purchase of school library books. The full implementation of the Book Ban will cause a recall of many books in K-12 public schools, bans of even more, and the establishment of an unconstitutional—and unprecedented—state-wide book licensing regime that compels private companies and individuals to adopt the State's messages or face government punishment.

---

[1] The text of H.B. 900, known as the Restricting Explicit and Adult-Designated Educational Resources ("READER") Act, is attached as Exhibit A. H.B. 900 is codified as proposed Tex. Educ. Code §§ 33.021, 35.001-002, 35.0021, 35.003-008.

3.      The Book Ban first compels each "library material vendor"[2] to separately review and rate all "library material"[3] previously sold to a "school district or open-enrollment charter school"[4] that remains in "active use" and is not part of the required curriculum *and* all books it seeks to sell to public schools that are not part of the required curriculum as "sexually explicit," "sexually relevant," or "no rating" based on unclear and arbitrary government criteria.[5] Books rated "sexually explicit" may not be sold to public schools and must be recalled by booksellers if they are in active use by a public school. Books rated "sexually relevant" may only be used by a student "outside the school library" with written parental consent. Booksellers must submit to the Texas Education Agency ("TEA") a list of their ratings, which will be posted on TEA's website. If booksellers do not rate their books and submit a list of their ratings to TEA, the State sanctions them by prohibiting them from selling *any* books to public schools (not only books deemed "sexually explicit").

4.      Although the Book Ban compels booksellers to establish an initial rating for each book, the Book Ban vests final decision-making power with the State to ultimately determine a book's rating. The Book Ban empowers TEA to review and overrule the booksellers' ratings, which, in turn, grants the government unchecked licensing authority to dictate which books are allowed in public schools and which booksellers can conduct business with public schools. If TEA disagrees with a bookseller's rating, it can overrule the bookseller's determination without

---

[2] A "library material vendor" is defined as "any entity that sells library material to a public primary or secondary school in this state." § 35.001(1) (hereinafter, "bookseller"). This definition could apply broadly to wholesalers, distributors, independent bookstores, online retailers, e-book sellers, publishers, authors, and others.

[3] "Library material" is not defined in the Book Ban. Read literally, "library material" could include an expansive collection of items, such as books, reference works, magazines, newspapers, and audio and audiovisual materials, in both physical and digital formats (hereinafter, "books").

[4] Hereinafter, "public schools."

[5] The State does not provide *any* funding to help booksellers complete this onerous task.

ORIGINAL COMPLAINT                                    3

explanation, regardless of whether the bookseller agrees with TEA's conclusion. Booksellers that refuse to adopt TEA's "corrected rating" are blocked from selling *any* books to public schools and are publicly shamed on TEA's website as booksellers that have disobeyed the government's wishes. The law does not require TEA to provide an explanation for changing a bookseller's rating or provide any right to appeal to a bookseller (or publisher or author).

5.      The Book Ban precludes booksellers from bringing claims against school districts, open-enrollment charter schools, or their employees for any damages caused by the law.

6.      The Book Ban establishes an unconstitutional regime of compelled speech, retaliation, and licensing that violates clear First Amendment precedent and this country's history of fostering a robust marketplace of ideas. The Court should thus issue preliminary and permanent injunctive relief under 42 U.S.C. § 1983 and block the enforcement of this patently unconstitutional law.

## II.      PARTIES

### A.      Plaintiffs.

7.      Plaintiff Book People, Inc. (originally named Grok Books) ("BookPeople"), Texas' largest independent bookstore, has been a staple in the Austin community since 1970. *See* Declaration of Charley Rejsek, CEO of BookPeople, attached as Exhibit B ("Rejsek Decl.") ¶ 3. BookPeople has been voted the Best Bookstore in Austin for over 20 years and was named *Publisher's Weekly*'s bookstore of the year in 2005. It sells books and other library materials to schools and teachers for school use in response to RFQs from school contacts, in response to online orders, in the bookstore, and at offsite events, festivals (including the Texas Book Festival co-founded in 1995 by former First Lady, Laura Bush), school events, and conferences. *Id*. ¶¶ 5-6. BookPeople is an authorized vendor to many school districts. *Id*. ¶ 4. It has no complete record of books and library materials sold for school use since 1970. *Id*. ¶¶ 9-10.

8.      Plaintiff VBK, Inc. d/b/a Blue Willow Bookshop ("Blue Willow Bookshop") has served Texas from its West Houston location since 1996. It sells books and other library materials for school use in response to RFPs and RFQs from schools; to librarians and teachers who are reimbursed; and as a result of arranging for author visits at schools. *See* Declaration of Valerie Koehler, owner of Blue Willow Bookshop, attached as Exhibit C ("Koehler Decl.") ¶ 3. In addition to school visits, Blue Willow Bookshop arranges three large festivals for young readers every year, each with a goal of promoting literacy and fostering lifelong readers: TeenCon, Tweens Read, and Bookworm. *Id*. ¶ 4. During those festivals, schools and teachers purchase books for students and classrooms. *Id*. Blue Willow Bookshop is an authorized vendor to many school districts. *Id*. ¶ 5. Blue Willow Bookshop has no complete record of books and library materials sold for school use since 1996. *Id*. ¶ 7.

9.      Plaintiff American Booksellers Association ("ABA") was founded in 1900 and is a national not-for-profit trade organization that works to help independently owned bookstores grow and succeed. *See* Declaration of David Grogan, Director of the American Booksellers for Free Expression, Advocacy and Public Policy, a division of the ABA, attached as Exhibit D ("Grogan Decl.") ¶ 3. ABA represents over 2,100 member companies operating in over 2,500 locations. *Id*. ¶ 4. ABA's core members are key participants in their communities' local economy and culture. *Id*. To assist them, ABA provides education, information dissemination, business products, and services; creates relevant programs; and engages in public policy, industry, and local-first advocacy. *Id*. The ABA has 156 members located in Texas who are vendors to school districts subject to the Book Ban. *Id*. ¶ 5.

10.     Plaintiff Association of American Publishers ("AAP"), a not-for-profit organization, represents the leading book, journal, and education publishers in the United States

on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions. *See* Declaration of Matthew Stratton, Deputy General Counsel of AAP, attached as Exhibit E ("Stratton Decl.") ¶ 3. AAP's members range from major commercial book and journal publishers to small, non-profit, university, and scholarly presses, as well as leading publishers of educational materials and digital learning platforms. *Id*. AAP's members publish a substantial portion of the general, educational, and religious books produced in the United States in print and digital formats, including critically acclaimed, award-winning literature for adults, young adults, and children. *Id*. AAP represents an industry that not only depends upon the free exercise of rights guaranteed by the First Amendment, but also exists in service to our Constitutional democracy, including the unequivocal freedom to publish, read, and inform oneself. *Id*. The AAP has many members that do business in Texas who are vendors to school districts and are subject to the Book Ban. *Id*. ¶ 4. Many AAP members only have partial records of books and library materials sold to public schools. *Id*. ¶ 5.

11.     Plaintiff Authors Guild, Inc. ("Guild") was founded in 1912 and is a national non-profit association of more than 13,000 professional, published writers of all genres, 483 of whom are located in Texas. Declaration of Mary E. Rasenberger, CEO of the Guild, attached as Exhibit F ("Rasenberger Decl.") ¶ 3. The Guild counts historians, biographers, academicians, novelists, journalists, and other writers of non-fiction and fiction as members; many write for children or young adults, and are frequent contributors to the most influential and well-respected publications in every field. *Id*. ¶ 4. The Guild works to promote the rights and professional interest of authors in various areas, including copyright, freedom of expression, antitrust, fair contracts and artificial intelligence. *Id*. Many Guild members earn a substantial portion of their livelihoods through their

writing, and the ability to write freely and distribute their work is vital to their incomes, as well as to the culture. *Id*. Guild members and their works are subject to the Book Ban. *Id*.

12.     Plaintiff Comic Book Legal Defense Fund ("CBLDF") is a nonprofit organization dedicated to protecting the legal rights of the comic arts community. *See* Declaration of Jeff Trexler, Executive Director of the CBLDF, attached as Exhibit G ("Trexler Decl.") ¶ 3. With a membership that includes creators, publishers, retailers, educators, librarians, and fans, CBLDF has participated in dozens of First Amendment cases in courts across the United States and led important educational initiatives promoting comics literacy and free expression. *Id*. The CBLDF has members located in Texas subject to the Book Ban. *Id*. ¶ 5.

**B.     Defendants.**

13.     Defendant Martha Wong ("Wong") is sued in her official capacity as the Chair of the Texas State Library and Archives Commission ("TSLAC").

14.     Defendant Keven Ellis ("Ellis") is sued in his official capacity the Chair of the Texas State Board of Education ("SBOE").

15.     Defendant Mike Morath ("Morath") is sued in his official capacity as the Commissioner of the Texas Education Agency ("TEA").

16.     On information and belief, Defendants will each exercise their discretion and legal authority to implement and enforce the Book Ban.

### III.     JURISDICTION AND VENUE

17.     The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action is brought under 42 U.S.C. § 1983 and seeks to vindicate civil rights protected by the First and Fourteenth Amendments to the U.S. Constitution.

18.     The Court has personal jurisdiction over Defendants because they are residents of Texas.

19.     Venue is proper under 28 U.S.C. § 1391(b) because any Defendant resides in this District and Defendants are residents of Texas, and a substantial part of events or omissions giving rise to Plaintiffs' claims occurred in this District.

20.     This Court has jurisdiction to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Fed. R. Civ. P. 65.

21.     This Court has authority to award costs and attorney's fees under 42 U.S.C. § 1988.

## IV.     LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | H.B. 900 (eff. September 1, 2023) |
| Exhibit B | Declaration of Charley Rejsek, CEO of BookPeople |
| Exhibit C | Declaration of Valerie Koehler, owner of Blue Willow Bookshop |
| Exhibit D | Declaration of David Grogan, Director of the American Booksellers for Free Expression, Advocacy and Public Policy, a division of the ABA. |
| Exhibit E | Declaration of Matthew Stratton, Deputy General Counsel of AAP |
| Exhibit F | Declaration of Mary E. Rasenberger, CEO of the Guild |
| Exhibit G | Declaration of Jeff Trexler, Executive Director of the CBLDF |

## V.     STATEMENT OF FACTS

**A.     The history of failed government censorship of expressive works demonstrates that the Book Ban conflicts with established U.S. Supreme Court precedent and this country's tradition of a robust marketplace of ideas.**

22.     Plaintiffs reallege all paragraphs above.

23.     A century ago, state and local governments actively used bodies known as "censorship boards" to dictate the dissemination of books and other expressive works, such as newspapers, magazines, and movies. Between 1923 and 1925, more than 34 states introduced censorship legislation, and by the end of the 1920s, eight states and nearly 100 municipalities had

developed censorship regimes.[6]

24.     Some of the earliest legal challenges to censorship regimes were frustrated, *see, e.g., Mutual Film Corp. v. Indus. Comm'n of Ohio*, 236 U.S. 230, 244 (1915) (upholding state film licensing regime and holding that states and local governments had the right to grant or withhold film licenses), but for the past 70 years courts have not hesitated to strike down censorship regimes and other laws that seek to punish the distribution of expressive works in the United States.

25.     In 1952, the U.S. Supreme Court overturned *Mutual Film* and held, 9-0, that the banning of a film by a New York censorship board for being "sacrilegious" was an unconstitutional prior restraint on speech. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 505 (1952). Seven years later, the U.S. Supreme Court found that a New York censorship board violated the U.S. Constitution for denying a license because a film contained "immoral" content. *Kingsley Int'l Pictures Corp. v. Regents of Univ. of State of N.Y.*, 360 U.S. 684, 688–89 (1959) (banning an expressive work because it "advocates an idea" that may be considered immoral strikes "at the very heart of constitutionally protected liberty"). In *Smith v. People of the State of California*, the U.S. Supreme Court overturned the conviction of a bookstore owner for distributing allegedly obscene books. 361 U.S. 147, 155 (1959). And in *Interstate Circuit, Inc. v. City of Dallas*, the U.S. Supreme Court held that a Dallas ordinance that created the "Motion Picture Classification Board," which rated films as "not suitable for young persons," was unconstitutional. 390 U.S. 676 (1968).[7]

26.     In 1981, Maryland became the last state to shut down its censorship board.[8] Despite the end of government censorship boards (decades ago), the Texas Legislature turned the clock

---

[6] *See* Samantha Barbas, *How the Movies Became Speech*, 64 RUTGERS L. REV. 665, 676 (2012).
[7] As explained below in § V.C.1., the Book Ban applies to films.
[8] *See* Ben A. Franklin, *Last Board of Censors Fades Away After 65 Years*, THE NEW YORK TIMES, June 29, 1981.

back more than a century by enacting the Book Ban, which functions as a modern-day censorship regime. Like the Ohio State Board of Censors in *Mutual Film Corp.*, the Book Ban establishes its own censorship board—the Texas Education Agency. Even worse, Texas seeks to force private actors, the booksellers, to do the—uncompensated and extremely onerous—heavy labor of establishing ratings for every book it has sold, which the state may overrule anyway if it believes they did the job incorrectly.

27.     The Book Ban harkens back to dark days in our nation's history when the government served as licensors and dictated the public dissemination of information. The lessons from our history should be learned, not ignored, and the constitutional prohibitions against censorship regimes should be respected, not rebuffed. This Court should heed the warnings of the past and enjoin the enforcement of the Book Ban. As guided by history and U.S. Supreme Court precedent, the government should not dictate what is allowed in the marketplace of ideas. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

**B.**     **The Texas Legislature adopts the Book Ban, ignoring its practical implications and constitutional concerns.**

28.     The Book Ban grew out of a 2021 inquiry by former state Rep. Matt Krause to many Texas school districts asking if their libraries contained any of 850 books related to race, sexuality, and innocuous subjects.[9]

---

[9] *See* Bill Chappell, *A Texas lawmaker is targeting 850 books that he says could make students feel uneasy*, NPR, October 28, 2021; Danika Ellis, *All 850 Books Texas Lawmaker Matt Krause Wants To Book Ban: An Analysis*, BOOK RIOT, November 5, 2021.

29.     That list inspired Rep. Jared Patterson to seek removal of approximately three dozen books from his own school district that he identified as personally offensive.[10] Rep. Patterson became the primary author of the Book Ban, which removes local control over school libraries (where libraries choose suitable books for their students subject to parental and community input) in favor of a statewide regulatory regime. That regime compels booksellers to make initial determinations regarding a book's suitability, although ultimate authority is vested in the State.

30.     During debate on the Book Ban, proponents ignored a variety of practical and constitutional concerns about how the legislation would operate and the books that could be banned from public school libraries as a result.

31.     Legislators expressed concern that the overbroad language of the Book Ban could result in the banning or restricting of access to many classic works of literature, such as *Twelfth Night*, *A Midsummer Night's Dream*, *Romeo and Juliet*, *Of Mice and Men*, *Ulysses*, *Jane Eyre*, *Jane Eyre*, *Maus*, *Anne Frank's Diary: The Graphic Adaptation*, *The Canterbury Tales*, *I Know Why the Caged Bird Sings*, and even the Bible.[11] Rep. James Talarico, a former school teacher, said the Book Ban would likely even prohibit school libraries from offering the quintessential Texas novel *Lonesome Dove*.[12]

32.     The Book Ban's authors similarly ignored concerns about requiring book vendors to rate the sexual content of library materials based on undefined community standards of decency. In the Senate Education Committee, Sen. Pete Flores questioned whether booksellers—many of

---

[10] *See* Debate on Tex. H.B.900 in the House Committee on Public Education, 88th Leg. (Mar. 21, 2023) ("H.B. 900 House Debate").

[11] *Id.*; *see* Trexler Decl. ¶¶ 8-9.

[12] *Id.*; *see also* Christopher Hooks, *Jared Patterson's School-Library Bill Would Book Ban Larry McMurtry's Novel*, Texas Monthly (Mar. 22, 2023).

whom are not based in Texas—could accurately assess the community standards in Texas, as the Book Ban requires.[13] Sen. Angela Paxton, the Book Ban's Senate sponsor, said TEA would review booksellers' ratings and that booksellers that did not accurately identify Texas' standards "can lose their privilege of selling books to all Texas school districts."[14]

33.     Concerns about the Bill's broad definitions were also dismissed by its authors. Rep. Patterson and Sen. Paxton conceded that the definitions used in the Book Ban were compiled using disparate sources, such as judicial opinions, FCC regulations, and the Texas Penal Code.[15] But, as other legislators noted, the patchwork definitions in the Book Ban omit crucial portions of those sources and create onerous and unworkable standards.[16]

34.     The Texas House and Senate rejected a series of amendments proposed to address many of the concerns raised during the Book Ban's consideration, including its potential impact on books addressing race, civil rights, and LGBTQ topics.[17]

35.     Despite these concerns, the Texas House passed the Book Ban on April 20, 2023, and the Texas Senate approved it on May 23, 2023. Gov. Greg Abbott signed the Book Ban on June 13, 2023. The Book Ban is scheduled to take effect on September 1, 2023 and applies to the 2023-2024 school year.

---

[13] Debate on Tex. H.B. 900 in the Senate Committee on Education, 88th Leg. (May 11, 2023) ("H.B. 900 Senate Debate").
[14] *Id.*
[15] H.B. 900 House Debate; H.B. 900 Senate Debate.
[16] *Id.*
[17] *Id.*; Floor Amendment Nos. 1, 2, 3, S.J. of Tex. 88th Leg. (May 23, 2023).

