No. 23-50668

# In the United States Court of Appeals for the Fifth Circuit

---

BOOK PEOPLE, INCORPORATED, VBK, INCORPORATED doing business as BLUE WILLOW BOOKSHOP; ASSOCIATION OF AMERICAN PUBLISHERS; AUTHORS GUILD, INCORPORATED; COMIC BOOK LEGAL DEFENSE FUND; AMERICAN BOOKSELLERS ASSOCIATION,

*Plaintiffs-Appellees*

*v.*

MARTHA WONG, IN HER OFFICIAL CAPACITY AS THE CHAIR OF THE TEXAS STATE LIBRARY AND ARCHIVES COMMISSION; KEVIN ELLIS, IN HIS OFFICIAL CAPACITY THE CHAIR OF THE TEXAS STATE BOARD OF EDUCATION; MIKE MORATH, IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF THE TEXAS EDUCATION AGENCY,

*Defendants-Appellants*

---

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

---

## BRIEF FOR DEFENDANTS-APPELLANTS

---

*(Counsel Listed on Inside Cover)*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

KATELAND R. JACKSON
Assistant Solicitor General
Kateland.Jackson@oag.texas.gov

Counsel for Defendants-Appellants

## Certificate of Interested Persons

No. 23-50668

Book People, Incorporated, VBK, Incorporated doing business as Blue Willow Bookshop; Association of American Publishers; Authors Guild, Incorporated; Comic Book Legal Defense Fund; American Booksellers Association,

*Plaintiffs-Appellees*

*v.*

Martha Wong, in her official capacity as the Chair of the Texas State Library and Archives Commission; Keven Ellis, in his official capacity as the Chair of the Texas State Board of Education; Mike Morath, in his official capacity as the Commissioner of the Texas Education Agency,

*Defendants-Appellants*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Kateland R. Jackson
Kateland R. Jackson
*Counsel of Record for*
*Defendants-Appellants*

i

# Statement Regarding Oral Argument

The Court has set this case for argument on November 29, 2023.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ............................................................. i

Statement Regarding Oral Argument ..................................................... ii

Table of Authorities ............................................................................... v

Introduction ........................................................................................... 1

Statement of Jurisdiction ...................................................................... 3

Issues Presented .................................................................................... 4

Statement of the Case ........................................................................... 4

    I.   Factual Background ..................................................................... 4

    II.  District Court Proceedings .......................................................... 9

Summary of the Argument .................................................................. 10

Standard of Review .............................................................................. 13

Argument .............................................................................................. 14

    I.   Plaintiffs Have Failed to Establish Federal-Court Jurisdiction
        Over Their Claims ..................................................................... 14

        A.  Plaintiffs' claims are unripe .............................................. 14

        B.  Plaintiffs lack Article III standing .................................... 17

            1.  Plaintiffs fail to allege an injury-in-fact ..................... 19

                a.   Plaintiffs' alleged injuries fail to satisfy the standard
                     for First Amendment pre-enforcement challenges
                     under *Speech First* ................................................ 20

                b.   Plaintiffs' alleged injuries are not actual, imminent,
                     concrete, or particularized .................................... 22

            2.  Plaintiffs' alleged injuries are neither traceable to State
                Defendants nor redressable by a favorable judicial decision ...... 26

        C.  State Defendants are entitled to sovereign immunity ...................... 29

    II.  Plaintiffs Have Not Shown a Substantial Likelihood of Success on
        the Merits ................................................................................. 31

        A.  READER does not implicate Plaintiffs' First Amendment
            rights .................................................................................. 32

1. The First Amendment does not force Texas to allow Plaintiffs' sexually explicit books in its schools ......................... 32

2. The First Amendment does not preclude Texas from removing sexually explicit material from public school libraries ..................................................................... 33

3. READER's rating system is government speech, not private speech subject to the First Amendment ........................ 34

B. Even if Plaintiffs' First Amendment rights are implicated, Plaintiffs are unlikely to prove they have been violated .................... 37

1. The public school library is a non-public forum in which Plaintiffs' free speech rights are not absolute ............................. 37

2. READER does not impose an unconstitutional prior restraint ...................................................................... 38

3. READER does not impose an unconstitutional delegation of government authority ................................................ 39

4. READER is not unconstitutionally vague or overbroad ............ 40

5. The government operations and commercial speech exceptions to the First Amendment apply ................................ 42

III. The District Court Abused Its Discretion in Granting Plaintiffs' Preliminary Injunction . ........................................................ 45

Conclusion ................................................................................. 47

Certificate of Service ................................................................... 48

Certificate of Compliance ............................................................ 48

# Table of Authorities

Page(s)

**Cases:**

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ........................................ 42

*Abbott Lab'ys v. Gardner,*
    387 U.S. 136 (1967) ................................... 14, 17

*Abdullah v. Paxton,*
    65 F.4th 204 (5th Cir. 2023), cert. denied, No. 23-39, 2023 WL
    6378509 (U.S. Oct. 2, 2023) .............................18, 26

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.,*
    851 F.3d 507 (5th Cir. 2017) ........................... 29

*Alexander v. United States,*
    509 U.S. 544 (1993) ................................... 38-39

*Am. Meat Inst. v. U.S. Dep't of Agric.,*
    760 F.3d 18 (D.C. Cir. 2014) (en banc) ..................36, 43

*Barber v. Bryant,*
    860 F.3d 345 (5th Cir. 2017) ........................... 18

*Bethel School District No. 403 v. Fraser,*
    478 U.S. 675 (1986) ............................3, 13, 32, 37

*Board of Education v. Pico,*
    457 U.S. 853 (1982) (plurality opinion) ...........3, 5, 28, 32-34

*Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n,*
    70 F.4th 914 (5th Cir. 2023) ...........................14-15

*BST Holdings, LLC v. OSHA,*
    No. 21-60845, 2021 WL 5166656 (5th Cir. Nov. 6, 2021) ....... 10

*Califano v. Sanders,*
    430 U.S. 99 (1977) ................................... 14

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ................................... 45

*California v. Texas,*
    141 S. Ct. 2104 (2021) .................................26-27

*Campbell v. St. Tammany Parish School Board,*
    64 F.3d 184 (5th Cir. 1995) ........................... 34

*Cantrell v. City of Murphy*,
    666 F.3d 911 (5th Cir. 2012) ............................................. 13

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
    447 U.S. 557 (1980) ..................................................... 42-44

*Choice Inc. of Tex. v. Greenstein*,
    691 F.3d 710 (5th Cir. 2012) ............................................. 17

*City of Austin v. Paxton*,
    943 F.3d 993 (5th Cir. 2019) ...................................... 13, 29-30

*Clapper v. Amnesty Int'l*,
    568 U.S. 398 (2013) ................................................. *passim*

*CTIA–The Wireless Ass'n v. City of Berkeley*,
    928 F.3d 832 (9th Cir. 2019) ....................................... 36, 43

*Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*,
    760 F.3d 427 (5th Cir. 2014) (en banc) ............................. 18, 27

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) ..................................................... 33

*Ex parte Young*,
    209 U.S. 123 (1908) .............................................. 12, 29-30

*Finley Res., Inc. v. Headington Royalty, Inc.*,
    672 S.W.3d 332 (Tex. 2023) ............................................. 41

*Ginsberg v. State of New York*,
    390 U.S. 629 (1968) ........................................ 3, 12, 37, 43

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
    721 F.3d 264 (4th Cir. 2013) (en banc) ............................. 43-44

*Harris v. McRae*,
    448 U.S. 297 (1980) ........................................... 22, 31, 33

*Haverkamp v. Linthicum*,
    6 F.4th 662 (5th Cir. 2021) ...................................... 12, 30

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988) ..................................................... 38

*K.P. v. LeBlanc*,
    729 F.3d 427 (5th Cir. 2013) ........................................... 29

*Little v. KPMG LLP*,
    575 F.3d 533 (5th Cir. 2009) ........................................... 26

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................ 18, 24, 26, 28

*Maher v. Roe,*
   432 U.S. 464 (1977) ............................................ 33

*Meese v. Keene,*
   481 U.S. 465 (1987) ............................................ 24

*Miller v. California,*
   413 U.S. 15 (1973) .............................................. 41

*Milwaukee Police Ass'n v. Jones,*
   192 F.3d 742 (7th Cir. 1999) ................................. 39

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ............................................ 11

*Morris v. Livingston,*
   739 F.3d 740 (5th Cir. 2014) ............................ 12, 29

*N.A.A.C.P. v. City of Kyle,*
   626 F.3d 233 (5th Cir. 2010) ................................. 13

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
   53 F.4th 869 (5th Cir. 2022) ............................ 39-40

*Netchoice L.L.C. v. Paxton,*
   49 F.4th 439 (5th Cir. 2022), cert. granted in part on other grounds
   2023 WL 6319650 (U.S. Sept. 23, 2023) ......................... 18-19, 41, 43

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,*
   833 F.2d 583 (5th Cir. 1987) ................................. 14

*New York v. Ferber,*
   458 U.S. 747 (1982) ............................................ 19

*Nken v. Holder,*
   556 U.S. 418 (2009) ........................................ 45-46

*Okpalobi v. Foster,*
   244 F.3d 405 (5th Cir. 2001) (en banc) ........................ 28

*Oles v. City of New York,*
   No. 22-1620-CV, 2023 WL 3263620 (2d Cir. May 5, 2023) ........ 43

*Pennhurst State Sch. & Hosp. v. Halderman,*
   465 U.S. 89 (1984) ............................................ 29

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Relations,*
   413 U.S. 376 (1973) ............................................ 43

*Pittston Co. v. United States,*
 368 F.3d 385 (4th Cir. 2004) ............................................................ 39

*Planned Parenthood of Greater Tex. Family Planning & Preventative*
 *Health Servs., Inc. v. Kauffman,*
 981 F.3d 347 (5th Cir. 2020) (en banc) ............................................. 14

*Restaurant L. Ctr. v. U.S. Dep't of Lab.,*
 66 F.4th 593 (5th Cir. 2023) ............................................................. 25

*Richardson v. Tex. Sec'y of State,*
 978 F.3d 220 (5th Cir. 2020) ............................................................ 12

*Rust v. Sullivan,*
 500 U.S. 173 (1991) ......................................................................... 33

