No. 23-50668

# In the United States Court of Appeals for the Fifth Circuit

**BOOK PEOPLE, INCORPORATED; VBK, INCORPORATED, doing business as BLUE WILLOW BOOKSHOP; ASSOCIATION OF AMERICAN PUBLISHERS; AUTHORS GUILD, INCORPORATED; COMIC BOOK LEGAL DEFENSE FUND; AMERICAN BOOKSELLERS ASSOCIATION,**

*Plaintiffs-Appellees,*

v.

**MARTHA WONG, in her official capacity as the Chair of the Texas State Library and Archives Commission; KEVEN ELLIS, in his official capacity the Chair of the Texas State Board of Education; MIKE MORATH, in his official capacity as the Commissioner of the Texas Education Agency,**

*Defendants-Appellants.*

**On Appeal from the United States District Court for the Western District of Texas, Austin Division Case No. 1:23-CV-00858-ADA, Judge Alan Albright**

### RECORD EXCERPTS OF PLAINTIFFS-APPELLEES

Laura Lee Prather
Catherine L. Robb
Michael J. Lambert
William Reid Pillifant
**HAYNES AND BOONE, LLP**
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone: (512) 867-8400

**ATTORNEYS FOR PLAINTIFFS-APPELLEES**

## <u>TABLE OF CONTENTS</u>

| Tab | Date | Document | Record Ref. |
|-----|------|----------|-------------|
| **Optional Contents** | | | |
| 1. | | Text of HB 900 | ROA.126-135 |
| 2. | 07/21/2023 | Declaration of Valerie Koehler | ROA.143-147 |
| 3. | 07/21/2023 | Declaration of Matthew Stratton | ROA.149-154 |
| 4. | 07/23/2023 | Declaration of Charley Rejsek | ROA.156-160 |
| 5. | 07/23/2023 | Declaration of David Grogan | ROA.162-166 |
| 6. | | Certificate of Service and ECF Certification | |

Respectfully submitted,

*/s/ Laura Lee Prather*

Laura Lee Prather
Texas Bar No. 16234200
laura.prather@haynesboone.com
Catherine L. Robb
Texas Bar No. 24007924
catherine.robb@haynesboone.com
Michael J. Lambert
Texas Bar No. 24128020
michael.lambert@haynesboone.com
William Reid Pillifant
Texas Bar No. 24126157
reid.pillifant@haynesboone.com

**HAYNES AND BOONE, LLP**
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone: (512) 867-8400
Facsimile: (512) 867-8470

**ATTORNEYS FOR PLAINTIFFS-APPELLEES**

# TAB 1

H.B. No. 900

1              AN ACT

2  relating to the regulation of library materials sold to or included

3  in public school libraries.

4        BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

5        SECTION 1.  This Act shall be known as the Restricting

6  Explicit and Adult-Designated Educational Resources (READER) Act.

7        SECTION 2.  Section 33.021, Education Code, is amended to

8  read as follows:

9        Sec. 33.021.  LIBRARY STANDARDS.  (a)  In this section,

10  "sexually explicit material" means any communication, language, or

11  material,  including  a  written  description,  illustration,

12  photographic image, video image, or audio file, other than library

13  material directly related to the curriculum required under Section

14  28.002(a), that describes, depicts, or portrays sexual conduct, as

15  defined by Section 43.25, Penal Code, in a way that is patently

16  offensive, as defined by Section 43.21, Penal Code.

17        (b)  The Texas State Library and Archives Commission, in

18  consultation with the State Board of Education, shall adopt

19  voluntary  standards  for  school  library  services,  other  than

20  collection development, that a[.  A] school district shall consider

21  [the standards] in developing, implementing, or expanding library

22  services.

23        (c)  The Texas State Library and Archives Commission, with

24  approval by majority vote of the State Board of Education, shall

1

H.B. No. 900

adopt standards for school library collection development that a
school district shall adhere to in developing or implementing the
district's library collection development policies.

 (d) The standards adopted under Subsection (c) must:

  (1) be reviewed and updated at least once every five
years; and

  (2) include a collection development policy that:

   (A) prohibits the possession, acquisition, and
purchase of:

    (i) harmful material, as defined by Section
43.24, Penal Code;

    (ii) library material rated sexually
explicit material by the selling library material vendor; or

    (iii) library material that is pervasively
vulgar or educationally unsuitable as referenced in *Pico v. Board
of Education*, 457 U.S. 853 (1982);

   (B) recognizes that obscene content is not
protected by the First Amendment to the United States Constitution;

   (C) is required for all library materials
available for use or display, including material contained in
school libraries, classroom libraries, and online catalogs;

   (D) recognizes that parents are the primary
decision makers regarding a student's access to library material;

   (E) encourages schools to provide library
catalog transparency;

   (F) recommends schools communicate effectively
with parents regarding collection development; and

