No. 23-50668

# In the United States Court of Appeals for the Fifth Circuit

**BOOK PEOPLE, INCORPORATED; VBK, INCORPORATED, doing business as BLUE WILLOW BOOKSHOP; ASSOCIATION OF AMERICAN PUBLISHERS; AUTHORS GUILD, INCORPORATED; COMIC BOOK LEGAL DEFENSE FUND; AMERICAN BOOKSELLERS ASSOCIATION,**

*Plaintiffs-Appellees*,

*v.*

**MARTHA WONG, in her official capacity as the Chair of the Texas State Library and Archives Commission; KEVEN ELLIS, in his official capacity as the Chair of the Texas State Board of Education; MIKE MORATH, in his official capacity as the Commissioner of the Texas Education Agency,**

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
Case No. 1:23-CV-00858-ADA, Judge Alan Albright

**BRIEF OF *AMICI CURIAE* THE ASSOCIATION OF UNIVERSITY PRESSES, BARNES & NOBLE, INC., THE EDUCATIONAL BOOK AND MEDIA ASSOCIATION, FREEDOM TO LEARN ADVOCATES, HALF PRICE BOOKS, RECORDS, MAGAZINES, INC., INDEPENDENT BOOK PUBLISHERS ASSOCIATION, PENGUIN RANDOM HOUSE LLC, and SOURCEBOOKS LLC IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

(Counsel listed on inside cover)

Linda Steinman
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone: (212) 489-8230
Fax: (212) 489-8340
Email: lindasteinman@dwt.com

Thomas S. Leatherbury
THOMAS S. LEATHERBURY LAW, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
Phone: (214) 213-5004
Email: tom@tsleatherburylaw.com

*ATTORNEYS FOR AMICI CURIAE*

Daniel Novack
PENGUIN RANDOM HOUSE LLC
1745 Broadway
New York, NY 10019
Phone: (212) 572-2355
Email: dnovack@penguinrandomhouse.com

*OF COUNSEL TO PENGUIN RANDOM HOUSE LLC*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES

### *Book People v. Wong*; No. 23-50668

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.    ***Amici Curiae* for Plaintiffs-Appellees and Affirmance**:

Pursuant to 5th Cir. R. 28.2.1:

Association of University Presses states that it is a non-profit organization with its principal place of business in New York that does not have any parent corporations or issue stock and consequently there exists no publicly held corporation which owns 10% or more of its stock.

Barnes & Noble, Inc. states that it is a privately held corporation incorporated under the laws of Delaware with its principal place of business in New York, New York. Barnes & Noble, Inc. is owned by funds advised by Elliott Advisors (UK) Limited. No other companies, private or public, own 10% or more of Barnes & Noble, Inc.

Educational Book and Media Association states that it is a non-profit organization with its principal place of business in Virginia that does not have any

parent corporations or issue stock and consequently there exists no publicly held corporation which owns 10% or more of its stock.

Freedom to Learn Advocates states that it is a non-profit organization with its principal place of business in Virginia that does not have any parent corporations or issue stock and consequently there exists no publicly held corporation which owns 10% or more of its stock.

Half Price Books, Records, Magazines, Inc. states that it is a privately held corporation incorporated under the laws of Texas with its principal place of business in Dallas Texas.  No other companies, private or public own 10% or more of Half Price Books, Records, Magazines, Incorporated.

The Independent Book Publishers Association states that it is a non-profit organization with its principal place of business in California that does not have any parent corporations or issue stock and consequently there exists no publicly held corporation which owns 10% or more of its stock.

Penguin Random House LLC states that it is a limited liability company organized under the laws of Delaware with its principal place of business in New York, New York. Penguin Random House is owned by Bertelsmann SE & Co KGaA, a private entity. No other companies, private or public, own 10% or more of Penguin Random House LLC.

Sourcebooks, LLC states that it is a limited liability company organized under the laws of Delaware with its principal place of business in Naperville, Illinois. Sourcebooks is a subsidiary of Penguin Random House LLC, which owns 55.991% of Sourcebooks. Penguin Random House LLC is a wholly owned subsidiary of Bertelsmann SE & Co. KGaA, a private entity. The remaining percentage of Sourcebooks is owned by Raccah Books, a private entity. No other companies, public or private, own 10% or more of Sourcebooks, LLC.

2.     **Counsel for *Amici Curiae* for Plaintiffs-Appellees**: Linda Steinman of Davis Wright Tremaine, LLP; and Thomas Leatherbury of Thomas Leatherbury Law, PLLC.

3.     **Plaintiffs-Appellees**: Book People, Inc., VBK, Inc. d/b/a Blue Willow Bookshop, American Booksellers Association, Association of American Publishers, Authors Guild, Inc., and Comic Book Legal Defense Fund. None of the Plaintiffs-Appellees are a publicly held corporation; no Plaintiff-Appellee has any parent corporation; and no publicly held corporation owns 10 percent or more of any Plaintiff-Appellee's stock.

4.     **Counsel for Plaintiffs-Appellees**: Laura Lee Prather, Catherine L. Robb, Michael J. Lambert, and William Reid Pillifant of Haynes and Boone, LLP.

5.     **Defendants-Appellants**: Martha Wong, Keven Ellis, and Mike Morath.

6.     **Counsel for Defendants-Appellants**: Angela Colmenero, Brent Webster, James Lloyd, Kimberly Gdula, Ryan Kercher, Christina Cella, Amy Pletscher, Ken Paxton, Brent Webster, Lanora C. Pettit, Ari Cuenin, Kateland R. Jackson, and Coy Westbrook of the Office of the Attorney General.

7.     *Amicus Curiae* **for Defendants-Appellants**: State Representative Jared Patterson.

