No. 23-50668

## In the United States Court
## of Appeals for the Fifth Circuit

BOOK PEOPLE, INCORPORATED; VBK, INCORPORATED, doing business as
BLUE WILLOW BOOKSHOP; ASSOCIATION OF AMERICAN
PUBLISHERS; AUTHORS GUILD, INCORPORATED; COMIC BOOK LEGAL
DEFENSE FUND; AMERICAN BOOKSELLERS ASSOCIATION,

*Plaintiffs-Appellees*

v.

MARTHA WONG, in her official capacity as the Chair of the Texas State Library
and Archives Commission; KEVIN ELLIS, in his official capacity as the Chair of
the Texas State Board of Education; MIKE MORATH, in his official capacity as
the Commissioner of the Texas Education Agency,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Western District of Texas,
No. 1:23-cv-00858-ADA, Hon. Alan D. Albright Presiding

## BRIEF OF *AMICUS CURIAE* TEXAS SPEECH COMMUNICATION
## ASSOCIATION IN SUPPORT OF APPELLEES AND AFFIRMANCE

Peter Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, TX  75275-0116
(214) 768-4077
psteffensen@smu.edu

Catherine B. Smith
Garrett T. Meisman
VINSON & ELKINS LLP
845 Texas Avenue, Suite 4700
Houston, Texas 77002
(713) 758-2391
csmith@velaw.com
gmeisman@velaw.com

*Attorneys for Amicus Curiae Texas Speech Communication Association*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

1. No. 23-50668, *Book People, Inc.*, *et al. v. Martha Wong, et al.*

2. The undersigned counsel of record certifies that—in addition to the persons and entities listed in Appellees' Certificate of Interested Persons and in the Certificates of Interested Persons of the other Amici Curiae—the following listed persons or entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

**_Amicus Curiae_**
Texas Speech Communication Association

**_Attorneys for Amici Curiae_**
Catherine B. Smith
Garrett T. Meisman
Vinson & Elkins LLP

Peter Steffensen
SMU Dedman School of Law First Amendment Clinic


No publicly traded company has an ownership interest of 10% in either of the entities listed above.

Respectfully submitted,

*/s/ Catherine B. Smith*
*Attorney of Record for Amicus Curiae*
Texas Speech Communication Association

2

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS.........................2

TABLE OF CONTENTS......................................................................................3

TABLE OF AUTHORITIES .............................................................................4

STATEMENT OF AMICUS CURIAE ..............................................................6

ARGUMENT .....................................................................................................7

I.    Absent a preliminary injunction, uncertainty as to the consequences of the READER Act will harm the public interest by chilling classroom activities.....................................................................................7

II.   Absent a preliminary injunction, the READER Act will harm the public interest by exacerbating the unprecedented hiring and retention challenges of Texas schools. .........................................................11

III.  The READER Act will place an impossible burden on teachers if they wish to maintain a classroom library ...................................................13

IV.   Teachers underscore that the READER Act will harm the public interest by interfering with students' right to receive information and learn. ............................................................................................................15

CONCLUSION ................................................................................................19

CERTIFICATE OF SERVICE .........................................................................21

CERTIFICATE OF COMPLIANCE.................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Educ. Island Trees Union Free Sch. Dist. v. Pico*,
    457 U.S. 853 (1982) ...................................................................... 17, 18

*Brown v. Ent. Merch. Ass'n*,
    564 U.S. 786 (2011) ............................................................................17

*Campbell v. St. Tammany Parish Sch. Bd.*,
    64 F.3d 184 (5th Cir. 1995) ......................................................... 17, 18

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) ............................................................................17

*Pratt v. Indep. Sch. Dist.*,
    670 F.2d 771 (8th Cir. 1982) ....................................................... 18, 19

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) ...............................................................7

*Tinker v. Des Moines Indep. Community School Dist.*,
    393 U.S. 503 (1969) ............................................................................16

**Statutes**

Tex. Educ. Code § 33.021(d)(2)(C) ............................................................8

Tex. Educ. Code § 33.021(d)(E) ..............................................................14

Tex. Educ. Code § 35.001 ............................................................................8

Tex. Educ. Code § 35.001(1) ....................................................................14

Tex. Educ. Code § 35.001(3) ......................................................................9

Tex. Educ. Code § 35.002(a) ....................................................................13

Tex. Educ. Code § 35.002(b) ....................................................................13

Tex. Educ. Code § 35.003(d) ......................................................................9

Tex. Educ. Code § 35.004 ............................................................................9

Tex. Educ. Code § 35.006 ........................................................................14

