**No. 23-50668**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

BOOK PEOPLE, INCORPORATED, VBK, INCORPORATED (DOING
BUSINESS AS BLUE WILLOW BOOKSHOP); ASSOCIATION OF
AMERICAN PUBLISHERS; AUTHORS GUILD, INCORPORATED;
COMIC BOOK LEGAL DEFENSE FUND; AMERICAN BOOKSELLERS
ASSOCIATION,

*Plaintiffs-Appellees,*

v.

MARTHA WONG, IN HER OFFICIAL CAPACITY AS THE CHAIR OF
THE TEXAS STATE LIBRARY AND ARCHIVES COMMISSION; KEVIN
ELLIS, IN HIS OFFICIAL CAPACITY THE CHAIR OF THE TEXAS
STATE BOARD OF EDUCATION; MIKE MORATH, IN HIS OFFICIAL
CAPACITY AS THE COMMISSIONER OF THE TEXAS EDUCATION
AGENCY,

*Defendants-Appellants*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
Civil Action No. 1:23-cv-00858-ADA

**UNOPPOSED MOTION FOR LEAVE TO FILE BRIEF OF THE
AMERICAN CIVIL LIBERTIES UNION OF TEXAS AND SCHOLARS OF
CONSTITUTIONAL LAW AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFFS-APPELLEES**

***Counsel for* Amici Curiae,**
**AMERICAN CIVIL LIBERTIES UNION OF TEXAS, AND**
**SCHOLARS OF CONSTITUTIONAL LAW DEAN LAWRENCE SAGER AND**
**PROFESSOR DALE CARPENTER**

Brian Klosterboer
Chloe Kempf
Thomas Buser-Clancy
Adriana Piñon
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288

Stuart M. Sarnoff
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036

James G. Byrd
   *Counsel of Record*
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025

Michael McMillin
Christian Rice
O'MELVENY & MYERS LLP
303 Colorado Street
Suite. 2750
Austin, TX 78702

## CERTIFICATE OF INTERESTED PERSONS

**Case Number and Style**: No. 23-50668, *Book People, Inc. v. Wong.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. **Plaintiffs-Appellees**: Book People, Inc., VBK, Inc. d/b/a Blue Willow Bookshop, American Booksellers Association, Association of American Publishers, Authors Guild, Inc., and Comic Book Legal Defense Fund. None of the Plaintiffs-Appellees are a publicly held corporation; no Plaintiff-Appellee has any parent corporation; and no publicly held corporation owns 10 percent or more of any Plaintiff-Appellee's stock.

2. **Counsel for Plaintiffs-Appellees**: Laura Lee Prather, Catherine L. Robb, Michael J. Lambert, and William Reid Pillifant of Haynes and Boone, LLP.

3. **Defendants-Appellants:** Martha Wong in her official capacity as chair of the Texas State Library and Archives Commission, Keven Ellis in his official capacity as chair of the Texas Board of Education, and Mike Morath in his official capacity as chair of the Commission of Education.

4. **Counsel for Defendants-Appellants**: Angela Colmenero, Brent Webster, James Lloyd, Kimberly Gdula, Ryan Kercher, Christina Cella, Amy Pletscher, Ken Paxton, Brent Webster, Lanora C. Pettit, Ari Cuenin, Kateland R. Jackson, and Coy Westbrook of the Office of the Attorney General.

5. **Amicus Curiae**: State Representative Jared Patterson.

6. **Counsel for Amicus Curiae**: Robert Henneke and Chance Weldon of the Texas Public Policy Foundation.

7. **Amici Curiae in District Court**: Educational Book & Media Association, Association of University Presses, Barnes & Noble, Inc., Freedom to

Read Foundation, Freedom to Learn Advocates, American Association of School Librarians, and Association of University Presses.

**8.    Counsel for *Amici Curiae* in District Court**: Peter D. Kennedy of Graves, Dougherty, Hearon & Moody, P.C.; Everett William Jack, Jr., Celyra Imani Myers, and Linda J. Steinman of Davis Wright Tremaine LLP.

**9.    *Amici Curiae***: American Civil Liberties Union of Texas, Dean Lawrence Sager, and Professor Dale Carpenter.

**10.    Counsel for *Amici Curiae***: James G. Byrd, Stuart M. Sarnoff, Michael McMillin, and Christian Rice of O'Melveny & Myers LLP; and Brian Klosterboer, Chloe Kempf, Thomas Buser-Clancy, and Adriana Piñon of the ACLU Foundation of Texas, Inc.

*/s/ James G. Byrd*

James G. Byrd
*Counsel of Record for*
Amici Curiae
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS, DEAN
LAWRENCE SAGER, AND
PROFESSOR DALE CARPENTER

## MOTION FOR LEAVE

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, *Amici Curiae* the American Civil Liberties Union of Texas ("ACLU of Texas"), Dean Lawrence Sager, and Professor Dale Carpenter hereby move the Court for leave to file a brief as *Amici Curiae* in support of Plaintiffs-Appellees.  The proposed brief of *Amici* is attached to this Motion as **Exhibit A**.

The ACLU of Texas has thousands of members and supporters across the State, and works with communities, at the State Capitol, and in the courts to fulfill the promises of the Constitution for every Texan.  To that end, the ACLU of Texas regularly files *Amicus* briefs in cases, like this one, that raise issues of concern to Texans' constitutional rights.  Dean Sager and Professor Carpenter are preeminent scholars of constitutional law, who study and publish on such matters as the limits of federal jurisdiction and the First Amendment, respectively.  Both scholars have an interest in the reasoned and consistent application of justiciability doctrines, such as those discussed in the proposed *Amicus* brief.

This brief is desirable and relevant because it will further inform the Court about two threshold jurisdictional questions that Defendants-Appellants have placed at the center of this appeal: standing and ripeness.  The ACLU of Texas regularly litigates these issues, and all *Amici Curiae* have decades of experience with, and expertise on, these and related issues.  Moreover, while the principal briefs touch on

standing and ripeness, they also discuss numerous other matters including the factual and statutory background and the issues on the merits. *Amici Curiae*, by comparison, have the advantage of devoting their entire proposed brief to standing and ripeness, allowing them to explore these issues more deeply than the parties, and allowing them to raise for the Court's consideration numerous points and authorities discussed by neither party.

For these reasons, *Amici Curiae* respectfully request that the Court grant leave to file the attached *Amicus* brief in support of Plaintiffs-Appellees.