36.     The effects of the Book Ban are already being felt as school districts prepare for how the law may be implemented.[18] In June 2023, Katy ISD stopped all library book purchases and placed all incoming books in storage as it awaits the impact of the new law.[19]

**C.     The Book Ban requires booksellers to rate books, punishes booksellers for refusing to adopt the State's ratings, establishes a licensing regime that bans access to books deemed "sexually explicit," and provides no means of recourse.**

**1.     The Book Ban requires booksellers to review and rate books as "sexually explicit" or "sexually relevant" based on unclear and arbitrary criteria.**

37.     The Book Ban includes a series of provisions that require every bookseller to separately review and rate each book it has previously sold to public schools and all books it may sell to public schools for the fast approaching 2023-2024 school year. *See* proposed TEX. EDUC. CODE §§ 33.021, 35.001, 35.002, 35.005.[20]

38.     The Book Ban requires that booksellers assess all books previously sold to public schools that remain in "active use" and rate them as "sexually explicit material" or "sexually relevant material," if applicable. *Id*. § 35.002.

39.     "Sexually explicit material" means "any communication, language, or material, including a written description, illustration, photographic image, video image,[21] or audio file, other than library material directly related to the curriculum required under Section 28.002(a),[22] that

---

[18] *See* Koehler Decl. ¶ 24; Stratton Decl. ¶ 16.

[19] Claire Goodman, *Katy ISD halts all library book purchases, new books stored*, HOUSTON CHRONICLE (June 27, 2023).

[20] Below references to the Education Code refer to *proposed* sections.

[21] The Book Ban applies broadly to films. Thus, works that are distributed in multiple mediums may be inconsistently rated such that they are banned in one form but not another. For example, the novel *Gone with the Wind* could be allowed in a school, yet the Academy-Award winning movie of the same name may be banned. *See* Grogan Decl. ¶ 17.

[22] The Book Ban does not explain how booksellers can determine what is in the required curriculum, how they will know if what is in the required curriculum changes (potentially requiring a re-evaluation of the rating), or how closely "related to" the curriculum the book must be. Because there is no statewide curriculum in Texas, there is no way to know what material is "related to the

describes, depicts, or portrays sexual conduct, as defined by Section 43.25, Penal Code,[23] in a way that is patently offensive, as defined by Section 43.21, Penal Code."[24] *Id*. § 33.021(a).

40. "Sexually relevant material" means "any communication, language, or material, including a written description, illustration, photographic image, video image, or audio file, other than library material directly related to the curriculum required under Section 28.002(a), that describes, depicts, or portrays sexual conduct, as defined by Section 43.25, Penal Code." *Id*. § 35.001(3).

41. While both "sexually explicit" and "sexually relevant" materials require the presence of descriptions or depictions of "sexual conduct," "sexually explicit" material requires that the description or depiction be in a way that is "patently offensive." *Id*. § 33.021(a).

42. To determine whether books are "sexually explicit," booksellers must "perform a contextual analysis of the material to determine whether the material describes, depicts, or portrays sexual conduct in a way that is patently offensive." [25] *Id*. § 35.0021(a).

---

curriculum" across all 1,025 Texas school districts. Curricula can also vary from classroom-to-classroom within a district and from day-to-day or year-to-year, requiring consistent reevaluation.
[23] "Sexual conduct" means "sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." TEX. PEN. CODE § 43.25(a)(2).
[24] "Patently offensive" means "so offensive on its face as to affront current community standards of decency." TEX. PEN. CODE § 43.21(a)(4). But the Book Ban, confusingly, does not tell booksellers whether this community standard is based on Austin, Texas, or Onalaska, Texas—or any of the more than 1,200 other incorporated municipalities across the state. Thus, Plaintiffs lack clarity to determine whether books conform to current community standards. *See* Rejsek Decl. ¶ 18; Grogan Decl. ¶¶ 10-12; .
[25] The "contextual analysis" does not account for the age of students. *See* Rejsek Decl. ¶ 17; Grogan Decl. ¶¶ 9-10; Stratton Decl. ¶ 11.f.; Rasenberger Decl. ¶ 12. Instead, the Book Ban uses a one-size-fits-all model for rating books for all K-12 students regardless of age, maturity, or school district. Under this overbroad policy, a high school senior may not have access to a book because it is deemed "sexually explicit" for a first grader. This creates a race-to-the-bottom where older students are blocked from accessing books that may be age-appropriate for them.

43.     In performing a "contextual analysis," booksellers must consider "three principal factors":

    (1)    the explicitness or graphic nature of a description or depiction of sexual conduct contained in the material;

    (2)    whether the material consists predominantly of or contains multiple repetitions of depictions [but not descriptions or portrayals] of sexual or excretory organs or activities; and

    (3)    whether a reasonable person would find that the material intentionally panders to, titillates, or shocks the reader.[26]

*Id*. § 35.0021(b).

44.     Booksellers must "weigh and balance each factor and conclude whether the library material is patently offensive, recognizing that because each instance of a description, depiction, or portrayal of sexual conduct contained in a material may present a unique mix of factors." *Id*. § 35.0021(c).[27]

45.     To determine "whether a description, depiction, or portrayal of sexual conduct contained in a material is patently offensive," booksellers must "consider the full context in which the description, depiction, or portrayal of sexual conduct appears, to the extent possible, recognizing that contextual determinations are necessarily highly fact-specific and require the consideration of contextual characteristics that may exacerbate or mitigate the offensiveness of the

---

[26] The Book Ban will cause the prohibition of swaths of constitutionally protected books. In determining whether a book is "sexually explicit," booksellers need not consider whether the book "taken as a whole, lacks serious literary, artistic, political, and scientific value," which is an element of obscenity for minors. *See Ginsberg v. State of N. Y.,* 390 U.S. 629 (1968), *modified by Miller v. California,* 413 U.S. 15, 24 (1973); TEX. PENAL CODE §43.21(a)(1).

[27] The Book Ban will be excessively burdensome for booksellers to review each of the hundreds of thousands of books across all genres sold to public schools over the decades. *See* Rejsek Decl. ¶¶ 8-17; Koehler Decl. ¶¶ 8-10, 12-16; Grogan Decl. ¶¶ 7, 19-21; Stratton Decl. ¶¶ 8-11.

material."[28] *Id*. § 35.0021(d).

46.     Booksellers are banned from selling books rated "sexually explicit" and must "issue

a recall"[29] for all books rated "sexually explicit" that are "in active use"[30] by a school or district.

*Id*. § 35.002(b).

47.     A student may only "reserve, check out, or otherwise use outside the school library"

a book rated "sexually relevant" if "written consent" is obtained from "the student's parent or

person standing in parental relation." *Id*. § 35.005.

48.     By April 1, 2024, booksellers must retrospectively "develop and submit" to TEA a

list of books rated as "sexually explicit" or "sexually relevant" that have ever been sold to a public

school[31] and that are still in "active use" by the school. *Id*. § 35.002(c). The list of ratings will be

posted "in a conspicuous place" on TEA's website. *Id*. § 35.002(e). Booksellers that do not issue

ratings are prohibited from selling *any* books[32] to school districts or open-enrollment charter

---

[28] The Book Ban's convoluted instructions and subjective requirements in determining whether a book is "sexually explicit" will result in inconsistent determinations. *See* Rejsek Decl. ¶¶ 17-18; Grogan Decl. ¶¶ 13-17; Stratton Decl. ¶¶ 11, 15; Trexler Decl. ¶ 7. Books are likely to receive inconsistent ratings from booksellers, who generally have no experience or training in making these technical determinations of law, especially considering the "highly fact-specific" assessments of "each instance" of "sexual conduct" required by the Book Ban. *See* Rejsek Decl. ¶¶ 17-18; Koehler Decl. ¶ 13; Grogan Decl. ¶ 8.

[29] The Book Ban does not explain what constitutes a "recall," how a bookseller should "issue a recall," whether the books must be returned by the school, or if the bookseller must offer a refund. *See* Grogan Decl. ¶ 21; Stratton Decl. ¶ 17.a.; Trexler Decl. ¶ 15.

[30] The Book Ban does not define "active use," provide a means of determining whether a book is in "active use," or explain when it ceases to be in "active use." *See* Rejsek Decl. ¶ 11; Koehler Decl. ¶ 9; Stratton Decl. ¶¶ 6-8, 11.c-d. "Active use" could presumably include books once but no longer sold. This requires booksellers to rate *every* book *ever* sold to public schools, even if the book is not in the booksellers' inventory and they do not intend to sell the book again.

[31] Plaintiffs, such as BookPeople and Blue Willow Bookshop, do not have complete record of books and library materials sold for school use. *See* Rejsek Decl. ¶¶ 9-10; Koehler Decl. ¶ 7; Grogan Decl. ¶ 6; Stratton Decl. ¶ 5.

[32] Should they not issue the government-imposed ratings, booksellers are even barred from selling books that are not rated as "sexually explicit" or "sexually relevant."

schools. *Id*. § 35.002(a).

> **2.**    **The Book Ban establishes a licensing regime that blocks the distribution of and access to books deemed "sexually explicit" and restricts certain uses of books deemed "sexually relevant" in public schools.**

49.    The Book Ban also includes a series of provisions vesting the State with licensing authority to decide what books are available in public schools and what booksellers can sell books to public schools. *Id*. §§ 35.003, 35.006.

50.    The Book Ban provides that TEA may review and overrule the ratings for any book that was "not rated" or that it believes was "incorrectly rated."[33] *Id*. § 35.003(a). Within 60 days of being notified that a rating has been overruled by TEA, a bookseller *must* adopt TEA's "corrected rating," regardless of whether it agrees with TEA's decision. *Id*. § 35.003(b). If a bookseller does not adopt TEA's rating, its name will be posted "in a conspicuous place" on TEA's website and public schools will be banned from purchasing *any* books from it.[34] *Id*. §§ 35.003(c), (d). TEA is not required to offer a basis for the re-rating, and the law does not provide any right to appeal. Booksellers are also barred from bringing claims against school districts, open-enrollment charter schools, or their employees for any damages caused by the Book Ban. *Id*. § 35.004. Their *only* and woefully inadequate recourse to the public shaming and permanent Book Ban is to accede to TEA's unconstitutional demand for compelled speech and unquestioningly adopt TEA's rating. If a bookseller adopts TEA's rating, a list of books rated by the bookseller as "sexually explicit" will be posted on TEA's website, which will inform potential customers (not only schools) that a

---

[33] The Book Ban does not require TEA to provide any justification for its decision to overrule a bookseller's rating.

[34] The Book Ban provides no opportunity to be heard to challenge TEA's decisions to overrule a bookseller's rating or bar schools from purchasing books from it. The purchasing ban continues indefinitely unless and until the bookseller acquiesces to the government's demands.

bookseller has deemed a book "sexually explicit," even if it disagrees with the compelled designation. *Id*. § 35.003(e).

51.     Books deemed "sexually relevant" will be continuously reviewed. By January 1 of every odd-numbered year, each school district and open-enrollment charter school must review books rated as "sexually relevant" and determine whether those books should remain available— even on a heavily restricted basis—in the school library catalog. *Id*. § 35.006(a).

**3.     The Book Ban requires the adoption of "standards" for "library collection development policies."**

52.     The Book Ban also requires that the Texas State Library and Archives Commission, "with approval by a majority vote of the State Board of Education," adopt "standards" for school districts to follow "in developing or implementing the district's library collection development policies." *Id*. § 33.021(c).

53.     The standards must include a "collection development policy" that

(A)     prohibits the possession, acquisition, and purchase of:

(i)     harmful material, as defined by Section 43.24, Penal Code;

(ii)     library material rated sexually explicit material by the selling library material vendor; or

(iii)     library material that is pervasively vulgar or educationally unsuitable as referenced in *Pico v. Board of Education*, 457 U.S. 853 (1982);

(B)     recognizes that obscene content is not protected by the First Amendment to the United States Constitution;

(C)     is required for all library materials available for use or display, including material contained in school libraries, classroom libraries, and online catalogs;

(D)     recognizes that parents are the primary decision makers regarding a student's access to library material;[35]

(E)     encourages schools to provide library catalog transparency;

(F)     recommends schools communicate effectively with parents regarding collection development; and

(G)     prohibits the removal of material based solely on the:

(i)      ideas contained in the material; or

(ii)     personal background of:

(a)      the author of the material; or

(b)      characters in the material."

*Id.* § 33.021(d)(2).

54.     The standards must be reviewed and updated at least once every five years. *Id*. § 33.021(d)(1).

## VI.     CAUSES OF ACTION

**A.     Count One: 42 U.S.C. § 1983, Violation of Free Speech Rights Under the First and Fourteenth Amendments to the U.S. Constitution—Compelled Speech**

55.     Plaintiffs reallege all paragraphs above.

56.     Defendants are state actors operating under color of state law.

57.     The First and Fourteenth Amendments to the U.S. Constitution prevent the government from compelling the expression of certain views. *See 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023) ("[T]he government may not compel a person to speak its own preferred messages.").

---

[35] This provision contradicts other aspects of the Book Ban, which remove control from parents in deciding whether books are "sexually explicit" and should be allowed in public schools.

58.     The Book Ban compels Plaintiffs' speech by coercing Plaintiffs to express that a book is "sexually explicit" or "sexually relevant" based on the government's (vague and ambiguous) standards, not their own, and requiring Plaintiffs to revise their own independent assessments to conform with the government's views. *See* Rejsek Decl. ¶ 19; Koehler Decl. ¶¶ 17, 21-22; Grogan Decl. ¶¶ 15, 22; Stratton Decl. ¶ 14; Trexler Decl. ¶¶ 14, 16.

59.     Booksellers must "develop and submit" to the State a list of books rated as "sexually explicit" or "sexually relevant" that have ever been sold to a public school based on criteria developed by the State. TEX. EDUC. CODE § 35.002(c). Booksellers that do not issue ratings are prohibited from selling *any* books to school districts or open-enrollment charter schools. *Id*. § 35.002(a). If the bookseller does issue ratings for their books, the State may then review the bookseller's ratings and overrule the rating for any book that it believes was "incorrectly rated." *Id*. § 35.003(a). If a bookseller does not adopt the State's rating, it will be banned from selling *any* books to school districts and open-enrollment charter schools. *Id*. §§ 35.003(c), (d). Banned booksellers are unable to bring claims against school districts, open-enrollment charter schools, or their employees for any damages caused by the law. *Id*. § 35.004. The ratings are posted on an official government website, allowing the public to see whether a bookseller has issued—or acquiesced in—a particular rating compelled by the State. *Id*. § 35.003(e).

60.     Compelling Plaintiffs to adopt the State's preferred speech violates the First Fourteenth Amendments to the U.S. Constitution.

**B.    Count Two: 42 U.S.C. § 1983, Violation of Free Speech and Due Process Rights Under the First and Fourteenth Amendments to the U.S. Constitution—Vagueness**

61.     Plaintiffs reallege all paragraphs above.

62.     Defendants are state actors operating under color of state law.

63.     The First and Fourteenth Amendments to the U.S. Constitution prohibit statutes that are so impermissibly vague that an ordinary person would not understand what conduct the statute prohibited or that are so standardless as to invite arbitrary enforcement.

64.     The Book Ban includes terms that are vague, indefinite, arbitrary, and subject to different meanings such that they fail to provide adequate notice of their obligations in violation of the First and Fourteenth Amendments to the U.S. Constitution. *Smith v. Goguen*, 415 U.S. 566, 582 (1974)

65.     The definitions of "sexually explicit material" and "sexually relevant material" are unconstitutionally vague. [36] TEX. EDUC. CODE § 33.02. Although their definitions exempt material "related to the curriculum required under Section 28.002(a)" of the Education Code, the Book Ban provides little, if any, guidance on what the exemption covers.[37] *Id.*; *see Nat'l Press Photographers Ass'n v. McCraw*, 594 F. Supp. 3d 789, 809 (W.D. Tex. 2022) (terms "surveillance" and "commercial purposes" as used in a Texas statute are void for vagueness).

66.     The definition of "sexually relevant material" is vague and confusing because any de minimus, non-explicit reference in any context to sexual relations could result in the rating. TEX. EDUC. CODE § 35.001(3); *see Nat'l Press Photographers Ass'n*, 594 F. Supp. 3d at 809. It could thus apply broadly to health-related works, religious texts, historical works, encyclopedias, dictionaries, and many other works.

---

[36] *See* Rejsek Decl. ¶ 17; Grogan Decl. ¶ 9; Stratton Decl. ¶ 11.f.; Rasenberger Decl. ¶¶ 7, 11-12; Trexler Decl. ¶ 7.
[37] *See* Koehler Decl. ¶ 19; Stratton Decl. ¶ 11.a.

67.     The "contextual analysis" required to determine whether a book is "sexually explicit" is unconstitutionally vague.[38] TEX. EDUC. CODE § 35.0021; *see Nat'l Press Photographers Ass'n*, 594 F. Supp. 3d at 809.

68.     The Book Ban's requirement that booksellers "recall" materials deemed "sexually explicit" if those materials are still "in active use" is unconstitutionally vague.[39] TEX. EDUC. CODE § 35.002(b); *see Nat'l Press Photographers Ass'n*, 594 F. Supp. 3d at 809.

69.     The Book Ban is unconstitutionally vague regarding whether books can be sold by booksellers between September 1, 2023 (the Book Ban's effective date) and April 1, 2024 (the date booksellers must issue their ratings).[40]

C.     **Count Three: 42 U.S.C. § 1983, Violation of Free Speech and Due Process Rights Under the First and Fourteenth Amendments to the U.S. Constitution—Prior Restraint**

70.     Plaintiffs reallege all paragraphs above.

71.     Defendants are state actors operating under color of state law.

72.     The Book Ban establishes a licensing regime that blocks the distribution of and access to books in public schools deemed by the government to be "sexually explicit" and restricts access to those books deemed to be "sexually relevant."

73.     Although the Book Ban requires booksellers to review and rate books as "sexually explicit," "sexually relevant," or "no rating," the Book Ban allows the State to review and overrule the booksellers' ratings without explanation, opportunity to be heard, or right to appeal.