*S. Christian Leadership Conf. v. Sup. Ct. of La.,*
 252 F.3d 781 (5th Cir. 2001) ..................................................... 18, 27

*Sable Commc'ns of Cal., Inc. v. FCC,*
 492 U.S. 115 (1989) ......................................................................... 33

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
 411 U.S. 1 (1973) ..................................................................... 42, 44

*Shurtleff v. City of Bos., Mass.,*
 142 S. Ct. 1583 (2022) .......................................................... 32, 35-36

*Smith v. Doe,*
 538 U.S. 84 (2003) ..................................................................... 30-31

*Speech First, Inc. v. Fenves,*
 979 F.3d 319 (5th Cir. 2020), as revised (Oct. 30, 2020) .......... 19-20, 22

*Spokeo, Inc. v. Robins,*
 578 U.S. 330 (2016) .............................................................. 17-18, 20

*Steffel v. Thompson,*
 415 U.S. 452 (1974) ......................................................................... 21

*Summers v. Earth Island Inst.,*
 555 U.S. 488 (2009) ......................................................................... 22

*Susan B. Anthony List v. Driehaus,*
 573 U.S. 149 (2014) ......................................................................... 21

*Swindol v. Aurora Flight Scis. Corp.,*
 805 F.3d 516 (5th Cir. 2015) ............................................................. 5

*Tawakkol v. Vasquez,*
 81 F.4th 397 (5th Cir. 2023) ............................................................ 29

*Tex. All. for Retired Ams. v. Scott*,
28 F.4th 669 (5th Cir. 2022) ............................................ 2, 12-13, 29

*Texas Democratic Party v. Abbott*,
978 F.3d 168 (5th Cir. 2020) ...................................................... 12, 29

*Texas v. Rettig*,
987 F.3d 518 (5th Cir. 2021) ............................................................. 40

*Texas v. United States Envt'l Prot. Agency*,
829 F.3d 405 (5th Cir. 2016) ...................................................... 36, 40

*Thomas v. Union Carbide Agric. Prods. Co.*,
473 U.S. 568 (1985) ................................................................... 15-16

*Trump v. New York*,
141 S. Ct. 530 (2020) ....................................................................... 15

*United States v. Arnold*,
740 F.3d 1032 (5th Cir. 2014) .......................................................... 42

*United States v. Billingsley*,
615 F.3d 404 (5th Cir. 2010) ............................................................ 45

*United States v. Clinical Leasing Serv.*,
925 F.2d 120 (5th Cir. 1991) ............................................................ 40

*United States v. Frame*,
885 F.2d 1119 (3d Cir. 1989) ........................................................... 39

*United States v. Sindel*,
53 F.3d 874 (8th Cir. 1995) .............................................................. 42

*United States v. Tansley*,
986 F.2d 880 (5th Cir. 1993) ............................................................ 40

*United Transp. Union v. Foster*,
205 F.3d 851 (5th Cir. 2000) ...................................................... 11, 15

*Veasey v. Abbott*,
870 F.3d 387 (5th Cir. 2017) ...................................................... 13, 45

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ................................................................... 32, 37

*Warth v. Seldin*,
422 U.S. 490 (1975) ......................................................................... 18

*West Virginia State Board of Education v. Barnette*,
319 U.S. 624 (1943) .................................................................... 33-34

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) ......................................................................... 22

ix

*Winter v. NRDC,*
  555 U.S. 7 (2008) ................................................................ 13, 31, 45
*Wisconsin v. Yoder,*
  406 U.S. 205 (1972) ...................................................................... 46
*Wooley v. Maynard,*
  430 U.S. 705 (1977) ...................................................................... 42
*Zauderer v. Off. of Disciplinary Counsel,*
  471 U.S. 626 (1985) ................................................................. 43-44

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const. amend. I ........................................................ *passim*

U.S. Const. amend. XIV ............................................................ 2

13 Tex. Admin. Code § 4.2 ........................................... 4, 11, 15

48 Tex. Reg.:
  6291 .......................................................................... 4, 5, 11, 15
  6292 .......................................................................... 5, 11, 15, 21
  6294 ..................................................................................... 5, 15

28 U.S.C.:
  § 1292 ....................................................................................... 3
  § 1292(a)(1) ............................................................................. 3
  § 1331 ....................................................................................... 3

42 U.S.C. § 1983 ..................................................................... 3, 9

Fed. R. App. P. 8(a)(1) ............................................................ 10

Fed. R. Evid. 201(b) ................................................................. 5

Restricting Explicit and Adult-Designated Educational Resources Act
  ("READER"), 88th Leg., R.S., ch. 808, 2023 Tex. Sess. Law Serv.
  2539, (H.B. 900) ................................................................ *passim*

Tex. Educ. Code:
  § 28.002(a) ............................................................................... 6
  § 33.021 ..................................................................... 1, 4, 15, 46
  § 33.021(a) ........................................................................... 5-6
  § 33.021(c) ................................................................... 1, 4, 6, 21
  § 33.021(d) ............................................................................ 21
  § 33.021(d)(1) ......................................................................... 4
  § 33.021(d)(2) ..................................................................... 1, 31
  § 33.021(d)(2)(A) .............................................. 6, 28, 30, 34
  § 33.021(d)(2)(A)(ii) ............................................................. 5

§ 35.001 ............................................................................................. 10

§ 35.001(1) ...................................................................................... 1, 6

§ 35.001(3) ......................................................................................... 6

§ 35.001-.008 ................................................................................... 1, 4

§ 35.002 ........................................................................ 6, 10, 27, 46

§ 35.002(a) ................................................................................. 1, 7, 21

§ 35.002(b) ...................................................................................... 1, 7

§ 35.002(c) ..................................................................................... 6-7, 45

§ 35.002(d) ...................................................................................... 6-7

§ 35.002(e) ................................................................................... 22, 36

§ 35.003 ........................................................................... 2, 10, 26-27

§ 35.003(a) ................................................................................ 8, 22, 37

§ 35.003(b) .................................................................................... 8, 45

§ 35.003(c) ........................................................................ 8, 22, 27, 30

§ 35.003(d) ................................................................................... 9, 30

§ 35.003(e) ........................................................................................ 9

§ 35.005 ............................................................................................. 6

§ 35.006(a) ........................................................................................ 7

§ 35.006(b) ........................................................................................ 7

§ 35.007 ....................................................................................... 8, 15

§ 35.008 ............................................................................................. 8

§ 35.0021 .................................................................................... 2, 10

§ 35.0021(a) ...................................................................................... 7

§ 35.0021(b) ...................................................................................... 8

§ 35.0021(c) ...................................................................................... 8

§ 35.0021(d) ...................................................................................... 8

Tex. Penal Code:

§ 43.21 ........................................................................................... 5-6

§ 43.24 ......................................................................................... 5, 28

§ 43.25 ........................................................................................... 5-6

## Other Authorities:

Douglas Dow, *Motion Picture Ratings*, MTSU: Free Speech Ctr. (Jan.
    1, 2009), https://firstamendment.mtsu.edu/article/motion-
    picture-ratings/ ............................................................................ 35

*U.S. Dep't of Health & Human Servs., The Health Consequences of
    Smoking-50 Years of Progress: A Report of the Surgeon General*
    (2014), available at http://tinyurl.com/smokingreport2014 ............................ 35

Melville Nimmer, *Nimmer on Freedom of Speech* § 4.03 (1984)............................. 38

Sabrina S. Adler *et. al.*, *You Want a Warning with That? Sugar-Sweetened Beverages, Safety Warnings, and the Constitution*, 71 Food & Drug L.J. 482 (2016) ................................................................... 35

# Introduction

In 2023, responding to reports that adult reading materials may have been made available to children in public schools at taxpayer expense, the Texas Legislature passed the Restricting Explicit and Adult-Designated Educational Resources Act ("READER"), 88th Leg., R.S., ch. 808, 2023 Tex. Sess. Law Serv. 2539, (H.B. 900) (codified at Tex. Educ. Code §§ 33.021, 35.001-.008). READER requires the Texas State Library and Archives Commission (the "Commission"), with approval by majority vote of the Texas State Board of Education (the "Board"), to "adopt standards for school library collection development." Tex. Educ. Code § 33.021(c). The standards must include a collection-development policy that prohibits school districts from purchasing "harmful," "sexually explicit," or "pervasively vulgar" materials. *Id.* § 33.021(d)(2). The law is designed to allow school districts and parents to know what books the State is purchasing for public schools with public money.

READER applies to third-party vendors *only* if they seek to sell materials to Texas public-school libraries. *See* Tex. Educ. Code § 35.001(1). To aid school districts in complying with the Commission's library collection standards, READER requires vendors to apply a rating system that identifies sexually explicit materials. Only library materials that satisfy express statutory definitions of "sexually explicit" and "sexually relevant" receive a rating, *Id.* § 35.002(a). Sexually explicit materials cannot be sold to a school district. *Id.* § 35.002(b). Vendors need not rate books they sell to any other customers but are encouraged to apropriately rate library materials sold to public school districts on an on-going basis to ensure no sexually explicit

materials are distributed to school children. *Id.* § 35.0021. If a vendor assigns an incorrect rating, the Texas Education Agency (the "Agency") retains discretion to issue an updated rating, *id.* § 35.003, but such a rating has no effect outside the public school library context.

Plaintiffs include two bookstores, three trade associations, and a legal defense organization (collectively, "Plaintiffs"), some of which would like to continue selling books to public school libraries. ROA.17-20; ROA.55; ROA.64. Although Plaintiffs concede that READER prevents "obscene and harmful material" from entering schools, ROA.38, they insist that the law violates the First and Fourteenth Amendments. ROA.15. In doing so, Plaintiffs reveal a misunderstanding regarding the scope of the First Amendment and the way it interacts with public funding. But more fundamentally, Plaintiffs misunderstand their ability to bring their claims before this Court in three important ways. *First*, Plaintiffs' claims are unripe because implementing rules and standards have not yet been set under READER in a way potentially harmful to Plaintiffs. *Second*, Plaintiffs have not established how they are injured by being required to provide information to their customers—let alone how any such injury is traceable to or redressable by the Commission, Board, or Agency, none of which are Plaintiffs' school district customers. *Third*, because Plaintiffs chose to sue non-customer State entities that have no ability to enforce READER through their purchasing decisions, Plaintiffs' claims are barred by sovereign immunity. *E.g.*, *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022).