2

H.B. No. 900

1        (G)  prohibits  the  removal  of  material  based
2   solely on the:
3             (i)  ideas contained in the material; or
4             (ii)  personal background of:
5                  (a)  the author of the material; or
6                  (b)  characters in the material.
7        SECTION 3.  Subtitle F, Title 2, Education Code, is amended
8   by adding Chapter 35 to read as follows:
9        CHAPTER 35.  REGULATION OF CERTAIN LIBRARY MATERIAL
10       Sec. 35.001.  DEFINITIONS.  In this chapter:
11            (1)  "Library material vendor" includes any entity that
12   sells library material to a public primary or secondary school in
13   this state.
14            (2)  "Sexually  explicit  material"  has  the  meaning
15   assigned by Section 33.021.
16            (3)  "Sexually  relevant  material"  means  any
17   communication,  language,  or  material,  including  a  written
18   description,  illustration,  photographic  image,  video  image,  or
19   audio file, other than library material directly related to the
20   curriculum  required  under  Section  28.002(a),  that  describes,
21   depicts, or portrays sexual conduct, as defined by Section 43.25,
22   Penal Code.
23       Sec. 35.002.  RATINGS REQUIRED.  (a)  A library material
24   vendor may not sell library materials to a school district or
25   open-enrollment  charter  school  unless  the  vendor  has  issued
26   appropriate  ratings  regarding  sexually  explicit  material  and
27   sexually relevant material previously sold to a district or school.

H.B. No. 900

1      (b)  A library material vendor may not sell library material

2  rated sexually explicit material and shall issue a recall for all

3  copies of library material sold to a district or school that is:

4            (1)  rated sexually explicit material; and

5            (2)  in active use by the district or school.

6      (c)  Not later than April 1, 2024, each library material

7  vendor shall develop and submit to the agency a list of library

8  material rated as sexually explicit material or sexually relevant

9  material sold by the vendor to a school district or open-enrollment

10  charter school before that date and still in active use by the

11  district or school.

12      (d)  Not later than September 1 of each year, each library

13  material vendor shall submit to the agency an updated list of

14  library material rated as sexually explicit material or sexually

15  relevant material sold by the vendor to a school district or

16  open-enrollment charter school during the preceding year and still

17  in active use by the district or school.

18      (e)  The agency shall post each list submitted under

19  Subsection (c) or (d) in a conspicuous place on the agency's

20  Internet website as soon as practicable.

21      Sec. 35.0021.  RATING GUIDELINES.  (a)  For purposes of

22  determining whether a library material is sexually explicit as

23  required by Section 35.002, a library material vendor must perform

24  a contextual analysis of the material to determine whether the

25  material describes, depicts, or portrays sexual conduct in a way

26  that is patently offensive.

27      (b)  In performing the contextual analysis of a library

4

H.B. No. 900

material, a library material vendor must consider the following
three principal factors with respect to the material:

        (1) the explicitness or graphic nature of a
description or depiction of sexual conduct contained in the
material;

        (2) whether the material consists predominantly of or
contains multiple repetitions of depictions of sexual or excretory
organs or activities; and

        (3) whether a reasonable person would find that the
material intentionally panders to, titillates, or shocks the
reader.

    (c) In examining the three factors listed under Subsection
(b), a vendor must weigh and balance each factor and conclude
whether the library material is patently offensive, recognizing
that because each instance of a description, depiction, or
portrayal of sexual conduct contained in a material may present a
unique mix of factors.

    (d) To determine whether a description, depiction, or
portrayal of sexual conduct contained in a material is patently
offensive, a library material vendor must consider the full context
in which the description, depiction, or portrayal of sexual conduct
appears, to the extent possible, recognizing that contextual
determinations are necessarily highly fact-specific and require
the consideration of contextual characteristics that may
exacerbate or mitigate the offensiveness of the material.

    Sec. 35.003. AGENCY REVIEW. (a) The agency may review
library material sold by a library material vendor that is not rated

H.B. No. 900

1  or incorrectly rated by the vendor as sexually explicit material,

2  sexually relevant material, or no rating in accordance with Section

3  35.002(a). If the agency determines that the library material is

4  required to be rated as sexually explicit material or sexually

5  relevant material or to receive no rating at all under that

6  subsection, the agency shall provide written notice to the vendor.

7  The notice must include information regarding the vendor's duty

8  under this section and provide the corrected rating required for

9  the library material.

10     (b)  Not later than the 60th day after the date on which a

11  library material vendor receives notice regarding library material

12  under Subsection (a), the vendor shall:

13         (1)  rate the library material according to the

14  agency's corrected rating; and

15         (2)  notify the agency of the action taken under

16  Subdivision (1).

17     (c)  The agency shall post and maintain in a conspicuous

18  place on the agency's Internet website a list of library material

19  vendors who fail to comply with Subsection (b).

20     (d)  A school district or open-enrollment charter school may

21  not purchase library material from a library material vendor on the

22  list described by Subsection (c).

23     (e)  A library material vendor placed on the list described

24  by Subsection (c) may petition the agency for removal from the list.