8.     **Counsel for** *Amicus Curiae* **for Defendants-Appellants**: Robert Henneke and Chance Weldon of the Texas Public Policy Foundation.

By:   /s/ *Linda Steinman*
LINDA STEINMAN
DAVIS WRIGHT TREMAINE LLP
*Counsel for Amici Curiae The Association*
*Of University Presses, Barnes & Noble, Inc.,*
*The Educational Book And Media*
*Association, Freedom To Learn Advocates,*
*Half Price Books, Records, Magazines, Inc.,*
*Independent Book Publishers Association,*
*Penguin Random House LLC, And*
*Sourcebooks, LLC*

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES .......................... i

TABLE OF CONTENTS ....................................................................................v

TABLE OF AUTHORITIES ........................................................................... vi

INTEREST OF *AMICI CURIAE* ....................................................................1

SUMMARY OF ARGUMENT .........................................................................4

ARGUMENT ....................................................................................................7

I.     PLAINTIFFS' CLAIMS ARE RIPE AND THEY HAVE STANDING .........7

II.    THE ACT IS UNCONSTITUTIONALLY VAGUE, FURTHER
       IMPACTING BOOK VENDORS ...................................................11

III.   THE ACT VIOLATES THE FIRST AMENDMENT ...................................13

       A.     The Act Compels Speech In Violation Of The First Amendment.......14

       B.     The Act Restricts the Dissemination of Speech In Violation of
              the First Amendment .........................................................20

CONCLUSION ................................................................................................26

CERTIFICATE OF SERVICE .........................................................................28

ECF CERTIFICATION....................................................................................28

CERTIFICATE OF COMPLIANCE ................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  143 S. Ct. 2298 (2023).................................................................15, 16

*Alexander v. U.S.*,
  509 U.S. 544 (1993).....................................................................22, 23

*Am. Booksellers Ass'n v. McAuliffe*,
  533 F. Supp. 50 (N.D. Ga. 1981).........................................................25

*Bantam Books v. Sullivan*,
  372 U.S. 58 (1963)............................................................................19

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982)...............................................................20, 21, 22

*Book People, Inc. v. Wong*,
  No. 1:23-cv-00858 (W.D. Tex. Sept. 18, 2023) ....................................6

*Brown v. Entm't Merchants Ass'n*,
  564 U.S. 786 (2011)...........................................19, 23, 24, 25, 26

*Calderon v. City of Buffalo*,
  61 A.D.2d 323 (N.Y. App. Div. 1978) .................................................25

*Campbell v. St. Tammany Parish School Board*,
  64 F.3d 184 (5th Cir. 1995) ....................................................14, 20, 21

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
  447 U.S. 557 (1980)............................................................................19

*Fayetteville Pub. Library v. Crawford Cty.*,
  No. 5:23-CV-05086, 2023 WL 4845636 (W.D. Ark. July 29, 2023) ...............23

*Fort Wayne Books, Inc. v. Indiana*,
  489 U.S. 46 (1989).............................................................................19

*Ginsberg v. New York*,
  390 U.S. 629 (1968)............................................................................25

*Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*,
  879 F.3d 101 (4th Cir. 2018) ............................................................... 19

*Hazelwood School Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988) ............................................................................ 22

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ...................................................................... 16, 17

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952) ............................................................................ 18

*Miller v. California*,
  413 U.S. 15 (1973) ........................................................................ 24, 25

*Milwaukee Police Ass'n v. Jones*,
  192 F.3d 742 (7th Cir. 1999) .............................................................. 22

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Relations*,
  413 U.S. 376 (1973) ............................................................................ 19

*Powell's Books, Inc. v. Kroger*,
  622 F.3d 1202 (9th Cir. 2010) ............................................................ 25

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ............................................................................ 23

*Roth v. United States*,
  354 U.S. 476 (1957) ............................................................................ 21

*Rushia v. Town of Ashburnham*,
  582 F. Supp. 900 (D. Mass. 1983) ...................................................... 25

*Sable Commc'ns of Cal., Inc. v. F.C.C.*,
  492 U.S. 115 (1989) ............................................................................ 23

*Sund v. City of Wichita Falls*,
  121 F. Supp. 2d 530 (N.D. Tex. 2000) ............................................... 25

*Time, Inc. v. Hill*,
  385 U.S. 374 (1967) ............................................................................ 19

*Virginia v. Am. Booksellers Ass'n*,
  372 S.E.2d 618 (Va. 1988) ..........................................................................24, 25

*Wooley v. Maynard*,
  430 U.S. 705 (1977)......................................................................................16

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985).....................................................................................18

**Statutes**

Fed. R. App. P.
  29(a)(2) ..........................................................................................................1
  29(a)(4)(E) ......................................................................................................1

Restricting Explicit and Adult-Designated Educational Resources Act ..........*passim*

Tex. Educ. Code
  § 33.021(a)......................................................................................................12
  § 35.001(3)......................................................................................................11
  § 35.002(a)........................................................................................................7
  § 35.0021(b)....................................................................................................13
  § 35.0021(c)....................................................................................................13
  § 35.0021(d)....................................................................................................13

Tex. Penal Code
  § 43.01(3)........................................................................................................11
  § 43.21............................................................................................................11
  § 43.25............................................................................................................11

U.S. Const., amend. I ........................................................................................*passim*

**Other Authorities**

Andrew Albanese, *As New Law Looms, Follett Asks Publishers Help 'Rate'
  Their Own Books for Sale in Texas*, Publishers Weekly, (Aug. 07, 2023)
  https://www.publishersweekly.com/pw/by-topic/industry-
  news/libraries/article/92927-as-new-law-looms-follett-asks-publishers-to-
  help-rate-their-own-books-for-sale-in-texas.html .................................................8

https://www.ala.org/advocacy/intfreedom/labelingratingqa....................................14