**Other Authorities**

*Developing a Thriving Teacher Workforce in Texas, Teacher Vacancy Task Force Final Report*, Texas Education Agency (Feb. 2023) (last visited Nov. 17, 2023) ........................................................... 12, 13, 14

Robert Kennedy, *Understanding the Consequences of Banning Books in K-12 Education*, PUBLIC SCHOOL REVIEW (Oct. 30, 2023) (last visited Nov. 17, 2023) ........................................................................16

*Teacher Retention Data Reports, Certification Exam Reimbursements & Teacher Talent Strategies*, Texas Education Agency (Apr. 20, 2023) (last visited Nov. 17, 2023) ................................................11

Texas Speech Communication Association, https://www.etsca.com (last visited Nov. 2, 2023) ........................................................................6

**Rules**

Fed. R. App. P. 29(a)(4)(E) ........................................................................6

Fed. R. App. P. 29(b)(4) ........................................................................6

## STATEMENT OF AMICUS CURIAE[1]

The Texas Speech Communication Association is a professional organization aimed at promoting effective communication in a variety of areas through educational programs and networking events.[2] It is the largest association of its kind in the United States, and much of its membership consists of educators and students in Texas public schools. These individuals often rely on written and audiovisual materials provided in school libraries to prepare for speeches, debates, and other presentations—some of which involve sensitive or controversial subject matters. The Association thus has a special interest in educators' and students' free access to information, and it is well positioned to address the impact of the READER Act on its members' academic activities. All parties consent to the filing of this brief.

---

[1] No party's counsel authored this brief in whole or in part. No party, or party's counsel, made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae or their counsel made such a monetary contribution. *See* Fed. R. App. P. 29(a)(4)(E).

[2] Texas Speech Communication Association, https://www.etsca.com (last visited Nov. 2, 2023).

## ARGUMENT

When deciding whether to affirm or reverse a preliminary injunction, this Court considers, among other factors, whether an injunction is in the public interest. *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013). The Texas Speech Communication Association believes that enjoining enforcement of the READER Act is in the public interest because classroom activities will otherwise be chilled by teachers' and administrators' uncertainty as to Act's application. This chilling effect has the potential to exacerbate problems with teacher attrition and retention in public schools. The Act also interferes with students' ability to learn and receive information. In light of these concerns, together with those expressed in the Appellees' brief, the district court's preliminary injunction should be affirmed.

## I.     Absent a preliminary injunction, uncertainty as to the consequences of the READER Act will harm the public interest by chilling classroom activities.

In the experience of the Association and its members, Texas school districts tend to devote scant resources to programs involving the oral exploration of literary works. As a result, teachers often use their own money to buy literary material to support their academic activities and those of their students. One teacher ("Teacher A"), who spoke on condition of anonymity, described the challenges associated with gathering these materials:

> I have been teaching Oral Interpretation at a large school in . . . Texas for over 10 years . . . . This class affords students the opportunity to explore different themes and different voices. They give life to literature through performance. Inherent within this opportunity is the necessity of having literature available for students to perform.
>
> I have found in conversation with colleagues that school districts often severely under-resource [Oral Interpretation and Performance of Literature] classes. Many of my colleagues report that the majority of the books in their classrooms are purchased with their own funds and often come from thrift stores or garage sales. We simply don't have the funds to purchase new books from stores. I can personally attest to this struggle. I have over 5,000 individual book titles in my classroom, the vast majority of which were purchased using personal funds.
>
> The curiosity and brilliance of students amazes me. They want to learn and they want to explore the voices that give life to the challenges of our time and of past eras. Students will often come to me wanting to learn more about the civil rights era after lessons in history class. I have been able to find many books from that time period while looking through thrift stores, books which are no longer in print and not available at current vendors.

The Act provides little guidance on the application of its requirements to these privately procured materials. Although the Act requires school districts to regulate the possession, acquisition, and purchase of "library materials" in "classroom libraries," it does not define either of those terms. *See* Tex. Educ. Code §§ 33.021(d)(2)(C), 35.001. The Act also exempts "library material directly related to the curriculum" from its rating regime, but it is unclear what degree of

"relatedness" qualifies. *Id.* §§ 33.021(a), 35.001(3). Teachers are thus left to wonder (a) whether the Act's restrictions apply to their (or their students') personal property, (b) what kind of relationship those materials should bear to the subject matter of their classes, and ultimately (c) the extent to which those materials can be used for academic activities. Another teacher ("Teacher B"), who likewise asked to remain anonymous, discussed the confusion that educators face when grappling with these questions:

> [M]y content area required a certain level of freedom for students to be able to discover and select literature for themselves. Students would bring books into my classroom that they had found for themselves. I found myself wondering if this would put me at risk—would a student's choice to bring a book into my classroom that they selected themselves for an assignment in class be my responsibility? Would I be held liable[3] for a book I hadn't read? How would I teach a course that requires a certain amount of student choice in what they choose to read? Currently, I have been left with far too many questions and not enough answers.