Dated:  November 17, 2023

Respectfully submitted,

*/s/ James G. Byrd*
James G. Byrd
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025
jbyrd@omm.com

Stuart M. Sarnoff
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
ssarnoff@omm.com

Michael McMillin
Christian Rice
O'MELVENY & MYERS LLP
303 Colorado Street Ste. 2750
Austin, TX 78702
mmcmillin@omm.com
crice@omm.com

Brian Klosterboer
Chloe Kempf
Thomas Buser-Clancy
Adriana Piñon
ACLU FOUNDATION
OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288
bklosterboer@aclutx.org
ckempf@aclutx.org
tbuserclancy@aclutx.org
apinon@aclutx.org

*Counsel for* Amici Curiae
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS, DEAN
LAWRENCE SAGER, AND
PROFESSOR DALE CARPENTER

**CERTIFICATE OF CONFERENCE**

Pursuant to 5th Cir. R. 27.4, I certify that counsel for *Amicus Curiae* ACLU of Texas has conferred with counsel for the parties regarding the relief requested in this motion. On November 16, 2023, counsel for Plaintiffs-Appellees informed counsel for *Amici Curiae* that they do not oppose the instant motion for leave to file an *Amicus* brief in support of Plaintiffs-Appellees, and on November 17, 2023, counsel for both Defendants-Appellants informed counsel for *Amici Curiae* that they do not oppose the instant motion for leave either.

*/s/ James G. Byrd*
James G. Byrd

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of November, 2023, a true and correct copy of the foregoing was filed electronically using the CM/ECF system which served counsel for the parties.

*/s/ James G. Byrd*
James G. Byrd

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 331 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word for Office 365 in 14-point Times New Roman font.

*/s/ James G. Byrd*
James G. Byrd

## CERTIFICATIONS UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ James G. Byrd*
James G. Byrd

# EXHIBIT A

No. 23-50668

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

BOOK PEOPLE, INCORPORATED, VBK, INCORPORATED (DOING
BUSINESS AS BLUE WILLOW BOOKSHOP); ASSOCIATION OF
AMERICAN PUBLISHERS; AUTHORS GUILD, INCORPORATED;
COMIC BOOK LEGAL DEFENSE FUND; AMERICAN BOOKSELLERS
ASSOCIATION,

*Plaintiffs-Appellees,*

v.

MARTHA WONG, IN HER OFFICIAL CAPACITY AS THE CHAIR OF
THE TEXAS STATE LIBRARY AND ARCHIVES COMMISSION; KEVIN
ELLIS, IN HIS OFFICIAL CAPACITY THE CHAIR OF THE TEXAS
STATE BOARD OF EDUCATION; MIKE MORATH, IN HIS OFFICIAL
CAPACITY AS THE COMMISSIONER OF THE TEXAS EDUCATION
AGENCY,

*Defendants-Appellants*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
Civil Action No. 1:23-cv-00858-ADA

# BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION OF TEXAS AND
# SCHOLARS OF CONSTITUTIONAL LAW AS *AMICI CURIAE* IN
# SUPPORT OF PLAINTIFFS-APPELLEES

**(Amici Curiae *& Counsel for* Amici Curiae *Listed on Inside Cover*)**

***Counsel for*** **Amici Curiae,**
**AMERICAN CIVIL LIBERTIES UNION OF TEXAS, AND**
**SCHOLARS OF CONSTITUTIONAL LAW DEAN LAWRENCE SAGER AND**
**PROFESSOR DALE CARPENTER**

Brian Klosterboer
Chloe Kempf
Thomas Buser-Clancy
Adriana Piñon
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288

Stuart M. Sarnoff
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036

James G. Byrd
    *Counsel of Record*
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025

Michael McMillin
Christian Rice
O'MELVENY & MYERS LLP
303 Colorado Street
Suite. 2750
Austin, TX 78702

**CERTIFICATE OF INTERESTED PERSONS**

**Case Number and Style**: No. 23-50668, *Book People, Inc. v. Wong.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    **Plaintiffs-Appellees**: Book People, Inc., VBK, Inc. d/b/a Blue Willow Bookshop, American Booksellers Association, Association of American Publishers, Authors Guild, Inc., and Comic Book Legal Defense Fund. None of the Plaintiffs-Appellees are a publicly held corporation; no Plaintiff-Appellee has any parent corporation; and no publicly held corporation owns 10 percent or more of any Plaintiff-Appellee's stock.

2.    **Counsel for Plaintiffs-Appellees**: Laura Lee Prather, Catherine L. Robb, Michael J. Lambert, and William Reid Pillifant of Haynes and Boone, LLP.

3.    **Defendants-Appellants:** Martha Wong, in her official capacity as chair of the Texas State Library and Archives Commission, Keven Ellis, in his official capacity as chair of the Texas Board of Education, and Mike Morath, in his official capacity as chair of the Commission of Education.

4.    **Counsel for Defendants-Appellants**: Angela Colmenero, Brent Webster, James Lloyd, Kimberly Gdula, Ryan Kercher, Christina Cella, Amy Pletscher, Ken Paxton, Brent Webster, Lanora C. Pettit, Ari Cuenin, Kateland R. Jackson, and Coy Westbrook of the Office of the Attorney General.

5.    *Amicus Curiae*: State Representative Jared Patterson.

6.    **Counsel for *Amicus Curiae***: Robert Henneke and Chance Weldon of the Texas Public Policy Foundation.

7.    ***Amici Curiae* in District Court**: Educational Book & Media Association, Association of University Presses, Barnes & Noble, Inc., Freedom to

Read Foundation, Freedom to Learn Advocates, American Association of School Librarians, and Association of University Presses.

**8.** **Counsel for *Amici Curiae* in District Court**: Peter D. Kennedy of Graves, Dougherty, Hearon & Moody, P.C.; Everett William Jack, Jr., Celyra Imani Myers, and Linda J. Steinman of Davis Wright Tremaine LLP.

**9.** ***Amici Curiae***: American Civil Liberties Union of Texas, Dean Lawrence Sager, and Professor Dale Carpenter.

**10.** **Counsel for *Amici Curiae***: James G. Byrd, Stuart M. Sarnoff, Michael McMillin, and Christian Rice of O'Melveny & Myers LLP; and Brian Klosterboer, Chloe Kempf, Thomas Buser-Clancy, and Adriana Piñon of the ACLU Foundation of Texas, Inc.