---

[38] *See* Stratton Decl. ¶ 11.f.; Rasenberger Decl. ¶¶ 7, 11-12.
[39] *See* Koehler Decl. ¶ 9; Stratton Decl. ¶¶ 6-7, 11.c-d.; 17.a.
[40] *See* Rejsek Decl. ¶ 24; Koehler Decl. ¶ 26.

74.     If a bookseller fails to "correct" the rating to that designated by the State, the bookseller is barred from selling books to any Texas public school or open-enrollment charter school.

75.     The Book Ban provides no due process or ability to challenge the States' final determinations with the State or a judicial body.

76.     The Book Ban forbids booksellers from bringing claims against school districts, open-enrollment charter schools, or their employees for any damages caused by the law.

77.     By giving the State unbridled and arbitrary discretion to declare books "sexually explicit" and "sexually relevant" and prohibit the sale of constitutionally protected materials by a bookseller, with no recourse and no provision for judicial review, the Book Ban constitutes a prior restraint that violates the First and Fourteenth Amendments to the U.S. Constitution. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *Book Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

**D.      Count Four: 42 U.S.C. § 1983, Violation of Free Speech Rights Under the First and Fourteenth Amendments to the United States Constitution—Facial and As Applied Challenge**

78.     Plaintiffs reallege all paragraphs above.

79.     Defendants are state actors operating under color of state law.

80.     Content-based restrictions on speech are presumptively unconstitutional. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). The First Amendment prohibits the government from regulating speech based on its content, unless the government can demonstrate that the law is necessary to achieve a "compelling government interest," it is "narrowly tailored" to achieve that interest, and it uses the "least restrictive means" to achieve that interest.

81. The Book Ban is a content-based restriction on speech because it regulates certain "library material" based on "the topic discussed, or the idea or message expressed." The Book Ban draws distinctions based on the type of messages conveyed.

82. The Book Ban distinguishes between "sexually explicit material" and "sexually relevant material," which are subject to the law's restrictions, and material that receives "no rating," which is not subject to the law, based on their content.

83. The Book Ban distinguishes between "material directly related to the curriculum," which is not subject to the law's restrictions, and material *not* "directly related to the curriculum," which is subject to the law, based on the material's content.

84. The Book Ban violates the First and Fourteenth Amendments to the U.S. Constitution on its face because it is neither narrowly tailored nor the least restrictive means of accomplishing a compelling government interest.

85. The Book Ban violates the First and Fourteenth Amendments to the U.S. Constitution as applied to Plaintiffs because it interferes with their ability to distribute constitutionally protected works. It also stigmatizes Plaintiffs, including booksellers, publishers, and authors, by labeling books as "sexually explicit" or "sexually relevant."[41]

86. The Book Ban unconstitutionally burdens Plaintiffs by requiring them to search past records to find the entire universe of library materials they ever sold to any Texas public school and review and rate those materials based on the Book Ban's vague definitions.[42]

**E.** **Count Five: 42 U.S.C. § 1983, Violation of Free Speech and Due Process Rights Under the First and Fourteenth Amendments to the U.S. Constitution—Overbreadth**

87. Plaintiffs reallege all paragraphs above.

---

[41] *See* Rejsek Decl. ¶ 21; Koehler Decl. ¶ 21; Stratton Decl. ¶ 12; Rasenberger Decl. ¶¶ 7-10; Trexler Decl. ¶ 12.

[42] *See* Rejsek Decl. ¶¶ 9-10, 14, 16; Koehler Decl. ¶ 9; Grogan Decl. ¶ 7; Stratton Decl. ¶¶ 6-8.

88. Defendants are state actors operating under color of state law.

89. The First and Fourteenth Amendments to the U.S. Constitution prohibit statutes that punish a substantial amount of protected speech in the course of regulating unprotected speech. Such statutes are unconstitutionally overbroad in violation of the First and Fourteenth Amendments. *United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023)

90. The Book Ban regulates substantially more speech that the First and Fourteenth Amendments permit.

91. Although the Book Ban may prohibit some obscene and harmful material, it also prohibits a wide swath of constitutionally protected material.

92. The Book Ban's significant overbreadth unconstitutionally chills Plaintiffs and others from engaging in protected expressive activity.[43]

**F.** **Count Six: 42 U.S.C. § 1983, Violation of Free Speech and Due Process Rights Under the First and Fourteenth Amendments to the U.S. Constitution—Unconstitutional Delegation of Government Authority**

93. Plaintiffs reallege all paragraphs above.

94. Defendants are state actors operating under color of state law.

95. Government authority may generally not be vested in private entities or individuals. *See Andrews v. Wilson*, 959 S.W.2d 686, 690 (Tex. App.—Amarillo 1998), *rev'd*, 10 S.W.3d 663 (Tex. 1999) (it is "generally recognized that governmental or legislative functions . . . cannot be delegated to private entities")

96. Delegating the power to regulate speech to private entities or individuals, such as the establishment of rating systems, violates the First and Fourteenth Amendments to the U.S. Constitution. *See Swope v. Lubbers*, 560 F. Supp. 1328, 1334 (W.D. Mich. 1983) ("[I]t is well-

---

[43] *See* Stratton Decl. ¶ 5; Rasenberger Decl. ¶¶ 7, 10-11.

established" that private ratings system "may not be used as a standard for a determination of constitutional status"); *Entm't Software Ass'n v. Hatch*, 443 F. Supp. 2d 1065, 1071 (D. Minn. 2006), *aff'd sub nom. Entm't Software Ass'n v. Swanson*, 519 F.3d 768 (8th Cir. 2008) (the delegation of governmental authority to a private entity to determine what video games a child under 17 years of age could rent or purchase violated the First and Fourteenth Amendments).

97.     The Book Ban grants private "library material vendors" the authority to review and rate books as "sexually explicit," "sexually relevant," or "no rating" and determine whether they are recalled from public schools, banned from public schools, or restricted in public schools. TEX. EDUC. CODE §§ 33.021(a), 35.001(3), 35.002.

98.     The Book Ban's delegation of government authority to private entities and individuals to rate and prohibit books violates the First and Fourteenth Amendments to the U.S. Constitution. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963) (delegation of government authority to Commission that rated books as objectionable and prevented their circulation to minors was unconstitutional); *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 553 (N.D. Tex. 2000) (enjoining the government's delegation of the selection and removal of library books to a group of private citizens because it was an "improper delegation of governmental authority").

## VII.     IRREPARABLE HARM

99.     There is no adequate remedy at law for the violation of Plaintiffs' constitutional rights. Unless the requested injunctive and declaratory relief is granted, Plaintiffs and their members will suffer immediate and irreparable harm.[44]

---

[44] Plaintiffs have already suffered actual injury by the Ban because at least one school district, Katy ISD, ceased all library book purchases, including those from Plaintiffs, after the Ban's passage. *See* Koehler Decl. ¶ 24. Further injury is imminent when the Book Ban takes effect on September 1, 2023. At that time, Plaintiffs will be burdened with the onerous and expensive task

100.    The existence of the Book Ban has a chilling effect on the exercise of Plaintiffs' constitutional rights. The Book Ban will cause Plaintiffs irreparable personal and economic injury each day it is in effect.

## VIII.   PRAYER FOR RELIEF

Plaintiffs request the following relief against Defendants:

a.      That this matter be set for a hearing on the requested preliminary injunctive relief at the earliest practical date;

b.      That the Court enter a preliminary and permanent injunction enjoining the Defendants and their agents, attorneys, servants, employees, and other representatives from enforcing the Book Ban in any manner whatsoever;

c.      That the Court enter a declaratory judgment that the Book Ban is unconstitutional, void, and of no effect;

d.      That Plaintiffs be awarded the costs of this action;

e.      That Plaintiffs recover from Defendants their reasonable attorney's fees under 42 U.S.C. § 1988; and

f.      That Plaintiffs be granted any other and further relief the Court deems proper.

---

of reviewing and rating all books sold to public schools "in active" use as "sexually explicit" and "sexually relevant" using a vague "contextual analysis." *See* Rejsek Decl. ¶¶ 15-16, 20-22, 25-26; Koehler Decl. ¶¶ 8-16; Grogan Decl. ¶¶ 7, 19-21; Stratton Decl. ¶¶ 8-11. Blue Willow Bookshop estimates that it will cost between $200 and $1,000 per book and between $4 million and $500 million total to read and rate books already sold to public schools according to the Book Ban's multi-layered criteria. *See* Koehler Decl. ¶¶ 14-16. These estimates do not account for the cost of reviewing future books or the cost of obtaining previously sold books. *Id*. ¶ 15. Because of these exponential costs and low margins, the Book Ban could cause bookstores to close and will likely deter new bookstores from opening in Texas.

Respectfully submitted,

*/s/ Laura Lee Prather*

Laura Lee Prather
Texas Bar No. 16234200
laura.prather@haynesboone.com
Catherine L. Robb
Texas Bar No. 24007924
catherine.robb@haynesboone.com
Michael J. Lambert
Texas Bar No. 24128020
michael.lambert@haynesboone.com
Reid Pillifant
Texas Bar No. 24126157
reid.pillifant@haynesboone.com

**HAYNES AND BOONE, LLP**
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone: (512) 867-8400
Facsimile: (512) 867-8470

**ATTORNEYS FOR PLAINTIFFS**

# EXHIBIT A

Case: 23-50668    Document: 00516902818    Page: 0172    Date Filed: 09/20/2023

H.B. No. 900

 1                             AN ACT
 2   relating to the regulation of library materials sold to or included
 3   in public school libraries.
 4       BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:
 5       SECTION 1.  This  Act  shall  be  known  as  the  Restricting
 6   Explicit and Adult-Designated Educational Resources (READER) Act.
 7       SECTION 2.  Section 33.021, Education Code, is amended to
 8   read as follows:
 9       Sec. 33.021.  LIBRARY STANDARDS.  (a)  In this section,
10   "sexually explicit material" means any communication, language, or
11   material,   including   a   written   description,   illustration,
12   photographic image, video image, or audio file, other than library
13   material directly related to the curriculum required under Section
14   28.002(a), that describes, depicts, or portrays sexual conduct, as
15   defined by Section 43.25, Penal Code, in a way that is patently
16   offensive, as defined by Section 43.21, Penal Code.
17       (b)  The Texas State Library and Archives Commission, in
18   consultation  with  the  State  Board  of  Education,  shall  adopt
19   voluntary  standards  for  school  library  services,  other  than
20   collection development, that a[.  A] school district shall consider
21   [the standards] in developing, implementing, or expanding library
22   services.
23       (c)  The Texas State Library and Archives Commission, with
24   approval by majority vote of the State Board of Education, shall

Case 1:23-cv-00858-ADA   Document 51-1   Filed 07/25/23   Page 178 of 263

H.B. No. 900

1  adopt standards for school library collection development that a

2  school district shall adhere to in developing or implementing the

3  district's library collection development policies.

4         (d)  The standards adopted under Subsection (c) must:

5               (1)  be reviewed and updated at least once every five

6  years; and

7               (2)  include a collection development policy that:

8                    (A)  prohibits the possession, acquisition, and

9  purchase of:

10                        (i)  harmful material, as defined by Section

11  43.24, Penal Code;

12                        (ii)  library  material  rated  sexually

13  explicit material by the selling library material vendor; or

14                        (iii)  library material that is pervasively

15  vulgar or educationally unsuitable as referenced in *Pico v. Board*

16  *of Education*, 457 U.S. 853 (1982);

17                    (B)  recognizes that obscene content is not

18  protected by the First Amendment to the United States Constitution;

19                    (C)  is  required  for  all  library  materials

20  available for use or display, including material contained in

21  school libraries, classroom libraries, and online catalogs;

22                    (D)  recognizes that parents are the primary

23  decision makers regarding a student's access to library material;

24                    (E)  encourages  schools  to  provide  library

25  catalog transparency;

26                    (F)  recommends schools communicate effectively

27  with parents regarding collection development; and

H.B. No. 900

1        (G)  prohibits  the  removal  of  material  based
2  solely on the:

3            (i)  ideas contained in the material; or
4            (ii)  personal background of:
5                (a)  the author of the material; or
6                (b)  characters in the material.

7     SECTION 3.  Subtitle F, Title 2, Education Code, is amended
8  by adding Chapter 35 to read as follows:

9     CHAPTER 35.  REGULATION OF CERTAIN LIBRARY MATERIAL

10    Sec. 35.001.  DEFINITIONS.  In this chapter:

11        (1)  "Library material vendor" includes any entity that
12  sells library material to a public primary or secondary school in
13  this state.

14        (2)  "Sexually  explicit  material"  has  the  meaning
15  assigned by Section 33.021.

16        (3)  "Sexually   relevant   material"   means   any
17  communication,  language,  or  material,  including  a  written
18  description,  illustration,  photographic  image,  video  image,  or
19  audio file, other than library material directly related to the
20  curriculum  required  under  Section  28.002(a),  that  describes,
21  depicts, or portrays sexual conduct, as defined by Section 43.25,
22  Penal Code.

23    Sec. 35.002.  RATINGS REQUIRED.  (a)  A library material
24  vendor  may  not  sell  library  materials  to  a  school  district  or
25  open-enrollment  charter  school  unless  the  vendor  has  issued
26  appropriate  ratings  regarding  sexually  explicit  material  and
27  sexually relevant material previously sold to a district or school.

3

Case 1:23-cv-00858-ADA   Document 51-9   Filed 10/25/23   Page 1 of 2

H.B. No. 900

1   (b)  A library material vendor may not sell library material
2  rated sexually explicit material and shall issue a recall for all
3  copies of library material sold to a district or school that is:
4       (1)  rated sexually explicit material; and
5       (2)  in active use by the district or school.
6   (c)  Not later than April 1, 2024, each library material
7  vendor shall develop and submit to the agency a list of library
8  material rated as sexually explicit material or sexually relevant
9  material sold by the vendor to a school district or open-enrollment
10  charter school before that date and still in active use by the
11  district or school.
12   (d)  Not later than September 1 of each year, each library
13  material vendor shall submit to the agency an updated list of
14  library material rated as sexually explicit material or sexually
15  relevant material sold by the vendor to a school district or
16  open-enrollment charter school during the preceding year and still
17  in active use by the district or school.
18   (e)  The agency shall post each list submitted under
19  Subsection (c) or (d) in a conspicuous place on the agency's
20  Internet website as soon as practicable.
21   Sec. 35.0021.  RATING GUIDELINES.  (a)  For purposes of
22  determining whether a library material is sexually explicit as
23  required by Section 35.002, a library material vendor must perform
24  a contextual analysis of the material to determine whether the
25  material describes, depicts, or portrays sexual conduct in a way
26  that is patently offensive.
27   (b)  In performing the contextual analysis of a library

Case 1:23-cv-00858-ADA   Document 40-1   Filed 07/25/23   Page 121 of 203

H.B. No. 900

1    material, a library material vendor must consider the following

2    three principal factors with respect to the material:

3              (1) the explicitness or graphic nature of a

4    description or depiction of sexual conduct contained in the

5    material;

6              (2) whether the material consists predominantly of or

7    contains multiple repetitions of depictions of sexual or excretory

8    organs or activities; and

9              (3) whether a reasonable person would find that the

10   material intentionally panders to, titillates, or shocks the

11   reader.

12        (c) In examining the three factors listed under Subsection

13   (b), a vendor must weigh and balance each factor and conclude

14   whether the library material is patently offensive, recognizing

15   that because each instance of a description, depiction, or

16   portrayal of sexual conduct contained in a material may present a

17   unique mix of factors.

18        (d) To determine whether a description, depiction, or

19   portrayal of sexual conduct contained in a material is patently

20   offensive, a library material vendor must consider the full context

21   in which the description, depiction, or portrayal of sexual conduct

22   appears, to the extent possible, recognizing that contextual

23   determinations are necessarily highly fact-specific and require

24   the consideration of contextual characteristics that may

25   exacerbate or mitigate the offensiveness of the material.

26        Sec. 35.003. AGENCY REVIEW. (a) The agency may review

27   library material sold by a library material vendor that is not rated

Case 1:23-cv-00858-A Document 20-1 Filed 07/25/23 Page 122 of 178

H.B. No. 900

1  or incorrectly rated by the vendor as sexually explicit material,

2  sexually relevant material, or no rating in accordance with Section

3  35.002(a).  If the agency determines that the library material is

4  required to be rated as sexually explicit material or sexually

5  relevant material or to receive no rating at all under that

6  subsection, the agency shall provide written notice to the vendor.

7  The notice must include information regarding the vendor's duty

8  under this section and provide the corrected rating required for

9  the library material.

10       (b)  Not later than the 60th day after the date on which a

11  library material vendor receives notice regarding library material

12  under Subsection (a), the vendor shall:

13            (1)  rate  the  library  material  according  to  the

14  agency's corrected rating; and

15            (2)  notify  the  agency  of  the  action  taken  under

16  Subdivision (1).

17       (c)  The  agency  shall  post  and  maintain  in  a  conspicuous

18  place on the agency's Internet website a list of library material

19  vendors who fail to comply with Subsection (b).

20       (d)  A school district or open-enrollment charter school may

21  not purchase library material from a library material vendor on the

22  list described by Subsection (c).

23       (e)  A library material vendor placed on the list described

24  by Subsection (c) may petition the agency for removal from the list.