On the merits, First Amendment protections—while broad—do not give private entities the right to peddle their wares to government entities. To the contrary, the

Supreme Court "otherwise sharply divided" in *Board of Education v. Pico*, 457 U.S. 853 (1982) (plurality opinion), "acknowledged that the school board has the authority to remove books that are vulgar." *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). More importantly, First Amendment protections are limited "where the speech is sexually explicit and the audience may include children." *Fraser*, 478 U.S. at 684; *see also Ginsberg v. State of New York*, 390 U.S. 629, 641-43 (1968). Plaintiffs are thus not entitled to enjoin a state law aimed at protecting children based on a putative First Amendment right to distribute sexually explicit materials to school children without any warning of their contents—let alone to do so at public expense.

Despite these jurisdictional faults and substantive failings, the district court found that Plaintiffs properly pleaded a cause of action under 42 U.S.C. § 1983 for alleged violations of the First Amendment. ROA.32-39. This Court should reverse the injunction and remand with instructions to dismiss Plaintiffs' claims.[1]

## Statement of Jurisdiction

The district court had federal-question jurisdiction pursuant to 28 U.S.C. § 1331. This Court has appellate jurisdiction over the district court's denial of defendants' motion to dismiss on the grounds of sovereign immunity under 28 U.S.C. § 1292, and over its grant of injunctive relief under 28 U.S.C. § 1292(a)(1).

---

[1] Though the Court granted an administrative stay, the request for a stay pending appeal remains pending. *Infra* p. 10. For the reasons discussed herein, the Court should either grant that stay or leave the administrative stay undisturbed.

## Issues Presented

1. Whether Plaintiffs established a justiciable controversy, including (a) a question ripe for adjudication, (b) Article III standing, and (c) an exception to sovereign immunity.

2. Whether Plaintiffs established a substantial likelihood of proving at trial that READER violates the First Amendment.

3. Whether the district court abused its discretion in granting Plaintiffs' preliminary injunction.

## Statement of the Case

### I.    Factual Background

**A.**    In 2023, the Texas Legislature enacted READER to regulate the sale and purchase of public school library materials. READER requires the Commission to develop standards for school districts to obtain library materials from third-party vendors. Tex. Educ. Code § 33.021(c). The Commission's standards must be approved by the Board and followed by school districts in formulating and implementing their own library collection policies. *Id*. §§ 33.021(d)(1), 33.021, n.4. The Commission must promulgate and adopt collection standards by January 1, 2024, and it must review and update those standards every five years. READER, 88th Leg., R.S., ch. 808, §4, 2023 Tex. Sess. Law Serv. 2539, (H.B. 900) (codified at Tex. Educ. Code, 35.001-.008); § 33.021(d)(1).

On August 30, 2023, the Board's Committee on Instruction considered the Commission's initial mandatory library collection development standards. *See* 48 Tex. Reg. 6291 (to be codified at 13 Tex. Admin. Code § 4.2) (proposed Oct. 27,

2023). The Commission then issued its first proposed rule regarding the mandatory standards on October 27, 2023. *See id.* The proposed rule is subject to a 30-day public comment period. *Id.* at 6292. The schedule on which any particular school district will incorporate these standards is somewhat unclear, but the proposed rule does instruct school districts to review their collection development policies under these standards "at least every two years" and update them "as necessary." *Id.* at 6294.[2]

The library collection standards that the Commission is in the process of preparing must include a collection development policy that prohibits a school district from possessing or purchasing "harmful material," material that is "pervasively vulgar or educationally unsuitable," and material that is "rated sexually explicit" by a vendor. Tex. Educ. Code § 33.021(d)(2)(A)(ii) (referencing Tex. Penal Code § 43.24 and *Pico*, 457 U.S. 853).

READER expressly defines "sexually explicit material" to include "any communication, language, or material . . . that describes, depicts, or portrays sexual conduct, as defined by Section 43.25, Penal Code, in a way that is patently offensive, as defined by Section 43.21, Penal Code." Tex. Educ. Code § 33.021(a). Section 43.25 of the Texas Penal Code in turn defines "sexual conduct" to include "sexual contact," "actual or simulated sexual intercourse," "masturbation," and the "lewd

---

[2] Although this information is provided primarily for context, to the extent the Court deems it necessary, State Defendants request the Court take judicial notice of this information, which is publicly available and not subject to reasonable dispute. *Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 518-19 (5th Cir. 2015) (taking judicial notice of "public records contained on the Mississippi Secretary of State's and the Virginia State Corporation Commission's websites"); Fed. R. Evid. 201(b).

exhibition" of intimate body parts. Section 43.21 of the Penal Code explains that something is "patently offensive" if it is "so offensive on its face as to affront current community standards of decency." READER's statutory definition of "sexually explicit material" excludes materials "directly related to" required curriculum. Tex. Educ. Code § 33.021(a) (citing *id.* § 28.002(a)). READER's definitions cover only materials that include inappropriate, explicit content.

**B.**    Although READER demands that *school districts* adhere to these standards by not purchasing materials rated as sexually explicit, *id.* § 33.021(c), it provides no authority to the Commission (or the Board or Agency) to enforce the standards against *third-party vendors*. Indeed, READER does not affect vendors' interactions with non-school district customers or require ratings for books not sold to schools. *Id.* § 35.002. Instead, READER establishes a rating system for third-party vendors to use if and only if the vendor decides to sell its products to Texas public schools. *Id.* §§ 35.001(1), 35.002. That rating system requires vendors to identify for their public-school customers whether any material the vendor seeks to sell to a school district is "sexually explicit" or "sexually relevant." *Id.* § 35.002(c)-(d). The first rating—sexually explicit—carries the same definition from the collection standards provision above. "Sexually relevant material" includes "any communication, language, or material . . . that describes, depicts, or portrays sexual conduct, as defined by Section 43.25" of the Penal Code. *Id.* § 35.001(3). Ultimately, materials rated as "sexually explicit" cannot be purchased by school districts, and those rated as "sexually relevant" require parental consent for student access. *Id.* §§ 33.021(d)(2)(A)(ii), 35.005.

Rather than imposing any sort of civil or criminal penalty, READER uses financial incentives to encourage vendors who wish to sell library materials to Texas public schools to adhere to the rating system. Every year, on September 1, school-library vendors are to submit to the Agency a list of sexually explicit and sexually relevant materials they have sold to a school district during the previous year and that are still in active use. *Id.* § 35.002(d). Vendors who have sold library materials without ratings to school districts in the past are also instructed to assign an appropriate rating and submit a list to the Agency of any sexually explicit or sexually relevant materials sold and to issue a recall for any sexually explicit materials still in use by April 1, 2024. *Id.* § 35.002(a)-(c). Any vendor who fails to do so may not sell additional books to public schools until they have complied with READER's requirements. *Id.* § 35.002(a).

To assist vendors in knowing which materials are still actively used (and thus must be rated), READER requires school districts to review their library catalogues every two years, on January 1, and issue a report identifying any sexually relevant materials. *Id.* § 35.006(a). The school district's report is not required to list the names of vendors or otherwise associate any vendor with any book or any rating. *Id.* § 35.006(b).

In assigning ratings, vendors perform a "contextual analysis" of a book or other library material "to determine whether the material describes, depicts, or portrays sexual conduct in a way that is patently offensive" such that the book is "sexually explicit." *Id.* § 35.0021(a). To provide guideposts in this analysis, READER encourages vendors to consider (1) "the explicitness or graphic nature of a

description or depiction of sexual conduct" in the material, (2) "whether the material consists predominantly of or contains multiple repetitions or depictions of sexual or excretory organs or activities," and (3) "whether a *reasonable person* would find that the material intentionally panders to, titillates, or shocks the reader." *Id.* § 35.0021(b) (emphasis added). READER acknowledges that these considerations "may present a unique mix of factors" and permits the vendor to "consider the full context" and "weigh and balance each factor" when issuing a rating. *Id.* § 35.0021(c)-(d).

**C.**    Although the Commission and the Board help in setting overall standards and policies, *supra* pp. 4-5, ultimately it is the Agency Commissioner who has authority to adopt rules to implement and administer READER on a day-to-day basis. *Id.* § 35.007. And the Agency is tasked with assisting school districts in complying with the law. *Id.* § 35.008. The Agency has no statutory power, however, to impose penalties over or otherwise enforce the law against third-party vendors. But the Agency may review vendor ratings for any book sold by a vendor to a school district. *Id.* § 35.003(a). If the Agency determines a book requires a corrected rating—for example, to reflect that a book is or is not sexually explicit—it will provide notice to the vendor so that the vendor has an opportunity to update the rating. *Id.* § 35.003(b). If the vendor chooses not to update the rating within 60 days, the Agency may then place that vendor on a list of vendors who fail to assign an accurate rating to sexually explicit or relevant materials. *Id.* § 35.003(c). Those vendors can sell whatever books they want to any private person or entity they choose (subject to other state and federal law), but school districts are prohibited

from purchasing library materials from vendors who appear on the non-compliance list. *Id.* § 35.003(d). Vendors have a statutory right to petition the Agency for removal from the non-compliance list at any time. § 35.003(e).

## II. District Court Proceedings

Before READER went into effect, Plaintiffs filed a complaint against the Commission, the Board, and the Agency (collectively, "State Defendants" or "Defendants") and sought an injunction pursuant to 42 U.S.C. § 1983 alleging that READER violates their free speech rights under a grab-bag of First Amendment theories. ROA.14, 98.[3] Specifically, Plaintiffs asserted that READER constitutes compelled private speech, is unconstitutionally vague and overbroad, is a prior restraint on speech, and is an unconstitutional delegation of authority. ROA.32-39. In opposing the preliminary injunction and seeking to dismiss Plaintiffs' complaint, State Defendants argued that Plaintiffs' claims were unripe, Plaintiffs lacked standing, and that sovereign immunity barred Plaintiffs' claims. ROA.245-54. Defendants also argued that READER does not violate the First Amendment because Plaintiffs' free speech rights are not implicated in the school context, any "speech" at issue is commercial speech or government speech, and READER withstands any applicable constitutional scrutiny. ROA.255-71. Finally, Defendants

---

[3] Defendants reserve the right to assert that these Plaintiffs are not similarly situated as to (among other things) justiciability issues. Because this appeal does not turn on those distinctions, however, Defendants will refer to them collectively as "Plaintiffs" to avoid confusion.

argued that Plaintiffs had not established any factor necessary for a preliminary injunction. ROA.272-74.