25  The agency may remove a vendor from the list only if the agency is

26  satisfied that the vendor has taken appropriate action under

27  Subsection (b).

1      Sec. 35.004.  LIABILITY.      A    school    district    or

2  open-enrollment charter school or a teacher, librarian, or other

3  staff member employed by a district or school is not liable for any

4  claim  or  damage  resulting  from  a  library  material  vendor's

5  violation of this chapter.

6      Sec. 35.005.  PARENTAL CONSENT REQUIRED FOR USE OF CERTAIN

7  LIBRARY MATERIALS.  A school district or open-enrollment charter

8  school may not allow a student enrolled in the district or school to

9  reserve, check out, or otherwise use outside the school library

10 library material the library material vendor has rated as sexually

11 relevant material under Section 35.002(a) unless the district or

12 school first obtains written consent from the student's parent or

13 person standing in parental relation.

14     Sec. 35.006.  REVIEW  AND  REPORTING  OF  CERTAIN  LIBRARY

15 MATERIALS.  (a)  Not later than January 1 of every odd-numbered

16 year, each school district and open-enrollment charter school

17 shall:

18         (1)  review the content of each library material in the

19 catalog of a district or school library that is rated as sexually

20 relevant material under Section 35.002(a) by the library material

21 vendor;

22         (2)  determine  in  accordance  with  the  district's  or

23 school's   policies   regarding   the   approval,   review,   and

24 reconsideration of school library materials whether to retain each

25 library  material  reviewed  under  Subdivision  (1)  in  the  school

26 library catalog; and

27         (3)  either:

7

H.B. No. 900

 1          (A)  post in a conspicuous place on the Internet
 2 website maintained by the district or school a report; or
 3          (B)  provide physical copies of the report at the
 4 central administrative building for the district or school.
 5     (b)  The report required under Subsection (a)(3) must
 6 include:
 7          (1)  the title of each library material reviewed under
 8 Subsection (a)(1);
 9          (2)  the district's or school's decision regarding the
10 library material under Subsection (a)(2); and
11          (3)  the school or campus where the library material is
12 currently located.
13     Sec. 35.007.  RULES.  The commissioner may adopt rules as
14 necessary to administer this chapter.
15     Sec. 35.008.  ASSISTANCE OF AGENCY.  The agency may provide
16 assistance to school districts and open-enrollment charter schools
17 in complying with this chapter.
18     SECTION 4.  Not later than January 1, 2024, the Texas State
19 Library and Archives Commission shall adopt the standards for
20 school library collection development as required under Section
21 33.021(c), Education Code, as added by this Act.
22     SECTION 5.  (a)  Not later than April 1, 2024, each library
23 material vendor, as defined by Section 35.001, Education Code, as
24 added by this Act, shall submit the initial list required under
25 Section 35.002(c), Education Code, as added by this Act.
26     (b)  Not later than September 1, 2024, each library material
27 vendor, as defined by Section 35.001, Education Code, as added by

8

H.B. No. 900

1   this Act, shall submit the initial updated list required under
2   Section 35.002(d), Education Code, as added by this Act.

3       (c)  Not later than January 1, 2025, each school district and
4   open-enrollment charter school shall conduct the initial content
5   review and submit the initial report required under Section
6   35.006(a), Education Code, as added by this Act.

7       SECTION 6.  The changes in law made by this Act to the
8   Education Code apply beginning with the 2023-2024 school year.

9       SECTION 7.  This Act takes effect immediately if it receives
10  a vote of two-thirds of all the members elected to each house, as
11  provided by Section 39, Article III, Texas Constitution.  If this
12  Act does not receive the vote necessary for immediate effect, this
13  Act takes effect September 1, 2023.

H.B. No. 900

_____    _____

   President of the Senate                  Speaker of the House

     I certify that H.B. No. 900 was passed by the House on April 20, 2023, by the following vote:  Yeas 95, Nays 52, 1 present, not voting.


_____

                  Chief Clerk of the House

     I certify that H.B. No. 900 was passed by the Senate on May 23, 2023, by the following vote:  Yeas 19, Nays 12.


_____

                  Secretary of the Senate


APPROVED:  _____

             Date


    _____

          Governor

10

# TAB 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| BOOK PEOPLE, INC., VBK d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND, | § § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CASE NO. |
| MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education, | § § § § § § § § | |
| Defendants. | § § | |

---

## DECLARATION OF VALERIE KOEHLER

---

Pursuant to 28 U.S.C. § 1746, Valerie Koehler declares:

1. My name is Valerie Koehler. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. The following statements are made within my personal knowledge and are true and correct.

2. I am the owner of VBK, Inc. d/b/a Blue Willow Bookshop, an independent bookstore in Houston, Texas ("Blue Willow"). I have been the owner of Blue Willow since 1996.

3. Blue Willow sells books and other library materials for school use in response to RFPs and RFQs from schools, to librarians and teachers who are reimbursed, and as a result of arranging for author visits at schools.