Jim Millot, "Starting Salaries at Big Publishers Grow," Publishers Weekly, (Apr. 21, 2023), available at:  https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/92099-starting-salaries-at-big-publishers-grow.html .............................................................................9

National Center for Education Statistics, Digest of Education Statistics, https://nces.ed.gov/programs/digest/d21/tables/dt21_215.30.asp (last visited Nov. 15, 2023)......................................................................................10

S.R. Ranganathan, *The Five Laws of Library Science* (1931)...................................4

Texas Health Data, available at https://healthdata.dshs.texas.gov/dashboard/surveys-and-profiles/youth-risk-behavior-survey (last visited Nov. 15, 2023) .............................................21

## INTEREST OF *AMICI CURIAE*[1]

Amici are organizations and corporations dedicated to books, who join together in opposition to H.B. 900. The law impairs each of their abilities to serve their mission. Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the timely filing of this amicus brief.

The Association of University Presses ("AUPresses") is an organization of more than 160 international nonprofit scholarly publishers, 80% of which are based in the United States. Since 1937, AUPresses has advanced the essential role of a global community of publishers whose mission is to ensure academic excellence and cultivate knowledge. The Association holds intellectual freedom, integrity, stewardship, and diversity and inclusion as core values. AUPresses members are active across many scholarly disciplines, including the humanities, arts, and sciences, and are innovators in the world of digital publishing.

Barnes & Noble, Inc. ("Barnes & Noble") is the world's largest retail bookseller and a leading retailer of content, digital media and educational products. The Company operates approximately 600 Barnes & Noble bookstores across the

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no party or party's counsel authored this amicus brief in whole or in part or contributed money toward the preparation of this brief. (Amici Penguin Random House is a member of the Association of American Publishers, a party, and Half Price Books is a member of the American Booksellers Association, a party, but Amici are not parties.) Further, no person other than Amici, its members, or its counsel, contributed money intended to fund this brief.

United States, and one of the Web's premier e-commerce sites, BN.com. Barnes & Noble's mission is to operate the best omni-channel specialty retail business in America, helping both its customers and booksellers reach their aspirations, while being a credit to the communities it serves.

The Educational Book and Media Association is a non-profit organization whose mission is to foster a unique community that brings together a wide range of wholesalers and publishers in order to address the ever-changing book and media buying needs of the educational marketplace.

Freedom to Learn Advocates (FTLA) was founded to promote universal access to books and educational resources for all communities regardless of race, economic status, religion, sexual orientation, gender identity, or political affiliation. Its mission is to resist initiatives that aim to limit access to books and information, often in the form of book banning policies.

Half Price Books, Records, Magazines, Inc. ("Half Price Books") is America's largest family-owned retailer for new and used books with a bustling website and more than 100 brick-and-mortar stores nationwide. With a foundation of keeping books in circulation and helping make the world a little better, Half Price Books has a long history of partnering with literacy programs and charity organizations nationwide.

2

The Independent Book Publishers Association ("IBPA") is the largest publishing trade association in the United States, with over 3,500 members. IBPA connects its members to the publishing industry and provides a forum for publishers to voice their concerns. IBPA's mission is to lead and serve the independent publishing community through advocacy, education, and tools for success.

Penguin Random House LLC ("Penguin Random House") is the United States arm of the world's largest trade publisher, comprised of more than 300 editorially and creatively independent publishing imprints globally.  Its mission is to ignite a universal passion for reading by creating books for everyone and a world where independent thinking, free expression, and creativity flourish. Penguin Random House also serves as a distributor for many independent publishers, providing new technologies, a leading supply chain, and the benefits and reach of its global sales force.

Sourcebooks, LLC ("Sourcebooks") is the largest woman-led publisher in the United States with offices in Illinois and New York.  Publishing both fiction and non-fiction for children, young adults, and adults across 19 imprints, Sourcebooks is committed to reaching readers with books that will illuminate, inspire, and enlighten lives and believes that "books change lives."

## SUMMARY OF ARGUMENT

Amici are publishers and booksellers who are in the business of helping books find their readers. The first three laws of library science are:

1.      Books are for use.

2.      Every person his or her book.

3.      Every book its reader.

S.R. Ranganathan, *The Five Laws of Library Science* 3, 75, 299 (1931). Not every book is for every person. That is where educators and librarians come in. Relying on their training and expertise, they help young Americans expand their intellectual horizons through literature by matching them with the right title at the right time in their lives.

Rather than supporting educators, the Restricting Explicit and Adult-Designated Educational Resources Act ("READER" or the "Act") disempowers them and forces "library materials vendors" against their will to participate in the State's overbroad efforts to restrict access in school libraries to books that contain the amorphously defined "sexually relevant material" or "sexually explicit material." In short, the State, through the Act, forces a poorly designed and constitutionally untenable regulatory regime on booksellers and publishers.

Under the Act, booksellers and publishers are forced to rate all books sold to Texas school libraries in the past and future, choosing from those vaguely defined

ratings of "sexually relevant material," "sexually explicit material" or "no rating." Further, book vendors are prohibited from selling "sexually explicit material" to Texas schools – even though the definition of "sexually explicit materials" does not contain an exemption for works of serious literary, artistic, or scientific value. "Sexually relevant material" can only be sold to schools and circulated to students where their libraries require parental or guardian consent – despite the fact that "sexually relevant" books would presumably need to include, by Amici's collective estimation if the vague definition were applied, such high school classics as *The Handmaid's Tale* by Margaret Atwood, *Slaughterhouse-Five* by Kurt Vonnegut, or *Angela's Ashes* by Frank McCourt.