Apparently because the Act forbids schools from purchasing library material from vendors that do not comply with the Act's rating requirements (Tex. Educ. Code § 35.003(d)), some school districts are preemptively restricting harmless

---

[3] The Act shields teachers from liability "for any claim or damage resulting from a *library material vendor's* violation" of the statute. Tex. Educ. Code § 35.004 (emphasis added). But this provision would do nothing to protect a teacher from potential disciplinary action for *their own* alleged violation of a school's policy implementing the Act's requirements.

materials on the belief that those items cannot be rated. Teacher A explained the

resulting impact on students' access to literature:

> I worry that under HB900, these books will no longer be
> available, not due to any explicit content but because my
> school district will bar access to books that cannot be rated
> by a vendor.

> As a teacher, I understand the necessity of keeping explicit
> or questionable content from students. I don't offer
> students access to books with material that could be
> banned. I do offer students access to an impressive library
> of literature that speaks to their concerns and their voices.
> I offer them access to literature that allows them to give
> voice to what they care about. These voices may be
> quashed due to the unintended consequences of HB 900.
> Some districts, including my own, in an overabundance of
> caution are limiting access to literature that in no way
> constitutes sexually explicit or sexually relevant literature.
> For my classroom, students will lose access to hundreds,
> if not thousands of books, not due to content, but because
> they can't be rated by a vendor.

Teacher B similarly felt impelled to pack up a classroom library when facing the

threat of impending restrictions on library materials even before the READER Act

passed:

> In August 2022, I was told that I needed to get rid of my
> classroom library. It wasn't an official policy—but it was
> likely to become one at the upcoming school board
> meeting. Suddenly, my last planning day before students
> would enter my classroom for the 2022-2023 school year
> was thrown into disarray as I had to pack up hundreds of
> books and plays to hide away . . . .

> Hundreds of students, teachers, parents, and community
> members attended the school board meeting where a series

> of controversial policies were officially voted on. Despite the majority of speakers condemning the proposed policy changes, the board voted to pass them . . . .
>
> I am not in favor of handing over pornographic material to students—but currently there is not enough direction on what is and is not allowed, leading to over-policing of literature and increased risk for educators with no sense of security.

As these stories demonstrate, the uncertainty surrounding the READER Act's application is placing significant stress on Texas public school teachers—many of whom are already over-burdened and under-resourced—in their efforts to provide appropriate and varied materials for their students.  This increased stress and uncertainty will undoubtedly cause increased teacher attrition, as described below.

## II.    Absent a preliminary injunction, the READER Act will harm the public interest by exacerbating the unprecedented hiring and retention challenges of Texas schools.

Texas schools are facing an unprecedented challenge in the hiring and retention of their teachers. The attrition rate of Texas teachers in 2022 rose to a "historic high of 13.4%" and the "[t]he proportion of newly hired teachers hired without any type of Texas Certification . . . rose during the 2022-2023 school year to an historic high of 28.8%. . . ." *Teacher Retention Data Reports, Certification Exam Reimbursements & Teacher Talent Strategies*, Texas Education Agency (Apr. 20, 2023), https://tea.texas.gov/sites/default/files/teacher-talent-data-and-resources.pdf (last visited Nov. 17, 2023).  In response to this, Governor Abbott

established the Teacher Vacancy Task Force ("TVTF") to "examine teacher retention and recruitment challenges across Texas." *Developing a Thriving Teacher Workforce in Texas, Teacher Vacancy Task Force Final Report*, Texas Education Agency 3 (Feb. 2023), https://tea.texas.gov/texas-schools/health-safety-discipline/tvtf-final-report.pdf (last visited Nov. 17, 2023). The TVTF identified "the highest-leverage opportunities to reduce teacher vacancies," which included "improving working conditions for teachers" and other contributing factors which led to "workplace stress." *Id.* at 10, 42. This Act, if enforced, has the potential to increase workplace stress for teachers and exacerbate the challenges facing school districts in hiring and retaining high quality teachers.

Teacher B highlighted the stress that the threat of impending restrictions on library materials has had as they were forced to take preemptive action to avoid potential conflict:

> Suddenly, my last planning day before students would enter my classroom for the 2022-2023 school year was thrown into disarray as I had to pack up hundreds of books and plays to hide away. I'll admit it; I cried. I cried for all the times a student's curiosity had been sparked by a random book on my shelf. I cried for the loss of access to literature. I cried because I feared for my job. I cried because education is rapidly changing and scared educators, like myself, are fleeing from the profession— afraid that if they stay, they will be swept up in a sea of judgment cast without clarity.