*/s/ James G. Byrd*
James G. Byrd
*Counsel of Record for*
Amici Curiae
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS, DEAN
LAWRENCE SAGER, AND
PROFESSOR DALE CARPENTER

# TABLE OF CONTENTS

**Page(s)**

INTERESTS OF *AMICI CURIAE* ............................................................1

INTRODUCTION ...................................................................................3

ARGUMENT .........................................................................................5

I.    The District Court Correctly Concluded That The Booksellers Have Article III Standing ...................................................5

      A.    The Booksellers have demonstrated both constitutional and economic injuries sufficient for Article III. ........................6

      B.    The Booksellers have demonstrated traceability and redressability. .........................................................17

II.    The District Court Correctly Held The Parties' Dispute Ripe For Resolution .................................................................21

      A.    The Booksellers' facial challenges to the Act's constitutionality are fit for review. .........................................22

      B.    READER imposes cognizable hardships on Booksellers........24

CONCLUSION .....................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ........................................................... 6, 7, 8, 11, 24

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967) ..................................................................... 24, 25

*Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.,*
   851 F.3d 507 (5th Cir. 2017) ......................................................... 10, 20

*All. for Hippocratic Med. v. FDA,*
   78 F.4th 210 (5th Cir. 2023)........................................................... 13, 14

*Babbitt v. United Farm Workers Nat'l Union,*
   442 U.S. 289 (1979) .................................................................... 6, 9, 12

*Barilla v. City of Houston,*
   13 F.4th 427 (5th Cir. 2021).................................................................8

*Bennett v. Spear,*
   520 U.S. 154 (1997) ...................................................................... 10, 17

*Book People, Inc. v. Wong,*
   2023 WL 6060045 (W.D. Tex. Sept. 18, 2023).......................... 22, 27

*Braidwood Mgmt., Inc. v. EEOC,*
   70 F.4th 914 (5th Cir. 2023)................................................................6

*California Trucking Ass'n v. Bonta,*
   996 F.3d 644 (9th Cir. 2021)................................................................9

*Clapper v. Amnesty International,*
   568 U.S. at 401, 406-07.......................................................... 6, 16, 17

*Club Madonna, Inc. v. City of Miami Beach,*
   924 F.3d 1370 (11th Cir. 2019)..........................................................22

*Craig v. Boren,*
   429 U.S. 190 (1976) ..........................................................................15

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ...................................................................21

*Duke Power Co. v. Carolina Envtl. Study Group*,
   438 U.S. 59 (1978) .....................................................................21

*Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*,
   729 F. App'x 287 (5th Cir. 2018)................................. 12, 15, 16, 20

*Edgar v. Haines*,
   2 F.4th 298 (4th Cir. 2021).......................................................21

*Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 302 (5th Cir.
   2005) ................................................................................. 18, 19

*Gov't Suppliers Consolidating Servs., Inc. v. Bayh*,
   975 F.2d 1267 (7th Cir. 1992)...................................................24

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................... 4, 6, 17

*Martin v. City of Struthers*,
   319 U.S. 141 (1943) ...............................................................7, 24

*Maryland Shall Issue, Inc. v. Hogan*,
   971 F.3d 199 (4th Cir. 2020).............................................. 13, 15, 20

*Nat'l Press Photographers Ass'n v. McCraw*,
   No. 22-50337, 2023 WL 6968750 (5th Cir. Oct. 23, 2023)............8, 19

*New Jersey Television Corp. v. F.C.C.*,
   393 F.3d 219 (D.C. Cir. 2004) ...................................................15

*New Mexicans for Bill Richardson v. Gonzales*,
   64 F.3d 1495 (10th Cir. 1995)....................................................21

*Northeastern Fla. Chapter of Associated Gen. Contractors v. City of
   Jacksonville*,
   508 U.S. 656 (1993) ........................................................... 15, 16

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ............................................................... 15, 18, 20

*Olivier v. City of Brandon*,
  2023 WL 5500223 (5th Cir. Aug. 25, 2023) ........................................................25

*Ostrewich v. Tatum*,
  72 F.4th 94, (5th Cir. 2023) ..............................................................................8

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev.
  Comm'n, 461 U.S. 190, 201 (1983)* ...................................................................25

*Railroad Comm'n of Texas v. Texas Citizens for a Safe Future and
  Clean Water*,
  336 S.W. 3d 619 (Tex. 2011) ...................................................................... 23, 24

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) .............................................................................8

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ............................................................................ 7, 21, 22

*Texas v. United States*,
  497 F.3d 491 (5th Cir. 2007) ...................................................................... 21, 24, 25

*Texas v. United States*,
  523 U.S. 296 (1998) ........................................................................................21

*Thomas v. Union Carbide Agr. Prod. Co.*,
  473 U.S. 568 (1985) ........................................................................... 24, 25, 27

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ..................................................................................13

*United States v. Quinones*,
  313 F.3d 49 (2d Cir. 2002) .............................................................................22

*Virginia v. Am. Booksellers Ass'n*,
  484 U.S. 383 (1988) ...................................................................................6, 14

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Winter v. Wolnitzek,*
  834 F.3d 681 (6th Cir. 2016) ................................................................21

**Statutes**

Tex. Educ. Code § 35.001 ......................................................................7

Tex. Educ. Code § 35.002 .............................................................. passim

Tex. Educ. Code § 35.0021 ...................................................................14

Tex. Educ. Code § 35.003 .............................................................. 11, 20

Tex. Educ. Code § 39.003 ......................................................................9

Tex. Educ. Code § 39A.002 ...................................................................9

Tex. Educ. Code § 7.002 .......................................................................9

**Rules**

Fed. R. App. P. 29 ...............................................................................1

## INTERESTS OF *AMICI CURIAE*[1]

*Amicus Curiae* American Civil Liberties Union of Texas ("ACLU of Texas") is a nonpartisan, nonprofit organization with thousands of members and supporters across the State.  Founded in 1938, the ACLU of Texas is headquartered in Houston and is the one of the largest ACLU affiliates in the nation.  The ACLU of Texas works with communities, at the State Capitol, and in the courts to fulfill the promises of the Constitution for every Texan, no exceptions.  From Amarillo to Brownsville and Beaumont to El Paso, we believe in a Texas that works for all of us—a Texas where each person has an equal say in the decisions that shape our future and everyone can build a good life.  The ACLU of Texas has expertise in the First Amendment and an interest in guarding against government censorship of free expression and ideas, which goes to the heart of this case, and in upholding pathways to challenge government censorship and unconstitutional laws, which is the focus of this brief on standing and ripeness.

*Amicus Curiae* Lawrence Sager is the Alice Jane Drysdale Sheffield Regents Chair at The University of Texas at Austin, School of Law, as well as the School's

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *Amici Curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  *See* Fed. R. App. P. 29(a)(4)(E), (b)(4); 5th Cir. R. 29.2.  Dean Sager and Professor Carpenter appear in their individual capacity; institutional affiliations are listed for identification purposes only.

former dean.  Dean Sager is one of the nation's preeminent constitutional theorists and scholars.  He has authored numerous books and articles on issues of constitutional law, including the limits on federal jurisdiction.  As such, Dean Sager has an interest in the reasoned and consistent application of justiciability doctrines.

*Amicus Curiae* Dale Carpenter is the Judge William Hawley Atwell Chair of Constitutional Law, Altshuler Distinguished Teaching Professor, and Professor of Law at Southern Methodist University Dedman School of Law.  A nationally recognized expert in constitutional law and the First Amendment, Professor Carpenter regularly teaches courses and publishes on both.  He, too, has an interest in the reasoned and consistent application of justiciability doctrines.