25  The agency may remove a vendor from the list only if the agency is

26  satisfied  that  the  vendor  has  taken  appropriate  action  under

27  Subsection (b).

H.B. No. 900

1    Sec. 35.004.  LIABILITY.    A    school    district    or
2  open-enrollment charter school or a teacher, librarian, or other
3  staff member employed by a district or school is not liable for any
4  claim  or  damage  resulting  from  a  library  material  vendor's
5  violation of this chapter.
6        Sec. 35.005.  PARENTAL CONSENT REQUIRED FOR USE OF CERTAIN
7  LIBRARY MATERIALS.  A school district or open-enrollment charter
8  school may not allow a student enrolled in the district or school to
9  reserve, check out, or otherwise use outside the school library
10  library material the library material vendor has rated as sexually
11  relevant material under Section 35.002(a) unless the district or
12  school first obtains written consent from the student's parent or
13  person standing in parental relation.
14        Sec. 35.006.  REVIEW  AND  REPORTING  OF  CERTAIN  LIBRARY
15  MATERIALS.  (a)  Not later than January 1 of every odd-numbered
16  year,  each  school  district  and  open-enrollment  charter  school
17  shall:
18        (1)  review the content of each library material in the
19  catalog of a district or school library that is rated as sexually
20  relevant material under Section 35.002(a) by the library material
21  vendor;
22        (2)  determine  in  accordance  with  the  district's  or
23  school's  policies  regarding  the  approval,  review,  and
24  reconsideration of school library materials whether to retain each
25  library  material  reviewed  under  Subdivision  (1)  in  the  school
26  library catalog; and
27        (3)  either:

H.B. No. 900

1            (A)  post in a conspicuous place on the Internet

2  website maintained by the district or school a report; or

3            (B)  provide physical copies of the report at the

4  central administrative building for the district or school.

5      (b)  The report required under Subsection (a)(3) must

6  include:

7            (1)  the title of each library material reviewed under

8  Subsection (a)(1);

9            (2)  the district's or school's decision regarding the

10  library material under Subsection (a)(2); and

11            (3)  the school or campus where the library material is

12  currently located.

13      Sec. 35.007.  RULES.  The commissioner may adopt rules as

14  necessary to administer this chapter.

15      Sec. 35.008.  ASSISTANCE OF AGENCY.  The agency may provide

16  assistance to school districts and open-enrollment charter schools

17  in complying with this chapter.

18      SECTION 4.  Not later than January 1, 2024, the Texas State

19  Library and Archives Commission shall adopt the standards for

20  school library collection development as required under Section

21  33.021(c), Education Code, as added by this Act.

22      SECTION 5.  (a)  Not later than April 1, 2024, each library

23  material vendor, as defined by Section 35.001, Education Code, as

24  added by this Act, shall submit the initial list required under

25  Section 35.002(c), Education Code, as added by this Act.

26      (b)  Not later than September 1, 2024, each library material

27  vendor, as defined by Section 35.001, Education Code, as added by

H.B. No. 900

1 this Act, shall submit the initial updated list required under

2 Section 35.002(d), Education Code, as added by this Act.

3    (c)  Not later than January 1, 2025, each school district and

4 open-enrollment charter school shall conduct the initial content

5 review and submit the initial report required under Section

6 35.006(a), Education Code, as added by this Act.

7    SECTION 6.  The changes in law made by this Act to the

8 Education Code apply beginning with the 2023-2024 school year.

9    SECTION 7.  This Act takes effect immediately if it receives

10 a vote of two-thirds of all the members elected to each house, as

11 provided by Section 39, Article III, Texas Constitution.  If this

12 Act does not receive the vote necessary for immediate effect, this

13 Act takes effect September 1, 2023.

Case 1:23-cv-00129-DAE   Document 40-1   Filed 07/25/23   Page 11 of 18

H.B. No. 900

_____          _____
     President of the Senate                  Speaker of the House

    I certify that H.B. No. 900 was passed by the House on April 20, 2023, by the following vote:  Yeas 95, Nays 52, 1 present, not voting.

                           _____
                             Chief Clerk of the House

    I certify that H.B. No. 900 was passed by the Senate on May 23, 2023, by the following vote:  Yeas 19, Nays 12.

                           _____
                           Secretary of the Senate

APPROVED:  _____
               Date

      _____
          Governor

Case: 23-50885 Document 00516902028 Page: 102 Date Filed: 09/20/2023

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| BOOK PEOPLE, INC., VBK d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND, | § § § § § § § § | |
| **Plaintiffs,** | § § | |
| v. | § § | **CASE NO.** |
| MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education, | § § § § § § § § § | |
| **Defendants.** | § § | |

## DECLARATION OF CHARLEY REJSEK

Pursuant to 28 U.S.C. § 1746, Charley Rejsek declares:

1.      My name is Charley Rejsek. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. The following statements are made within my personal knowledge and are true and correct.

2.      I am the CEO of Book People, Inc., ("BookPeople") an independent bookstore that sells new books in Austin, Texas. I have been the CEO of BookPeople since 2022 and previously served as the company's general manager.

3.      BookPeople was founded in 1970 as Grok Books. Since its founding, BookPeople has sold books and other library materials to Texas school districts for use in their school libraries.

4.      BookPeople is an authorized vendor to many school districts.

5.      BookPeople sells books and other library materials to schools and teachers for school use in response to RFQs from school contacts, in response to online orders, in the bookstore, and at offsite events, festivals, school events, bookfairs, and conferences.

6.      Book People is the official bookseller for the Texas Book Festival co-founded by former First Lady Laura Bush.

7.      BookPeople intends to continue selling books and other library materials to Texas school districts for use in school libraries in the future.

8.      BookPeople is not able to comply with H.B. 900 (the "Book Ban"), which requires BookPeople to identify and rate every book it has ever sold to a public school district that is "still in active use."

9.      BookPeople does not have complete records detailing all products sold to schools during its 53 years in business, so it cannot identify all books previously sold to school districts, as the Book Ban requires.

10.     BookPeople has changed record-keeping and inventory systems several times in its 53-year history and records from previous decades have largely been lost. BookPeople did not expect that it would someday need to access these decades-old records in order to comply with a government mandate.

11.     Because BookPeople does not have records of all sales during its existence, it also has no way of knowing which books sold by BookPeople are still "in active use" by a school district. BookPeople does not have any way of ascertaining this information. BookPeople does not have records of every school district to which it has sold books.

12.     BookPeople does not ask its customers to specify how the books they are purchasing will be used.

13.     Even if BookPeople had records of its sales, BookPeople would be unable to comply with the Book Ban's rating requirements.

14.     Many of the books that BookPeople has previously sold would no longer be in our current inventory. The Book Ban requires us to review and rate these books—which are not in our possession—regardless of whether we plan to sell them in the future. These are books that BookPeople was well within its rights to sell at the time. The Book Ban now forces us to—decades after the fact—obtain and review these books.

15.     BookPeople is a fixed-price bookseller; the vast majority of our books arrive with the price already printed on the book. As a result, BookPeople operates with very narrow profit margins.

16.     The financial resources that would be required to have BookPeople's staff identify, read and rate every book that BookPeople sells—or has ever sold—to school districts, as the Book Ban requires, would be financially unsustainable. As CEO, I do not see any way for BookPeople to comply with the Book Ban and remain in business.

17.     Even if BookPeople did have the resources to comply with the Book Ban, our staff would not know how to rate books based on the subjective nature of the Book Ban's rating requirements. For instance, the Book Ban requires BookPeople to assess books based on "current community standards," but which community? BookPeople is based in Austin, Texas, but serves many communities throughout the State, each of which has its own community character. Our ratings would necessarily differ from vendors who serve other communities.

18.     Our ratings would also consider the age-appropriateness of a given work. However, the Book Ban does not specify what age group we should consider in reviewing the works. This alone makes it impossible to apply an accurate rating.

19.     Even if BookPeople could rate these materials according to the State's criteria, BookPeople does not believe it should be compelled to provide these ratings, based on criteria in which it does not agree, in order to sell books to public schools.

20.     If BookPeople does rate these books, our ratings can still be overridden by the State and then publicly posted as if they represent our own speech. BookPeople would not want customers to believe these ratings reflect its views on the books. But if BookPeople resists adopting the State's ratings, then we will be identified on the State's public blacklist, which would cause reputational damage to the company.

21.     I am also concerned that the public posting of any ratings by BookPeople would lead to stigma and reputational harm for BookPeople. If BookPeople does participate in this system of compelled speech, we stand to lose customers who disagree with the Book Ban.

22.     The Book Ban also states that if we do not comply with the State's ratings, the State will prevent us from selling *any* books to public schools. This will cause direct financial harm.

23.     The law does not specify how long BookPeople would be banned if it runs afoul of the State's rating regime, so BookPeople cannot fully assess whether to comply. Nor does the law explain how the State will handle ratings that differ among vendors—an inevitable outcome when numerous vendors are being asked to review thousands of works.

24.     BookPeople does not have clarity as to whether it can continue selling books to Texas public school districts between the law's effective date (September 1, 2023) and the date that its ratings are due to be submitted (April 1, 2024).

DECLARATION OF CHARLEY REJSEK          4

25.     BookPeople is a community bookstore and we want to continue supporting *all* schools in our area. By imposing an unfunded mandate to review and rate every book that we have ever sold to a public school, the State of Texas will force BookPeople to discontinue its work with local public schools, in violation of its First Amendment rights.

26.     If BookPeople was not able to work with local public schools, its reputation and commitment to serving the community would be harmed.

27.     I hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 23rd day of July, 2023.

/s/ *Charley Rejsek*
Charley Rejsek

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **BOOK PEOPLE, INC., VBK d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND,** | § § § § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **CASE NO.** |
| **MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education,** | § § § § § § § § § | |
| **Defendants.** | § § | |

## DECLARATION OF VALERIE KOEHLER

Pursuant to 28 U.S.C. § 1746, Valerie Koehler declares:

1.      My name is Valerie Koehler. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. The following statements are made within my personal knowledge and are true and correct.

2.      I am the owner of VBK, Inc. d/b/a Blue Willow Bookshop, an independent bookstore in Houston, Texas ("Blue Willow"). I have been the owner of Blue Willow since 1996.

3.      Blue Willow sells books and other library materials for school use in response to RFPs and RFQs from schools, to librarians and teachers who are reimbursed, and as a result of arranging for author visits at schools.

4.      In addition to school visits, Blue Willow Bookshop arranges three large festivals for young readers every year, each with a goal of promoting literacy and fostering lifelong readers: TeenCon, Tweens Read, and Bookworm. During those festivals, schools and teachers purchase books for students and classrooms.

5.      Blue Willow is an authorized vendor to many school districts and has sold books to at least 22 Texas school districts in the last 15 years.

6.      Although Blue Willow intends to comply with House Bill 900 (the "Book Ban") to the best of its ability, I do not know how we will be able to do so.

7.      Blue Willow has no complete record of books and library materials sold for school use since 1996. Blue Willow has not attempted to keep complete records of every sale, and Blue Willow has migrated its records among various record-keeping systems, which has resulted in the loss of some records.

8.      As a result, Blue Willow is not able to comply with the Book Ban, which requires Blue Willow to identify and rate every book it has ever sold to a public school district—even books it may no longer sell or that are out of circulation.

9.      Blue Willow also has no way of knowing which books are in "active use." Blue Willow does not ask its customers how its books will be used, and Blue Willow does not have any information as to where books it has sold are housed within a school district or school—whether they are used in conjunction with a school's curriculum, used in the classroom, used in a library, given or loaned to students, or whether these books are still within the district's possession.

10.     Even if Blue Willow had these records, it would be impossible for Blue Willow to devote the financial resources necessary to comply with the Book Ban's rating requirements.

11.     Blue Willow estimates it has sold between 20,000 and 50,000 different titles to Texas schools or school districts in its 26 years of business.

12.     Many of the books that Blue Willow has previously sold would no longer be in our current inventory. The Book Ban requires us to review and rate these books—which are not in our possession—regardless of whether we plan to sell them in the future. These are books that Blue Willow was well within its rights to sell at the time. The Book Ban now forces us to—decades after the fact—obtain and review these books.

13.     Based on the Book Ban's highly fact-specific criteria, Blue Willow does not believe that its staff would be capable of producing accurate ratings and believes such a review would require employing legal professionals.

14.     To read and rate a book according to the Book Ban's multi-layered criteria, Blue Willow estimates that it would cost between $200 and $1,000 per book.

15.     Blue Willow estimates the total cost to read and rate books already sold would be between $4 million and $500 million dollars. This estimate does not account for the cost of reviewing future book sales or the cost of obtaining previously sold books.

16.     Blue Willow does not have the financial resources to comply with the Book Ban. Blue Willow's annual sales are just over $1 million per year.

17.     Blue Willow does not want to be compelled by the State to issue ratings for books based on criteria with which it does not agree. Blue Willow sells a wide variety of books, including books that I would not personally be interested in reading. However, we do not judge our customer's choices. We would not want our customers to think the ratings reflect our views of these books.

DECLARATION OF VALERIE KOEHLER          3

18.     The standards for rating books that are contained in the Book Ban are confusing and vague. I have discussed this issue with my staff, and we do not know how we could rate books based on the Book Ban's criteria, since the criteria are inherently subjective, and what might be offensive to one person would not be to another. For instance, is a book that contains kissing acceptable under the Ban? Is kissing between the same sex acceptable? This is just one small example of the confusion our staff would face.

19.     Blue Willow is also confused as to which books are exempt from ratings as part of the required curriculum. Blue Willow does not know, and has no realistic way of ascertaining, the curriculum for each school, grade level and classroom in each of the Texas districts to which we sell books.

20.     If Blue Willow does rate these books, our ratings can still be overridden by the State and then publicly posted as if they represent our own speech. Blue Willow would not want customers to believe these ratings reflect our views of these books. But if Blue Willow resists adopting the State's ratings, then the State will prevent us from selling *any* books to public schools, and we will be identified on the State's public blacklist, which would cause both financial and reputational damage to our company.

21.     I am also concerned that the public posting of any ratings by Blue Willow would lead to stigma and reputational harm for our company. If Blue Willow does participate in this system of compelled speech, we stand to lose customers who disagree with the Book Ban.

22.     Blue Willow also does not wish to participate in a forced recall of books based on ratings with which we do not agree. I am concerned that the issuance of recall requests from Blue Willow to school districts would be interpreted as our own speech, when, in fact, it is being compelled by the State.

23.     Approximately 20 percent of Blue Willow's sales are directly to schools or are related to school author visits and our three festivals. Blue Willow would lose the vast majority of this revenue if schools were no longer able to purchase from Blue Willow.

24.     Blue Willow has already lost sales as a result of the Book Ban. Blue Willow has sold over $200,000 in books to Katy Independent School District in the past 5-7 years, but Katy ISD has now paused its purchasing in response to the uncertainty surrounding the Book Ban.

25.     Blue Willow anticipates that it will continue to lose sales at a rapid rate because of the Book Ban.

26.     Blue Willow does not have clarity as to whether it can continue selling books to Texas public school districts between the law's effective date (September 1, 2023) and the date that its ratings are due to be submitted (April 1, 2024).

27.     Blue Willow intends to continue selling books and other library materials to Texas school districts for use in school libraries in the future.

28.     I hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 21st day of July, 2023.

/s/ *Valerie Koehler*
Valerie Koehler

Case: 23-50885 Document 00516928892 Page: 1 Date Filed: 10/20/2023

# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| BOOK PEOPLE, INC., VBK d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND, | § § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CASE NO. |
| MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education, | § § § § § § § § | |
| Defendants. | § § | |

---

## DECLARATION OF DAVID GROGAN

---

Pursuant to 28 U.S.C. § 1746, David Grogan declares:

1.      My name is David Grogan. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. The following statements are made within my personal knowledge and are true and correct.

2.      I am the Director of the American Booksellers for Free Expression, Advocacy and Public Policy ("ABFE"), a division of the American Booksellers Association ("ABA"). I have been employed by the ABA since 2002.

3.      ABA was founded in 1900 and is a national not-for-profit trade organization that works to help independently owned bookstores grow and succeed.

4.      ABA represents over 2,100 member companies operating in over 2,500 locations. ABA's core members are key participants in their communities' local economy and culture. To assist them, ABA provides education, information dissemination, business products, and services; creates relevant programs; and engages in public policy, industry, and local-first advocacy.

5.      The ABA has 156 members located in Texas who are vendors to school districts subject to the Ban.

6.      Our members each utilize different systems for tracking their sales and inventory, and thus have different sets of records. Many of our members do not have complete records of all sales they have ever made to school districts. As a result, they are unable to comply with the requirements of House Bill 900 (the "Book Ban").

7.      The Book Ban places an extreme burden on booksellers to rate books for their sexual content. It is impossible for any bookseller or bookstore owner to know the contents of every book they sell or have sold, making the law impossible for any bookstore to follow. Over four million new books were published in 2022, according to numerous sources. Fear of inadvertently running afoul of the law would result in a bookseller erring on the side of caution, thereby limiting students' access to age-appropriate, relevant materials.

8.      Importantly, the rating is not just for the book as a whole. The Book Ban requires a bookseller to review every page of every book for any description of genitals, buttocks or breasts or any description of mild sexual activity.  As a result, booksellers will need to do much more than review a handful of sexual health books or prominent biographies or fiction by people who are known for writing about sexual topics—they will have to comb through every page of every book.

9.      The Book Ban's vague standards would also make it difficult for booksellers to comply with the rating system's criteria. The rating must be based on sexual content, but also on

contemporary standards of decency as to minors (this is the difference between sexually explicit and sexually relevant). The community standard is entirely undefined and subjective—forcing vendors to guess what a community thinks is appropriate for minors.

10.    The Book Ban also fails to distinguish between minors based on age (5- versus 17-year-olds), maturity (advanced reader versus academically challenged reader) or geographic location (Houston versus Wichita Falls).

11.    Concerns over this subjectivity would lead booksellers to err on the side of caution, ultimately labeling a book as "sexually explicit" or "sexually relevant" that may not need this rating. This could ultimately deprive students of age-appropriate works of literature. Just as an example, these titles could include *Dracula*, *Romeo & Juliet*, *Ulysses*, *Gone with the Wind*, and *The Color Purple.*

12.    Additionally, due to the vagueness of the law, the Book Ban could result in the banning of a book that is "sexually relevant" as to younger minors but appropriate for older teenagers. What is appropriate to a 15-year-old may not be appropriate for a child under the age of 10. This law does not discern these nuances, and it places the onus on booksellers to make this impossible determination.