The district court held hearings on August 18 and 28, 2023. ROA.782; ROA.869. On September 18, the court entered a preliminary injunction preventing READER from going into effect as to sections 35.001, 35.002, 35.0021, and 35.003. ROA.758.

Consistent with Federal Rule of Appellate Procedure 8(a)(1), State Defendants promptly sought a stay in district court before seeking relief from this Court. ROA.662. The district court denied the relief requested orally on August 31, and did not revisit the issue in its formal, written order. *Compare* ROA.965-66, *with* ROA.700-58. Defendants asked for this Court to grant a stay—or, in the alternative an administrative stay—to permit Defendants to comply with their state-law obligations. *E.g.*, *BST Holdings, LLC v. OSHA*, No. 21-60845, 2021 WL 5166656, at *1 (5th Cir. Nov. 6, 2021) (per curiam) (granting an administrative stay to allow the Court to further consider stay briefing). This Court granted the administrative stay on September 25, 2023 and ordered that Defendants' motion to stay the preliminary injunction pending appeal be carried with the case. On appeal, this Court reviews the district court's denial of Defendants' motion to dismiss on sovereign immunity grounds and grant of Plaintiffs' preliminary injunction.

## Summary of the Argument

**I.**    Despite acknowledging READER's ability to remove "obscene and harmful material" from Texas schools, ROA.38, Plaintiffs allege that READER violates their First Amendment free speech rights. But Plaintiffs' claims are unripe, and they fail

to establish that they have standing to assert such claims without running afoul of State Defendants' sovereign immunity. *First*, Plaintiffs' claims are unripe because the underlying issues are not fit for immediate judicial consideration. Here, Plaintiffs' allegations "sit[] atop a mountain of conjecture and speculation," primarily because Defendants have not even promulgated rules yet to implement READER. *United Transp. Union v. Foster*, 205 F.3d 851, 858 (5th Cir. 2000). The Commission, in consultation with the Board, issued an initial proposed rule to implement READER's library collection standards just three days before this brief was filed. *See* 48 Tex. Reg. 6291 (to be codified at 13 Tex. Admin. Code § 4.2) (proposed Oct. 27, 2023). As of this filing, that proposed rule is currently open to a 30-day public comment period in which Plaintiffs may participate. *Id.* at 6292. A challenge to the law during the pendency of this rulemaking process is premature.

*Second*, Plaintiffs lack standing because they cannot demonstrate a "concrete, particularized, and actual or imminent" harm, which requires more than mere speculation about future injury. *See Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). Instead, any injury would require a series of contingencies involving multiple State and local entities, not all of whom are parties to this lawsuit and each of whom has an independent obligation to abide by the Constitution. As a result, any alleged injury is entirely speculative and not traceable to (or redressable by) State Defendants. Even under the standard of standing for First Amendment pre-enforcement challenges, Plaintiffs' allegations are too speculative and fail to demonstrate any real threat of enforcement by Defendants.

*Third*, Plaintiffs' claims are barred by sovereign immunity because State Defendants are state officials sued in their official capacities. Plaintiffs cannot use the narrow exception to sovereign immunity recognized in *Ex parte Young*, 209 U.S. 123 (1908), because instead of suing local school district officials who might enforce READER through public funding decisions, Plaintiffs seek to "control [an officer] in the exercise of his discretion" in setting statewide policy. *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 242 (5th Cir. 2020) (alteration in original) (quoting *Ex parte Young*, 209 U.S. at 158); *see also e.g.*, *Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021) (per curiam). That is, the *Ex parte Young* exception to sovereign immunity does not apply here because although State Defendants may help to set rules regarding READER, no Defendant has a "particular duty to enforce" READER or is otherwise able to "compel or constrain" Plaintiffs under the new law. *Texas Democratic Party v. Abbott*, 978 F.3d 168, 179, 180 (5th Cir. 2020) (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)); *TARA.*, 28 F.4th at 672.

**II.**   Even if Plaintiffs were able to convince the Court it had jurisdiction to hear the case, Plaintiffs are not entitled to an injunction because they have failed to show a substantial likelihood of success on the merits. Plaintiffs' First Amendment rights are not absolute, and their decision to sell potentially explicit books to public-school libraries for distribution to school-aged children necessarily limits those rights. *See Fraser*, 478 U.S. at 684. Indeed, the First Amendment is less demanding when children are the audience and the purported "speech" concerns sexual material. *Id.*; *see also, Ginsberg*, 390 U.S. at 641-43. In the context of books in schools specifically, the Court has "acknowledged that the school board has the authority to remove

books that are vulgar." *Fraser*, 478 U.S. at 684. And, regardless, Plaintiffs are not entitled to First Amendment protection because book ratings are *government speech*— not Plaintiffs' private speech. Thus the First Amendment is not implicated here.

Even if the First Amendment applies to Plaintiffs' claims, READER satisfies any applicable constitutional scrutiny. Notably, READER does not impose an unconstitutional prior restraint or unconstitutional delegation of government authority, and it is not unconstitutionally vague or overbroad. And, regardless, a public school library is a quintessential non-public form in which the State may exercise control over speech. For these additional reasons, Plaintiffs' First Amendment claims fail.

**III.** The district court abused its discretion in granting a preliminary injunction, which is an "extraordinary remedy." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). Plaintiffs will suffer no irreparable harm in the absence of injunctive relief, but the State "necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). The State's injury is particularly acute here where the challenged law protects Texas school children from harmful, sexually explicit, and vulgar material.

## Standard of Review

This Court "review[s] sovereign immunity and standing *de novo.*" *TARA*, 28 F.4th at 671 (citing *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019); *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 236 (5th Cir. 2010)). It is always the plaintiff's burden to negate immunity. *Cantrell v. City of Murphy*, 666 F.3d 911, 918 (5th Cir. 2012). This Court "review[s] a preliminary injunction for abuse of

discretion, reviewing findings of fact for clear error and conclusions of law de novo." *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 354 (5th Cir. 2020) (en banc) (citation omitted).

**ARGUMENT**

## I. Plaintiffs Have Failed to Establish Federal-Court Jurisdiction Over Their Claims.

The Court need not and should not ever get to whether Plaintiffs are likely to prove the merits of their First Amendment claims because Plaintiffs have not met their affirmative burden to establish federal-court jurisdiction for at least three separate reasons: (1) lack of a ripe controversy, (2) lack of standing, and (3) sovereign immunity. Any one of those failings is fatal to both the district court's injunction and Plaintiffs' claims.

### A. Plaintiffs' claims are unripe.

The speculative nature of Plaintiffs' prospective alleged injuries implicates ripeness. To determine ripeness, the Court must consider two factors: (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "[A] claim is 'fit for judicial decision' if it presents a pure question of law that needs no further factual development." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 930 (5th Cir. 2023) (citing *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 586–87 (5th Cir. 1987)). But "if a claim

is 'contingent [on] future events that may not occur as anticipated, or indeed may not occur at all,' the claim is not ripe." *Braidwood Mgmt.*, 70 F.4th at 930 (alteration in original) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)); *see also Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam).

This case is unfit and ill-suited for immediate judicial review. Here, Plaintiffs' "challenge sits atop a mountain of conjecture and speculation," *United Transp. Union*, 205 F.3d at 858, as additional legal and factual developments related to the law's implementation continue to unfold. To start, the regulatory scheme underpinning READER is not yet established. Under Tex. Educ. Code § 35.007, the Agency "[C]ommissioner may adopt rules as necessary to administer this chapter." And the Commission must promulgate its implementing rules for library collection standards. *See* § 33.021, n.4. On October 27, 2023, the Commission published its first proposed rule governing the implementation of those standards. *See* 48 Tex. Reg. 6291 (to be codified at 13 Tex. Admin. Code § 4.2) (proposed Oct. 27, 2023). That proposed rule is now subject to an open, 30-day public comment period. *Id.* at 6292. During this time, the public (including Plaintiffs) will have an opportunity to shape how READER will practically go into effect in ways that may obviate (or at least significantly alter) Plaintiffs' constitutional concerns. For instance, by detailing who ultimately has responsibility for implementing the library collection policies (school districts and school libraries, not private third parties) and providing additional specific evaluation and selection criteria those responsible entities must meet to maintain the State's standards. *Id.* at 6292-94. Accordingly, because the

regulatory scheme is incomplete, there are enough unanswered *legal* questions that require further development.

Additional factual development is also necessary to ripen Plaintiffs' claims. For example, Plaintiffs assert a fear that they might inadvertently omit or eventually dispute a book's rating, which could lead to a future harm. ROA.30. But READER does not penalize the absence of an initial rating for a particular book, so any harm that might eventuate from a dispute about a hypothetical future rating is entirely "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." *Union Carbide*, 473 U.S. at 580-81 (citation omitted). Such a claim might ripen only if Plaintiffs (1) continue selling books to public-school libraries, (2) refuse to comply with READER's rating system for schoolbooks, (3) rate books in the wrong categories to elicit Agency review, (4) disagree with the Agency's suggested rating, if different, and (5) refuse to adopt the Agency's rating. Likewise, State Defendants would have to (1) recognize discrepancies in its ratings of books as compared with ratings assigned to individual books by vendors, (2) identify Plaintiffs as the public school library vendors who sold mis-rated books, (3) exercise discretion to issue updated ratings for Plaintiffs' books, (4) notify Plaintiffs of the updated rating, (5) create a list of non-compliant vendors, and (6) place Plaintiffs on that list. By Plaintiffs' own admission, just "the second link in the above-described chain of contingencies," is highly unlikely. *Clapper*, 568 U.S. at 410. (After all, if it were easy to tell which books Plaintiffs sold, it would hardly cost half-a-billion dollars to identify and rate them. ROA.62). But fatal to Plaintiffs' claims, *none* of these anticipated

future events have yet occurred, and they may never. Because such factual developments are essential to Plaintiffs' assertions, their claims are unripe.