DECLARATION OF VALERIE KOEHLER          1

23-50668.143

4.     In addition to school visits, Blue Willow Bookshop arranges three large festivals for young readers every year, each with a goal of promoting literacy and fostering lifelong readers: TeenCon, Tweens Read, and Bookworm. During those festivals, schools and teachers purchase books for students and classrooms.

5.     Blue Willow is an authorized vendor to many school districts and has sold books to at least 22 Texas school districts in the last 15 years.

6.     Although Blue Willow intends to comply with House Bill 900 (the "Book Ban") to the best of its ability, I do not know how we will be able to do so.

7.     Blue Willow has no complete record of books and library materials sold for school use since 1996. Blue Willow has not attempted to keep complete records of every sale, and Blue Willow has migrated its records among various record-keeping systems, which has resulted in the loss of some records.

8.     As a result, Blue Willow is not able to comply with the Book Ban, which requires Blue Willow to identify and rate every book it has ever sold to a public school district—even books it may no longer sell or that are out of circulation.

9.     Blue Willow also has no way of knowing which books are in "active use." Blue Willow does not ask its customers how its books will be used, and Blue Willow does not have any information as to where books it has sold are housed within a school district or school—whether they are used in conjunction with a school's curriculum, used in the classroom, used in a library, given or loaned to students, or whether these books are still within the district's possession.

10.     Even if Blue Willow had these records, it would be impossible for Blue Willow to devote the financial resources necessary to comply with the Book Ban's rating requirements.

23-50668.144

11.     Blue Willow estimates it has sold between 20,000 and 50,000 different titles to Texas schools or school districts in its 26 years of business.

12.     Many of the books that Blue Willow has previously sold would no longer be in our current inventory. The Book Ban requires us to review and rate these books—which are not in our possession—regardless of whether we plan to sell them in the future. These are books that Blue Willow was well within its rights to sell at the time. The Book Ban now forces us to—decades after the fact—obtain and review these books.

13.     Based on the Book Ban's highly fact-specific criteria, Blue Willow does not believe that its staff would be capable of producing accurate ratings and believes such a review would require employing legal professionals.

14.     To read and rate a book according to the Book Ban's multi-layered criteria, Blue Willow estimates that it would cost between $200 and $1,000 per book.

15.     Blue Willow estimates the total cost to read and rate books already sold would be between $4 million and $500 million dollars. This estimate does not account for the cost of reviewing future book sales or the cost of obtaining previously sold books.

16.     Blue Willow does not have the financial resources to comply with the Book Ban. Blue Willow's annual sales are just over $1 million per year.

17.     Blue Willow does not want to be compelled by the State to issue ratings for books based on criteria with which it does not agree. Blue Willow sells a wide variety of books, including books that I would not personally be interested in reading. However, we do not judge our customer's choices. We would not want our customers to think the ratings reflect our views of these books.

DECLARATION OF VALERIE KOEHLER            3

18.     The standards for rating books that are contained in the Book Ban are confusing and vague. I have discussed this issue with my staff, and we do not know how we could rate books based on the Book Ban's criteria, since the criteria are inherently subjective, and what might be offensive to one person would not be to another. For instance, is a book that contains kissing acceptable under the Ban? Is kissing between the same sex acceptable? This is just one small example of the confusion our staff would face.

19.     Blue Willow is also confused as to which books are exempt from ratings as part of the required curriculum. Blue Willow does not know, and has no realistic way of ascertaining, the curriculum for each school, grade level and classroom in each of the Texas districts to which we sell books.

20.     If Blue Willow does rate these books, our ratings can still be overridden by the State and then publicly posted as if they represent our own speech. Blue Willow would not want customers to believe these ratings reflect our views of these books. But if Blue Willow resists adopting the State's ratings, then the State will prevent us from selling *any* books to public schools, and we will be identified on the State's public blacklist, which would cause both financial and reputational damage to our company.

21.     I am also concerned that the public posting of any ratings by Blue Willow would lead to stigma and reputational harm for our company. If Blue Willow does participate in this system of compelled speech, we stand to lose customers who disagree with the Book Ban.

22.     Blue Willow also does not wish to participate in a forced recall of books based on ratings with which we do not agree. I am concerned that the issuance of recall requests from Blue Willow to school districts would be interpreted as our own speech, when, in fact, it is being compelled by the State.

DECLARATION OF VALERIE KOEHLER                    4

23.     Approximately 20 percent of Blue Willow's sales are directly to schools or are related to school author visits and our three festivals. Blue Willow would lose the vast majority of this revenue if schools were no longer able to purchase from Blue Willow.

24.     Blue Willow has already lost sales as a result of the Book Ban. Blue Willow has sold over $200,000 in books to Katy Independent School District in the past 5-7 years, but Katy ISD has now paused its purchasing in response to the uncertainty surrounding the Book Ban.

25.     Blue Willow anticipates that it will continue to lose sales at a rapid rate because of the Book Ban.

26.     Blue Willow does not have clarity as to whether it can continue selling books to Texas public school districts between the law's effective date (September 1, 2023) and the date that its ratings are due to be submitted (April 1, 2024).