Under READER, all book vendors must submit their ratings to the Texas Education Agency before being allowed to sell any title to schools – and the review will encompass any book ever sold by the book vendor to school libraries in Texas. The Texas Education Agency is empowered to challenge any rating, including no rating, forcing the book vendor to pick one of the "sexually explicit material" or "sexually relevant material" labels. The agency can then force the book vendor to recall a book if it takes issue with the book vendor's rating. Moreover, the agency can maintain a public list of those book vendors who failed to comply with the agency's directives and prohibit those vendors from continuing to sell to Texas schools.

The Act violates the First Amendment in two critical regards, and as detailed below, Appellants ignore the realities experienced by Amici when Appellants claim the matter is not ripe and that Plaintiffs lack standing. First, the mandatory ratings are classic "compelled speech" in violation of the First Amendment. As the District Court held, READER impermissibly compels Amici to "create speech that [we do] not wish to make, and in addition, in which [we do] not agree with," in violation of the First Amendment. *See Book People, Inc. v. Wong*, No. 1:23-cv-00858 (W.D. Tex. Sept. 18, 2023) (Order Granting Pl.'s Mot. for Prelim. Inj.) at Record on Appeal ("ROA") 702.

Second, the Act's provisions restricting the Plaintiffs' dissemination of "sexually relevant" and "sexually explicit" books – many of which have already been chosen by Texas school librarians as educationally suitable for their schools – violates the First Amendment under several established doctrines. These include that (1) the Act constitutes an impermissible prior restraint; (2) the Act is a content-based regulation that cannot survive strict scrutiny. There is no compelling reason why Texas needs to restrict the distribution of numerous classics and modern favorites that many generations of students before now have read, solely because they contain some depictions of sex as set forth in amorphous standards.

Appellants' brief frequently tries to wish away constitutional problems. For example, Appellants try to defeat the "compelled speech" infirmities of the Act by

arguing that although the Act forces booksellers and publishers to review and rate all books sold to Texas school libraries, no one will realize that fact, and everyone instead will view the ratings as having been created by the government. This is nothing more than magical thinking. Likewise, lacking a single case precedent, Appellants claim that books should be treated as commercial speech, not core protected speech, merely because they are sold – in contradiction of centuries of caselaw. In sum, the District Court's sound ruling should be affirmed.

## ARGUMENT

## I.     PLAINTIFFS' CLAIMS ARE RIPE AND THEY HAVE STANDING

The Act has an immediate impact on Plaintiffs and several Amici. In addition to requiring library materials vendors to submit lists of ratings to the state beginning April 1, 2024, a task that will take many months, effective September 1, 2023, READER prohibits book vendors from selling library materials to a school district or open-enrollment charter school unless they have rated all previous material sold to Texas school libraries. Tex. Educ. Code § 35.002(a). In other words, to sell books now and in the near future to Texas schools, book vendors must engage in the lengthy, Sisyphean – if not utterly impossible -- task of parsing every phrase of every book previously or currently being sold to a Texas school library to determine if the work is "sexually explicit," "sexually relevant" or "no rating."

7

The burdens of the Act will be felt by booksellers and book publishers alike, including Amici. Already, publishers have been asked for assistance developing ratings. In August 2023, a leading book distributor of books to schools, reacting to the approaching effective date of the Act, requested that publishers *self-rate* their books. Citing the absence of clarity in the statute and lack of rating infrastructure, the distributor stated: "our goal is to get as robust of a collection of purchasable content ready on September 1st" (the effective date of READER).[2]

READER puts Amici in an impossible bind. The costs of non-compliance are extraordinary. But so are the costs of compliance. Amici do not have employees available – or trained – to perform a task that the state concedes is highly subjective and contextual. Nor could they, given that, as Judge Albright stated, "it is an open question whether this community standard is based on Austin, Texas, or Onalaska, Texas -- or any of the more than 1,200 incorporated municipalities across Texas." ROA.704.

To give some idea of the costs, industry-standard starting salary for editorial assistants at book publishers is approximately $47,583 dollars a year at major

---

[2] Andrew Albanese, *As New Law Looms, Follett Asks Publishers Help 'Rate' Their Own Books for Sale in Texas*, Publishers Weekly, (Aug. 07, 2023) https://www.publishersweekly.com/pw/by-topic/industry-news/libraries/article/92927-as-new-law-looms-follett-asks-publishers-to-help-rate-their-own-books-for-sale-in-texas.html.

publishers, roughly $25 dollars per hour.[3]  On average, it takes approximately one hour to read sixty pages of a book.  Take an average book length of 300 pages: at five hours reading time at the starting salary level, complying with the Act would cost publishers a minimum of $187.50 dollars per publication, without considering training, oversight, and time deliberating on whether any given title meets the labeling standard of the Act.  Simply reviewing a modest backlist of 500 titles would cost a minimum of $93,750 dollars.

For publishers with large backlists, that expense would be exorbitant. Fifty thousand titles would require 250,000 employee hours and cost at least $9.375 million dollars. For reference, Penguin Random House offers more than 100,000 titles in the K-12 setting. Worse, these estimates do not account for the time and cost of rating new works or re-rating existing works based on changing community standards.

It is also important to understand the impact of the penalties imposed by the Act.  Library materials vendors lose the ability to distribute and sell their books to the Texas school market if they either (i) do not comply with the problematic and prohibitively expensive mandatory ratings process or (ii) refuse to adopt a TEA's

---

[3] *See* Jim Millot, "Starting Salaries at Big Publishers Grow," Publishers Weekly, Apr. 21, 2023, available at:  https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/92099-starting-salaries-at-big-publishers-grow.html.  Booksellers do not even have this type of personnel.

rating contrary to their view. For booksellers and publishers that sell directly to school districts, the risk is particularly acute. A single imprint's refusal to accept the TEA's views on a disputed ranking could mean publishers and booksellers would be legally prohibited from selling to Texas school districts for all of the publisher's titles and all books in the bookseller's catalog. Losing access to Texas schools is a devastating prospect. Texas is home to 25 of the 120 largest school districts by enrollment in the United States.[4] For example, in the past four fiscal years, even accounting for the pandemic, Barnes & Noble's sales to Texas public school districts have exceeded 10 million dollars a year.