This statement highlights the second- and third-order effects this Act has on teachers, as they face increasing challenges in the classroom to provide their students with high quality educational materials, and the increasing challenges schools face in retaining teachers in the face of ever-increasing burdens placed on these teachers.

As the TVTF Chair noted, "Texas cannot afford to keep losing the most important factor in a child's academic success: our classroom teachers." *Developing a Thriving Teacher Workforce in Texas, Teacher Vacancy Task Force Final Report*, Texas Education Agency 7 (Feb. 2023), https://tea.texas.gov/texas-schools/health-safety-discipline/tvtf-final-report.pdf (last visited Nov. 17, 2023). If enforcement of the Act is allowed to proceed, it risks exacerbating the hiring and retention issues Texas school districts already face, thereby harming the very students that the Act is aimed at protecting.

## III.   The READER Act will place an impossible burden on teachers if they wish to maintain a classroom library

The Act requires "library material vendor[s]" to assign a rating to all "library material . . . previously sold to a school district or school." Tex. Educ. Code § 35.002(a). Additionally, the Act requires that the vendor "issue a recall for all copies of library material sold to a district or school that is (1) rated sexually explicit material; and (2) in active use by the district or school." Tex. Educ. Code § 35.002(b). A "library material vendor" is defined as "any entity that sells library material to a public primary or secondary school in [Texas]." Tex. Educ. Code §

35.001(1). Under a broad interpretation, library material vendors could include publishers, independent bookstores, distributors, wholesalers, e-book sellers, online retailers, vendors of database services, and other entities. Further, the Act requires that every school district "review the content of each library material in the catalog of a . . . school library" every other year. Tex. Educ. Code § 35.006. Additionally, the Act "encourages schools to provide library catalog transparency." Tex. Educ. Code § 33.021(d)(E). This places an impossible burden on teachers who have accumulated abundant library materials in their classrooms.

As Teacher A noted, "I have over 5,000 individual book titles in my classroom." The implications of this law would require Teacher A to maintain a catalog of the books in their classroom, constantly monitor all vendor ratings of the books in their catalog, and remove all books that are "rated sexually explicit" and recalled by a vendor. TVTF stated that, "unsustainable workloads are negatively impacting teachers and are the *number one* issue cited by those who recently left the profession." *Developing a Thriving Teacher Workforce in Texas, Teacher Vacancy Task Force Final Report*, Texas Education Agency 34 (Feb. 2023), https://tea.texas.gov/texas-schools/health-safety-discipline/tvtf-final-report.pdf (last visited Nov. 17, 2023) (emphasis added).

The time requirement for teachers, such as Teacher A, to maintain a compliant classroom library due to the burdens imposed by the READER Act would further

add to their "unsustainable workloads" and may increase teacher attrition rates. Further, it will reduce the number of books, plays, essays, and other materials students can access in the classroom as teachers are forced to abstain from having classroom libraries due to the burdens imposed by the READER Act.

## IV.    Teachers underscore that the READER Act will harm the public interest by interfering with students' right to receive information and learn.

The statements above demonstrate that the READER Act would have many negative impacts on public education, as the Act's chilling effect reaches far more than just sexually relevant and sexually explicit literature. Students' ability to be exposed to a wide variety of ideas at school is one of the significant benefits of our educational system. The teachers have stated that the READER Act would significantly impair their students' willingness to explore and to learn, which in turn would impoverish public school education. The real-life harm of the READER Act (and even earlier book censorship policies) is substantiated by the teachers' lived experience dealing with the suppression of reading materials in public schools in response to the Act. This suppressive effect stunts teachers' ability to provide a high-quality and robust education. Absent a preliminary injunction, the READER Act undermines the students' ability to learn and prepare to enter society. The teachers' statements also reflect the views of others who have written about this subject. One commentator said that the removal of books "can have detrimental effects on students' educational experiences" and that removing access to educational

materials "can limit students' exposure to different perspectives, stifle critical thinking, and hinder their understanding of important societal issues."[4] In this way, if the READER Act were allowed to go into effect, its restrictions on the flow of information in the classroom would harm the public interest.

The teachers' statements highlight many problems the READER Act creates. Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 506 (1969). "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Id.* at 512 (internal quotations omitted). This is because the "[n]ation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Id.* (internal quotations omitted). The Supreme Court has embraced the idea that the "classroom is peculiarly the marketplace of ideas." *Id.* (internal quotations omitted). As a result, "students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Id.* at 511.