## INTRODUCTION

The Texas Legislature enacted the Restricting Explicit and Adult-Designated Educational Resources Act ("READER" or the "Act") to ban non-obscene books rated "sexually explicit" from school libraries and to restrict non-obscene books rated "sexually relevant" to students who receive parental consent. But the State of Texas did not take on the responsibility to review all of the subject books and issue those ratings itself. Instead, the Legislature placed that heavy and unwanted burden on private "library materials vendors," including the Booksellers.[2] By its plain language, the Act requires the Booksellers to conduct a "contextual analysis" of every book they ever sold to a Texas school district that remains in "active use," to decide which books are too "sexually explicit" or "sexually relevant" for Texas students—spanning from ages 5 to 18, and to bear all attendant expense. The district court was right to enjoin the law's operation: it is void for vagueness; it compels unwanted speech; and it serves as an unconstitutional prior restraint.

Confronting a litany of civil-rights violations, Defendants[3] would

---

[2] For purposes of this brief, "Booksellers" means Plaintiffs-Appellees Book People, Inc. ("Book People") and VBK Inc. (d/b/a Blue Willow Bookshop ("Blue Willow")).

[3] "Defendants" means Defendants-Appellants Martha Wong in her official capacity as chair of the Texas State Library and Archives Commission, Keven Ellis in his official capacity as chair of the Texas Board of Education, and Mike Morath in his official capacity as Commissioner of Education.

understandably prefer to avoid a ruling on the merits, and so they focused their opening brief on justiciability. Defendants challenge Booksellers' standing to sue, claiming their injuries are too "speculative," and similarly challenge the dispute's ripeness, claiming their lawsuit is "premature." Neither argument has merit. At the heart of Defendants' appeal is feigned uncertainty over what the Act requires, how it impacts the Booksellers, and whether Defendants can enforce it.

*Amici Curiae* submit this brief to help clarify these matters: READER has *already* inflicted constitutional and economic injuries on Booksellers because the Act currently prohibits them from selling books to school districts; and, absent this Court's intervention, those injuries will mount. On its face, the law thrusts the Booksellers into an impossible predicament. If they try to comply with the law, they will endure further violations of their fundamental rights while incurring financially ruinous expenses endeavoring to judge thousands of books against vague standards. If they refuse to comply, they will be forbidden from selling books to Texas schools going forward, costing them vital customers and revenues they have enjoyed and relied upon for decades. Either way, the Act inflicts concrete injuries on Booksellers that are ripe for this Court's consideration.

That Defendants are charged with enforcing the law against the Booksellers is equally plain. The law is aimed directly at "library material vendor[s]," *i.e.*, booksellers. And by Defendants' own admission, the Texas Education Agency

("TEA")—overseen by named defendant and Commissioner of Education Mike Morath—can issue "sanctions" against school districts that purchase books from noncomplying Booksellers. Those sanctions include barring districts from purchasing books from Booksellers. Such coercive acts against the Booksellers' interests necessarily constitute enforcement against the Booksellers. Even READER's own author, Texas State Representative Jared Patterson, agrees that the Booksellers have standing to challenge the Act's constitutionality and that such challenges are ripe for consideration to the extent READER "directly regulates" the Booksellers.[4] Neither standing nor ripeness present any barrier to jurisdiction.[5]

## ARGUMENT

### I.   The District Court Correctly Concluded That The Booksellers Have Article III Standing

The Booksellers have standing to sue because they have demonstrated both constitutional and economic injuries that flow directly from READER. To establish Article III standing, a plaintiff must show an "injury in fact," a "causal connection"

---

[4] *See* Brief for *Amicus Curiae* Texas State Rep. Jared Patterson ISO Defs.-Appts., at 8. Rep. Patterson is mistaken, however, to the extent he contends that any of the at-issue provisions of READER do not regulate the Booksellers directly.

[5] *Amici Curiae* are mindful of the Court's direction to "avoid the repetition of facts or legal arguments contained in the principal briefs" (5th Cir. R. 29.2), and that the parties' principal briefs addressed both standing and ripeness. This brief thus endeavors to elaborate on these issues, raising additional points and authorities for the Court's consideration, without unnecessarily rehashing the points made by Plaintiffs-Appellees.

between the plaintiff's injury and the challenged conduct, and a likelihood that the injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). While speculative allegations of a "possible future injury" will not support an injury in fact, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), a "concrete" invasion of a protected interest that is "actual or imminent" will suffice, *Lujan*, 504 U.S. at 560. The Booksellers meet all three elements.

### A. The Booksellers have demonstrated both constitutional and economic injuries sufficient for Article III.

READER has already inflicted concrete injuries on the Booksellers by both chilling their First Amendment activities and injuring their economic interests. Absent this Court's intervention, substantial future injuries are both imminent and inevitable. Under settled law, the Booksellers have suffered cognizable constitutional and economic injuries, either of which is sufficient to support standing.

*Constitutional injuries.* In the First Amendment context, chilled speech, or "self-censorship," is an injury sufficient to confer standing. *E.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). A litigant need not violate a statute and risk its enforcement before challenging a law on constitutional grounds. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). This doctrine promotes the very "purpose of the Declaratory Judgment Act"—under which the Booksellers sued—by allowing them "to settle 'actual controversies' before they

6

ripen into violations of law." *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 926 (5th Cir. 2023). To make out a constitutional injury, the Booksellers need only demonstrate (a) an intent to engage in conduct "arguably affected with a constitutional interest," but proscribed by the law in question, and (b) a "credible threat" of future enforcement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014).

The Booksellers made both showings below. Because they wish to distribute literature to schools without engaging in a costly, book-by-book analysis and ratings exercise against their will (ROA.55, 61-64), the Booksellers seek to engage in conduct "arguably affected with a constitutional interest," but forbidden by the Act. While Defendants assert that READER "does not implicate" Booksellers' First Amendment rights (Defs.' Br. 20), the Act speaks for itself. Among other things, it forbids them from distributing non-obscene literature to school districts if that content meets the Act's vague definition of "sexually explicit," and it likewise prohibits Booksellers from distributing all literature to school districts unless they submit to unconstitutionally compelled speech. Tex. Educ. Code §§ 35.001(a), 35.002(a), (b). There is no question these provisions "arguably" implicate Booksellers' First Amendment rights to distribute literature and avoid compelled speech. *See Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (First Amendment "embraces the right to distribute literature"); *303 Creative LLC v.*

*Elenis*, 600 U.S. 570, 586 (2023) (government cannot "compel a person to speak its own preferred messages" consistent with First Amendment). Taking aim at a strawman, Defendants claim that "selling books" to Texas school districts "is not proscribed" by READER. Defs.' Br. 20. But the Booksellers seek to continue selling books to public schools *without submitting to the Act's mandated intrusions*—the epitome of conduct "proscribed" by law.[6]

There is also a "credible threat" that READER will be enforced against the Booksellers. *Driehaus*, 573 U.S. at 158-59. Under Defendants' own authority, "when dealing with pre-enforcement challenges to recently enacted . . . statutes that facially restrict expressive activity" by the plaintiff's class, courts in the Fifth Circuit "*assume* a credible threat" of enforcement "in the absence of compelling contrary evidence." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020)[7] (cited in Defs.' Br. at 19-20, 22; emphasis added).[8] READER "facially restrict[s]" the Booksellers' expressive activity by banning them from distributing non-obscene literature to school districts, and forcing them to make public declarations about the

---

[6] *See, e.g.*, ROA.145 ("Blue Willow does not have the financial resources to comply with the Book Ban."); ROA.147 ("Blue Willow intends to continue selling books . . . to Texas school districts . . . in the future.").