13.    The lack of specificity in the Book Ban will inevitably lead to inconsistent ratings among our members and the broader bookselling community. It could also lead to financial liability from authors unhappy with their rating, who may place blame on booksellers for lost sales.

14.    Our members do not believe that they are best positioned to evaluate every book for school use. They believe these decisions are best left to experienced, professional librarians, with parental input.

15.     Our members do not wish to participate in a public rating system that compels them to rate books on criteria with which they do not agree. They are concerned that these ratings—which are compelled by the State but published under their name—would be interpreted as their own speech.

16.     Our members believe these ratings are inherently subjective. The Book Ban's requirement that the ratings be listed online could lead to classic or award-winning books, such as *The Bluest Eye* or *The Color Purple*, being branded with a proverbial Scarlet letter. It is not a stretch to imagine that a book being label as "sexually explicit" or "sexually relevant" on the TEA's website could impact whether a parent buys a book at a bookstore for their child, thereby limiting access to titles that could be a positive influence on, and potentially life-changing for, a given child.

17.     Further, because videos and movies that are based on books, like Academy Award-winning *Gone with the Wind,* are often shown in public school classrooms, it is also likely that the ratings provided to these books may foreclose their availability in the library, even while the movie version is still shown in the classroom—creating inconsistent treatment of similar content.

18.     Our members believe the State has no business determining what books are acceptable for anyone to read. It is simply Orwellian for the State to do so. Our members further believe the impact of these ratings will not only affect what books are available in schools, but also extend into what books are sold in bookstores.

19.     The Book Ban will undoubtedly lead to financial harm for our members, whether it is due to a loss of book sales, potential exposure to liability from book authors, or because bookstores need to hire additional staff to handle the burdensome responsibility of rating books sold to schools. The average net operating profit of an independent bookstore (as reported in

ABA's annual financial survey) from book sales in 2023 was 1.5 percent. Moreover, book prices are set by the publishers and printed on the books. If bookstore expenses increase, a bookstore owner cannot increase the price of books to offset this new expense.

20.     Our members do not yet know the extent of the labor and resources that will be necessary to handle rating the books due to the vagueness of the law. It is conceivable that attempting to comply with the law will put a bookstore out of business. Aside from being unconstitutional, this law is impractical and burdensome for bookstore businesses and will result in a loss of net income.

21.     Our members are also unclear what is required regarding recalling certain books. The law does not make clear their responsibilities nor what they are required to do if a school does not comply with such a recall. There are significant questions as to how the books that are recalled will be handled and what further burdens this could place on a bookstore.

22.     Our members are also concerned that the issuance of a recall would be interpreted by school districts and the general public as an expression of the bookseller's views and values, when its speech is actually being compelled by the government.

23.     It is impossible to overstate the importance of local businesses, such as independent bookstores, to their communities. In economic terms, according to a civic economics study, independent businesses recirculate a substantially greater proportion of their revenues back into the local economy than do their chain competitors.

24.     I hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 23rd day of July, 2023.

                                        /s/ *David Grogan*
                                        David Grogan

DECLARATION OF DAVID GROGAN          5

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **BOOK PEOPLE, INC., VBK d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND,** | § § § § § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **CASE NO.** |
| **MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education,** | § § § § § § § § § § | |
| **Defendants.** | § § | |

---

## DECLARATION OF MATTHEW STRATTON

---

Pursuant to 28 U.S.C. § 1746, Matthew Stratton declares:

1.     My name is Matthew Stratton. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. The following statements are made within my personal knowledge and are true and correct.

2.     I am the Deputy General Counsel of the Association of American Publishers ("AAP").

3.     The Association of American Publishers ("AAP") is a not-for-profit organization that represents the leading book, journal, and education publishers in the United States on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression,

professional content, and learning solutions. AAP's membership includes approximately 130 individual members, who range from major commercial book and journal publishers to small, non-profit, university, and scholarly presses, as well as leading publishers of educational materials and digital learning platforms. AAP's members publish a substantial portion of the general, educational, and religious books produced in the United States in print and digital formats, including critically acclaimed, award-winning literature for adults, young adults, and children. AAP represents an industry that not only depends upon the free exercise of rights guaranteed by the First Amendment, but also exists in service to our Constitutional democracy, including the unequivocal freedoms to publish, read, and inform oneself.

4.      The AAP has a number of members that do business in Texas who are vendors to school districts subject to House Bill 900 (the "Book Ban"). AAP also has many more members that publish titles that are distributed to Texas schools through third-party vendors subject to the Book Ban. As the latter category of AAP members will also have their books rated, they will experience the same harms discussed in paragraphs 12-16.

5.      A number of AAP's members have only a partial set of records of past sales to Texas public schools or school districts. The records are limited because, among other reasons: (i) AAP members may sell books to Texas public schools or school districts without being aware of it; and (ii) AAP members may have document-retention policies under which records that are no longer needed are destroyed and/or not reasonably accessible. As a result, these AAP members are unable to comply with the Book Ban.

6.      Even if AAP's members did possess these records, AAP's members have no way to know which books are in active use (or even what "active use" means), so it is impossible for

AAP members to undertake the task of rating and recalling (if applicable) these materials, absent receiving information from the schools.

7.      Furthermore, schools may purchase the same books from multiple vendors so it may not be feasible to determine whether the copies of books sold by AAP members are those that remain in active use.  With multiple vendors for the same book, the likelihood of consistent ratings is slim.

8.      The rating system imposed by the Book Ban would be a burden on AAP's members, requiring significant time and expense to identify past sales and compare those to books in "active use." Some of AAP's members have sold tens of thousands of books to Texas schools and school districts, and it is estimated that hundreds of hours of work or even more would be required by each of these members to attempt to search sales records and compare them against lists of books in active use (assuming such lists were provided to AAP's member), as required by the Book Ban. It would be an enormous burden in terms of resources, staff, and costs, and would require significantly diverting existing staff or hiring new staff.

9.      Likewise, applying ratings would be a significant burden on AAP's members. There are millions of books in Texas school libraries. Our members do not have existing staff or an existing process for the purpose of applying the ratings. It would be cost-prohibitive, difficult and time-consuming to hire and train new staff (or re-train existing staff) to apply ratings, given the vague and confusing process outlined by the Book Ban.

10.     The amount of time per book (e.g., a 450-page work of fiction or non-fiction in a high school library would take significantly longer to review than a picture book in an elementary school library), but broadly speaking the time to read, analyze, and possibly solicit other viewpoints could require a substantial, double-digit number of hours per book on average.

DECLARATION OF MATTHEW STRATTON        3

11. AAP members will have difficulty applying the rating standards set forth in the Book Ban for at least the following reasons:

    a. It is unclear what it means for library material to be "directly related" to the required curriculum (and therefore exempt from the ratings). Oftentimes AAP members do not even get copies of the curriculum.

    b. It is unclear how a vendor would know if library material is being used in a way that is directly related to the required curriculum.

    c. It is unclear what "active use" means.

    d. It is unclear how a vendor will know if a library material remains in "active use."

    e. The "sexually relevant" rating is vague and confusing insofar as any de minimis, non-explicit reference, in any context, to sexual relations, could result in the rating. It could apply broadly to health-related works, religious texts, historical works, encyclopedias, dictionaries, and many other works.

    f. The "sexually explicit" rating is vague and confusing because the contextual analysis does not adjust for differences in ages or communities and does not provide for consideration of the work as a whole.

    g. Vendors may not have any knowledge about the contemporary community standards of decency nor do they know which community's standards should be considered

    h. The balancing test is entirely subjective and cannot be applied with any consistency.

12. The ratings will stigmatize books that are rated "sexually explicit" or "sexually relevant" and will risk reducing sales of these works—not just to Texas schools, but globally, since the ratings are posted online. This, in turn, risks publishers foregoing investment in important new works.

13. The ratings could also reduce royalties to authors, and therefore reduce the incentive for authors to produce new works or expose those who issue ratings to potential liability for doing so.

14. The ratings will also chill members' and their authors' constitutionally protected speech. The ratings compel our members to adopt a highly subjective opinion that they patently disagree with or suffer a significant financial penalty. If members refuse to adopt the State's speech as their own, then they lose all business with Texas public school districts.

15. By refusing to rate books, or by being placed on the State's blacklist, the universe of vendors and titles would contract. A member would be forced to weigh the prejudice to sales and distribution globally against the prospect of losing the school market in Texas. Many members would consider no longer selling books to Texas schools. The impact of the State licensing regime could extend beyond the State's borders. Other localities or states may rely on the ratings, either informally or formally. In addition, other states may decide to adopt their own ratings requirements, which could lead to a patchwork of inconsistent rating regimes and likely result in vendors adopting the most restrictive ratings for all states.

16. Members have reported that there are schools that are stopping or delaying buying books. This trend may escalate in August, when fall back-to-school buying ordinarily starts. The confusion is expected to be detrimental to our members' sales.

17.     With less than 45 days until the law takes effect, our members remain confused about their responsibilities under the Book Ban, including (but not limited to) the following unanswered questions:

    a.   What is the definition of a "recall"? Is a refund required if a vendor is required to recall material?

    b.   How does a vendor communicate a library material rating to a school? On the library material? In marketing material? On a pro forma invoice? A list? Other?

    c.   What happens if different vendors adopt different ratings for identical titles?

    d.   What happens if a vendor no longer sells a book that is still in "active use" by a district? Is it then compelled to re-purchase the book and rate it?

    e.   May vendors sell library material to a school prior to submission of the list with ratings for prior sales (on or before April 1, 2024), and if so, must that library material be rated?

    f.   If after being added to the banned vendor list, a vendor changes its ratings as instructed by the TEA, does the TEA have discretion to refuse removal from the banned vendor list?

18.     I hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 21st day of July, 2023.

/s/ *Matthew Stratton*
Matthew Stratton

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **BOOK PEOPLE, INC., VBK d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND,** | § § § § § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **CASE NO.** |
| **MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education,** | § § § § § § § § | |
| **Defendants.** | § § | |

---

## DECLARATION OF MARY E. RASENBERGER

Pursuant to 28 U.S.C. § 1746, Mary E. Rasenberger declares:

1.      My name is Mary E. Rasenberger. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. The following statements are made within my personal knowledge and are true and correct.

2.      I am the Chief Executive Officer ("CEO") of the Authors Guild, Inc. ("Authors Guild" or "Guild"). I have held this position since 2014, when I joined the Guild (with a title change from Executive Director to CEO in 2020).

3.      Authors Guild was founded in 1912 and is a national non-profit association of more than 13,000 professional, published writers of all genres, 483 of whom are located in Texas. It

**DECLARATION OF MARY E. RASENBERGER**

submitted an *amicus curiae* brief before the Circuit Court of Virginia Beach *In re: A Court of Mist and Fury* and *In re: Gender Queer, a Memoir,* in which a petitioner asked the court to find these two books obscene for unrestricted viewing by minors; the Court denied that request. It is currently a plaintiff before the Western District of Arkansas in *Fayetteville Public Library et al. v. Crawford County Arkansas et al.*, asking the court to declare portions of an Arkansas law unconstitutional for violating plaintiffs' rights to disseminate, receive, and read constitutionally protected books and other media.

4.     The Guild counts historians, biographers, academicians, novelists, journalists, and other writers of non-fiction and fiction as members; many write for children or young adults, and are frequent contributors to the most influential and well-respected publications in every field. The Guild works to promote the rights and professional interest of authors in various areas, including copyright, freedom of expression, antitrust, fair contracts and artificial intelligence. Many Guild members earn a substantial portion of their livelihoods through their writing, and the ability to write freely and distribute their work is vital to their incomes, as well as to the culture.

5.     The ability of Guild members to write on topics of their choosing and to have their work available through bookstores and libraries is vital to their ability to make a living in their chosen profession. Schools are a vital market for many Guild members, especially for children's, young adult, and crossover writers.

6.     Guild members and their works are subject to House Bill 900 (the "Book Ban").

7.     The rating system imposed by the Book Ban will effectively ban many educationally valuable books written by our members from schools. Books marked "sexually explicit" are expressly banned, even for students who are 18 and older, and books marked as "sexually relevant" are effectively banned, as they are highly unlikely to be included in official

curricula due to the difficulty of librarians getting written consent from parents to allow the books to circulate. This includes books where there is *any* reference to the sex of a person, anything related to people's sexuality, biology related to human or animal sexuality. Given the overbreadth, vagueness, and ambiguity of the law, book sellers will have to err far on the side of being over-inclusive in rating books as either "sexually explicit" or "sexually relevant". Many authors' books will undoubtedly be effectively banned in the significant Texas school market even when there is nothing remotely obscene or sexualized in them. As a result, our members will lose the entire Texas school market, which will adversely impact their incomes. Because many publishers and books sellers cannot practically sell different books to different markets, authors will lose school market throughout the country – which many children's, young adult, and literary classics authors rely upon.

8.      The law also ignores the literary artistic, political, or scientific value of the work as a whole.  The definitions in the Book Ban allow the State to cherry-pick terms and passages to justify removing books. Rating a book as either "sexually explicit" or "sexually relevant" will create the false impression that the book is obscene or pornographic. This stands to disproportionately apply to books that include LGBTQ+ or sexually active characters, which are often accused of containing obscenity even when they do not. As a result, the Book Ban would bar books from schools based on the political attitude that discussions of sexuality (especially LGBTQ+ sexuality) are "patently offensive" by their very nature.

9.      Under the Book Ban, authors do not have any involvement in the rating process. This greatly increases the odds that their work will be mischaracterized by individuals determined to remove books based upon viewpoint discrimination. There is no recourse under the Book Ban for an author to protest a rating or attempt to provide context for the passages in question.

10. The Book Ban will lead to self-censorship among both authors and publishers, so that they can retain the school markets and avoid being offensively labelled. We have already seen this occur in other states such as Florida, where textbook publishers attempted to eliminate race from a discussion about Rosa Parks.

11. Given the influence of the Texas book market, this vague and ambiguous rating system could result in publishers not daring to publish some books out of fear that they would violate the Book Ban, which could devastate authors' incomes and careers.

12. The lack of guidance in the Book Ban makes it effectively impossible for authors to know how to meet its standards in their future works. Of the twenty books by Jodi Picoult that were banned in Florida, half of them didn't even have a kiss in them. The only surefire way to avoid a damaging rating under the Book Ban is to eliminate any reference to sex or sexuality altogether, which is impossible for most works about humans and biology, since most humans and animals have a sex (i.e., are male or female) and have children through sex. Further, because the Book Ban makes no distinction as to age, the censorship will cause authors who wish to sell to schools to avoid writing stories or books that address important issues that many teenagers experience in their lives or communities, including important topics like family, love, preventing or dealing with pregnancy. Like teachers, authors of books written for children and young adults know their audience – they are highly educated and deeply invested in understanding and speaking to the age group they are addressing. The Book Ban will censor authors' speech at the cost of the children's and teenagers' comprehension of their world, including some who are of or close to voting age. It is an attack on democracy itself.

13. I hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 24th day of July, 2023.

/s/ *Mary E. Rasenberger*_____
Mary E. Rasenberger

# EXHIBIT G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| BOOK PEOPLE, INC., VBK d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND, | § § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CASE NO. |
| MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education, | § § § § § § § § | |
| Defendants. | § § | |

---

## DECLARATION OF JEFF TREXLER

---

I, Jeff Trexler, Pursuant to 28 U.S.C. § 1746, do declare:

1. My name is Jeff Trexler. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. The following statements are made within my personal knowledge and are true and correct.

2. I am the Interim Director of the Board of the Comic Book Legal Defense Fund ("CBLDF"). I have held this position since 2020.

3. The CBLDF is a nonprofit organization founded in 1986 dedicated to protecting the legal rights of the comic arts community. With a membership that includes creators, publishers, retailers, educators, librarians, and fans, the CBLDF has defended dozens of First Amendment

DECLARATION OF JEFF TREXLER         1

cases in courts across the United States and led important educational initiatives promoting comics literacy and free expression.

4.      In recent years, the comic arts have received widespread recognition for their value in expressing serious literary, artistic, political, and scientific content in genres across demographic categories, including middle-grade, young adult, and material addressed to older audiences. A particularly significant historical milestone in this regard was the awarding of a Pulitzer Prize in 1992 to Art Spiegelman for *Maus*, a graphic novel about the Holocaust. Subsequent decades have seen numerous other cartoonists and graphic novelists win significant awards, including Neil Gaiman, author of *The Sandman* (World Fantasy Award, 1991); Marjane Satrapi, author of *Persepolis* (Angoulême Coup de Couer Award, 2013); Alison Bechdel, author of *Fun Home* (MacArthur Award, 2014); Ari Folman and David Polonsky, creators of *Anne Frank's Diary: The Graphic Adaptation* (Will Eisner Comic Industry Award and the Munich Documentation Center for the History of National Socialism, 2019); Maia Kobabe, author of *Gender Queer* (American Library Association Stonewall Book Award and Alex Award, 2020); and Mike Curato, author of *Flamer* (Lambda Literary Award, 2021).

5.      Comic artists, publishers and retailers are all subject to the requirements of House Bill 900 (the "Book Ban").

6.      Despite their accolades and obvious literary merit, all of the award-winning works listed above would likely be subject to restriction or removal under the definitions of "sexually relevant" and "sexually explicit" contained in the Book Ban.

7.      Determining where books may fall in light of these vague categories is not at all clear, especially in light of recent mischaracterizations of certain graphic novels as obscene,

pornographic, or otherwise "harmful to minors" despite the books' demonstrable and widely recognized artistic, meritorious, and serious value for minors.