By contrast, any hardship in waiting for some of these developments to unfold is minimal. "The Supreme Court has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being forced to modify one's behavior in order to avoid future adverse consequences." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (cleaned up). Here, it is hard to say whether any specific vendor's behavior will be affected at all. After all, it is unclear whether Plaintiffs have sold sexually explicit material to libraries; according to them, they are merely concerned with uncertainty over which books they can sell. ROA.692. Once promulgated, the Commission's library collection standards and the Agency's rules (some of which are currently under consideration) may eliminate that uncertainty—and possibly any risk of enforcement against specific vendors— entirely. But because the Court has no way to assess whether READER will *ever* be applied to these particular Plaintiffs, Plaintiffs' claims for constitutional harm are not yet "fit[] . . . for judicial decision." *Abbott Laby's*, 387 U.S. at 149.

## B.  Plaintiffs lack Article III standing.

Plaintiffs' claims also falter at the outset because they have not met their burden to show the most basic building block of justiciability: standing. The test for standing is well-known: Plaintiffs must show that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S.

330, 338 (2016) (citation omitted). To be cognizable, Plaintiffs' injury-in-fact must be "concrete, particularized, and actual or imminent"—speculation about potential, future injury is not enough. *Clapper*, 568 U.S. at 409 (2013); *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023), *cert. denied*, No. 23-39, 2023 WL 6378509 (U.S. Oct. 2, 2023). Moreover, although proof of proximate cause is not required, "there must be a causal connection between the injury and the conduct complained of" such that the injury is "fairly traceable to the challenged action of the defendant." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). And "[f]or a plaintiff's claim to be redressable, it must be 'likely, as opposed to merely speculative, that a favorable decision will redress the plaintiff's injury.'" *Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427, 432 (5th Cir. 2014) (en banc) (quoting *S. Christian Leadership Conf. v. Sup. Ct. of La.*, 252 F.3d 781, 788 (5th Cir. 2001)).

Standing is "no[] mere pleading requirement[] but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. At the pleading stage, Plaintiffs needed to "'clearly . . . allege facts demonstrating' each element" of standing to establish jurisdiction. *Spokeo*, 578 U.S. at 338 (alteration in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975). Here, Plaintiffs sought a preliminary injunction facially invalidating a state law in a pre-enforcement challenge. To establish standing for such relief, Plaintiffs must make a "clear showing" of each element of standing. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). That is particularly so because such a challenge requires a form of "[i]nvalidate-the-law-now, discover-how-it-works-later judging" that is difficult to reconcile with federalism. *Netchoice L.L.C. v. Paxton*, 49 F.4th 439, 449 (5th Cir. 2022), *cert. granted in part on other grounds* 2023

WL 6319650 (U.S. Sept. 23, 2023). When unelected members of the federal judiciary engage in such judging, they both "deprive[] state courts of the opportunity to construe a law to avoid constitutional infirmities," and threaten "to countermand the State's democratically accountable policymakers." *Id.* (cleaned up) (quoting *New York v. Ferber*, 458 U.S. 747, 768 (1982)). As a result of "the disfavor that attaches to pre-enforcement facial challenges," this Court has explained, "the legal standard for them is extraordinarily high." *Id.*

### 1. Plaintiffs fail to allege an injury-in-fact.

Plaintiffs cannot meet that burden even as to injury. In a First Amendment pre-enforcement challenge, like here, Plaintiffs suffer an injury-in-fact if they "(1) ha[ve] an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) [their] intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (cleaned up). Plaintiffs allege what appear to be three potential injuries: (1) compelled speech in the form of adopting the government's ratings, (2) reputational harm, and (3) financial costs associated with the rating of books and an inability to sell future books. ROA.111-12. None of these theories satisfy this Court's test for a concrete injury in a First Amendment pre-enforcement challenge, *Speech First*, 979 F.3d at 330, or entail particularized, concrete, and actual or imminent harm, *see Clapper*, 568 U.S. at 409.

### a. Plaintiffs' alleged injuries fail to satisfy the standard for First Amendment pre-enforcement challenges under *Speech First*.

In a First Amendment pre-enforcement challenge, this Court has said that Plaintiffs establish an injury-in-fact if they show they "(1) ha[ve] an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) [their] intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial." *Speech First*, 979 F.3d at 330 (cleaned up). Plaintiffs must "clearly allege facts demonstrating *each element*" of standing. *Spokeo*, 578 U.S. at 338 (cleaned up). Here, Plaintiffs cannot even satisfy each element of injury under *Speech First*.

*First*, Plaintiffs allege an intention to exercise their free speech rights under the First Amendment by selling books to school libraries. But for the reasons discussed below, *infra* Section II, READER does not implicate Plaintiffs' First Amendment rights, and Plaintiffs do not allege it affects any other constitutional interests.

*Second*, Plaintiffs' intended future conduct—selling books to public schools—is not proscribed by READER. READER has no provision that is enforceable by Defendants that would prevent Plaintiffs from selling books. And because it is not clear that Plaintiffs sell harmful, vulgar, explicit, or educationally unsuitable books, it is not clear that non-party school districts would not purchase particular books from Plaintiffs. The rating system provides an accessible mechanism by which Plaintiffs can maintain desired business relationships with State entities, including State Defendants, expressly tasked with monitoring students' safety and educational well-being.

*Third*, there can be no serious threat of enforcement because READER does not include any enforcement mechanism by *these State Defendants* against *these Plaintiffs*. To start, the library collection standards: the Commission, in consultation with the Board, develops and promulgates these standards, and school districts must adhere to them. Tex. Educ. Code § 33.021(c). The standards must specifically relate to school library collection development policies and are designed to prevent schools from distributing sexually explicit material to school children. *See id.* § 33.021(c)-(d). Importantly, the Commission's October 27 proposed rule makes clear that the Commission does not have direct "enforcement authority with respect to *school libraries*," even though libraries have a duty under READER to implement and adhere to the Commission's standards. *See* 48 Tex. Reg. at 6292 (emphasis added). No Plaintiff, or any other vendor, has any duty under the library collection standards, and no Defendant has authority to enforce the collection standards against Plaintiffs. Notably, this is very different from the situation seen in an archetypal pre-enforcement challenge, in which the threat of severe criminal or civil penalties may lead to a chill of First Amendment protected activity. *See Steffel v. Thompson*, 415 U.S. 452, 475 (1974) (permitting injunctive relief with a facially unconstitutional criminal statute); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014) (holding that threatened administrative action is "sufficient to justify pre-enforcement review").

So too with the rating system: vendors who wish to sell to public schools must rate sexually explicit and relevant materials. Tex. Educ. Code § 35.002(a). But even if Plaintiffs do not comply with the rating system, this provision does not expressly

authorize any penalties against Plaintiffs. School districts are prohibited from purchasing materials from a non-compliant vendor,[4] which may cause Plaintiffs to lose a customer, but that customer is the State who has the right to control its own funds. *Harris v. McRae*, 448 U.S. 297, 317 n.19 (1980) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a "penalty" on that activity."). The only interaction between any vendor and any State Defendant occurs if the Agency, in its discretion, chooses to review a vendor's ratings and to issue a corrected rating, if appropriate. Tex. Educ. Code § 35.003(a). And although READER provides vendors reasonable discretion in issuing ratings, school districts are ultimately the ones responsible for ensuring that their library catalogues reflect State education standards. *Id.* As a result, there is no "threat of future enforcement of the challenged policies [that] is substantial" enough to satisfy *Speech First*'s test for harm under a pre-enforcement theory. 979 F.3d at 330 (cleaned up).

### b. Plaintiffs' alleged injuries are not actual, imminent, concrete, or particularized.

**i.** Even under more general standing principles, Plaintiffs' claims fail because their alleged injuries are not actual, imminent, concrete, or particularized. *See Clapper*, 568 U.S. at 409. To start, Plaintiffs make what appear to be related claims that READER's rating system improperly compels private speech and thereby causes reputational harms because vendors' initial and updated ratings will eventually be broadcast on the Agency's website "as [Plaintiffs' own] speech," not

---

[4] School districts cannot purchase from a vendor who does not adopt the Agency's corrected rating under Texas Education Code section 35.003(a) and is placed on the non-compliance list under Texas Education Code section 35.003(c).

that of the government. ROA.718. Accordingly, Plaintiffs assert that READER compels Plaintiffs to adopt "speech"—a government rating of either sexually explicit or sexually relevant—with which Plaintiffs may or may not disagree. Again, Plaintiffs' fears require uncertain future events to unfold: Plaintiffs must continue selling books to school districts; at least one of those books must be sexually explicit or relevant; Plaintiffs must fail to assign an appropriate rating for that book; and the Agency must review Plaintiffs' rating and issue a corrected rating. Only then will Plaintiffs be able to assert their allegation that they may disagree with an Agency rating and be "compelled" to adopt the Agency's "speech"—something no one can yet know. ROA.718. And only if Plaintiffs do adopt an Agency rating (whether they disagree with it or not), and only if enough of Plaintiffs' customers react adversely to their adoption of that rating, can Plaintiffs' reputational harm claims materialize. ROA.525.

Plaintiffs' protracted theory is precisely the type of "standing theory premised on a speculative chain of possibilities" that the Supreme Court has repeatedly rejected as improper speculation rather than a concrete, particularized injury. *Clapper*, 568 U.S. at 410 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *Whitmore v. Arkansas*, 495 U.S. 149, 157-60 (1990)). Nothing in READER requires State Defendants to identify or otherwise associate any vendor with any book or any rating. And Plaintiffs do not explain how vendors' ministerial application of the State's rating system for sexually explicit materials somehow pegs Plaintiffs as the authors of a government message or expression—particularly when the "speech" would occur on a government website. *See* Tex. Educ. Code § 35.002(e).

Plaintiffs cannot explain how that government message (if it were one) could be reasonably attributed to Plaintiffs, or to any specific vendor. Such a "highly attenuated" "theory of standing" hardly "satisf[ies] the requirement that threatened injury must be certainly impending. *Clapper*, 568 U.S. at 410 (citation omitted).