27.     Blue Willow intends to continue selling books and other library materials to Texas school districts for use in school libraries in the future.

28.     I hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 21st day of July, 2023.

/s/ *Valerie Koehler*
Valerie Koehler

23-50668.147

# TAB 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| BOOK PEOPLE, INC., VBK d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND, | § § § § § § § § | |
| **Plaintiffs,** | § § | |
| v. | § § | **CASE NO.** |
| MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education, | § § § § § § § § | |
| **Defendants.** | § § | |

## DECLARATION OF MATTHEW STRATTON

Pursuant to 28 U.S.C. § 1746, Matthew Stratton declares:

1.     My name is Matthew Stratton. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. The following statements are made within my personal knowledge and are true and correct.

2.     I am the Deputy General Counsel of the Association of American Publishers ("AAP").

3.     The Association of American Publishers ("AAP") is a not-for-profit organization that represents the leading book, journal, and education publishers in the United States on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression,

23-50668.149

professional content, and learning solutions. AAP's membership includes approximately 130 individual members, who range from major commercial book and journal publishers to small, non-profit, university, and scholarly presses, as well as leading publishers of educational materials and digital learning platforms. AAP's members publish a substantial portion of the general, educational, and religious books produced in the United States in print and digital formats, including critically acclaimed, award-winning literature for adults, young adults, and children. AAP represents an industry that not only depends upon the free exercise of rights guaranteed by the First Amendment, but also exists in service to our Constitutional democracy, including the unequivocal freedoms to publish, read, and inform oneself.

4.     The AAP has a number of members that do business in Texas who are vendors to school districts subject to House Bill 900 (the "Book Ban"). AAP also has many more members that publish titles that are distributed to Texas schools through third-party vendors subject to the Book Ban. As the latter category of AAP members will also have their books rated, they will experience the same harms discussed in paragraphs 12-16.

5.     A number of AAP's members have only a partial set of records of past sales to Texas public schools or school districts. The records are limited because, among other reasons: (i) AAP members may sell books to Texas public schools or school districts without being aware of it; and (ii) AAP members may have document-retention policies under which records that are no longer needed are destroyed and/or not reasonably accessible. As a result, these AAP members are unable to comply with the Book Ban.

6.     Even if AAP's members did possess these records, AAP's members have no way to know which books are in active use (or even what "active use" means), so it is impossible for

23-50668.150

AAP members to undertake the task of rating and recalling (if applicable) these materials, absent receiving information from the schools.

7.  Furthermore, schools may purchase the same books from multiple vendors so it may not be feasible to determine whether the copies of books sold by AAP members are those that remain in active use. With multiple vendors for the same book, the likelihood of consistent ratings is slim.

8.  The rating system imposed by the Book Ban would be a burden on AAP's members, requiring significant time and expense to identify past sales and compare those to books in "active use." Some of AAP's members have sold tens of thousands of books to Texas schools and school districts, and it is estimated that hundreds of hours of work or even more would be required by each of these members to attempt to search sales records and compare them against lists of books in active use (assuming such lists were provided to AAP's member), as required by the Book Ban. It would be an enormous burden in terms of resources, staff, and costs, and would require significantly diverting existing staff or hiring new staff.

9.  Likewise, applying ratings would be a significant burden on AAP's members. There are millions of books in Texas school libraries. Our members do not have existing staff or an existing process for the purpose of applying the ratings. It would be cost-prohibitive, difficult and time-consuming to hire and train new staff (or re-train existing staff) to apply ratings, given the vague and confusing process outlined by the Book Ban.

10. The amount of time per book (e.g., a 450-page work of fiction or non-fiction in a high school library would take significantly longer to review than a picture book in an elementary school library), but broadly speaking the time to read, analyze, and possibly solicit other viewpoints could require a substantial, double-digit number of hours per book on average.

23-50668.151

11.     AAP members will have difficulty applying the rating standards set forth in the Book Ban for at least the following reasons:

a.      It is unclear what it means for library material to be "directly related" to the required curriculum (and therefore exempt from the ratings). Oftentimes AAP members do not even get copies of the curriculum.

b.      It is unclear how a vendor would know if library material is being used in a way that is directly related to the required curriculum.

c.      It is unclear what "active use" means.

d.      It is unclear how a vendor will know if a library material remains in "active use."

e.      The "sexually relevant" rating is vague and confusing insofar as any de minimis, non-explicit reference, in any context, to sexual relations, could result in the rating. It could apply broadly to health-related works, religious texts, historical works, encyclopedias, dictionaries, and many other works.

f.      The "sexually explicit" rating is vague and confusing because the contextual analysis does not adjust for differences in ages or communities and does not provide for consideration of the work as a whole.

g.      Vendors may not have any knowledge about the contemporary community standards of decency nor do they know which community's standards should be considered

h.      The balancing test is entirely subjective and cannot be applied with any consistency.