In short, the Act's ramifications for booksellers and book publishers alike are daunting from an economic and cultural perspective. Larger publishers and booksellers will suffer a significant loss of revenue. Smaller ones could conceivably be forced to discontinue operations entirely. In this way, READER incentivizes booksellers and publishers to only acquire and sell "safe" titles, foregoing the opportunity to introduce students to important voices and ideas.

Finally, the Act will have cultural and economic effects outside of schools. Librarians are often the greatest champions of works that present new perspectives and new information. By stripping autonomy from them, fewer new works will be

---

[4] National Center for Education Statistics, Digest of Education Statistics, https://nces.ed.gov/programs/digest/d21/tables/dt21_215.30.asp (last visited Nov. 15, 2023).

available to young Texans, depriving them of valuable learning and developmental

opportunities, quite literally thwarting their development and confining their

perspective. These effects are destructive of a robust and flourishing marketplace

of ideas.

## II.     THE ACT IS UNCONSTITUTIONALLY VAGUE, FURTHER IMPACTING BOOK VENDORS

READER is also unconstitutionally vague, a problem that only increases the

current impact on book vendors. The Act turns on two definitions:

1. "Sexually relevant" material is defined as material that "describes or

   portrays sexual conduct," as defined by Texas Penal Code 43.25, which

   includes any "sexual contact," "sexual intercourse" or "any portion of the

   female breast below the top of the areola." Tex. Educ. Code § 35.001(3).

   "Sexual contact," in turn, is defined as "any touching of the anus, breast,

   or any part of the genitals of another person with intent to arouse or

   gratify the sexual desire of any person." Tex. Penal Code § 43.01(3).

   (Notably, there is no requirement that the material taken as a whole

   appeal to the prurient interest or describe sexual conduct that is patently

   offensive.)

2. "Sexually explicit" material is material that "describes, depicts, or

   portrays sexual conduct . . . in a way that is patently offensive," as

   defined by Section 43.21 of the Texas Penal Code ("'Patently offensive'

11

means so offensive on its face as to affront current community standards

of decency."). Tex. Educ. Code § 33.021(a).

These definitions are far too vague to apply, and will also lead to

inconsistent results from the thousands of library materials vendors forced to apply

them. For the "sexually relevant" category, what does it mean to "portray" sexual

conduct? The law does not offer guidance. How explicit or detailed does the

portrayal need to be? Is a fleeting reference sufficient? Is there some threshold of

how graphic the portrayal needs to be? What about double entendres or

euphemisms? Again, no guidance is offered.

The Bible contains numerous portrayals of sexual conduct (e.g., Genesis

35.22: "It came about while Israel was dwelling in that land, that Reuben went and

lay with Bilhah his father's concubine, and Israel heard of it"). Must art history

books displaying nudes created by revered masters from Leonardo DaVinci and

Goya to Matisse and Modigliani be labeled as "sexually relevant" so as to be

withheld from high school students absent parental consent? How about line

drawings in medical texts? These are all open questions.

The definition of "sexually explicit" is even more vague. Texas is a big state

filled with many varieties of thought and ideology. As the District Court observed,

there is no way to discern one unified "community standard." ROA.744-45.

Complicating matters, the Act provides for the weighing and balancing of multiple

subjective factors.  See § 35.0021(b) ("in performing the **contextual** analysis …

[the] vendor must consider the following…"); § 35.0021(c) ("a vendor must **weigh**

and **balance each factor** …"); § 35.0021(d) ("a library material vendor must

consider the **full context** in which the description, depiction, or portrayal of sexual

conduct appears, to the extent possible, recognizing that contextual determinations

are necessarily **highly fact-specific** and require the consideration of **contextual**

**characteristics** that may exacerbate or mitigate the offensiveness of the material.")

(emphasis added); ROA.744.

      The vague and subjective nature of these definitions make it impossible to

engage in thorough, consistent, and accurate application of the ratings.  As the

District Court correctly held, "it is unavoidable that the personal and highly

subjective test will yield disparate ratings for the same books by different

vendors."  *See* ROA.741-43.  Book vendors – fearing the consequences of

contested designations by the State – may well err on the side of caution and over-

designate. In sum, the vagueness of the law compounds the burden felt by Amici

and exacerbates the chilling effects of its overbreadth.

## III.   THE ACT VIOLATES THE FIRST AMENDMENT

      The theme of Appellants' brief is that booksellers and book publishers have

no First Amendment right to sell books to school libraries.  This turns

constitutional doctrine on its head and is not an accurate summary of the Plaintiffs'

argument.  "The Supreme Court has repeatedly recognized that the broad authority of school officials over educational matters must be exercised in a manner that comports with fundamental constitutional safeguards."  *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184, 188, n.14 (5th Cir. 1995) (citing cases).  Where government regulates speech, as the READER Act does, it must abide by First Amendment dictates.  Here, the Act violates the Constitution both by compelling speech from book vendors and by restricting the dissemination of First Amendment protected materials.

### A.     The Act Compels Speech In Violation Of The First Amendment

As the District Court properly ruled, the Act, with its coercive scheme requiring library materials vendors to rate books against their wishes, compels speech in violation of the First Amendment.  The book publishing community, including publishers and authors, has long been strongly opposed to ratings for books – especially coerced ratings.