---

[4] Robert Kennedy, *Understanding the Consequences of Banning Books in K-12 Education*, PUBLIC SCHOOL REVIEW (Oct. 30, 2023), https://www.publicschoolreview.com/blog/understanding-the-consequences-of-banning-books-in-k-12-education#:~:text=Banning%20books%20can%20have%20detrimental,understanding%20of%20important%20societal%20issues (last visited Nov. 17, 2023).

The government's power to protect children from harm does not include "a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 794 (2011). Stated differently, speech "that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). Rather, the exercise of discretion over the contents of school materials "must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Bd. of Educ. Island Trees Union Free Sch. Dist. v. Pico*, 457 U.S. 853, 864 (1982). In interpreting the plurality opinion by the Supreme Court in *Pico*, this Court "observed that if school officials intended by their removal decision to deny students access to ideas with which the school officials disagreed, and this intent was the *decisive* factor in the removal decision, then the school officials had exercised their discretion in violation of the Constitution" *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 188–189 (5th Cir. 1995) (internal citations omitted) (emphasis in original). Just like the school library in *Pico*, the classroom serves as "the principal locus" where student engage in inquiry to gain "new maturity and understanding." *Pico*, 457 U.S. at 868-69. Furthermore, in light of *Pico*, this Court has recognized that "students have a First Amendment right to receive information" and state officials cannot "seek . . . to prescribe what shall be orthodox in politics,

nationalism, religion, or other matters of opinion." *Campbell*, 64 F.3d at 188–189 (internal citations omitted). Access to a broad range of information in the classroom promotes the policy of preparing "students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Pico*, 457 U.S. at 868. As the teachers made clear, the READER Act is having a ripple effect beyond removing materials that are "persuasively vulgar" or "educationally unsuitable." *Campbell*, 64 F.3d at 189. As the teachers have said, the mere possibility of the READER Act going into effect and the sheer confusion about what the Act encompasses is causing school officials to remove school materials that are not necessarily objectionable just to be safe.

The Eighth Circuit had this to say about removing certain material from the school curriculum: "The symbolic effect of removing the films from the curriculum is more significant than the resulting limitation of access to the story. The board has used its official power to perform an act clearly indicating that the ideas contained in the films are unacceptable and should not be discussed or considered. This message is not lost on students and teachers, and its chilling effect is obvious." *Pratt v. Indep. Sch. Dist.*, 670 F.2d 771, 779 (8th Cir. 1982) (noting the "chilling effect" of removing the films from school curriculum) (citing *Pico*, 638 F.2d at 436). Furthermore, in line with what the teachers have said, "[w]hen one must guess what conduct or utterance may lose him his position, one necessarily will steer far wider

of the unlawful zone." *Id.* at 778 (internal quotations omitted). The risk of the chilling effect requires standards that "clearly inform" people of what is prohibited by the READER Act. *Id.* Absent a preliminary injunction, the READER Act would bar access to vital sources of information and learning and cast a pall on teachers' ability to inspire their students' creativity and expression.

## CONCLUSION

For these reasons and the reasons stated by Appellees, this Court should life the administrative stay, deny Appellants' motion to stay, and affirm the preliminary injunction.

Dated: November 17, 2023                Respectfully submitted,

                                        */s/ Catherine B. Smith*
                                        Catherine B. Smith
                                        Garrett T. Meisman
                                        VINSON & ELKINS LLP
                                        845 Texas Avenue, Suite 4700
                                        Houston, Texas 77002
                                        (713) 758-2391
                                        csmith@velaw.com
                                        gmeisman@velaw.com

                                        Peter Steffensen
                                        SMU DEDMAN SCHOOL OF LAW[5]
                                        FIRST AMENDMENT CLINIC
                                        P.O. Box 750116
                                        Dallas, Texas 75275-0116
                                        (214) 768-4077
                                        psteffensen@smu.edu

                                        *Attorneys for Amicus Curiae Texas*
                                        *Speech Communication Association*

---

[5] Third-year law students and associate members of the State Bar of Texas, Zachary Belew and Clint Nuckolls, contributed to this brief.

## CERTIFICATE OF SERVICE

I certify that on November 17, 2023, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the CM/ECF system. I certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Catherine B. Smith*
*Attorney of Record for Amicus Curiae*
*Texas Speech Communication*
*Association*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that:

1.      This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 3,323 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rules 32.1 and 32.2 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.


*/s/ Catherine B. Smith*
*Attorney of Record for Amicus Curiae*
*Texas Speech Communication*
*Association*