[7] *Accord, e.g.*, *Nat'l Press Photographers Ass'n v. McCraw*, 84 F.4th 632, 644 (5th Cir. 2023); *Ostrewich v. Tatum*, 72 F.4th 94, 102 (5th Cir. 2023); *Barilla v. City of Houston*, 13 F.4th 427, 433 (5th Cir. 2021).

[8] *See also 303 Creative*, 600 U.S. at 583 (plaintiff had standing to challenge unconstitutional statute based on "credible threat" of enforcement against her).

sexual content in literature. *Supra* at 7. The Booksellers are thus entitled to a presumption of a "credible threat" of enforcement.

Defendants offer no "compelling" evidence rebutting the presumption. *Speech First*, 979 F.3d at 335. On the contrary, they refuse to "disavow[] any intention" of enforcing the Act (*see* ROA.882-83, 902-04), thus giving the Booksellers "some reason" to fear the law's enforcement. *Babbitt*, 442 U.S. at 302. And while Defendants claim READER provides Defendants no "enforcement mechanism" against Booksellers (Defs.' Br. 21), the uncontroverted record proves otherwise. Defendants themselves admit that TEA—which, of course, includes Commissioner Morath[9]—is empowered to conduct a "special investigation" into, and issue "sanctions" against, school districts that fail to comply with the Act. ROA.882-83; *accord* Tex. Educ. Code §§ 39.003(a)(17), 39A.002. Among the "sanctions" and "interventions" available, TEA can "appoint a management team to direct the operations of the district," thus barring it from purchasing books from noncompliant booksellers. *Id.* § 39A.002(2)(C), (8). So, in other words, TEA possesses mechanisms for enforcing READER against Booksellers.[10]

---

[9] *See* Tex. Educ. Code § 7.002(a) ("The commissioner of education and the agency staff comprise the Texas Education Agency.").

[10] Given the law's novelty, it is inconsequential that TEA has yet to invoke such enforcement authority. *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2903 (2022) (courts give "little weight" to "'the

That TEA wields this enforcement authority through school districts rather than against Booksellers directly is a distinction without a difference. Under the provisions just identified, TEA eliminates the school districts' ability to act on their own behalf and instead requires them to do TEA's bidding. *Supra* at 9. Courts have had no trouble finding standing against government entities that injure the plaintiff through another entity. *See Bennett v. Spear*, 520 U.S. 154, 169-70 (1997) (Scalia, J.) (ranchers had standing to challenge agency action that caused third party to reduce water availability to ranchers' detriment because the third party's conduct was "produced by" the agency's "determinative" or "coercive" action); *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 513 (5th Cir. 2017) (rejecting contention that plaintiff lacked standing to challenge federal law because it was "not directly 'enforced' against" plaintiff "but against [third-party] insurers" since the law's operation still "effectively" caused plaintiff's losses). Ultimately, orders issued by TEA "direct[ing]" school districts not to purchase books from Booksellers harm the Booksellers; it does not matter that TEA enlists third parties to serve those ends.

This enforcement authority is, of course, separate from and in addition to TEA's statutory obligation to enforce compliance with its own rating determinations

---

history of enforcement" "when the challenged law is relatively new") (internal quotations omitted).

and censure noncompliant booksellers publicly—which has the statutorily mandated effect of precluding Booksellers from selling to school districts. READER facially requires TEA to provide written notice to booksellers when TEA deems their rating incorrect. Tex. Educ. Code § 35.003(a). That notice "must include information regarding the vendor's *duty* under this section and provide the corrected rating required for the library material." *Id.* (emphasis added). Receipt of such notice then triggers compulsory action on the bookseller's part to correct its rating and to notify TEA of such correction. *Id.* § 35.003(b) (bookseller who receives notice from TEA "*shall* . . . rate the library material according to the agency's corrected rating" and notify the agency of such correction) (emphasis added). The law then mandates that TEA "shall" post on the agency's website a list of all booksellers that fail to comply with their statutory "duty" to analyze and rate many thousand books based on their sexual content and perceived propriety for students of all ages. *Id.* § 35.003(c). Once TEA places a bookseller on this list, it prevents them from selling their books to school districts indefinitely. *Id.* § 35.003(d) (school districts "may not" purchase from booksellers that TEA has placed on list).

To recap, the Legislature enacted an education-focused statute, amending the Texas Education Code to regulate the books that "library materials vendor[s]" sell, or have previously sold, to school districts, and it specifically directed the Texas Education Agency to police the vendors that fail to abide. *See also* Tex. Educ. Code

§ 7.055(b)(5) (TEA "shall carry out the duties imposed" on it by "the legislature"). Defendants' attempts to distance themselves from the Act's enforcement machinery are belied by both the law and the record.

So too is their contention that the Act imposes no "penalties" on Booksellers is meritless. Defs.' Br. 8, 21-22. As discussed more fully below, the law penalizes Booksellers by forcing financial losses on them—losses that will accrue regardless of whether they comply with the Act. *Infra* at 13-15. This penalty is not hypothetical: Under a plain reading of the text, Booksellers *currently* "may not sell" books "to [] school district[s] or open-enrollment charter[s] unless" the Booksellers have "issued appropriate ratings regarding sexually explicit material and sexually relevant material previously sold" to the district or school. Tex. Educ. Code § 35.002(a); *see also* READER, H.B. 900, 88th Leg. § 7 (2023) (statute took effect September 1, 2023); ROA.273 (Defendants conceding the law went into effect September 1, 2023). In fact, one school district and longtime customer of Plaintiff Blue Willow has already refused to buy books from the store until it complies with the Act, costing the Blue Willow both revenues and valuable business opportunities. ROA.64, 147. There can be no doubt that Booksellers suffer "a direct injury as a result of the statute's operation or enforcement." *Babbitt*, 442 U.S. at 298.

Still, Defendants claim the Booksellers' injuries are "speculative" because, they suggest, Booksellers and TEA might never disagree about the rating of even a

single book, so TEA might never compel any Bookseller to endorse an individual rating. Defs.' Br. 22-24. Given the law's vague standards, the parties' divergent interests, and the thousands upon thousands of books that require ratings, this argument is wishful thinking. It also ignores the numerous other constitutional injuries that READER inflicts on Booksellers. *Supra* at 7-8. It even disregards the compelled-speech problem that the Act creates even if, as Defendants suggests, no book-rating dispute ever arises. Indeed, long before TEA reviews a single bookseller's ratings, that bookseller must issue an initial list of book ratings (Tex. Educ. Code § 35.002(c)); and to do so, the bookseller must submit to speaking an unwanted message—that thousands of books are "sexually explicit," "sexually relevant," or neither—"when [the booksellers] would prefer to remain silent." *303 Creative*, 600 U.S. at 586; *see* ROA.145. Presumably because they have no answer to it, Defendants' standing analysis is silent on *this* compelled-speech violation.