8. *Maus*, for instance, is one of the most respected graphic works of our generation and a pillar of Holocaust studies. But it contains a single image of a partially nude woman. Under the Book Ban, that would appear to be enough to qualify as "sexually relevant" material, subject to restriction and parental approval. That single image could also lead to a total ban, depending on who is performing the multi-layered contextual analysis required by the Book Ban. Losing this important work in libraries and classrooms would be a detriment to Holocaust education and a disservice to those who attempt to keep its memory alive.

9. Similarly, the illustrated *Anne Frank's Diary: The Graphic Adaptation* could be subject to restriction or ban based on a brief description of male and female body parts. This work undoubtedly has societal valuable and clearly suitable for older students, but the Book Ban provides no mechanism for evaluating works based on their suitability for certain ages, nor does it allow for rating books on age-appropriate scale.

10. Should books like these be banned from public school libraries, Texas youth will not have available to them accurate and significant renditions of history that both help to educate about our past and help society not repeat grotesque wrongs, such as the Holocaust, in the future.

11. Many more works of equal merit are likely to be restricted or banned based on the Book Ban.

12. The public nature of the Book Ban's ratings could also have a stigmatizing effect on comic works, depressing the market for these works.

13.     For creators in the comic arts, these restrictions would substantially limit their ability to write freely on topics of their choosing and to have their work purchased by school districts and available to students.

14.     Retail members and publishers are also subject to the rating system through their sales to public schools. The Book Ban would force comic retailers to engage in compelled speech by rating books based on criteria with which they do not agree.

15.     These retailers would also be required to issue recalls for books that the State disfavors, forcing them to participate in the removal of important works from library shelves—a process with which they fundamentally disagree.

16.     If the Book Ban is allowed to take effect, it will unconstitutionally compel the speech of retailers and publishers, while chilling the speech of comic artists.

17.     I hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 24th day of July, 2023.

/s/ *Jeff Trexler*
Jeff Trexler

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

BOOK PEOPLE, INC., VBK, INC. d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND

## DEFENDANTS

MARTHA WONG, KEVEN ELLIS, MIKE MORATH

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Travis County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Laura Lee Prather, Catherine L. Robb, Michael J. Lambert, Reid Pillifant, Haynes and Boone, LLP, 600 Congress Ave., Suite 1300, Austin, TX 78701 (512) 867-8400

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| [ ] 140 Negotiable Instrument | Liability | [ ] 367 Health Care/ | | | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted | Liability | [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| Student Loans | [ ] 340 Marine | Injury Product | | New Drug Application | [ ] 470 Racketeer Influenced and |
| (Excludes Veterans) | [ ] 345 Marine Product | Liability | | [ ] 840 Trademark | Corrupt Organizations |
| [ ] 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | [ ] 371 Truth in Lending | Act | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | Product Liability | [ ] 380 Other Personal | [ ] 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal | Property Damage | Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury | [ ] 385 Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury - | Product Liability | [ ] 751 Family and Medical | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate | | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ | Sentence | | or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - | [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | [ ] 462 Naturalization Application | | Agency Decision |
| | [ ] 446 Amer. w/Disabilities - | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [x] 950 Constitutionality of |
| | Other | [ ] 550 Civil Rights | Actions | | State Statutes |
| | [ ] 448 Education | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause:
Civil rights action challenging the constitutionality of H.B. 900

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   Jul 25, 2023

SIGNATURE OF ATTORNEY OF RECORD   /s/ Laura Lee Prather

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.)**

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# Exhibit C: Transcript of August 31, 2023 Status Conference

<pre>
 1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
 2                     AUSTIN DIVISION

 3  BOOK PEOPLE, INC., ET AL ) Docket No. A 23-CA-858 ADA
                             )
 4  vs.                      ) Austin, Texas
                             )
 5  MARTHA WONG, IN HER      )
    OFFICIAL CAPACITY AS THE )
 6  CHAIR OF THE TEXAS STATE )
    LIBRARY AND ARCHIVES     )
 7  COMMISSION, ET AL        ) August 31, 2023

 8      TRANSCRIPT OF STATUS CONFERENCE VIA VIDEOCONFERENCE
             BEFORE THE HONORABLE ALAN D. ALBRIGHT
 9

10  APPEARANCES:

11  For the Plaintiff:      Mr. Michael J. Lambert
                            Mr. W. Reid Pillifant
12                          Ms. Laura L. Prather
                            Ms. Catherine L. Robb
13                          Haynes & Boone, LLP
                            600 Congress Avenue, Suite 1300
14                          Austin, Texas 78701

15

16  For the Defendant:      Ms. Amy E. Pletscher
                            Texas Attorney General's Office
17                          300 West 15th Street, 6th Floor
                            Austin, Texas 78711

18

19  Court Reporter:         Ms. Lily Iva Reznik, CRR, RMR
                            501 West 5th Street, Suite 4153
20                          Austin, Texas 78701
                            (512)391-8792

21

22

23

24

25  Proceedings reported by computerized stenography,
    transcript produced by computer-aided transcription.
</pre>

| 11:31:59 | 1 | THE COURT:  Good afternoon -- good morning, |
| 11:32:00 | 2 | everyone. |
| 11:32:01 | 3 | Jen, would you call the case, please. |
| 11:32:03 | 4 | THE CLERK:  Civil action in Case AU-23-CV-858, |
| 11:32:07 | 5 | BookPeople, Incorporated, Et Al vs. Martha Wong, Et Al. |
| 11:32:10 | 6 | Case called for a status conference. |
| 11:32:12 | 7 | THE COURT:  Could I have announcements from |
| 11:32:13 | 8 | counsel, please. |
| 11:32:18 | 9 | MS. PRATHER:  Your Honor, Laura Prather, Reid |
| 11:32:21 | 10 | Pillifant and Michael Lambert here on behalf of the |
| 11:32:23 | 11 | plaintiffs. |
| 11:32:23 | 12 | THE COURT:  Welcome. |
| 11:32:24 | 13 | MS. PLETSCHER:  Good morning, your Honor. |
| 11:32:25 | 14 | Amy Pletscher on behalf of defendants. |
| 11:32:27 | 15 | THE COURT:  I'd like to thank Lily for being here |
| 11:32:30 | 16 | as the court reporter helping us out. |
| 11:32:32 | 17 | So we are not going to be able to get an order |
| 11:32:38 | 18 | finalized until next week, hopefully by next week, within |
| 11:32:42 | 19 | two weeks for sure, but our goal is by the end of next |
| 11:32:45 | 20 | week.  But I wanted to let you all know that in the order, |
| 11:32:48 | 21 | we are going to find that the plaintiff has standing -- |
| 11:32:52 | 22 | plaintiffs have standing.  We're going to find that |
| 11:32:56 | 23 | sovereign immunity does not -- we're going to deny the |
| 11:32:58 | 24 | motion to dismiss with respect to sovereign immunity and |
| 11:33:00 | 25 | that we will be granting a -- an injunction. |

| | | |
|---|---|---|
| 11:33:04 | 1 | And so, I'll ask, Ms. Pletscher, my general take |
| 11:33:11 | 2 | from the two hearings we had was that there will be no |
| 11:33:18 | 3 | immediate impact on the state because of your contention |
| 11:33:22 | 4 | that it's not till April 1st that these folks have to turn |
| 11:33:26 | 5 | the lists in, right? |
| 11:33:28 | 6 | MS. PLETSCHER:  As far as an immediate impact, |
| 11:33:31 | 7 | your Honor, it is our position that that will impact the |
| 11:33:34 | 8 | portions of the statute that influence SBOE, TSLAC, and |
| 11:33:40 | 9 | TEA in their creation and implementation of their policies |
| 11:33:43 | 10 | that are needed to move the statute forward.  So I guess |
| 11:33:47 | 11 | we would just -- |
| 11:33:48 | 12 | THE COURT:  Well then, you actually did a better |
| 11:33:51 | 13 | job answering my question than I did asking it.  I am |
| 11:33:54 | 14 | enjoining any further action by the state.  I wasn't sure |
| 11:33:59 | 15 | -- my take was, there was no other action by the state but |
| 11:34:03 | 16 | whatever action there is, I'm enjoining.  There will be an |
| 11:34:07 | 17 | order out within a week or two to that effect setting out |
| 11:34:11 | 18 | the reasons why.  And for Ms. Prather's clients' concerns |
| 11:34:16 | 19 | under my order, they have no obligation to comply with the |
| 11:34:19 | 20 | state law. |
| 11:34:20 | 21 | So that takes care -- I'll come back to you in |
| 11:34:23 | 22 | just a second, Ms. Pletscher. |
| 11:34:26 | 23 | With regard to Ms. Prather, is there anything |
| 11:34:28 | 24 | else you need me -- I'm sorry we can't get an order out. |
| 11:34:31 | 25 | I think it's better to have an order that I assume the |

| | | |
|---|---|---|
| 11:34:34 | 1 | state's going to want to take this up and, you know, we |
| 11:34:37 | 2 | wanted it to be as fulsome as possible.  That being said, |
| 11:34:41 | 3 | is there anything else you feel I need to do today to give |
| 11:34:47 | 4 | relief to your clients other than what I've done? |
| 11:34:52 | 5 | MS. PRATHER:  Your Honor, I think that what |
| 11:34:53 | 6 | you've done is sufficient if you felt like you needed to |
| 11:34:57 | 7 | enter a one-line temporary restraining order just to |
| 11:35:00 | 8 | ensure that something was in writing, you could do that, |
| 11:35:03 | 9 | as well. |
| 11:35:03 | 10 | THE COURT:  I don't know Ms. Pletscher well, but |
| 11:35:06 | 11 | I get the impression that me articulating this at a |
| 11:35:09 | 12 | hearing is sufficient for her and the state.  And so, I |
| 11:35:14 | 13 | tend not to feel like I need a belt and suspender -- I'm |
| 11:35:19 | 14 | old-fashioned enough that I feel like if a judge orders |
| 11:35:22 | 15 | something that that tends to be enough.  And I'm going to |
| 11:35:26 | 16 | give Ms. Pletscher the credit of not feeling like she |
| 11:35:29 | 17 | could say, oh, but he didn't put it in writing. |
| 11:35:34 | 18 | So is there anything else -- I'm more concerned |
| 11:35:37 | 19 | -- less with the procedural of how it's done than if I |
| 11:35:42 | 20 | said -- if I granted all the injunctive relief you think |
| 11:35:46 | 21 | you need to have temporarily until we get the order out. |
| 11:35:51 | 22 | MS. PRATHER:  Yes, your Honor. |
| 11:35:52 | 23 | THE COURT:  Now, from Ms. Pletscher, is there |
| 11:35:55 | 24 | anything you need to ask me about the injun -- because |
| 11:35:59 | 25 | there may be effects I'm not fully conversant with on the |

| 11:36:03 | 1 | state, if there's anything you want to articulate and have |
| 11:36:06 | 2 | me clarify to the extent I can orally before we get you |
| 11:36:09 | 3 | the order, I'm happy to take that up. |
| 11:36:12 | 4 | MS. PLETSCHER: Thank you, your Honor. |
| 11:36:12 | 5 | So just to clarify, you are enjoining the statute |
| 11:36:15 | 6 | in its totality, correct, so not parsing out? |
| 11:36:18 | 7 | THE COURT: (Moving head up and down.) |
| 11:36:19 | 8 | MS. PLETSCHER: Okay. And then, also, your |
| 11:36:21 | 9 | Honor -- |
| 11:36:21 | 10 | THE COURT: Let me say on the record, I shook my |
| 11:36:24 | 11 | head yes, which is a bad thing. Yes on the record. |
| 11:36:28 | 12 | MS. PLETSCHER: Thank you, your Honor. |
| 11:36:28 | 13 | THE COURT: Lily may have gotten that, but let me |
| 11:36:30 | 14 | go ahead and the answer is yes on the record. |
| 11:36:33 | 15 | MS. PLETSCHER: And then, your Honor, just to |
| 11:36:35 | 16 | kind of follow up on that, we do intend to appeal any |
| 11:36:39 | 17 | granting of an injunction, and as such, we would, of |
| 11:36:42 | 18 | course, be seeking a stay of the injunction. If your |
| 11:36:45 | 19 | Honor's not so inclined to grant the stay of injunction |
| 11:36:48 | 20 | pending our appeal, would your Honor be amenable to |
| 11:36:54 | 21 | clearly articulating in your order that you are not |
| 11:36:57 | 22 | granting a stay of the injunction pending appeal? |
| 11:37:00 | 23 | THE COURT: So why don't we do it this way. I |
| 11:37:03 | 24 | think this is the first injunction hearing I've had so -- |
| 11:37:07 | 25 | it's the first one I've granted at least. And so, to make |

| | | |
|---|---|---|
| 11:37:10 | 1 | sure I'm doing it -- because I want to protect your |
| 11:37:13 | 2 | rights, as well.  If you want to go ahead since I am not |
| 11:37:18 | 3 | in writing but order -- doing it now, if you want to go |
| 11:37:21 | 4 | ahead and make the motion for me to stay it and I will -- |
| 11:37:25 | 5 | and I will deny it now, then we'll also include it in the |
| 11:37:28 | 6 | order if that protects you on appeal. |
| 11:37:30 | 7 | MS. PLETSCHER:  Okay.  And there may be a written |
| 11:37:35 | 8 | motion to stay forthcoming, as well, but I just wanted to |
| 11:37:38 | 9 | mention that is on the record. |
| 11:37:39 | 10 | THE COURT:  That's fine. |
| 11:37:41 | 11 | MS. PLETSCHER:  Okay. |
| 11:37:42 | 12 | THE COURT:  We're doing the best we -- you know. |
| 11:37:44 | 13 | MS. PLETSCHER:  Sure. |
| 11:37:44 | 14 | THE COURT:  We couldn't get an order out with my |
| 11:37:48 | 15 | schedule.  And obviously I think it protects the parties |
| 11:37:51 | 16 | much better on the appeal for us to have articulated the |
| 11:37:55 | 17 | reasons, you know, we're denying your motion.  But let me |
| 11:37:59 | 18 | just -- this is for both sides.  I have no ego here. |
| 11:38:04 | 19 | Whatever you all need to do to protect your clients' |
| 11:38:07 | 20 | interests, you know, I don't get offended when -- I've had |
| 11:38:12 | 21 | -- you know, you may have heard, I've had a mandamus or |
| 11:38:15 | 22 | two.  I'm sort of past the point of being, you know -- I'm |
| 11:38:19 | 23 | okay with the fact that people have to protect their |
| 11:38:22 | 24 | rights on appeal. |
| 11:38:23 | 25 | Whatever it is you each need to do, that's fine |

| | | |
|---|---|---|
| 11:38:27 | 1 | with me.  And if there's anything we can do procedurally |
| 11:38:30 | 2 | to help one side or the other protect their rights, just |
| 11:38:33 | 3 | let us know and that's my intent. |
| 11:38:36 | 4 | So is there anything else on behalf of the state |
| 11:38:40 | 5 | you'd like to ask me to do or articulate? |
| 11:38:43 | 6 | MS. PLETSCHER:  No.  Thank you, your Honor. |
| 11:38:45 | 7 | THE COURT:  Okay.  Well, like I said, we intend |
| 11:38:48 | 8 | to have this out, you know, if we can, by the end of next |
| 11:38:52 | 9 | week.  It will be very shortly after that, if not -- and |
| 11:38:58 | 10 | then, you all can do whatever you want to with it. |
| 11:39:01 | 11 | So have a good -- I don't mean to say -- but go |
| 11:39:06 | 12 | ahead and have a good weekend.  It's a holiday weekend and |
| 11:39:09 | 13 | then, you could take battling over this again when we get |
| 11:39:12 | 14 | the order out.  Take care. |
| 11:39:13 | 15 | MS. PLETSCHER:  Thank you, your Honor. |
| 11:39:14 | 16 | MS. PRATHER:  Thanks, your Honor. |
| | 17 | (Proceedings concluded.) |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
 1                        *  *  *  *  *  *

 2

 3   UNITED STATES DISTRICT COURT  )

 4   WESTERN DISTRICT OF TEXAS       )

 5

 6      I, LILY I. REZNIK, Certified Realtime Reporter,

 7   Registered Merit Reporter, in my capacity as Official

 8   Court Reporter of the United States District Court,

 9   Western District of Texas, do certify that the foregoing

10   is a correct transcript from the record of proceedings in

11   the above-entitled matter.

12      I certify that the transcript fees and format comply

13   with those prescribed by the Court and Judicial Conference

14   of the United States.

15      WITNESS MY OFFICIAL HAND this the 1st day of September,

16   2023.