Plaintiffs also fail to explain how their reputations (and business relationships) will be harmed by acquiescing to the Agency's rating system. Because Plaintiffs want to *continue* selling books to schools, presumably their customer base includes school districts that must comply with READER; Plaintiffs' application of the ratings will only help rather than hurt those customers, so it is difficult to understand Plaintiffs' reputational harm claims. Tellingly, Plaintiffs mentioned reputational interests summarily and in passing in two declarations—one from each individual bookseller. ROA.57 (Decl. of Rejsek); ROA.63 (Decl. of Koehler). Those threadbare allegations about reputational harm absent more are insufficient to show an actual, concrete reputational injury.[5] For example, in *Meese v. Keene*, the Court found a claim of reputational harm to be sufficient to establish standing on behalf of a politician because "his constituency would be influenced against him," and thereby "impair[] his political career." 481 U.S. 465, 475 (1987). Plaintiffs here have not alleged any

---

[5] Plaintiffs also mention a fear that "potential buyers in and outside of the state" would hold the ratings against the vendors, ROA.736, and that being listed on the Agency's website would amount to public shaming. ROA.525. How the public or customers might view Plaintiffs is "merely speculative" and insufficient to confer standing. *Lujan*, 504 U.S. at 561 (cleaned up).

comparably specific impacts that a harm to reputation would have on their businesses.

**ii.**  Equally unsupported are Plaintiffs' theories that they will suffer financial injuries from having to comply with READER's rating system. ROA.123. To start, plaintiffs allege it will cost $4,000,000 to $500,000,000 to retroactively rate sold books and assign each book a statutory rating. ROA.62. Although a plaintiff can successfully allege a harm based on the costs of complying with a mandatory regulatory regime, *e.g.*, *Restaurant L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023), that is simply not the case here because Plaintiffs are under no obligation to participate in the rating system. Plaintiffs may choose to participate in the rating system to sell materials to school districts, or they may choose to continue selling unrated books to the rest of their non-school district customers. *Supra* p. 7. In other words, Plaintiffs are free to choose *not* to sell library materials if doing so is not economically in their best interest. Any costs associated with implementing the rating system are not necessary to Plaintiffs' continued operations. Indeed, plaintiffs may be able to pass along those costs in the form of higher prices—but this determination is still highly speculative at this time.

Plaintiffs also claim they may suffer financial injuries as a result of READER's library collection standards, which they explain could discourage business with existing or future customers. Although Plaintiffs avoid admitting they sell sexually explicit material that would require a rating, they claim the "uncertainty surrounding which books may be possessed, acquired, or purchased has caused . . . school districts to stop purchasing books from Plaintiffs." ROA.692. And that therefore, the

"reduction of books purchased from Plaintiffs because of the Library Standards will economically harm Plaintiffs." ROA.692. But purchasing choices that "depend[] on several layers of decisions by third parties" are "too speculative to confer Article III standing." *Little v. KPMG LLP*, 575 F.3d 533, 541 (5th Cir. 2009). Given that State Defendants are still developing rules and standards to implement READER, Plaintiffs' contention that they will be required to comply with yet-to-be-enacted standards may never crystalize into a concrete dispute. ROA.112; *see also* § 35.003. Such a theory is too "speculative, conjectural, [and] hypothetical" to support standing. *Abdullah*, 65 F.4th at 208 (citation omitted).

The only actual and concrete economic harm Plaintiffs allege is that "one school district, Katy ISD, ceased all library book purchases, including from Plaintiffs, after [READER's] passage." ROA.111. But Plaintiffs conspicuously chose not to sue the decisionmakers in Katy ISD, and Katy ISD's purchasing decisions are, largely, its own. "A claim of injury generally is too conjectural or hypothetical to confer standing when the injury's existence depends on the decisions of third parties not before the court." *Little*, 575 F.3d at 540 (citation omitted).

**2.    Plaintiffs' alleged injuries are neither traceable to State Defendants nor redressable by a favorable judicial decision.**

Plaintiffs fail to satisfy the remaining elements of standing—traceability and redressability—because State Defendants did not cause any of Plaintiffs alleged injuries. *Lujan*, 504 U.S. at 560. Plaintiffs' injuries are traceable to Defendants only if Plaintiffs can show "a causal connection between the injury and the conduct complained of." *Id.* (cleaned up); *see also California v. Texas*, 141 S. Ct. 2104, 2115

(2021). Redressability requires Plaintiffs to show that it is "likely, as opposed to merely speculative," that a favorable judicial decision will relieve Plaintiffs' alleged injury. *Dep't of Texas, Veterans of Foreign Wars of U.S.*, 760 F.3d at 432 (quoting *S. Christian Leadership Conference*, 252 F.3d at 788).

Here, Plaintiffs' alleged First Amendment, reputational, and future economic injuries are neither traceable to State Defendants' conduct nor redressable by the Court in an order directed to these Defendants. They are not traceable to Defendants because only one Defendant (the Agency) takes any action that could potentially affect any Plaintiff. *See* Tex. Educ. Code § 35.003(c). But again, the chain of causation is highly attenuated: if Plaintiffs continue to sell library materials to school districts, and if Plaintiffs issue an inaccurate book rating, and if the Agency chooses to review and correct Plaintiffs' inaccurate rating, and if Plaintiffs refuse to adopt the Agency's corrected rating, only then may the Agency place Plaintiffs on a non-compliance list. *Id.* §§ 35.002, 35.003. That action—being placed on the non-compliance list—arguably could precipitate potential reputational harm and associated lost-revenue injuries. But there are innumerable explanations for Plaintiffs' hypothetical future reputational or financial losses, including some that have absolutely nothing to do with State Defendants. At its core, READER does not require or instruct the Agency to identify or otherwise associate Plaintiffs with any book or any rating on any list. In fact, if a Plaintiff is ever placed on the non-compliance list, it can be removed at any time based on its own efforts.

Additionally, Plaintiffs' alleged injuries will not be redressed by injunctive relief if Defendants are enjoined from enforcing READER. Both this Court and the

Supreme Court have held that federal courts do not enjoin laws but rather the individuals who enforce those laws and who are uniquely positioned to redress any supposed harm. *See Okpalobi v. Foster*, 244 F.3d 405, 426-27 (5th Cir. 2001) (en banc). But without an actual enforcement authority—that is, without the "power to redress [Plaintiffs'] asserted injuries" or "to order" compliance with the law—Defendants cannot be enjoined. *See Okpalobi*, 244 F.3d at 427. Here, no State Defendant has the required enforcement authority over Plaintiffs' conduct to redress Plaintiffs' asserted injuries. The only named Defendant that might arguably have authority related to Plaintiffs is the Agency because it can place vendors on a non-compliance list if a vendor fails to adopt a corrected rating in a timely manner. *Supra* pp. 9-10. But enjoining the Agency from placing a Plaintiff on the non-compliance list will not redress Plaintiffs' alleged injuries; school districts still may choose not to purchase material that is harmful, sexually explicit, pervasively vulgar, or educationally unsuitable from any vendor. *See* Tex. Educ. Code § 33.021(d)(2)(A) (referencing Tex. Penal Code § 43.24 and *Pico*, 457 U.S. 853). In short, because no State Defendant has the requisite enforcement authority over Plaintiffs' conduct, Plaintiffs' alleged injuries are neither traceable to nor redressable by those Defendants. *Okpalobi*, 244 F.3d at 427. Because such an order enjoining Defendants would not resolve Plaintiffs' harm, the Court has no ability to enter the order. *Lujan*, 504 U.S. at 560-61.

\* \* \*

In sum, because Plaintiffs have not alleged—let alone made a clear enough showing to justify the preliminary-injunction standard on a facial challenge to a state

law—an injury-in-fact that is traceable to State Defendants' conduct and redressable by a favorable judicial decision, they fail to establish standing. Without standing, Plaintiffs have no case.

## C.  State Defendants are entitled to sovereign immunity.

Even assuming there is a justiciable controversy here, sovereign immunity bars suit against these State Defendants. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-02 (1984). Of course, the *Ex parte Young* exception to sovereign immunity allows a plaintiff to seek prospective injunctive relief when a state officer acts in violation of the Constitution. *Tawakkol v. Vasquez*, 81 F.4th 397, 401 (5th Cir. 2023); *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013). But for the exception to apply, the officer must have a "connection with the enforcement of the [challenged] act." *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017). To have a connection with enforcement, the officer must have a duty beyond "the general duty to see that the laws of the state are implemented." *City of Austin*, 943 F.3d at 999-1000 (quoting *Morris*, 739 F.3d at 746). He must also have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Texas Democratic Party*, 978 F.3d at 179 (quoting *Morris*, 739 F.3d at 746). And finally, "enforcement means compulsion or constraint," so "[i]f the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *TARA*, 28 F.4th at 672 (5th Cir. 2022) (first quoting *City of Austin*, 943 F.3d at 1000) (internal quotations omitted) (then citing *Air Evac EMS, Inc.*, 851 F.3d at 520).

The *Ex parte Young* exception to sovereign immunity does not apply because Defendants lack the required connection to the enforcement of READER against Plaintiffs. "Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, [the Court's] *Young* analysis ends." *City of Austin*, 943 F.3d at 998. Here, to the extent Plaintiffs are compelled to or constrained from doing anything, it is by *school districts*. Tex. Educ. Code § 33.021(d)(2)(A); Tex. Educ. Code § 35.003(d). Yet rather than sue the specific school districts with whom they contract (and thereby give the Court a concrete factual basis upon which to rule), Plaintiffs chose to name as Defendants only statewide officials who set policy under READER—not the school districts with whom they directly contract. *See* ROA.983. But this Court has squarely held that the "authority to promulgate [policy], standing alone, is not the power to enforce that policy" within the meaning of *Ex parte Young. Haverkamp*, 6 F.4th at 670.

Indeed, no State Defendant has the *particular* duty to enforce either the library collection standards or the rating system against Plaintiffs. Plaintiffs may argue that the Agency Commissioner has the duty to enforce the rating requirements because he has a duty to list non-compliant vendors who fail to issue corrected ratings. Tex. Educ. Code § 35.003(c). But creating a non-compliance list to ensure the public has access to truthful and transparent information regarding explicit school library material does not compel or constrain any Plaintiff to do anything. Indeed, "[o]ur system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment." *Smith v. Doe*, 538 U.S. 84, 98 (2003). And because "the State does not make the publicity and the resulting stigma

an integral part of the objective of the regulatory scheme," it should not be understood as a shaming technique. *Id.* at 99. Because Defendants are State officials who lack the required connection to enforce the law against Plaintiffs, sovereign immunity bars Plaintiffs' claims, and the district court's preliminary injunction is improper.