23-50668.152

12. The ratings will stigmatize books that are rated "sexually explicit" or "sexually relevant" and will risk reducing sales of these works—not just to Texas schools, but globally, since the ratings are posted online. This, in turn, risks publishers foregoing investment in important new works.

13. The ratings could also reduce royalties to authors, and therefore reduce the incentive for authors to produce new works or expose those who issue ratings to potential liability for doing so.

14. The ratings will also chill members' and their authors' constitutionally protected speech. The ratings compel our members to adopt a highly subjective opinion that they patently disagree with or suffer a significant financial penalty. If members refuse to adopt the State's speech as their own, then they lose all business with Texas public school districts.

15. By refusing to rate books, or by being placed on the State's blacklist, the universe of vendors and titles would contract. A member would be forced to weigh the prejudice to sales and distribution globally against the prospect of losing the school market in Texas. Many members would consider no longer selling books to Texas schools. The impact of the State licensing regime could extend beyond the State's borders. Other localities or states may rely on the ratings, either informally or formally. In addition, other states may decide to adopt their own ratings requirements, which could lead to a patchwork of inconsistent rating regimes and likely result in vendors adopting the most restrictive ratings for all states.

16. Members have reported that there are schools that are stopping or delaying buying books. This trend may escalate in August, when fall back-to-school buying ordinarily starts. The confusion is expected to be detrimental to our members' sales.

23-50668.153

17.     With less than 45 days until the law takes effect, our members remain confused about their responsibilities under the Book Ban, including (but not limited to) the following unanswered questions:

    a.   What is the definition of a "recall"? Is a refund required if a vendor is required to recall material?

    b.   How does a vendor communicate a library material rating to a school? On the library material? In marketing material? On a pro forma invoice? A list? Other?

    c.   What happens if different vendors adopt different ratings for identical titles?

    d.   What happens if a vendor no longer sells a book that is still in "active use" by a district? Is it then compelled to re-purchase the book and rate it?

    e.   May vendors sell library material to a school prior to submission of the list with ratings for prior sales (on or before April 1, 2024), and if so, must that library material be rated?

    f.   If after being added to the banned vendor list, a vendor changes its ratings as instructed by the TEA, does the TEA have discretion to refuse removal from the banned vendor list?

18.     I hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 21st day of July, 2023.

*/s/ Matthew Stratton*
Matthew Stratton

# TAB 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| BOOK PEOPLE, INC., VBK d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND, | § § § § § § § § | |
| **Plaintiffs,** | § § | |
| v. | § § | CASE NO. |
| MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education, | § § § § § § § § § | |
| **Defendants.** | § § | |

---

### DECLARATION OF CHARLEY REJSEK

---

Pursuant to 28 U.S.C. § 1746, Charley Rejsek declares:

1. My name is Charley Rejsek. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. The following statements are made within my personal knowledge and are true and correct.

2. I am the CEO of Book People, Inc., ("BookPeople") an independent bookstore that sells new books in Austin, Texas. I have been the CEO of BookPeople since 2022 and previously served as the company's general manager.

3. BookPeople was founded in 1970 as Grok Books. Since its founding, BookPeople has sold books and other library materials to Texas school districts for use in their school libraries.

23-50668.156

4.      BookPeople is an authorized vendor to many school districts.

5.      BookPeople sells books and other library materials to schools and teachers for school use in response to RFQs from school contacts, in response to online orders, in the bookstore, and at offsite events, festivals, school events, bookfairs, and conferences.

6.      Book People is the official bookseller for the Texas Book Festival co-founded by former First Lady Laura Bush.

7.      BookPeople intends to continue selling books and other library materials to Texas school districts for use in school libraries in the future.

8.      BookPeople is not able to comply with H.B. 900 (the "Book Ban"), which requires BookPeople to identify and rate every book it has ever sold to a public school district that is "still in active use."

9.      BookPeople does not have complete records detailing all products sold to schools during its 53 years in business, so it cannot identify all books previously sold to school districts, as the Book Ban requires.

10.     BookPeople has changed record-keeping and inventory systems several times in its 53-year history and records from previous decades have largely been lost. BookPeople did not expect that it would someday need to access these decades-old records in order to comply with a government mandate.

11.     Because BookPeople does not have records of all sales during its existence, it also has no way of knowing which books sold by BookPeople are still "in active use" by a school district. BookPeople does not have any way of ascertaining this information. BookPeople does not have records of every school district to which it has sold books.

23-50668.157

12.     BookPeople does not ask its customers to specify how the books they are purchasing will be used.

13.     Even if BookPeople had records of its sales, BookPeople would be unable to comply with the Book Ban's rating requirements.

14.     Many of the books that BookPeople has previously sold would no longer be in our current inventory. The Book Ban requires us to review and rate these books—which are not in our possession—regardless of whether we plan to sell them in the future. These are books that BookPeople was well within its rights to sell at the time. The Book Ban now forces us to—decades after the fact—obtain and review these books.