So, too, the American Library Association, which has stated:

> Librarians employ objective professional judgment through selection, cataloging, classification, and readers' services to make available the information that library patrons want or need.  Cataloging decisions, labels, or ratings applied in an attempt to restrict or discourage access to materials or to suggest moral or doctrinal endorsement is a violation of the First Amendment and *Library Bill of Rights.*

https://www.ala.org/advocacy/intfreedom/labelingratingqa.  Rating systems for books like that created by the Act are inevitably subjective, tar the reputation of a

14

work, and will discourage interested readers who may well find the book enlightening or enjoyable. Further, compelled ratings are the predicate to broad censorship of non-obscene materials, and thus anathema to Amici and to many readers of all stripes.

As the District Court held, the Act directly conflicts with settled constitutional jurisprudence by compelling booksellers' speech in at least two ways. ROA.732. First, the Act coerces book vendors to label a book as "sexually explicit" or "sexually relevant" based on government standards which are unconstitutionally vague, highly subjective, indecipherable as to their meanings, and against their principles. Second, the Act requires book vendors to change their own independent determinations to conform to the State's views, if the State feels that a given book should have a different rating. If the library materials vendor fails to adhere to this clear coercion, public schools will be banned from purchasing any books from that vendor in the future, resulting in significant financial injury to the vendor while depriving students and schools access to huge swathes of books that form the backbone of students' educations. A more coercive regime is hardly imaginable.

As the Supreme Court repeatedly has held, "[T]he government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023) (enjoining Colorado from forcing wedding

website to carry messages inconsistent with the member-owner's religious belief that marriage should be reserved to unions between one man and one woman).  In *303 Creative*, the Supreme Court treated this right as so important that it trumped anti-discrimination laws.  It is a bedrock principle in First Amendment jurisprudence that, "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 633-34; *id.*, at 645 (1943) (Murphy, J., concurring)).  "[A] speaker has the autonomy to choose the content of his own message."  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995).  "Since *all* speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'"  *Id.* (internal citation omitted).  "[T]his general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid."  *Id.*  Finally, there is no countervailing need for the State of Texas to require library material vendors to rate books already carefully chosen by school librarians based on the books and their reviews.

Appellants' preliminary argument that the ratings required of and created by the book vendors after a laborious review will be understood by the public to constitute "Government Speech" rather than the speech of the booksellers (see Appellants' Br. at 34-35), is nothing more than wishful thinking.  First, the plain reality is that the vendors are being forced to make the ratings.  Further, under the Supreme Court's precedent in *Hurley*, there is no room to argue that the forced rating scheme does not constitute compelled speech merely because the book vendors do not need to explicitly opine on a book's appropriateness for children; at the very least, they are being compelled to provide a supposed "statement of fact" about the books, which is sufficient to establish impermissible forced speech – especially where the State is using those coerced statements to enforce a censorious regime.

Appellants' main argument in the face of the District Court's conclusion that the Act violates the compelled speech doctrine is that Plaintiffs' speech constitutes commercial speech, and that mandatory commercial disclosure requirements only trigger rational-basis review.  Appellants' Br. at 42-43.  This is equally unsustainable.  First, Appellants improperly assume that the allegedly commercial speech at issue is the book vendors' mandatory ratings disclosures.  (*Id.*)  Instead, as decades of caselaw demonstrates, courts examine whether the underlying speech (here, the books) is commercial speech and if so whether it is constitutional to

impose mandatory disclosure requirements in connection with that commercial speech, for example to ensure that it is not misleading.  Thus, for example, in Appellants' key case, *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), the Supreme Court examined an attorney's advertisement promoting his legal work in contingency fee cases involving the Dalkon Shield; because that advertisement was classic commercial speech, the Supreme Court upheld a state law requirement that the advertisement disclose that the firm's clients might be liable for significant litigation costs.  As the Court stated, "Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, appellant's constitutionally protected interest in <u>not</u> providing any particular factual information in his advertising is minimal." 471 U.S. at 651 (internal citation omitted).

Here, of course, books are not commercial speech, and thus all of the cases cited by Appellants regarding mandatory disclosures are wholly inapplicable. Rather, books are classic, fully protected speech, works of literature and learning, brimming with ideas.  "That books, newspapers and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-502 (1952).  Numerous cases involving the restriction or

censorship of books, newspapers, and magazines accord them full First
Amendment protection, and do not treat them as commercial speech. *See, e.g.,
Bantam Books v. Sullivan*, 372 U.S. 58 (1963); *Fort Wayne Books, Inc. v. Indiana*,
489 U.S. 46, 62-68 (1989); *Time, Inc. v. Hill*, 385 U.S. 374, 397 (1967); *see also
Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011)(videogames are First
Amendment protected speech).

Indeed, as Appellants are forced to admit, "Commercial speech…is
expression related solely to the economic interests of the speaker and its audience,
see *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561
(1980), and 'does no more than propose a commercial transaction,' *Pittsburgh
Press Co. v. Pittsburgh Comm'n on Hum. Relations*, 413 U.S. 376, 385 (1973)
(citation omitted)." Appellants' Br. at 42-43. Books certainly do not fall within
this description; instead, they primarily communicate the author's ideas – they tell
wondrous imaginative tales, narrate history, or explore other non-fiction topics.
They bear no resemblance to advertisements or the sale of products like cell
phones – the subjects of Appellants' cases.[5] On this ground alone, the Act cannot
stand.