***Economic injuries.*** Constitutional injuries aside, the Booksellers have separately established economic injuries sufficient to establish a concrete injury in fact. "[E]conomic harm—like damage to one's business interest—is a quintessential Article III injury." *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 235 (5th Cir. 2023). As the Supreme Court put it, "monetary harms" are among the "most obvious" that "qualify as concrete injuries under Article III." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021).

Complying with READER would ruin the Booksellers financially. They would have to devote immense resources toward identifying thousands of books that they previously sold to school districts, performing "contextual" analyses of each one, and then rating each book based on its sexual content. Tex. Educ. Code §§ 35.002(a)-(c), 35.0021; *see* ROA.56 ("As CEO, I do not see any way for Book People to comply with [READER] and remain in business."); ROA.61 ("[I]t would be impossible for Blue Willow to devote the financial resources necessary to comply with [READER]'s rating requirements."). This potentially lethal "damage" to the Booksellers' "business interest" clearly qualifies as concrete and particularized. *All. for Hippocratic Med.*, 78 F.4th at 235. The Supreme Court recognized as much in *Virginia v. Am. Booksellers Ass'n* when it held that the bookstore-plaintiffs had standing to sustain a constitutional challenge against a similar statute prohibiting the sale of sexually explicit literature because complying with the law would have forced the bookstores to "take significant and costly [] measures." 484 U.S. at 392.

Defendants nevertheless suggest the Act inflicts no economic injury on Booksellers because they "are under no obligation to participate in the rating system" (Defs.' Br. 25), and they can simply "take their business somewhere else." ROA.904. Though the premise may be true, the conclusion does not follow. An unbroken line of "well-established" caselaw provides that a "plaintiff suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit."

14

*Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 292 (5th Cir. 2018) (collecting cases).[11]  It is undisputed that the Booksellers sold books to Texas school districts in the past and wish to continue doing so.  ROA.54-55, 64. But if the Booksellers simply "take their business somewhere else," as Defendants suggest, they would necessarily lose "an opportunity to pursue [the] benefit" of book sales.  *Ecosystem Inv. Partners*, 729 F. App'x at 292.  Conceding the point, Defendants acknowledge that, under READER, "[s]chool districts are prohibited from purchasing [books] from a non-compliant vendor, which may cause [Booksellers] to lose a customer."  Defs.' Br. 22.  What Defendants fail to acknowledge—but the law makes clear—is that "lost business opportunities" like these, which shrink the plaintiff's "pool of potential customers," are no less

---

[11] *See also, e.g.*, *Craig v. Boren*, 429 U.S. 190, 194 (1976) (alcohol vendor had standing to challenge statute raising legal drinking age because statute narrowed the "buyers' market," reducing vendor's business opportunities); *Northeastern Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 659 (1993) (organization had standing to challenge ordinance limiting ability of organization's members to compete for government contracts, even though organization "failed to allege" that any of its members "would have been awarded a contract but for the challenged ordinance"); *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 211 (4th Cir. 2020) ("lost business opportunities" qualify as Article III injuries where law operates to constrict plaintiff's "pool of potential customers"); *New Jersey Television Corp. v. F.C.C.*, 393 F.3d 219, 221 (D.C. Cir. 2004) ("Loss of an opportunity to compete for a benefit may be an injury in fact if it is not merely 'illusory.'").

cognizable under Article III than run-of-the-mill pocketbook injuries. *Hogan*, 971 F.3d at 212.

The same unbroken line of caselaw likewise refutes Defendants' assertion that any economic injury caused by the Act would be contingent on the "purchasing decisions" of school districts and is thus "speculative." Defs.' Br. 26. A lost business opportunity is a concrete injury "even [if] the plaintiff may not be able to show that it was *certain to receive* [the desired] benefit had it been accorded the lost opportunity." *Ecosystem Inv. Partners*, 729 F. App'x at 292; *accord City of Jacksonville*, 508 U.S. at 659. And while Defendants claim that Booksellers' economic injury is premised on a "protracted" or "speculative chain of possibilities" (Defs.' Br. 23), the Act *directly* deprives noncomplying Booksellers of potential customers, and Booksellers have already lost business opportunities as a result. *Supra* at 12. Independent of all other injuries discussed in this brief, that alone is enough for Article III standing. *E.g.*, *Hogan*, 971 F.3d at 211.

Defendants repeatedly invoke *Clapper v. Amnesty International* in an attempt to bolster their standing challenge, but *Clapper* does not address the kind of actual and direct injuries at issue here. Rather, *Clapper* involved allegations of "threatened" injuries, stemming from a prediction by the plaintiffs—a coalition of attorneys and human rights, labor, and media organizations—that they would be surveilled by the federal government in the future over their sensitive

communications with "likely targets" of such scrutiny. 568 U.S. at 401, 406-07. The Court held that the plaintiffs lacked standing because "threatened" injuries must be "*certainly* impending," whereas any future injury to the plaintiffs necessarily turned on a "speculative chain of possibilities," including the government's decision to target plaintiffs' associates, its decision to invoke the specific surveillance statute in question, and its ability to obtain authorization from the FISA Court. *Id.* at 410. Here, the Booksellers' injuries are not merely "threatened," nor do they depend on future contingencies or decisions by third parties. The Booksellers have already suffered *actual* injuries, directly attributable to READER and reinforced by Defendants' enforcement authority. *See, e.g.*, ROA.39-40; *supra* at 7-8, 12-14 (discussing constitutional injuries and lost business opportunities).

**B.    The Booksellers have demonstrated traceability and redressability.**

To complete the three-part test for Article III standing, the Booksellers must also show their injuries are "fairly traceable" to the challenged conduct, and that a favorable judicial decision would "redress" their injuries. *Lujan*, 504 U.S. at 560. Booksellers readily satisfy these two requirements.

The injuries already described are the direct product of READER's demands. Ensnaring them in a catch-22, the Act presents Booksellers with two unacceptable options: (1) submit to unconstitutionally compelled speech and intrusions on their right to distribute literature while simultaneously hemorrhaging cash and resources

17

attempting to abide by an unclear statute; or (2) decline to comply and consequently lose decades-long customers and a consistent stream of revenue. *Supra* at 6-7, 14-16. The Booksellers suffer in either event. But this dilemma only exists because of the enforcement authority that Defendants wield. *See supra* at 9-12 (discussing TEA's enforcement mechanisms under READER). But for that authority, the Booksellers would face no injury for noncompliance, making the Booksellers' injuries "fairly traceable" to Defendants. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017) (financial injury to nonprofit resulting from Texas election statute was "fairly traceable" to Texas Secretary of State "as the 'chief election officer of the state,'" charged with enforcing the law); *Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 302 (5th Cir. 2005) ("economic injury" claimed by plaintiff "as a result of the regulations" are "fairly traceable" to City's actions "enforcing" them). Indeed, TEA's enforcement authority goes straight to READER's core provisions, and Booksellers' core complaints: TEA can prohibit school districts from purchasing books from Booksellers that fail to submit unconstitutionally compelled sexual-content ratings, that refuse to allow intrusions on their right to distribute literature, or that decline to incur the losses necessary to comply with the Act. *Supra* at 9-12. Eliminate that enforcement authority and Booksellers would have no injury to complain of.