17                           Lily Iva Reznik

18                           ~~~~~~~~~~~~~~~~~~~~~~~~
                             LILY I. REZNIK, CRR, RMR
19                           Official Court Reporter
                             United States District Court
20                           Austin Division
                             501 West 5th Street,
21                           Suite 4153
                             Austin, Texas 78701
22                           (512)391-8792
                             SOT Certification No. 4481
23                           Expires: 1-31-25

24

25
```

**Exhibit D: Defendant's Motion for Stay of Proceedings Pending Appeal (ECF 37)**

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| Book People, Inc., VBK, Inc., American Booksellers Association, Association of American Publishers, Authors Guild, Inc., Comic Book Legal Defense Fund<br>    *Plaintiffs*,<br><br>v.<br><br>Martha Wong, Keven Ellis, Mike Morath,<br>    *Defendants.* | Civil No.<br>AU: 23-CV-00858-ADA |

---

### Defendants' Motion for Stay of Proceedings Pending Appeal

---

Defendants Martha Wong, in her official capacity as Chair of the Texas State Library and Archives Commission, Keven Ellis, in his official capacity as Chair of the Texas State Board of Education, and Mike Morath, in his official capacity as Commissioner of the Texas Education Agency (collectively, "Defendants") file this Motion to Stay Proceedings Pending Appeal pursuant to Federal Rule of Appellate Procedure 8(a)(1)(A).

### INTRODUCTION

In bifurcated proceedings on August 18th and August 23rd, 2023, this Court considered Defendants' Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and Plaintiffs' Motion for Preliminary Injunction. ECF No. 19; ECF No. 6.

At a scheduling conference on August 31, 2023, the Court subsequently made oral bench rulings denying Defendants' Motion to Dismiss and granting Plaintiffs' Motion for Preliminary Injunction. The Court further expressed its intent to enjoin HB 900 (hereinafter, "READER") in its entirety. Defendants subsequently indicated their intent to appeal the granting of a preliminary injunction, and orally requested the injunction be stayed pending appeal, which the Court denied. The Court indicated that its oral bench rulings would be accompanied by a forthcoming written order.

In an abundance of caution and because no written order has yet issued, Defendants file this Motion to Stay to ensure compliance with <u>Federal Rule of Appellate Procedure 8(a)(1)(A)</u> (requiring that "[a] party must ordinarily move first in the district court" for "a stay of the judgment or order of a district court pending appeal"). Given the impact that this order will have on Texas public schools, Texas public school children, and multiple state entities, Defendants respectfully request a stay of the injunction until the matter is resolved by the Fifth Circuit. At a minimum, any order enjoining READER in its *entirety* should specifically be stayed pending appeal, because any injunction that enjoins READER's provisions covering the promulgation of new library-collection standards for Texas school districts improperly extends far beyond the relief required to redress alleged injuries of the library-material vendor Plaintiffs in this case.

## LEGAL STANDARD

"A party must ordinarily move first in the district court for…a stay of the judgment or order of a district court pending appeal." Fed. R. App. P. 8(a)(1)(A). A stay pending appeal maintains the status quo to allow appellate courts to bring "considered judgment" to a case. *Texas All. For Retired Americans v. Hughs*, 976 F.3d 564, 566 (5th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 427, 429 (2009)). When considering a stay pending appeal, the Fifth Circuit considers the following four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (quoting *Nken*, 556 U.S. at 426,); *see also Hughs*, 976 F.3d 564 at 566. The first two factors, namely whether the appellant is likely to succeed on the merits and whether the appellant to suffer irreparable harm, are often the "most critical." *See Hughs*, 976 F.3d 564 at 566 (quoting *Nken,* 556 U.S. at 434). But where the "balance of the equities weighs *heavily* in favor of granting the stay," only a "serious legal question" is required. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 397 (5th Cir. 2020). Each of the foregoing factors weighs heavily in favor of Defendants, and thus the Court should grant a stay pending the decision of the Circuit Court.

## ARGUMENT

**A. Defendants are likely to succeed on appeal because this Court lacks subject-matter jurisdiction and the challenged provisions are constitutional.**

**1.** Defendants are likely to show this Court lacked subject-matter jurisdiction over Plaintiffs' claims, as explained in Defendants' Motion to Dismiss. ECF No. 19 at 6–15. Plaintiffs have not made the "clear showing" of standing necessary to obtain a preliminary injunction. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). But perhaps even more importantly, Defendants are entitled to sovereign immunity. Plaintiffs have not shown the requisite "connection" to any non-discretionary "enforcement" of READER by the Defendant state-agency heads in this case. *City of Austin v. Paxton*, 943 F.3d 993, 999-1000 (5th Cir. 2019). The Fifth Circuit has repeatedly and recently upheld state officials' sovereign immunity against challenges that do little more than blame the official for seeing that the State's laws are followed—even in the First Amendment context. *See, e.g.*, *Ostrewich v. Tatum*, 72 F.4th 94, 100 (5th Cir. 2023); ECF No. 19 at 11–13 (citing cases).

Any injunction as to READER in its *entirety* is also impermissibly overbroad. An injunction is "overbroad if it is not narrowly tailor[ed] ... to remedy the specific action which gives rise to the order as determined by the substantive law at issue." *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016). Additionally, "[i]njunctions must be narrowly tailored within the context of the substantive law at issue to address the specific relief sought." *E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021). Plaintiffs' requested statewide preliminary injunction focuses on the alleged irreparable harms

of requiring vendors to generate book ratings by April 1, 2024. ECF No. 6 at 13–26. That relief does not require enjoining READER's other provisions addressed to school districts or state agencies.

**2.** As outlined in Defendants' Motion to Dismiss, Plaintiffs' First Amendment rights are not implicated by READER taking effect. ECF No. 19 at 16–33. The devising and implementation of public-school library policy is government speech, *Id*. at 16–19, a public-school library is a nonpublic forum in which Plaintiffs have no First Amendment rights, *Id*. at 19–22, and compelled speech is not at issue, *Id*. at 24–27. At most, the disputed ratings concern commercial speech, and READER withstands the respective intermediate scrutiny analysis that might apply. ECF No. 19 at 24–26.

Further, even if READER *does* implicate Plaintiffs' speech, READER does not violate the First Amendment. READER is not vague as applied to Plaintiffs, *Id*. at 27–29, is not overbroad, *Id*. at 31–32, does not constitute an unconstitutional prior restraint or delegation, *Id*. at 29–30; 33, and is otherwise not facially invalid. *Id*. at 30–31. Because READER does not want for constitutionality, and given the wide authority and discretion conferred in local and state entities and officials regarding the creation and implementation of educational policy in Texas public schools, *see* Tex. Educ. Code §7.102; Tex. Educ. Code §33.021; *see also Chiras v. Miller*, 432 F.3d 606, 608 (5th Cir. 2005); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988), Defendants are likely to succeed on appeal.

Moreover, each of these issues poses a "serious legal question" about the First Amendment. *Tex. Democratic Party*, 961 F.3d 389, 397 (5th Cir. 2020). That is all that is required where, as explained below, the equities heavily favor a stay. *See id.*

**B. Defendants, along with the entire Texas public school system, will be irreparably harmed by the enforcement of the Court's order.**

The second factor, whether the appellant will be irreparably injured if the injunction is not stayed, weighs heavily in favor of Defendants. States enjoined from giving effect to their statutes generally suffer a form of automatic irreparable injury. *E.g.*, *Vote.org v. Callanen*, 39 F.4th 297, 308 (5th Cir. 2022). "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,* 734 F.3d 406, 419 (5th Cir.2013); *see also Veasey v. Perry,* 769 F.3d 890, 895 (5th Cir. 2014); *Texas All. for Retired Americans v. Hughs*, 976 F.3d 564, 569 (5th Cir. 2020). And applied to the context of a school year which has already begun, Defendants, the Texas public school system, and the children it educates would most certainly be irreparably harmed if they are unable to implement READER.

Separate and apart from the requirements or obligations of Plaintiffs, READER requires *immediate* action from several state entities. Tex. Educ. Code §33.021; Tex. Educ. Code Ch. 35, Sec. 4. Specifically, it requires TSLAC, in consultation with SBOE, to devise and adopt standards for school library services in regard to the implementation of READER. Tex. Educ. Code §33.021(b–d). This must be complete by January 1, 2024. Tex. Educ. Code Ch. 35, Sec. 4. Meeting that *future* deadline is

an arduous task that requires significant *present* action: First, TSLAC must meet and consider standards for proposal. Second, TSLAC's proposed standards must be filed with the Texas Register. Third, SBOE must meet to vote on the proposed standards. SBOE only meets a few times a year, and the only remaining meeting prior to the January 1, 2024 deadline is November 14, 2023. Assuming SBOE approves the proposed standards, they must then be published in the Texas Register for a period of 30 days to allow for public comment. Finally, TSLAC must meet again to formally adopt the standards. Although Plaintiffs are not formally affected by any requirements of READER until April 1, 2024, none of the front-end, internal policy-making requirements of the state can take place with an order enjoining READER in place. Additionally, enjoinment of READER robs vendors of likely needed preparatory time to rate their books and prepare their lists. If and when the injunction is stayed, everyone— Plaintiffs as well as state entities— will be irreparably harmed by having less time to comply with the statutory deadlines.

Most importantly, Texas public school children will be harmed by enforcement of the Court's order. States have the "high responsibility for education of its citizen," which includes the obligations to set standards for what children learn in school and to protect parents' right to protect their children from inappropriate material. *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972). Texans, by and through the state legislature, have indicated that it is of the utmost importance to regulate the material they are exposed to in public school libraries. The Court's Order denies them the ability to exercise these values, and subsequently the planned and anticipated

safeguards will likely not be in place for the 2023–2024 school year. Texas experiences irreparable harm every day that its law is enjoined. *See, e.g.*, *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017).

**C. Plaintiffs will not be injured by a stay of the injunction.**

Plaintiffs will not be harmed by a stay of the injunction. Given that Plaintiffs need not issue any ratings until April 2024, a stay will not "substantially injure" Plaintiffs. *Nken*, 556 U.S. at 426. To the contrary, in the event the Fifth Circuit overturns the injunction and a stay had *not* been in place, Plaintiffs will suffer *more* harm than if a stay *had been* in place. If this Court fails to issue a stay pending appeal but the Fifth Circuit does, it would only cause Plaintiffs to have even *less time* to comply with their April 1, 2024 deadline. Indeed, depending on the pace of Fifth Circuit proceedings, Plaintiffs' position means they may forego the ability to compete as a potential vendor for the 2023–2024 school year altogether.

Plaintiffs will likely argue that they will be harmed by a stay, as it would "force" them to use time and resources to rate books and prepare a list that would be unneeded if the Fifth Circuit upholds the District Court's Order. That argument fails, however, because Plaintiffs do not have any guarantee that any school district will ultimately buy any books from them, at all. More importantly, if— as Plaintiffs themselves have alleged— the anticipation of READER has already caused school districts to pause book purchases, ECF No. 1 at 13, Plaintiffs adduced no evidence that any school district will sua sponte resume purchasing until the appeal is settled

by the Fifth Circuit. It is implausible that school districts would voluntarily bear the risk of Plaintiffs' loss on appeal.

**D. The public interest is in protecting children.**

The last factor, that the public interest is best served by a stay of a judgment, also weighs in favor of Defendants. "When 'the State is the appealing party, its interest and [aforementioned] harm merge with that of the public.'" *Hughs*, 976 F.3d 564 at 569 (quoting *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017)). This notion, put in the context of protecting children from exposure to inappropriate reading material in public school, makes perfect sense. For every Texan— regardless of whether they utilize the public school system or not— trust in a public-school education and in the educational policies of Texas is of the utmost importance, as Texas children are the future of Texas.

PRAYER

Defendants request that the Court's Order granting Plaintiffs' Motion for Preliminary Injunction be stayed pending appeal. Such an injunction will do irreparable harm to the State and its public-school children, and a stay would not substantially harm the Plaintiffs in this case. In addition, Defendants' showing of the likelihood of success on the merits, the balance of the equities, and compelling public interest show that a stay is warranted. Given that the equitable balance heavily favors the State, enjoining READER would indisputably pose serious legal questions about the First Amendment, and that is sufficient to justify a stay.

Respectfully submitted.

**ANGELA COLMENERO**
Provisional Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**JAMES LLOYD**
Acting Deputy Attorney General for Civil
Litigation

**KIMBERLY GDULA**
Deputy Chief, General Litigation Division

**RYAN KERCHER**
Deputy Chief, General Litigation Division

*/s/ Christina Cella*
**CHRISTINA CELLA**
Assistant Attorney General
Texas State Bar No. 24106199
Telephone: (512) 475-2952
Christina.Cella@oag.texas.gov

**AMY PLETSCHER**
Assistant Attorney General
Texas State Bar No. 24113663
Telephone: (512) 936-0927
Amy.Pletscher@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**ATTORNEYS FOR DEFENDANT**S

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2023, a true and correct copy of the foregoing document was served on all counsels of record.

/s/ Christina Cella
CHRISTINA CELLA
Assistant Attorney General
Texas State Bar No. 24106199

# Exhibit E: Transcript of September 11, 2023 Motions Hearing

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                            WACO DIVISION

 3    BOOK PEOPLE, INC., ET AL*
                           *      September 11, 2023
 4    VS.                  *
                           * CIVIL ACTION NO. 1:23-CV-858
 5    MARTHA WONG, ET AL    *

 6            BEFORE THE HONORABLE ALAN D ALBRIGHT
                    MOTIONS HEARING (via Zoom)
 7
      APPEARANCES:
 8
      For the Plaintiff:  Laura Lee Prather, Esq.
 9                        Michael Joseph Lambert, Esq.
                          William Reid Pillifant, Esq.
10                        Haynes and Boone, LLP
                          600 Congress Ave., Suite 1300
11                        Austin, TX 78701

12    For the Defendant:  Christina Cella, Esq.
                          Amy Elizabeth Pletscher, Esq.
13                        Office of the Attorney General
                           of Texas
14                        PO Box 12548
                          Capitol Station
15                        Austin, TX 78701

16    Court Reporter:     Kristie M. Davis, CRR, RMR
                          PO Box 20994
17                        Waco, Texas 76702-0994
                          (254) 340-6114
18

19      Proceedings recorded by mechanical stenography,

20    transcript produced by computer-aided transcription.

21

22

23

24

25
```

| | | |
|---|---|---|
| 03:00 | 1 | (Hearing begins.) |
| 03:00 | 2 | DEPUTY CLERK:  A civil action in Case |
| 03:00 | 3 | 1:23-CV-858, Book People, Inc., et al., versus Martha |
| 03:00 | 4 | Wong, et al.  Case called for a motions hearing. |
| 03:00 | 5 | THE COURT:  Ms. Prather, announcements |
| 03:01 | 6 | from counsel? |
| 03:01 | 7 | MS. PRATHER:  Good afternoon, Your Honor. |
| 03:01 | 8 | Laura Prather here along with Michael Lambert and Reid |
| 03:01 | 9 | Pillifant on behalf of the plaintiffs. |
| 03:01 | 10 | THE COURT:  Welcome. |
| 03:01 | 11 | MS. CELLA:  Good afternoon, Your Honor. |
| 03:01 | 12 | Christina Cella and Amy Pletscher on behalf of the |
| 03:01 | 13 | defendants.  And a few of my clients are on the call as |
| 03:01 | 14 | well. |
| 03:01 | 15 | THE COURT:  Well, welcome to them as |
| 03:01 | 16 | well. |
| 03:01 | 17 | I'm not sure which of you to start with |
| 03:01 | 18 | today, but I think I'll probably start with you, |
| 03:01 | 19 | Ms. Cella, because the purpose of today's hearing is to |
| 03:01 | 20 | deal with your concerns that what I did orally -- and |
| 03:01 | 21 | we're going to get the order in this week, so that's |
| 03:01 | 22 | going to be -- that part of it will be taken care of -- |
| 03:01 | 23 | but the -- your concern about the breadth of the |
| 03:01 | 24 | injunction. |
| 03:01 | 25 | And so why don't you give me an idea, on |

03:01    1    the record, of what you believe should be excluded from

03:02    2    the order assuming it's consistent with the idea that I

03:02    3    don't believe that it is constitutional for the State

03:02    4    to be imposing the burdens that they are on the

03:02    5    plaintiffs and third parties.

03:02    6          But if there are -- I don't mean to be

03:02    7    (inaudible) when I say "bureaucratic."  If there are

03:02    8    things that are -- that need to be done by the TEA or

03:02    9    by some state agency that don't impose a burden on the

03:02   10    plaintiffs, that's really what I'm hoping you can set

03:02   11    out for me so I can -- I definitely want to tailor the

03:02   12    injunction in a way to only have it apply to protect

03:02   13    the plaintiffs.

03:02   14          But of course, I'll hear their point of

03:02   15    view after you chat.

03:02   16          MS. CELLA:  Thank you, Your Honor.

03:02   17          Yes.  So as you're aware, we don't think

03:02   18    any of it should be enjoined.  But as it pertains only

03:02   19    to the state agencies' portion, there are specific

03:03   20    timelines that the state agencies, mainly TSLAC on the

03:03   21    forefront and then the State Board of Education on the

03:03   22    back end of that, but TSLAC needs to consider standards

03:03   23    for a proposal standards and guidelines.

03:03   24          Some of that relates to books being rated

03:03   25    as sexually explicit, but some of it just has to do

03:03    1    with overall standards.

03:03    2            And as you're, I'm sure, aware of the

03:03    3    administrative procedure, proposed rules need to be

03:03    4    published in the Texas Register, and then TSLAC needs

03:03    5    to propose these standards as well to the State Board

03:03    6    of Education.  And things just need to be approved on

03:03    7    the State end that don't entirely involve the

03:03    8    plaintiffs' rating of books.

03:03    9            THE COURT:  Well, let me amend -- let me

03:03    10    try and make sure I understand.  Again, the line I

03:03    11    see -- and I'll hear from Ms. Prather because I may not

03:04    12    have it completely right.

03:04    13            But the way I see the line is

03:04    14    administrative actions that you need to take -- that

03:04    15    the State needs to take that have no impact on the

03:04    16    plaintiffs, I'm probably -- I'm considering allowing

03:04    17    those to continue, you know, where the plaintiff can't

03:04    18    show any harm or potential prejudice.

03:04    19            And so can you -- as best you can, if you

03:04    20    identify specifically maybe from the statute itself.

03:04    21    And so what -- if you could help me out by telling me

03:04    22    exactly what it is that you want me not to enjoin and

03:04    23    that way Ms. Prather can tell me what she thinks about

03:04    24    that.