## II. Plaintiffs Have Not Shown a Substantial Likelihood of Success on the Merits.

Because the temporary injunction was jurisdictionally invalid, the Court cannot and should not reach the merits. If the Court nevertheless does so, it must reverse the injunction because Plaintiffs have not shown they are "likely to succeed on the merits"—let alone that they are "likely to suffer irreparable harm in the absence of preliminary relief," that "the balance of equities tips in [their] favor," and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. Contrary to plaintiffs' inflammatory suggestion, READER is not a "Book Ban" that seeks to "punish" Plaintiffs. ROA.15. Instead, it is a reasonable, targeted effort to protect Texas school children from being exposed to harmful and explicit content. *See* Tex. Educ. Code § 33.021(d)(2). It does so not by regulating what Plaintiffs can say or sell but by placing appropriate conditions on the expenditure of public money on school library materials. *Harris*, 448 U.S. at 317 n.19 (1980) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity."). Such a regulation does not implicate the First Amendment rights of third-party vendors. Even if it did, READER would not violate those rights under any applicable standard of scrutiny.

## A.  READER does not implicate Plaintiffs' First Amendment rights.

Despite acknowledging READER's ability to prevent "obscene and harmful material" from entering schools, ROA.38, Plaintiffs allege that READER violates their free speech rights. But Plaintiffs' conduct—selling potentially explicit materials to public school libraries for distribution to children without reviewing and labeling their contents—receives no First Amendment protection. Far from requiring Texas to allow Plaintiffs to sell sexually explicit books to its schools, the "otherwise sharply divided" Court in *Board of Education v. Pico*, 457 U.S. 853 (1982) (plurality opinion), "acknowledged that the school board has the authority to remove books that are vulgar." *Fraser*, 478 U.S. at 684. Indeed, to the extent any speech is implicated, it is that of the government, which it expresses in a nonpublic forum— not plaintiffs' private speech. "When the government speaks for itself, the First Amendment" is not implicated and "does not demand airtime for all views." *Shurtleff v. City of Bos., Mass.*, 142 S. Ct. 1583, 1587 (2022). Instead, it is well recognized that "the government must be able to 'promote a program' or 'espouse a policy' in order to [perform its] function[s]." *Id.* (quoting *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015)). Here, that function is the provision of an appropriate pedagogical environment for children, free of the harmful effects of sexually explicit material.

### 1.  The First Amendment does not force Texas to allow Plaintiffs' sexually explicit books in its schools.

Put simply, no Plaintiff has a First Amendment right to force the government to purchase its sexually explicit books and place them on school library shelves. The

State is free to choose to expend public funds on public interest programs, or not. *See Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *see also Harris*, 448 U.S. at 317 n.19; *Maher v. Roe*, 432 U.S. 464, 475 (1977). And it has authority to limit children's access to sexually explicit material to which adults may have a constitutional right. *Cf. Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975); *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). It would strain logic to conclude that the State cannot lawfully consider whether a children's book is sexually explicit or relevant when deciding how to expend public funds on school library material. Neither Plaintiffs nor the district court cite legal authority for that remarkable proposition, and Defendants are aware of none.

### 2. The First Amendment does not preclude Texas from removing sexually explicit material from public school libraries.

As the *Pico* plurality noted, school districts can remove books that are vulgar or educationally unsuitable from school libraries without encroaching on the First Amendment. 457 U.S. at 870-71. In the *Pico* case, the local school board removed books from the public school library because they were deemed "improper fare for school students." *Id.* at 856. The plurality in *Pico* stated that a school board's ability to remove books from libraries is informed by the constitutional principle elucidated in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943). *Pico*, 457 U.S. at 872. That is, "local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* (quoting *Barnette*, 319 U.S. at 642). But they still

retain discretion to remove books "in such a way as to transmit community values," as "there is a legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political." *Id.* at 864 (citation omitted).

Although this Court has determined that the *Pico* plurality is not "binding precedent, it may properly serve as guidance in determining whether [a school's] removal decision was based on unconstitutional motives." *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184, 189 (5th Cir. 1995). Applying that understanding, READER is not a law that removes books for reasons implicating the First Amendment: there is no indication that Texas seeks or sought to establish what is orthodox in matters of politics, nationalism, religion, or other matters of opinion. Any view of such matters may still find its way into a public school library for young and inquisitive minds to consume and digest. And rightfully so. But Texas properly draws a line that those materials that fall under the statutory definition of "sexually explicit material" are not properly housed in a public school library or purchased with public funds. Tex. Educ. Code § 33.021(d)(2)(A). That line is consistent with Texas's constitutional obligations to the booksellers, children, and parents alike.

### 3. READER's rating system is government speech, not private speech subject to the First Amendment.

If the rating system under READER implicates *any* speech, it is government speech—not the speech of private parties. As the Supreme Court recently reiterated, drawing a line between government and private speech when the speech is entangled requires "a holistic inquiry designed to determine whether the government intends

to speak for itself or to regulate private expression." *Shurtleff*, 142 S. Ct. at 1589. Plaintiffs insist that initial and corrected ratings will be placed on the Agency's website "as [Plaintiffs' own] speech," not that of the government. ROA.718. Examining the three factors highlighted by *Shurtleff*—"the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression"—belies this contention. 142 S. Ct. at 1589-90. Under these factors, the ratings are government speech.

*First*, there is an abundant history of product labels—including music, television, movie, and video game ratings—appearing on goods sold in the United States. These labels operate largely the same as the rating system under READER: an entity *other* than the creator, distributor, or seller of a certain work establishes a labeling system, and works are then assigned an appropriate label or rating prior to being sold. That labeling entity can be the government or another association. *See* U.S. Dep't of Health & Human Servs., *The Health Consequences of Smoking—50 Years of Progress: A Report of the Surgeon General* (2014) at 23-24, available at http://tinyurl.com/smokingreport2014; *See* Douglas Dow, *Motion Picture Ratings*, MTSU:       Free       Speech       Ctr.       (Jan. 1,       2009), https://firstamendment.mtsu.edu/article/motion-picture-ratings/; *accord* Sabrina S. Adler *et. al.*, *You Want a Warning with That? Sugar-Sweetened Beverages, Safety Warnings, and the Constitution*, 71 Food & Drug L.J. 482, 497 (2016) (explaining how governments can design warning labels consistent with the First Amendment). Indeed, such labels are so common that there is an entire constitutional test just to

determine whether they are consistent with the First Amendment. *CTIA–The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845-48 (9th Cir. 2019); *see Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 20-21 (D.C. Cir. 2014) (en banc). Given the well-developed history of rating systems as well as the public school context of these ratings, it would be unreasonable for any member of the public to assume that a sexually explicit or sexually relevant rating assigned to a children's book reflects the private, expressive speech of any Plaintiff.

*Second*, the public is particularly unlikely to misattribute these warnings to Plaintiffs for additional reasons. The public knows that school library books are government property and used to further a government interest in educating children. Moreover, the State has set out rating requirements expressly and publicly in READER. *Supra* pp. 7-19. A vendor who rates a book under READER does not express an opinion on the subject matter being rated or the book's appropriateness for children. Instead, it is a form of consistency review which, under this Court's caselaw, is considered a purely ministerial task. *See, e.g.*, *Texas v. United States Envt'l Prot. Agency*, 829 F.3d 405, 411 (5th Cir. 2016). And ultimately, the ratings are published on a government website—not any document or publication or property of the Plaintiffs. Tex. Educ. Code § 35.002(e). Taken "holistic[ally]," *Shurtleff*, 142 S. Ct. at 1589, it is unlikely that a reasonable viewer would perceive these ratings as anything other than what they are: a product label that alerts school districts and parents if a certain book fails to meet Statewide library school catalogue standards.

*Third*, apart and in addition to the public's perception, the speech actually is that of the government—not private parties. READER provides that, ultimately, the

Agency may review vendors' ratings and issue new, corrected ratings. *See* Tex. Educ. Code §35.003(a); *see also Walker*, 576 U.S. at 212. And, again, those ratings are published on the Agency's website—something that private entities cannot do on their own. Such publication is indicative of government speech, and thus does not implicate the First Amendment.

## B. Even if Plaintiffs' First Amendment rights are implicated, Plaintiffs are unlikely to prove they have been violated.

Even if the First Amendment applies to Plaintiffs' claims, READER satisfies any applicable constitutional scrutiny. *See Fraser*, 478 U.S. at 684-85; *Ginsberg*, 390 U.S. at 643. Contrary to Plaintiffs' claims, READER regulates access to a quintessential non-public forum for third-party vendors (*i.e.*, a public school library), does not impose an unconstitutional prior restraint, does not unconstitutionally delegate state governmental authority, and is not unconstitutionally vague or overbroad. Moreover, even if the Court were to conclude that READER compels speech (and it should not), it does not do so in a way that violates applicable First Amendment standards.

### 1. The public school library is a non-public forum in which Plaintiffs' free speech rights are not absolute.

Even if READER implicated protected speech, it would not violate the First Amendment, first and foremost, because a public school library is a non-public forum to which the State *is allowed* to control access. In the public school context, the First Amendment does not guarantee "an unlimited audience where the speech is sexually explicit and the audience may include children." *Fraser*, 478 U.S. at 684. Instead,

"school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (citation omitted). Educators "exercise greater control over" speech in a school environment to ensure "readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school"— including speech that "might reasonably be perceived to advocate . . . irresponsible sex, or conduct otherwise inconsistent with 'the shared values of a civilized social order.'" *Id.* at 271-72 (citation omitted).

Here, Plaintiffs seek to place their books on school library shelves. Their First Amendment rights to free speech are necessarily limited because the school library is a non-public forum in which a vulnerable population can be found. Plaintiffs' First Amendment rights are naturally curbed.

### 2.   READER does not impose an unconstitutional prior restraint.

For similar reasons, READER is not an unconstitutional prior restraint. The "term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting Melville Nimmer, *Nimmer on Freedom of Speech* § 4.03, p. 4–14 (1984)). Such restraints are highly problematic when they "forbid" speech *broadly*, but they are not inherently suspect if they are limited to serve an important purpose or protect a vulnerable audience. *Cf. id.* (collecting cases). In the public school context, "prior restraint on speech ... is constitutional if reasonably related to legitimate

pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999). Here, READER does not represent an unlawful prior restraint on Plaintiffs: to the extent it implicates First Amendment protected speech, it does not forbid "communications" to any audience outside of Texas schools, *Alexander*, 509 U.S. at 550, and it is intertwined with State Defendants' duty to monitor children's educational well-being. READER satisfies that minimal standard.