15.     BookPeople is a fixed-price bookseller; the vast majority of our books arrive with the price already printed on the book. As a result, BookPeople operates with very narrow profit margins.

16.     The financial resources that would be required to have BookPeople's staff identify, read and rate every book that BookPeople sells—or has ever sold—to school districts, as the Book Ban requires, would be financially unsustainable. As CEO, I do not see any way for BookPeople to comply with the Book Ban and remain in business.

17.     Even if BookPeople did have the resources to comply with the Book Ban, our staff would not know how to rate books based on the subjective nature of the Book Ban's rating requirements. For instance, the Book Ban requires BookPeople to assess books based on "current community standards," but which community? BookPeople is based in Austin, Texas, but serves many communities throughout the State, each of which has its own community character. Our ratings would necessarily differ from vendors who serve other communities.

23-50668.158

18.     Our ratings would also consider the age-appropriateness of a given work. However, the Book Ban does not specify what age group we should consider in reviewing the works. This alone makes it impossible to apply an accurate rating.

19.     Even if BookPeople could rate these materials according to the State's criteria, BookPeople does not believe it should be compelled to provide these ratings, based on criteria in which it does not agree, in order to sell books to public schools.

20.     If BookPeople does rate these books, our ratings can still be overridden by the State and then publicly posted as if they represent our own speech. BookPeople would not want customers to believe these ratings reflect its views on the books. But if BookPeople resists adopting the State's ratings, then we will be identified on the State's public blacklist, which would cause reputational damage to the company.

21.     I am also concerned that the public posting of any ratings by BookPeople would lead to stigma and reputational harm for BookPeople. If BookPeople does participate in this system of compelled speech, we stand to lose customers who disagree with the Book Ban.

22.     The Book Ban also states that if we do not comply with the State's ratings, the State will prevent us from selling *any* books to public schools. This will cause direct financial harm.

23.     The law does not specify how long BookPeople would be banned if it runs afoul of the State's rating regime, so BookPeople cannot fully assess whether to comply. Nor does the law explain how the State will handle ratings that differ among vendors—an inevitable outcome when numerous vendors are being asked to review thousands of works.

24.     BookPeople does not have clarity as to whether it can continue selling books to Texas public school districts between the law's effective date (September 1, 2023) and the date that its ratings are due to be submitted (April 1, 2024).

DECLARATION OF CHARLEY REJSEK                    4

23-50668.159

25.     BookPeople is a community bookstore and we want to continue supporting *all* schools in our area. By imposing an unfunded mandate to review and rate every book that we have ever sold to a public school, the State of Texas will force BookPeople to discontinue its work with local public schools, in violation of its First Amendment rights.

26.     If BookPeople was not able to work with local public schools, its reputation and commitment to serving the community would be harmed.

27.     I hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 23rd day of July, 2023.

/s/ *Charley Rejsek*
Charley Rejsek

23-50668.160

# TAB 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **BOOK PEOPLE, INC., VBK d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND,** | § § § § § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **CASE NO.** |
| **MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education,** | § § § § § § § § § | |
| **Defendants.** | § § | |

---

## DECLARATION OF DAVID GROGAN

---

Pursuant to 28 U.S.C. § 1746, David Grogan declares:

1.      My name is David Grogan. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. The following statements are made within my personal knowledge and are true and correct.

2.      I am the Director of the American Booksellers for Free Expression, Advocacy and Public Policy ("ABFE"), a division of the American Booksellers Association ("ABA"). I have been employed by the ABA since 2002.

3.      ABA was founded in 1900 and is a national not-for-profit trade organization that works to help independently owned bookstores grow and succeed.

23-50668.162

4.      ABA represents over 2,100 member companies operating in over 2,500 locations. ABA's core members are key participants in their communities' local economy and culture. To assist them, ABA provides education, information dissemination, business products, and services; creates relevant programs; and engages in public policy, industry, and local-first advocacy.

5.      The ABA has 156 members located in Texas who are vendors to school districts subject to the Ban.

6.      Our members each utilize different systems for tracking their sales and inventory, and thus have different sets of records. Many of our members do not have complete records of all sales they have ever made to school districts. As a result, they are unable to comply with the requirements of House Bill 900 (the "Book Ban").

7.      The Book Ban places an extreme burden on booksellers to rate books for their sexual content. It is impossible for any bookseller or bookstore owner to know the contents of every book they sell or have sold, making the law impossible for any bookstore to follow. Over four million new books were published in 2022, according to numerous sources. Fear of inadvertently running afoul of the law would result in a bookseller erring on the side of caution, thereby limiting students' access to age-appropriate, relevant materials.

8.      Importantly, the rating is not just for the book as a whole. The Book Ban requires a bookseller to review every page of every book for any description of genitals, buttocks or breasts or any description of mild sexual activity.  As a result, booksellers will need to do much more than review a handful of sexual health books or prominent biographies or fiction by people who are known for writing about sexual topics—they will have to comb through every page of every book.