---

[5] *See also Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and
City Council of Baltimore,* 879 F.3d 101, 110 (4th Cir. 2018) (holding that Catholic
pregnancy clinic did not propose any transactions in its patient waiting room and
therefore could not be compelled to disclose that the clinic did not refer clients for
abortions, and noting that "compelled speech" raises "particularly troubling First

**B.      The Act Restricts the Dissemination of Speech In Violation of the First Amendment**

This is not a case involving school curriculum, required reading, or discipline of a student's speech during a class or school event.  Instead, the Act takes direct aim at the school library and involves the Texas legislature imposing a state-wide censorious regime opposed by library organizations (rather than a decision by educators based on educational criteria to remove a particular book from a library).  This is particularly problematic because the historical function served by the school library is to introduce students to diverse materials of interest to them that will encourage life-long reading and learning.  Both the United States Supreme Court and the Fifth Circuit have recognized that school libraries differ from curriculum and are a rare "place dedicated to quiet, to knowledge, and to beauty" and "a place to test or expand upon ideas presented to [the student], in or out of the classroom."  *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868-69 (1982) (citation omitted).  As the Fifth Circuit stated with approval in *Campbell:*

> The *Pico* plurality stressed the "unique role of the school library" as a place where students could engage in voluntary inquiry.  It also observed that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding" and that the school library served as "the principal locus of such freedom."

---

Amendment concerns"  where "the message conveyed by the required speech would be antithetical to the Plaintiff's "moral . . and ideological" views.)

64 F.3d at 188.[6]

Moreover, "Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." *Roth v. United States*, 354 U.S. 476, 487 (1957). This statement is especially true for teens. More than any other age group, teens need books – especially books carefully selected by school librarians, rather than inaccurate or pornographic sites on the Internet or social media to which teens have ready access – to understand and explore sexuality.[7]

The context here is therefore critical. The following two doctrines summarized below (among other lines of legal thought) clearly support the conclusion that the Act restricts the dissemination of the Plaintiffs' (and Amicis') speech in violation of the First Amendment.

---

[6] Thus, Appellants overstate when they assert, citing *Pico*, that local school boards retain discretion "to remove books [from libraries] 'in such a way as to transmit community values.'" Appellants' Br. at 33-34. Instead, *Pico* makes clear that curriculum and libraries must be treated differently and only indicates that school boards must be permitted "to establish and apply their curriculum in such a way as to transmit community values." 457 U.S. at 864 (emphasis added).

[7] According to one Texas study, 11% of students aged 15 or below were currently sexually active, 30% of students between 16 and 17 were sexually active, and among seniors, almost 45% were sexually active. Texas Health Data, available at https://healthdata.dshs.texas.gov/dashboard/surveys-and-profiles/youth-risk-behavior-survey (last visited Nov. 15, 2023) (sorted by "sexual behavior, currently sexually active, and age").

**<u>Prior Restraint</u>**:

Appellants barely challenge the thoughtful analysis by the District Court declaring the Act to be an unconstitutional prior restraint on the Plaintiffs' right to distribute literature.  The right to disseminate speech is a critical component of freedom of expression.  Appellants admit that prior restraints "are highly problematic when they 'forbid' speech broadly" Appellants' Br. at 38.  As the Order establishes, the fact that Plaintiffs (and Amici) can distribute their books without restrictions in markets other than Texas school libraries is irrelevant.  *See* ROA.751.  As for Appellants' assertion that prior restraints "are not inherently suspect if they are limited to serve an important purpose or protect a vulnerable audience," Appellants' Br. at 38, that is simply not an accurate statement of the law or supported by the two cited cases.  *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999), merely cites *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) – a case that is inapposite because it addresses a journalism class that was part of the school curriculum, which has always been treated differently than the school library.  *Pico*, 457 U.S. at 869. Appellants' only other case, *Alexander v. U.S.*, 509 U.S. 544 (1993), confirms the long-standing constitutional concerns with prior restraints and merely reaches the common-sense conclusion that RICO forfeiture provisions are not prior restraints because "the [RICO] statute is oblivious to the expressive or nonexpressive nature of the assets

forfeited" and "the forfeitures order . . . imposes no legal impediment to . . . petitioner's ability to engage in any expressive activity he chooses." *Id.* at 550-51.

**Content-Based Regulation of Speech**:  The Act is also a content-based regulation of protected speech and accordingly subject to strict scrutiny.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."); *Brown,* 564 U.S. at 799-800; *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989); *Fayetteville Pub. Library v. Crawford Cty.*, No. 5:23-CV-05086, 2023 WL 4845636, at *18-19 (W.D. Ark. July 29, 2023)(finding challenged procedure for public library books to be content-based restriction on speech).  "Content-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163-64; *see also Brown*, 564 U.S. at 799-800.  The Supreme Court underscored the extensive nature of this burden in *Brown*, which struck down as unconstitutional a California regulation that prohibited the sale or rental of violent video games to minors without parental consent and required their packaging to be labeled "18." As the Supreme Court stated in that similar case:

> The State must specifically identify an "actual problem" in need of solving, and the curtailment of free speech must be actually necessary to the solution.  That is a demanding standard.  "It is rare that a

> regulation restricting speech because of its content will ever be
> permissible."

*Brown*, 584 U.S. at 799 (citations omitted).  Indeed, the Supreme Court found that

California could not meet this demanding standard where "it cannot show a direct

causal link between violent video games and harm to minors"; as it underscored,

"ambiguous proof will not suffice."  *Id.* at 799-800.

Here, the Texas Book Ban serves no compelling (or even reasonable)

interest, it is not narrowly tailored or the least restrictive means of advancing its

interests, and it is vastly overbroad.  There is no compelling rationale why Texas

needs to diminish the ability of booksellers to distribute *The Grapes of Wrath* by

John Steinbeck, or *Brave New World* by Aldous Huxley, or *The Sound and the

Fury* by William Faulkner to students without parental consent, solely because they

contain some depictions of sex defined under amorphous and ambiguous standards

– books that many generations of students before them have read.  *See Virginia v.