Redressability follows in turn.  An order enjoining Defendants from enforcing READER would remove Booksellers from this predicament.  *See, e.g.*, *Energy Mgmt. Corp.*, 397 F.3d at 302 (order declaring challenged regulations "unenforceable" would bar further "interference" with plaintiff's economic interests); *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 498 (5th Cir. 2004) (economic injury to plaintiffs "traceable to the ordinances enacted by defendants . . . would be remedied" if the Court held "the ordinances [] unconstitutional").

Echoing their efforts to deny the Booksellers' injuries, Defendants argue that the Booksellers can establish neither traceability nor redressability because TEA's only "enforcement authority" against Booksellers is to "place [them] on a non-compliance list if a vendor fails to adopt a corrected rating in a timely manner." Defs. Br. 28.  But that both fundamentally understates TEA's authority and ignores the practical implications for Booksellers that fail to comply with the Act. Defendants have conceded that TEA has authority to open "special investigations" into, and "sanction," noncomplying school districts (ROA.882-83); TEA also has authority to "direct" those school districts not to purchase books from noncomplying Booksellers.  *Supra* at 9.  Again, it is no response to say these enforcement mechanisms are directed at school districts rather than Booksellers because, in serving TEA's ends, the Education Code gives districts no say in the matter, and the

Booksellers ultimately pay the consequences of TEA's actions. *Id.*; *see also Air Evac EMS*, 851 F.3d at 513 (challenged policy "effectively" caused plaintiff's losses even though it was "not directly 'enforced' against" plaintiff); *Bennett*, 520 U.S. at 169-70 (challenged policy "produced" plaintiff's injury by "coerc[ing]" third party to inflict injury on plaintiff).  Furthermore, the statutorily-mandated consequence of TEA placing a bookseller on the "non-compliance list" is to prohibit school districts from purchasing books from the bookseller indefinitely.  Tex. Educ. Code § 35.003(d).  Because TEA possesses—and refuses to disavow—authority to enforce READER against Booksellers' interests, the Booksellers' injuries are "fairly traceable" to TEA.  *OCA-Greater Houston*, 867 F.3d at 613.

That school districts could conceivably decline to purchase books from the Booksellers in the Act's absence (Defs.' Br. 28) is beside the point.  As discussed above, "lost business opportunities" are cognizable injuries, even if the plaintiff is not guaranteed a profit. *E.g.*, *Hogan*, 971 F.3d at 211; *Ecosystem Inv. Partners*, 729 F. App'x at 292.  Enjoining the Act's enforcement would restore these "opportunities" to Booksellers, thereby redressing those injuries.

## II.     The District Court Correctly Held The Parties' Dispute Ripe For Resolution[12]

The Booksellers' constitutional challenges are ripe for review. Ripeness seeks to prevent courts from adjudicating disputes that depend on "contingent future events" that might "not occur as anticipated" or "at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). As Defendants acknowledge (Defs.' Br. 14), a controversy is ripe so long as the "fitness" and "hardship" factors are met. *Driehaus*, 573 U.S. at 167. A "fit" dispute poses a "purely legal" issue, and a cognizable "hardship" exists where denying prompt review would work a "substantial hardship" on the plaintiff. *Id.* These principles are "relaxed" in First Amendment challenges, given the risk of the challenged policy chilling protected speech. *E.g.*, *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995); *Edgar v. Haines*, 2

---

[12] Supreme Court precedent counsels against finding a dispute unripe where the plaintiff has demonstrated Article III standing. Because standing and ripeness both "originate" from Article III's case-or-controversy requirement, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), the inquiries "overlap," *Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007). In fact, in "preenforcement First Amendment challenges," the "line between Article III standing and ripeness" has "evaporated." *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016). Hence, a plaintiff's standing in this context "would appear" to render a claim ripe under Article III. *See, e.g.*, *Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 81 (1978). To the extent ripeness stems from prudential considerations, such that a federal court could find a claim nonjusticiable despite the presence of an Article III injury, this doctrine stands "in some tension" with the settled principle "that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'" *Driehaus*, 573 U.S. at 167 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)).

F.4th 298, 311 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 2737 (2022).  Relaxed or not, the Booksellers satisfy both prongs.

## A. The Booksellers' facial challenges to the Act's constitutionality are fit for review.

The "fitness" prong is met where a dispute "presents an issue that is 'purely legal, and will not be clarified by further factual development.'"  *Driehaus*, 573 U.S. at 167.  Among the "purely legal" issues at bar are whether READER is void for vagueness, whether it unconstitutionally compels speech, and whether it serves as an impermissible prior restraint.  *Book People, Inc. v. Wong*, 2023 WL 6060045, at *14-25 (W.D. Tex. Sept. 18, 2023).  Such constitutional challenges to a state statute present "purely legal" issues that would "not be clarified" by fact development. *Driehaus*, 573 U.S. at 167.  Given the lack of factual development necessary to resolve "facial" challenges like these (ROA.23), the issues are "presumptively ripe for judicial review."  *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019); *cf. United States v. Quinones*, 313 F.3d 49, 59 (2d Cir. 2002) ("A challenge to the facial constitutionality of a criminal statute is a pure question of law.").

Defendants nonetheless characterize the Booksellers' challenge as "premature" because the TEA is empowered to issue implementing regulations that *might* clarify some of the statute's uncertainty.  *See* Defs.' Br. 15-16.  Speculation

aside, Defendants cite no authority for this novel proposition; and it fails for at least two reasons.

*First*, the statute is already in effect and has already harmed the Booksellers. As mentioned above, the Act currently prohibits them from selling books to school districts until they submit a ratings list against their will.   Tex. Educ. Code § 35.002(a); *see* READER, H.B. 900, 88th Leg. § 7 (2023) (statute took effect September 1, 2023).   Regardless of whether future agency action *might* mitigate *future* injuries to the Booksellers, it will not remedy their *current* injury, nor any further harms they suffer in the meantime.