03:04    25            MS. CELLA:  Do you want the specific

-5-

| | | |
|---|---|---|
| 03:04 | 1 | section numbers, or how do you want me to go through? |
| 03:05 | 2 | THE COURT:  I think that'd be the best |
| 03:05 | 3 | way so there's no -- if you tell me the specific |
| 03:05 | 4 | section numbers, then we can identify those in the |
| 03:05 | 5 | order either -- I guess maybe the injunction does not |
| 03:05 | 6 | cover this type of thing or whatever. |
| 03:05 | 7 | And also, that'll help Ms. Prather |
| 03:05 | 8 | identify specifically what she needs to respond to |
| 03:05 | 9 | about why, in her opinion, if she has an opinion, they |
| 03:05 | 10 | would be included in the injunction. |
| 03:05 | 11 | MS. CELLA:  Okay.  So I don't have -- you |
| 03:05 | 12 | know, I have the bill in front of me and I know what it |
| 03:05 | 13 | says.  I don't have the specific section numbers off |
| 03:05 | 14 | the top of my head that would pertain to my clients.  I |
| 03:05 | 15 | can either send that to you after this in a quick -- |
| 03:05 | 16 | THE COURT:  Okay.  Let's do this then. |
| 03:05 | 17 | Why don't you run through with as much specificity as |
| 03:05 | 18 | you can the -- I always say buckets -- the specific |
| 03:05 | 19 | State action -- the specific procedures you would like |
| 03:05 | 20 | the State to be allowed to continue to take because, in |
| 03:06 | 21 | your opinion, they don't prejudice the plaintiff by me |
| 03:06 | 22 | allowing you to continue doing. |
| 03:06 | 23 | And then I think it -- then I'm perfectly |
| 03:06 | 24 | fine with you sending Ms. Prather and the Court a list |
| 03:06 | 25 | of specifically which sections those are identified in. |

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
| 03:06 | 1  | MS. CELLA:  Sure.                                         |
| 03:06 | 2  | So it is mainly the -- and again, I don't                |
| 03:06 | 3  | want to keep harping on this, but we don't think any of  |
| 03:06 | 4  | it should be enjoined.                                    |
| 03:06 | 5  | But the portions that pertain                            |
| 03:06 | 6  | specifically to the State are the guidelines that TSLAC  |
| 03:06 | 7  | needs to develop and then the State Board of Education   |
| 03:06 | 8  | needs to approve or not approve.  But those come up for  |
| 03:06 | 9  | vote by the State Board, but TSLAC does develop them.    |
| 03:06 | 10 | And I don't think that that would prejudice the          |
| 03:06 | 11 | plaintiffs in any way.                                    |
| 03:06 | 12 | THE COURT:  Ms. Prather, do you have a                   |
| 03:06 | 13 | response to that?                                         |
| 03:06 | 14 | MS. PRATHER:  Yes, Your Honor.  I do.                    |
| 03:06 | 15 | We actually believe very strongly that                   |
| 03:07 | 16 | the bill in its entirety needs to be enjoined.  And      |
| 03:07 | 17 | really, there's three reasons for that.                  |
| 03:07 | 18 | We sought the injunction of HB 900 in its                |
| 03:07 | 19 | entirety because the unconstitutional definitions that   |
| 03:07 | 20 | have been discussed at the prior hearings permeate the   |
| 03:07 | 21 | statute.  And in fact, the very beginning of the         |
| 03:07 | 22 | library standards section, which is the section that     |
| 03:07 | 23 | opposing counsel is focusing on not being stayed, is     |
| 03:07 | 24 | the definition of sexually explicit material.  That's    |
| 03:07 | 25 | in 33.021(a).                                             |

| | | |
|---|---|---|
| 03:07 | 1 | And that right there is one of the big |
| 03:07 | 2 | discussion points that we've had about the |
| 03:07 | 3 | unconstitutionally vague and overbroad definitions. |
| 03:07 | 4 | We also -- and I'll go into more detail, |
| 03:07 | 5 | but three basic things. |
| 03:07 | 6 | One, these unconstitutional definitions |
| 03:07 | 7 | permeate the statute. |
| 03:08 | 8 | Two, all of HB 900 is linked such that a |
| 03:08 | 9 | partial injunction would actually invade the |
| 03:08 | 10 | legislative process. |
| 03:08 | 11 | Here, the legislature did not include a |
| 03:08 | 12 | severability provision.  They do that all the time. |
| 03:08 | 13 | They did it in more than 500 bills this session they |
| 03:08 | 14 | didn't hear, which then implies that there should be no |
| 03:08 | 15 | severability. |
| 03:08 | 16 | And, third, because the preliminary |
| 03:08 | 17 | injunction, the purpose is to maintain the status quo, |
| 03:08 | 18 | there already are library standards on the books. |
| 03:08 | 19 | Those library standards have been in place for decades. |
| 03:08 | 20 | They were most recently amended five years ago, and |
| 03:08 | 21 | those library standards can continue to be used while |
| 03:08 | 22 | this case is apparently going to be taken up to the |
| 03:08 | 23 | Fifth Circuit. |
| 03:08 | 24 | Now, I would like to go into a little |
| 03:08 | 25 | more detail on each of those points if it's okay, Your |

| | | |
|---|---|---|
| 03:08 | 1 | Honor? |
| 03:09 | 2 | THE COURT:  Yes, please. |
| 03:09 | 3 | MS. PRATHER:  So as I said, we sought in |
| 03:09 | 4 | our pleadings a stay in its entirety.  We did that with |
| 03:09 | 5 | the pleadings and we did that with the selection of the |
| 03:09 | 6 | defendants. |
| 03:09 | 7 | As you saw, we included as a defendant |
| 03:09 | 8 | the TSLAC commissioner and the Texas Board of Education |
| 03:09 | 9 | chair in part because of their role in developing the |
| 03:09 | 10 | library standards. |
| 03:09 | 11 | In addition, under this bill, the |
| 03:09 | 12 | development of those library standards, the library |
| 03:09 | 13 | collection development, under 33.021 are mandatory. |
| 03:09 | 14 | Those are mandatory provisions that they would be |
| 03:09 | 15 | issuing now while you'd have a preliminary injunction |
| 03:09 | 16 | in place requiring school districts to adhere. |
| 03:09 | 17 | So 33.021(a) has that constitutionally |
| 03:09 | 18 | infirm definition of sexually explicit; 33.021(b) says |
| 03:10 | 19 | that:  The standards that are going to be developed by |
| 03:10 | 20 | TSLAC are mandatory; (c) says requires that the school |
| 03:10 | 21 | districts shall adhere to these standards; and (d) sets |
| 03:10 | 22 | forth what must be included in these standards.  And in |
| 03:10 | 23 | what must be included in these standards are the |
| 03:10 | 24 | constitutionally infirm issues. |
| 03:10 | 25 | And so by allowing them to go forward |

9

03:10    1    with the standards, you're basically eviscerating the

03:10    2    preliminary injunction that you would be putting in

03:10    3    place.

03:10    4              The standards would immediately impact

03:10    5    the possession of books in the library.  So it's not

03:10    6    just ratings.  It talks about, under this policy, it

03:10    7    would prohibit the possession.  So you'd have books

03:10    8    taken off the shelf, existing books taken off the

03:10    9    shelves.  It would -- prohibits possession,

03:11   10    acquisition, and purchase.

03:11   11              So it directly impacts our clients and it

03:11   12    directly impacts the First Amendment protections that

03:11   13    they are protecting not just for themselves but for

03:11   14    students to have access to information.

03:11   15              This is not dealing with curriculum.

03:11   16    This is dealing with library collection standards, and

03:11   17    those collection standards have to have constitutional

03:11   18    protections in place.  That is what the U.S. Supreme

03:11   19    Court has said.

03:11   20              When you look again at that sexually

03:11   21    explicit definition which appears at the very beginning

03:11   22    of the library standards section, that definition is in

03:11   23    the statute more than ten different times.  It

03:11   24    permeates the entire statute.

03:11   25              And if you impose these library

| 03:11 | 1 | standards -- which by the way, I think I heard at the |
| 03:11 | 2 | prior hearings nothing needs to be done until |
| 03:11 | 3 | April 1st.  These libraries standards have already been |
| 03:12 | 4 | drafted.  The day of our last hearing, the committee |
| 03:12 | 5 | that is considering these standards was looking at a |
| 03:12 | 6 | draft of these standards two hours before our hearing. |
| 03:12 | 7 | So don't think this hasn't already been |
| 03:12 | 8 | done.  It has already been done, and it's just not been |
| 03:12 | 9 | mentioned to the Court. |
| 03:12 | 10 | But the imposition of these standards, |
| 03:12 | 11 | once they are imposed, is going to function as an |
| 03:12 | 12 | unconstitutional prior restraint because you will end |
| 03:12 | 13 | up having books removed from public school libraries |
| 03:12 | 14 | based upon these standards without any form of judicial |
| 03:12 | 15 | review. |
| 03:12 | 16 | And that, Your Honor, under the Bantam |
| 03:12 | 17 | Books case is something that is unconstitutional.  It |
| 03:12 | 18 | falls short of the constitutional requirements for the |
| 03:12 | 19 | government regulation of obscenity because it reaches, |
| 03:12 | 20 | in this case, as we've already demonstrated, |
| 03:12 | 21 | constitutionally protected works. |
| 03:13 | 22 | That's the first reason not to allow a |
| 03:13 | 23 | partial preliminary injunction. |
| 03:13 | 24 | The second reason is because everything |
| 03:13 | 25 | is intertwined in this bill and that means that it's |

— 11 —

03:13 1  not readily susceptible to any sort of partial

03:13 2  injunction.

03:13 3           As I mentioned, we end up having a

03:13 4  situation here where what is being asked of you is to

03:13 5  rewrite the law to try to conform it to constitutional

03:13 6  requirements.  And that is actually an invasion of the

03:13 7  legislative process.  Under U.S. versus Stevens, that

03:13 8  is not permissible.

03:13 9           There is a provision in here that I want

03:13 10 to flag as well for the Court that is not in the

03:13 11 library standards section that is sort of a "one man

03:13 12 trumps all" provision.

03:13 13          If you look at Section 35.007, in that

03:13 14 provision, it allows the TEA commissioner to adopt

03:14 15 rules as necessary to administer the chapter.  It's a

03:14 16 very broad right that it allows the TEA commissioner to

03:14 17 have.

03:14 18          So, again, if the Court just enjoins part

03:14 19 of the statute, it would open the door for the

03:14 20 commissioner to basically circumvent the injunction

03:14 21 through 35.007, which would defeat the purpose of

03:14 22 enjoining the law to begin with.

03:14 23          The failure to include a severability

03:14 24 clause by the legislature, this is not an oversight.

03:14 25 This was an intentional choice.

| 03:14 | 1 | As I mentioned, 579 bills introduced last |
|---|---|---|
| 03:14 | 2 | session have severability provisions, including bills |
| 03:14 | 3 | by these same House and Senate sponsors.  They chose |
| 03:14 | 4 | not to do that here. |
| 03:14 | 5 | And under Carter versus Carter Coal, a |
| 03:14 | 6 | U.S. Supreme Court decision, that lack of severability |
| 03:15 | 7 | clause actually suggests the inseverability of the |
| 03:15 | 8 | provisions.  That omission, in and of itself, suggests |
| 03:15 | 9 | that the provisions are not severable. |
| 03:15 | 10 | Finally, the third point that I'd like to |
| 03:15 | 11 | bring up is the purpose behind a preliminary injunction |
| 03:15 | 12 | to begin with, and that is to maintain the status quo. |
| 03:15 | 13 | Because we already have standards and |
| 03:15 | 14 | guidelines in place -- got them right here, they're |
| 03:15 | 15 | big, thick guidelines that have been in place since |
| 03:15 | 16 | 2018, they were originally developed back in 1997 -- it |
| 03:15 | 17 | is not as though there would be no standards for the |
| 03:15 | 18 | libraries to follow.  In fact, there are existing |
| 03:15 | 19 | standards. |
| 03:15 | 20 | The problem is if you only partially |
| 03:15 | 21 | enjoin, then you're going to end up with a situation |
| 03:15 | 22 | where constitutionally infirm definitions and processes |
| 03:15 | 23 | that allow for no judicial review, unconstitutional |
| 03:16 | 24 | prior restraints will go into effect.  And that will |
| 03:16 | 25 | create a tremendous environment of uncertainty for |

—13—

| | | |
|---|---|---|
| 03:16 | 1 | people moving forward. |
| 03:16 | 2 | The libraries won't know what to do. |
| 03:16 | 3 | They won't know what to buy.  They won't know what to |
| 03:16 | 4 | return.  They won't have any guidance.  And that, in |
| 03:16 | 5 | and of itself, will then chill the First Amendment |
| 03:16 | 6 | freedoms of the students, of the booksellers, and of |
| 03:16 | 7 | anyone who's trying to access information through |
| 03:16 | 8 | public school libraries. |
| 03:16 | 9 | What we see here is, you know, this is an |
| 03:16 | 10 | unconstitutional law.  It's unconstitutional, all four |
| 03:16 | 11 | corners of it, and there is no right to enforce an |
| 03:16 | 12 | unconstitutional law. |
| 03:16 | 13 | If the Court were to allow TSLAC and |
| 03:16 | 14 | others to go forward and develop these regulations |
| 03:16 | 15 | based on unconstitutional definitions and |
| 03:16 | 16 | unconstitutional procedures, then that would be like |
| 03:17 | 17 | wielding the sword of Damocles over booksellers and |
| 03:17 | 18 | students alike because those standards fall prey to the |
| 03:17 | 19 | same constitutional impairments of prior restraint, |
| 03:17 | 20 | vagueness, and overbreadth that we've already talked |
| 03:17 | 21 | about in the prior proceedings. |
| 03:17 | 22 | So we urge the Court to enter an |
| 03:17 | 23 | injunction of HB 900 in its entirety and don't see how |
| 03:17 | 24 | it can be parsed. |
| 03:17 | 25 | THE COURT:  A response? |

03:17  1          MS. CELLA:  Yes.  Thank you, Your Honor.

03:17  2  A few things.

03:17  3          Ms. Prather indicated that there are

03:17  4  already standards in place, and that is true.  Prior to

03:17  5  this bill even coming out.  That is true.  So the State

03:17  6  does have the ability to amend standards even if this

03:17  7  bill had not ever come out.  So the fact that there are

03:17  8  already standards in place does go towards that.

03:17  9          Another item that Ms. Prather mentioned

03:17 10  was that these are already done and developed.  That's

03:17 11  not accurate, and it's not based on any facts.

03:18 12          TSLAC did write a draft.  It was nothing

03:18 13  final.  They were set to officially propose those

03:18 14  standards on September the 7th.  After the hearing last

03:18 15  week, that was immediately stopped and they have not

03:18 16  been proposed.  So to say that it's already done is --

03:18 17  it's just flat out incorrect.

03:18 18          And finally, I think, and most

03:18 19  importantly, the harm that plaintiffs are claiming

03:18 20  would occur if this was enjoined in its entirety are

03:18 21  not any harm to the plaintiff.

03:18 22          So the school districts were mentioned.

03:18 23  The students were mentioned.  But there's no standing

03:18 24  for Ms. Prather and the -- on behalf of the plaintiffs

03:18 25  to advocate for the school districts or the students.

| | | |
|---|---|---|
| 03:18 | 1 | We've been through that. |
| 03:18 | 2 | And enjoining this partially is not -- |
| 03:18 | 3 | there's just not going to be any harm to the |
| 03:18 | 4 | plaintiffs. |
| 03:18 | 5 | And I apologize. I accidentally left my |
| 03:18 | 6 | video off, which it is back on now. |
| 03:19 | 7 | THE COURT: I think you were done, but |
| 03:19 | 8 | I'm not sure. Are you done? |
| 03:19 | 9 | MS. CELLA: I was. Yes. |
| 03:19 | 10 | THE COURT: Ms. Prather, anything else? |
| 03:19 | 11 | MS. PRATHER: Just briefly, Your Honor. |
| 03:19 | 12 | There is certainly standing for the |
| 03:19 | 13 | booksellers and the plaintiffs in this case to bring |
| 03:19 | 14 | this argument concerning the library standards. |
| 03:19 | 15 | As I mentioned, this library standards |
| 03:19 | 16 | deal with the prohibition of possessing books, |
| 03:19 | 17 | possessing books that my clients have provided to |
| 03:19 | 18 | libraries, it's also dealing with the acquisition and |
| 03:19 | 19 | purchase of books that my clients would be selling to |
| 03:19 | 20 | the libraries. |
| 03:19 | 21 | In addition, as we've previously |
| 03:19 | 22 | mentioned, under Virginia versus American Booksellers |
| 03:19 | 23 | and other cases, my clients do have the right and have |
| 03:19 | 24 | brought this action, in addition, on behalf of those |
| 03:19 | 25 | third parties whose right to receive information will |

```
03:19   1   be violated, and that certainly would be impacted by
03:19   2   the imposition of these library standards at this time.
03:20   3               THE COURT:  I'll be back in just a
03:20   4   second.
03:20   5               (Pause in proceedings.)
03:23   6               THE COURT:  Okay.  If we could go back on
03:23   7   the record.
03:23   8               Is there anything else either counsel
03:23   9   would like to raise before -- we'll include in our
03:23  10   order what we're going to do.  Is there -- and that
03:23  11   will be out this week.
03:23  12               Is there anything else we should include
03:23  13   in the order?
03:23  14               MS. CELLA:  No, Your Honor.
03:23  15               THE COURT:  You want us to include in the
03:23  16   order.
03:23  17               MS. CELLA:  No, Your Honor.
03:23  18               THE COURT:  Ms. Prather?
03:23  19               MS. PRATHER:  No, Your Honor.
03:23  20               THE COURT:  Thank you all for being here.
03:23  21   Have a good day.
03:23  22               (Hearing adjourned.)
       23
       24
       25
```

```
1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS     )

3

4

5                I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10               I certify that the transcript fees and

11   format comply with those prescribed by the Court and

12   Judicial Conference of the United States.

13               Certified to by me this ^ day of

14   September 2023.

15
                         /s/ Kristie M. Davis
16                       KRISTIE M. DAVIS
                         Official Court Reporter
17                       800 Franklin Avenue
                         Waco, Texas 76701
18                       (254) 340-6114
                         kmdaviscsr@yahoo.com oh
19

20

21

22

23

24

25
```

03:23