### 3. READER does not impose an unconstitutional delegation of government authority.

Neither Plaintiffs nor the district court explain how READER would violate nondelegation principles. The district court found that although "[t]he government has the power to do the contextual ratings for the books itself" and "to restrict the ability of its school district as to which books it may purchase," these powers "should be exercised by the *state directly*." ROA.736 (emphasis added). Generally, nondelegation requires the transfer of "public power to private bodies." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) (internal citations omitted). Under federal nondelegation principles, "a private entity may wield government power only if it 'functions subordinately' to an agency with 'authority and surveillance' over it." *Black*, 53 F.4th at 881. That is, a government entity may "employ private entities for *ministerial* or *advisory* roles," but it may *not* give binding "governmental power" to a private party. *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004) (citing *United States v. Frame*, 885 F.2d 1119, 1129 (3d Cir. 1989)).

Even assuming federal nondelegation principles apply here (Plaintiffs do not adequately allege they do, *see* ROA.38-39), no private party wields binding governmental power under READER. Private vendors are not State subordinates. At most, a vendor is tasked with carrying out a ministerial role by reviewing school library materials and applying pre-set, governmental standards. *See United States Envt'l Prot. Agency*, 829 F.3d at 411; *accord Black*, 53 F.4th at 886 (noting that consistency review of rules "does not include reviewing the substance of the rules themselves"). And vendors perform that task subject to the discretionary supervision of the Agency, which has the power to revise ratings should it see fit. *Supra* p. 8. READER urges vendors to adopt the State's rating system; it does not demand that Plaintiffs assert any control, power, or authority reserved to the State. As a result, READER is entirely consistent with this Court's understanding of when private nondelegation is permissible. *See Texas v. Rettig*, 987 F.3d 518, 532-33 (5th Cir. 2021).

### 4.   READER is not unconstitutionally vague or overbroad.

READER is entirely consistent with how this Court determines whether a statute is unconstitutionally vague or overbroad. To start, the void-for-vagueness doctrine is a poor fit to analyze the permissibility of READER because it almost always applies in "criminal or quasi-criminal" contexts—not civil regulations regarding the expenditure of public funds for school libraries. *United States v. Clinical Leasing Serv.*, 925 F.2d 120, 122 (5th Cir. 1991). But assuming the same standard applies, only "a reasonable degree of certainty is required" to survive scrutiny under vagueness. *United States v. Tansley*, 986 F.2d 880, 885 (5th Cir. 1993) (citation

omitted). The overbreadth doctrine is "a last resort," and only succeeds "if a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Netchoice*, 49 F.4th at 450.

Plaintiffs allege that READER's collection standards are subjective; do not include a carve out for works with literary, artistic, scientific, or political value; and require considering books in active use, but not in the curriculum, in their context. ROA.114-15. They also claim that although READER prohibits "obscene and harmful material," they fear "it also prohibits a wide swath of constitutionally protected material." ROA.38. Leaving aside that these allegations conflate First Amendment doctrines such as vagueness and overbreadth with the definition of obscenity, the position ignores that in *Miller*, the Supreme Court allowed standards based on the "contemporary standards of the State of California" as "constitutionally adequate." *Miller v. California*, 413 U.S. 15, at 33 (1973). And, despite Plaintiffs' concerns about overly broad language, the lack of a carveout for otherwise valuable works may make the statute *broader*. As the Texas Supreme Court has recognized, "mere breadth of a disputed term does not perforce equate to ambiguity"—let alone unconstitutional vagueness or overbreadth. *Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 340 (Tex. 2023). If anything, the omission of such an exception makes the law *clearer*. And it will only become clearer when the developing standards are finalized. *Supra* Section I.A.

**5. The government operations and commercial speech exceptions to the First Amendment apply.**

Finally, to the extent that READER compels any speech (and it does not, *supra* Section II.A), that does not render it unconstitutional. Defendants do not dispute that generally "the government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023); *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977). But that rule is subject to exceptions, at least two of which apply here.

*First*, "[t]here is no right to refrain from speaking when 'essential operations of government require it for the preservation of an orderly society.'" *United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014) (citation omitted); *see also United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) ("A First Amendment protection against compelled speech, however, has been found only in the context of governmental compulsion to disseminate a particular political or ideological message."). READER addresses one of the most essential operations of government: the education of the next generation. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973). And Plaintiffs are merely asked to provide information to be used in reviewing the sexual content of books in Texas public school libraries, not to "disseminate publicly a message with which [they] disagree[]." *Sindel*, 53 F.3d at 878.

*Second*, any "speech" expresses truthful, factual information about the composition of Plaintiffs' commercial products—that is, commercial speech. Commercial speech is expression related solely to the economic interests of the speaker and its audience, *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,

447 U.S. 557, 561 (1980), and does "no more than propose a commercial transaction," *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Relations*, 413 U.S. 376, 385 (1973) (citation omitted). The Supreme Court in *Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626 (1985), upheld commercial disclosure requirements because they were "purely factual and uncontroversial" and "reasonably related to the State's interest." 471 U.S. at 651. Courts have clarified that *Zauderer* applies to disclosures that inform "purchasers about what the [government] has concluded is appropriate use of the product they are about to buy," so long as they do not require the company to "take sides in a heated political controversy." *CTIA*, 928 F.3d at 848; *see Am. Meat Inst.*, 760 F.3d at 21 (D.C. Cir. 2014) (en banc). *Zauderer* triggers only rational-basis review. *Oles v. City of New York*, No. 22-1620-CV, 2023 WL 3263620, at *3 (2d Cir. May 5, 2023); *see Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013) (en banc); *see Netchoice*, 49 F.4th at 485, *cert. granted in part on other grounds* 2023 WL 6319650 (U.S. Sept. 23, 2023).

Here, the "speech" (a government rating) informs public schools and parents whether library materials meet standards set by the State. Providing such information does not require a book vendor to pass judgment or express a view on the validity of the standard or a book's propriety to be shown to children. Rather, like a nutrition label's food-allergen warning, the rating tells the buyer what they are receiving. *Supra* p. 1. Such a rating is rationally related to the governmental interest of protecting children from sexually explicit material at school. *See Ginsberg*, 390 U.S. at 641-43 (finding a rational basis for a statute criminalizing distribution of

obscene material to minors). Or, in the alternative, READER is related to the interest in ensuring public school libraries know what they are buying such that they are not confused or being deceived. *See Greater Balt. Ctr. for Pregnancy Concerns*, 721 F.3d at 283. READER survives rational-basis review under *Zauderer*.

Even without *Zauderer*, the Constitution still "accords a lesser protection to commercial speech." *Cent. Hudson*, 447 U.S. at 563. The "speech" at issue here relates solely to the economic interests of Plaintiffs and their "audience" (potential purchasers). A State may regulate such commercial speech if it has "a substantial interest to be achieved by restrictions" and "the regulatory technique" is "in proportion to that interest." *Id.* at 564. The importance of public education is indisputable. *E.g.*, *Rodriguez*, 411 U.S. at 35. And requiring Plaintiffs to inform schools how books are rated under Statewide standards proportionally advances that interest. Plaintiffs complain that READER will require them to know and rate what is in the items they wish to sell to Texas public schools. But, even outside the ambit of *Zauderer*, those basic expectations of commercial speech are constitutional.

* * *

In sum, even if the district court had jurisdiction (and it did not), it erred as a matter of law in granting the preliminary injunction because Plaintiffs have no probability of success in proving that READER implicates the First Amendment— let alone that READER violates any applicable constitutional standard of review.

### III. The District Court Abused Its Discretion in Granting Plaintiffs' Preliminary Injunction.

Apart from its substantive errors, the district court abused its discretion in granting Plaintiffs' preliminary injunction. A preliminary injunction—particularly one that facially invalidates a state statute—is "an extraordinary remedy" that is *never* given as of right. *Winter*, 555 U.S. at 24. Instead, the court must require the plaintiff to show all four *Winter* factors, *see United States v. Billingsley*, 615 F.3d 404, 408 n.4 (5th Cir. 2010), and then be careful to tailor the relief so that it is not more burdensome than necessary to remedy the plaintiff's injury. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The district court did not do so here.

Plaintiffs will suffer no cognizable, irreparable harm in the absence of an injunction. Every vendor has five months to "develop and submit to the [A]gency a list of library material rated as sexually explicit material or sexually relevant material." Tex. Educ. Code § 35.002(c). Even then, Plaintiffs fail to identify any consequence imposed by READER for failing to capture specific titles in those initial ratings. Before they can be placed on the non-compliance list, they are entitled to 60 days to cure the problem. Tex. Educ. Code § 35.003(b). As a result, it would likely be months before Plaintiffs might incur any damages, which could be considered entirely by the district court if appropriate.

By contrast, "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey*, 870 F.3d at 391. The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435

(2009). These interests are particularly acute here because READER was designed to protect children from sexually explicit, harmful, and other educationally inappropriate materials and to preserve parents' rights to control the upbringing of their children. Tex. Educ. Code §§ 33.021, 35.002. And it does so on a statewide basis when the only asserted harm is that a single school district (which is not a party to this litigation) has paused further library book purchases pending publication of final regulations. *Supra* p. 26. Equity cannot justify entry of such a sweeping remedy to such a minor alleged injury—particularly when that remedy prevents the State from fulfilling its solemn "responsibility for [the] education of its citizens." *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972).

## Conclusion

The Court should reverse the injunction. It should also remand with instructions to dismiss plaintiffs' claims or, alternatively, stay the injunction.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

/s/ Kateland R. Jackson
Kateland R. Jackson
Assistant Solicitor General
Kateland.Jackson@oag.texas.gov

Counsel for Defendants-Appellants

## CERTIFICATE OF SERVICE

On October 30, 2023, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Kateland R. Jackson
KATELAND R. JACKSON

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 12,343 words, excluding the parts of the motion exempted by rule; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Kateland R. Jackson
KATELAND R. JACKSON