9.      The Book Ban's vague standards would also make it difficult for booksellers to comply with the rating system's criteria. The rating must be based on sexual content, but also on

contemporary standards of decency as to minors (this is the difference between sexually explicit and sexually relevant). The community standard is entirely undefined and subjective—forcing vendors to guess what a community thinks is appropriate for minors.

10.     The Book Ban also fails to distinguish between minors based on age (5- versus 17-year-olds), maturity (advanced reader versus academically challenged reader) or geographic location (Houston versus Wichita Falls).

11.     Concerns over this subjectivity would lead booksellers to err on the side of caution, ultimately labeling a book as "sexually explicit" or "sexually relevant" that may not need this rating. This could ultimately deprive students of age-appropriate works of literature. Just as an example, these titles could include *Dracula*, *Romeo & Juliet*, *Ulysses*, *Gone with the Wind*, and *The Color Purple.*

12.     Additionally, due to the vagueness of the law, the Book Ban could result in the banning of a book that is "sexually relevant" as to younger minors but appropriate for older teenagers. What is appropriate to a 15-year-old may not be appropriate for a child under the age of 10. This law does not discern these nuances, and it places the onus on booksellers to make this impossible determination.

13.     The lack of specificity in the Book Ban will inevitably lead to inconsistent ratings among our members and the broader bookselling community. It could also lead to financial liability from authors unhappy with their rating, who may place blame on booksellers for lost sales.

14.     Our members do not believe that they are best positioned to evaluate every book for school use. They believe these decisions are best left to experienced, professional librarians, with parental input.

23-50668.164

15.     Our members do not wish to participate in a public rating system that compels them to rate books on criteria with which they do not agree. They are concerned that these ratings—which are compelled by the State but published under their name—would be interpreted as their own speech.

16.     Our members believe these ratings are inherently subjective. The Book Ban's requirement that the ratings be listed online could lead to classic or award-winning books, such as *The Bluest Eye* or *The Color Purple*, being branded with a proverbial Scarlet letter. It is not a stretch to imagine that a book being label as "sexually explicit" or "sexually relevant" on the TEA's website could impact whether a parent buys a book at a bookstore for their child, thereby limiting access to titles that could be a positive influence on, and potentially life-changing for, a given child.

17.     Further, because videos and movies that are based on books, like Academy Award-winning *Gone with the Wind,* are often shown in public school classrooms, it is also likely that the ratings provided to these books may foreclose their availability in the library, even while the movie version is still shown in the classroom—creating inconsistent treatment of similar content.

18.     Our members believe the State has no business determining what books are acceptable for anyone to read. It is simply Orwellian for the State to do so. Our members further believe the impact of these ratings will not only affect what books are available in schools, but also extend into what books are sold in bookstores.

19.     The Book Ban will undoubtedly lead to financial harm for our members, whether it is due to a loss of book sales, potential exposure to liability from book authors, or because bookstores need to hire additional staff to handle the burdensome responsibility of rating books sold to schools. The average net operating profit of an independent bookstore (as reported in

DECLARATION OF DAVID GROGAN                4

ABA's annual financial survey) from book sales in 2023 was 1.5 percent. Moreover, book prices are set by the publishers and printed on the books. If bookstore expenses increase, a bookstore owner cannot increase the price of books to offset this new expense.

20.     Our members do not yet know the extent of the labor and resources that will be necessary to handle rating the books due to the vagueness of the law. It is conceivable that attempting to comply with the law will put a bookstore out of business. Aside from being unconstitutional, this law is impractical and burdensome for bookstore businesses and will result in a loss of net income.

21.     Our members are also unclear what is required regarding recalling certain books. The law does not make clear their responsibilities nor what they are required to do if a school does not comply with such a recall. There are significant questions as to how the books that are recalled will be handled and what further burdens this could place on a bookstore.

22.     Our members are also concerned that the issuance of a recall would be interpreted by school districts and the general public as an expression of the bookseller's views and values, when its speech is actually being compelled by the government.

23.     It is impossible to overstate the importance of local businesses, such as independent bookstores, to their communities. In economic terms, according to a civic economics study, independent businesses recirculate a substantially greater proportion of their revenues back into the local economy than do their chain competitors.

24.     I hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 23rd day of July, 2023.

/s/ *David Grogan*
David Grogan

23-50668.166

# TAB 6

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2023, I electronically transmitted Appellees' Record Excerpts to the Clerk of the Court of the Fifth Circuit Court of Appeals using the ECF System of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Laura Lee Prather*
Laura Lee Prather
Attorney for Plaintiffs-Appellees

## ECF CERTIFICATION

I hereby certify that (i) required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (ii) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; (iii) the document has been scanned for viruses using the most recent version of Windows Defender and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues, pursuant to 5th Cir. R. 25.2.9.

Dated: November 13, 2023

*/s/ Laura Lee Prather*
Laura Lee Prather
Attorney for Plaintiffs-Appellees