Am. Booksellers Ass'n*, 372 S.E.2d 618, 621-24 (Va. 1988) (holding that none of

the 16 book titles targeted, such as *The Witches of Eastwick* by John Updike,

*Forever* by Judy Blume, *Ulysses* by James Joyce, *The Family of Woman*, *The New

Our Bodies, Ourselves*, or *The Penguin Book of Love Poetry* could be deemed

harmful to minors because of their serious literary, artistic, political or scientific

value for older adolescents).  Nor does the Act incorporate the critical limitations

on speech regulations set forth in *Miller v. California*, 413 U.S. 15, 24 (1973), and

*Ginsberg v. New York*, 390 U.S. 629, 633 (1968), in either its definitions of

"sexually explicit" or "sexually relevant."[8]  Indeed, the Act does not even

differentiate in any manner by age, imposing a regime whereby library material

vendors are compelled to rate books with no regard to the age of the reader.

*Compare Am. Booksellers Ass'n*, 372 S.E.2d 618.

As the Supreme Court reiterated in *Brown,* no state may restrict access to

ideas merely because it believes them to be unsuitable for minors:

> "[M]inors are entitled to a significant measure of First Amendment
> protection, and only in relatively narrow and well-defined
> circumstances may government bar public dissemination of protected
> materials to them." *Erznoznik v. Jacksonville*, 422 U.S. 205, 212–213
> . . . (1975) (citation omitted).  No doubt a State possesses legitimate
> power to protect children from harm, *Ginsberg, supra*, at 640–641 . .
> .; *Prince v. Massachusetts*, 321 U.S. 158, 165 . . . (1944), but that does
> not include a free-floating power to restrict the ideas to which children
> may be exposed. "Speech that is neither obscene as to youths nor
> subject to some other legitimate proscription cannot be suppressed
> solely to protect the young from ideas or images that a legislative
> body <u>thinks unsuitable for them</u>." *Erznoznik, supra,* at 213–214…

---

[8] *See Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1213-14 (9th Cir. 2010)
(finding state statute unconstitutionally overbroad where it failed to incorporate the
*Ginsberg* and *Miller* standards); *Rushia v. Town of Ashburnham*, 582 F. Supp. 900,
904 (D. Mass. 1983) (same); *Am. Booksellers Ass'n v. McAuliffe*, 533 F. Supp. 50,
57 (N.D. Ga. 1981) (same); *see also Calderon v. City of Buffalo*, 61 A.D.2d 323,
330 (N.Y. App. Div. 1978) (same); *Sund v. City of Wichita Falls*, 121 F. Supp. 2d
530, 552 (N.D. Tex. 2000) ("[i]t is true . . . that states may regulate children's
access to materials not deemed obscene for adults; however, such regulation is
permissible [in a public library] only where the restricted materials meet the
stringent test for obscenity as to children or 'harmful to minors.'").

564 U.S. at 794-95 (emphasis added). That is exactly what has happened here. In sum, on these additional grounds, the Act should be enjoined.

## CONCLUSION

Amici respectfully request that the Court lift the administrative stay, deny the Motion to Stay, and affirm the preliminary injunction and denial of the Motion to Dismiss.[9]

Dated: November 17, 2023                Respectfully submitted,


                                        By:   /s/ *Linda J. Steinman*
                                               Linda Steinman
                                        DAVIS WRIGHT TREMAINE LLP
                                        1251 Avenue of the Americas, 21st Floor
                                        New York, New York 10020
                                        Phone: (212) 489-8230
                                        Fax: (212) 489-8340
                                        Email: lindasteinman@dwt.com

                                        Thomas S. Leatherbury
                                        THOMAS S. LEATHERBURY LAW, PLLC
                                        1901 North Akard Street
                                        Cumberland Hill School Building
                                        Dallas, TX 75201-2305
                                        Phone: (214) 213-5004
                                        Email: tom@tsleatherburylaw.com

                                        *Attorneys for Amici Curiae The Association*
                                        *of University Presses, Barnes & Noble, Inc.,*
                                        *The Educational Book And Media*
                                        *Association, Freedom To Learn Advocates,*
                                        *Half Price Books, Records, Magazines, Inc.,*

---

[9] Amici thank Ojasvinee Singh of Penguin Random House for her contributions to this brief.

*Independent Book Publishers Association,
Penguin Random House LLC, and
Sourcebooks, LLC*

*Of counsel to Penguin Random House LLC:*

Daniel Novack
Penguin Random House LLC
1745 Broadway
New York, NY 10019
Phone:  (212) 572-2355
Email:  dnovack@penguinrandomhouse.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2023, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. Service of such filing will be accomplished by the CM/ECF system upon all participants.

DATED this 17th day of November, 2023.

DAVIS WRIGHT TREMAINE LLP

By:   /s/ *Linda J. Steinman*
       Linda Steinman
      Counsel for *Amici Curiae*

**ECF CERTIFICATION**

I hereby certify that (i) required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (ii) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; (iii) the document has been scanned for viruses using the most recent version of Windows Defender and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues, pursuant to 5th Cir. R. 25.2.9.

DATED this 17th day of November, 2023.

DAVIS WRIGHT TREMAINE LLP

By:   /s/ *Linda J. Steinman*
       Linda Steinman
      Counsel for *Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

The foregoing document complies with the word limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 5995 words.

This document complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rules of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2021 in 14-point Times New Roman font.

DATED this 17th day of November, 2023.

DAVIS WRIGHT TREMAINE LLP

By:   /s/ *Linda J. Steinman*
       Linda Steinman
       Counsel for *Amici Curiae*