*Second*, no future regulation issued under READER could "conflict with" the Act's language. *E.g.*, *Railroad Comm'n of Texas v. Texas Citizens for a Safe Future and Clean Water*, 336 S.W. 3d 619, 624 (Tex. 2011).   While implementing regulations might fill gaps in the law with policies consistent with the Act's letter (*see id.*), they cannot correct the glaring constitutional defects stamped on READER's face.   The statute unequivocally prohibits Booksellers from selling books to libraries "unless" they have "issued [] ratings regarding sexually explicit material and sexually relevant material," Tex. Educ. Code § 35.002(a), and it likewise provides that Booksellers "may not sell" to libraries non-obscene books "rated sexually explicit," *id.* § 35.002(b).   The first provision requires Booksellers to communicate messages they wish not to express, contrary to their freedom of

speech, *303 Creative*, 600 U.S. at 586, and both provisions are straightforward restrictions on Booksellers' "right to distribute literature," *Martin*, 319 U.S. at 143. No TEA regulation could erase or remedy these central policies from the Act. *Railroad Comm'n of Texas*, 336 S.W. 3d at 624. "There is [thus] no need to wait for regulations . . . to evaluate and make a conclusive determination as to the legal issue presented." *Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 975 F.2d 1267, 1276 (7th Cir. 1992). "The provisions are ripe for review." *Id.*[13]

### B.    READER imposes cognizable hardships on Booksellers.

The "hardship" prong is satisfied where the challenged policy creates a direct and immediate "dilemma" for the plaintiff. *Abbott Labs. v. Gardner*, 387 U.S. 136, 152-53 (1967) (abrogated on other grounds). Sufficient "hardship" exists where, for instance, a statute forces the plaintiff "to modify" its "behavior in order to avoid future adverse consequences," *Texas*, 497 F.3d at 499, or where it imposes substantial "uncertainty and expense" on the plaintiff, *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 581 (1985). As this Court recently put it, where a

---

[13] Defendants also suggest that "factual development" is necessary to ripen the Booksellers' challenge because TEA has yet to override any Bookseller's sexual-content rating on any given book. Defs.' Br. 16. Again, this argument ignores a host of distinct injuries to Booksellers, including those that have already materialized, and the independent compelled-speech violation inherent in the statute. *Supra* at 12-13. READER injures Booksellers in several ways long before TEA has an opportunity to veto a Bookseller's rating on any given book. *Id.*

legal restriction "requires an immediate and significant change in the plaintiffs' conduct . . . with serious penalties attached to noncompliance, hardship has been demonstrated." *Olivier v. City of Brandon*, 2023 WL 5500223, at *3 (5th Cir. Aug. 25, 2023).

Just so here.  READER "requires an immediate and significant change" in Booksellers' conduct: identify, analyze, and rate tens of thousands of books at their own expense; and Booksellers face "series penalties" should they refuse to comply: a permanent ban on selling books to Texas school districts. *Id.* at *3.  Stated differently, READER forces Booksellers "to modify" their "behavior" by immediately undertaking costly, confusing, and onerous compliance measures "to avoid" lost business opportunities, *Texas*, 497 F.3d at 499, imposing on them significant "uncertainty and expense" in the process, *Thomas*, 473 U.S. at 581. Again, the Act forces the Booksellers into a lose-lose situation: They can undertake the ratings process, tolerate constitutional infringements, and suffer financially; or they can refuse to comply, and suffer financially all the same. *Supra* at 17-18.  That is just the sort of "dilemma" that the Supreme Court held, in its leading ripeness case,[14] to present a justiciable hardship.  *See Abbott Labs.*, 387 U.S. at 153

---

[14] *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (*Abbott* contains the Supreme Court's "leading discussion" on ripeness).

("hardship" element met where challenged rule forced plaintiffs either to comply and incur significant costs or refuse and risk penalties).

Ignoring this dilemma altogether, Defendants claim the "hardship" to Booksellers of awaiting future regulations and crystallized disputes over sexual-content ratings is "minimal." Defs.' Br. 17. Not only is that wrong, but it misses the point. The hardship to Booksellers has already materialized, and further hardship is imminent. The Act forbids them from distributing literature to school districts until they submit their initial ratings list; and, to review and rate the *tens of thousands* of books necessary to even attempt to comply with READER's April 1, 2024 deadline to submit an initial ratings list (ROA.62), the Booksellers must start this process at once. *See* ROA.74, 151. Lucy Podmore, a school librarian from San Antonio, testified before the Texas Senate Committee on Education that the "current collection" in her library alone contains "nearly 18,000 books."[15] Looking to a sample of just six Texas school districts of varying sizes, Ms. Podmore testified that the "library collections" of these districts alone totaled "over six million items."[16]

---

[15] Hearing on Tex. H.B. 900 before the Senate Comm. on Educ., 88th Leg., R.S. (May 11, 2023), *available at* https://tlcsenate.granicus.com/MediaPlayer.php?viewid=53&clip_id=17930 (1:13:52-1:14:25) (last visited Nov. 15, 2023).
[16] *Id.*

According to TEA, there are 1,208 school districts in Texas.[17]  "[T]here can be no question that to meet the April 1, 2024, deadline, Plaintiffs must begin the costly reviewal and rating process much sooner, most likely immediately." *Book People*, 2023 WL 6060045, at *12.  And, again, no future implementing regulations could cleanse the Act of the many constitutional shortcomings apparent on its face. *Supra* at 23-24.

All told, "[n]othing would be gained by postponing a decision, and the public interest would be well served by a prompt resolution of the constitutionality of" the READER Act. *Thomas*, 473 U.S. at 582.

## CONCLUSION

The Court should affirm the district court's order preliminarily enjoining Defendants from enforcing the READER Act.

Dated:  November 17, 2023

Respectfully submitted,

*/s/ James G. Byrd*
James G. Byrd
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025
jbyrd@omm.com

Stuart M. Sarnoff
O'MELVENY & MYERS LLP

---

[17] TEA, Snapshot Download Statistics, *available at* https://rptsvr1.tea.texas.gov/perfreport/snapshot/download.html (see downloadable Excel sheet entitled "district.xls") (last visited Nov. 15, 2023).

Times Square Tower
7 Times Square
New York, NY 10036
ssarnoff@omm.com

Michael McMillin
Christian Rice
O'MELVENY & MYERS LLP
303 Colorado Street Ste. 2750
Austin, TX 78702
mmcmillin@omm.com
crice@omm.com

Brian Klosterboer
Chloe Kempf
Thomas Buser-Clancy
Adriana Piñon
ACLU FOUNDATION
OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288
bklosterboer@aclutx.org
ckempf@aclutx.org
tbuserclancy@aclutx.org
apinon@aclutx.org

*Counsel for* Amici Curiae
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS, DEAN
LAWRENCE SAGER, AND
PROFESSOR DALE CARPENTER

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of November, 2023, a true and correct copy of the foregoing was filed electronically using the CM/ECF system, which served counsel for the parties.

*/s/ James G. Byrd*
James G. Byrd

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,255 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Times New Roman, font size 14.

*/s/ James G. Byrd*
James G. Byrd

## CERTIFICATIONS UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ James G. Byrd*
James G. Byrd
