No. 23-50668

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

BOOK PEOPLE, INCORPORATED; VBK, INCORPORATED doing business as BLUE WILLOW BOOKSHOP; ASSOCIATION OF AMERICAN PUBLISHERS; AUTHORS GUILD, INCORPORATED; COMIC BOOK LEGAL DEFENSE FUND; AMERICAN BOOKSELLERS ASSOCIATION,

*Plaintiffs-Appellees,*

v.

MARTHA WONG, IN HER OFFICIAL CAPACITY AS THE CHAIR OF THE TEXAS STATE LIBRARY AND ARCHIVES COMMISSION; KEVIN ELLIS, IN HIS OFFICIAL CAPACITY AS THE CHAIR OF THE TEXAS STATE BOARD OF EDUCATION; MIKE MORATH, IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF THE TEXAS EDUCATION AGENCY,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Western Division of Texas, Austin Division
1:23-cv-00858-ADA

---

## BRIEF OF AMICI CURIAE FREEDOM TO READ FOUNDATION, AND AMERICAN ASSOCIATION OF SCHOOL LIBRARIANS IN SUPPORT OF APPELLEES AND AFFIRMANCE

---

(Counsel Listed Inside Cover)

Ryan W. Goellner
FROST BROWN TODD
LLP
301 E. Fourth Street
Cincinnati, Ohio
45202
T: (513) 651-6840
F: (513) 651-6981
rgoellner@fbtlaw.com

Thomas F. Allen, Jr.
Benjamin A. West
FROST BROWN TODD
LLP
2101 Cedar Springs
Rd. Suite 900
Dallas, Texas 75201
T: (214) 545-3472
F: (214) 545-3473
tfallen@fbtlaw.com
bwest@fbtlaw.com

Kevin Shook
FROST BROWN TODD
LLP
10 W. Broad Street
Suite 2300
Columbus, Ohio
43215
T: (614) 464-1211
F: (614) 464-1737
kshook@fbtlaw.com

*Counsel for Amici Curiae Freedom to Read Foundation
and American Association of School Librarians*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Case No. 23-50668, *Book People v. Wong*

Pursuant to 5TH CIR. RULES 28.2.1 and 29.2, I hereby certify that I am aware of no persons or entities, in addition to those listed in the party briefs, that have a financial interest in the outcome of this litigation. I certify that the Freedom to Read Foundation (FTRF) is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code; and that FTRF, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock. I certify that the American Association of School Librarians (AASL) is a not-for-profit organization and a division of the American Library Association, which is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code; and that AASL, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*s/ Thomas F. Allen, Jr.*
Thomas F. Allen, Jr.

# TABLE OF CONTENTS

**Page**

Supplemental Certificate of Interested Persons ......................................ii

Table of Contents ..................................................................................... iii

Table of Authorities..................................................................................v

Statement of Interest of Amici Curiae......................................................1

Statement of Contributions.......................................................................3

Introduction..............................................................................................4

Argument..................................................................................................6

I.  School libraries provide students access to a diversity of ideas
    and prepare an informed citizenry. ..................................................6

    A.  Public school libraries are not merely extensions of the
        classroom but are havens for independent student
        inquiry. ...................................................................................6

    B.  Public school librarians are trained to facilitate this
        inquiry without state-imposed labels. ....................................8

        1.  School librarians must meet rigorous academic
            standards.......................................................................9

        2.  School librarians must comply with canons of ethics. 10

II. H.B. 900 negates the crucial role of school libraries and
    librarians. .......................................................................................14

    A.  H.B. 900's vague labeling system violates the mission of
        the school library..................................................................14

B.    H.B. 900's one-size-fits-all mechanism is incompatible with the informative and educational mission of school libraries across a large and diverse state. ............................ 17

III.    Appellants' First Amendment analysis is flawed ......................... 21

A.    State efforts to remove books from school library shelves must comply with the First Amendment ............................. 21

B.    H.B. 900's labeling system is not "government speech." ...... 23

C.    Forum analysis of school libraries is inapplicable because H.B. 900 imposes limitations on private vendors, not curriculum or student expression. ........................................ 24

Conclusion ................................................................................. 27

Certificate of Compliance ...................................................... 29

Certificate of Service ............................................................. 30

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Bantam Books v. Sullivan,*
    372 U.S. 58 (1963) .......................................................................... 24

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
    457 U.S. 853 (1982) ............................................... 7, 8, 20, 21

*Bethel School District No. 403 v. Fraser,*
    478 U.S. 675 (1986) .................................................................... 24, 25

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ............................................... 15, 22, 23

*Campbell v. St. Tammany Parish School Bd.,*
    64 F.3d 184 (5th Cir. 1995) ................................... 7, 21, 22, 24

*Chiras v. Miller,*
    432 F.3d 606 (5th Cir. 2005) ...................................................... 23

*Engdahl v. City of Kenosha,*
    317 F. Supp. 1133 (E.D. Pa. 1970) ........................................... 24

*Erznoznik v. Jacksonville,*
    422 U.S. 205 (1975) ..................................................................... 23

*Grove Press, Inc. v. Gerstein,*
    378 U.S. 577 (1964) ..................................................................... 16

*Hazelwood School District v. Kuhlmeier,*
    484 U.S. 260 (1988) .................................................................... 24, 25

*Hobbs v. Hawkins,*
    968 F.2d 471 (5th Cir. 1992) ...................................................... 26

*Jacobellis v. Ohio,*
    378 U.S. 577 (1964) ..................................................................... 16

*Keyishian v. Bd. of Regents,*
    385 U.S. 589 (1967) ....................................................................... 7

*Kleindienst v. Mandel,*
  408 U.S. 753 (1972) ................................................................... 7

*Miller v. California,*
  413 U.S. 15 (1973) ................................................................... 15

*Red Lion Broad. Co. v. FCC,*
  395 U.S. 367 (1969) ................................................................... 7

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) ................................................................. 26

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
  393 U.S. 503 (1969) ............................................................... 6, 7

**Statutes**

TEX. EDUC. CODE § 33.021 .................................................... 4, 15

TEX. EDUC. CODE § 35.001 ........................................... *passim*

TEX. EDUC. CODE § 35.002 ................................... 4, 15, 22, 26

TEX. EDUC. CODE § 35.005 .................................................... 4, 15

TEX. PENAL CODE § 43.21 .......................................................... 15

TEX. PENAL CODE § 43.25(a)(2) ................................... 4, 15, 16

**Other Authorities**

13 TEX. ADMIN. CODE § 1.84 ...................................................... 9

19 TEX. ADMIN. CODE § 239.40(a) ................................... 10, 18

19 TEX. ADMIN. CODE § 239.55 ................................................ 9

19 TEX. ADMIN. CODE § 239.60 .............................................. 10

*AASL Standards Framework for Learners*,
    AM. ASS'N OF SCH. LIBRARIANS,
    https://standards.aasl.org/wp-content/uploads/2017/11/AASL-
    Standards-Framework-for-Learners-pamphlet.pdf (last visited
    Nov. 10, 2023). ................................................................... 13

*Access to Resources and Services in the School Library: An
    Interpretation of the Library Bill of Rights*,
    AM. LIBR. ASS'N,
    https://www.ala.org/advocacy/intfreedom/librarybill/interpretati
    ons/accessresources#:~:text=The%20school%20library%20plays
    %20a,needed%20in%20a%20pluralistic%20society (last visited
    Nov. 10, 2023). ............................................................ 12, 13

*Accreditation Frequently Asked Questions*,
    AM. LIBR. ASS'N,
    https://www.ala.org/educationcareers/accreditedprograms/faq
    (last visited Nov. 16, 2023) ................................................ 10

AM. LIBR. ASS'N CODE OF ETHICS,
    https://www.ala.org/tools/ethics (last visited Nov. 16, 2023) ....... 10, 11

AM. LIBR. ASS'N LIBRARY BILL OF RIGHTS,
    https://www.ala.org/advocacy/intfreedom/librarybill (last visited
    Nov. 10, 2023). ..................................................... 11, 12, 18

JUDY BLUME, THEN AGAIN, MAYBE I WON'T (1971) ................................. 16

*Crosswalk of the Common Core Standards and the Standards for
    the 21st-Century Learner*,
    AM. ASS'N OF SCH. LIBRARIANS,
    https://www.ala.org/aasl/sites/ala.org.aasl/files/content/guidelin
    esandstandards/commoncorecrosswalk/pdf/ReadingLitSciAllSta
    ndards.pdf (last visited Nov. 10, 2023) ................................... 19

*Diverse Collections: An Interpretation of the Library Bill of Rights*,
    AM. LIBR. ASS'N,
    https://www.ala.org/advocacy/intfreedom/librarybill/interpretati
    ons/diversecollections (last visited Nov. 10, 2023). .................... 13

HENRY MILLER, THE TROPIC OF CANCER (1934) ....................................... 16

*Pocket Edition, 2021-22 Texas Public School Statistics*,
  TEX. EDUC. AGENCY,
  https://tea.texas.gov/about-tea/news-and-
  multimedia/2022teapocketedition.pdf (last visited Nov. 10,
  2023). ........................................................................................ 17, 18

*School Library Programs: Standards and Guidelines for Texas*,
  TEX. STATE LIBRARY AND ARCHIVES COMM'N,
  https://www.tsl.texas.gov/sites/default/files/public/tslac/ld/schoo
  llibs/sls/Texas%20School%20Library%20Standards%20E-
  Version%20FINAL.pdf (revised Aug. 2017). ........................ 8, 9, 18, 21

## STATEMENT OF INTEREST OF AMICI CURIAE

The Freedom to Read Foundation (FTRF) is an organization established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections and make available to the public any work they may legally acquire; establish legal precedent for the freedom to read of all citizens; protect the public against efforts to suppress or censor speech; and support the right of libraries to collect and individuals to access information that reflects the diverse voices of a community so that every individual can see themselves reflected in the library's materials and resources.

The American Association of School Librarians (AASL) is the preeminent national professional association for school librarians. All aspects of the association's work reflect its core values: learning; innovation; equity; diversity; inclusion; intellectual freedom; and collaboration. The AASL *National School Library Standards* (2018) provide that the role of the school librarian is to work with students to ensure they can independently evaluate resources and make responsible and ethical decisions regarding the use of these resources to develop

critical thinking and learning skills. AASL is committed to ensuring that all learners have a school library collection that is physically and intellectually accessible and where access is best met at the time of need. AASL is a partner with school administrators and national educational organizations in advocating for and shaping educational opportunities and policy.

FTRF and AASL believe that content or viewpoint censorship violates the core value of preserving intellectual freedom and thus have a strong interest in the outcome of this case.

Appellants and Appellees consent to the filing of this amici curiae brief.

## STATEMENT OF CONTRIBUTIONS

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, FTRF and AASL state that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person (other than the amici curiae, their members, or their counsel) contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION

The impact of House Bill 900 ("HB 900")[1] is far-reaching. H.B. 900 commandeers book vendors to rate all books sold to Texas school libraries in three categories: "sexually explicit," "sexually relevant," or "no rating."[2] Materials that a vendor has labeled "sexually explicit"—a term that draws its meaning from the Texas Penal Code—may not be sold to school libraries and must be eliminated from school library shelves.[3] For any materials that a vendor has labeled "sexually relevant," the school librarian must obtain parental consent before allowing a student to access the book.[4]

Appellants argue that H.B. 900 is simply an innocuous mechanism to protect school children from "sexually explicit materials."[5] But as the district court recognized, H.B. 900 goes much further, implicating potentially "any sexual-related topic."[6] The statute offers no "bright

---

[1] 88th Leg., R.S., ch. 88, 2023 Tex. Sess. Law Serv. 2539 (H.B. 900), *codified at* TEX. EDUC. CODE §§ 33.021, 35.001-35.008.

[2] TEX. EDUC. CODE §§ 35.001, 35.002.

[3] TEX. EDUC. CODE §§ 33.021(a), 35.001(2), 35.002(b).

[4] TEX. EDUC. CODE § 35.005.

[5] Appellants' Br. at 3.

[6] ROA.704 (Op. at 5 n.1 (citing TEX. PENAL CODE § 43.25(a)(2))).

line[s]" to guide vendors in labeling books—a judgment call for which they likely have no training.[7]

Fortunately, there are people already equipped to make these calls: public school librarians. School librarians are highly trained professionals. They complete rigorous academic instruction and follow canons of ethics that guide the creation (and ongoing curation) of school library collections. By virtue of their training and professional standards, school librarians are uniquely qualified to select materials that satisfy the needs of all students in a particular community, not just those that reflect popular—or politically favorable—views and opinions. Librarians do not need state-imposed labels to do their jobs.

H.B. 900 is therefore unnecessary and unwise. It is also incompatible with the First Amendment. In addition to compelling speech by book vendors, H.B. 900 will undoubtedly result in denuded school library collections, stripped of materials that bear no resemblance to obscene or even "sexually explicit" materials. Because H.B. 900 unconstitutionally burdens the First Amendment rights of both book

---

[7] ROA.704.

vendors and school students, the Court should affirm the district court's injunction against the statute.

## ARGUMENT

## I.    School libraries provide students access to a diversity of ideas and prepare an informed citizenry.

H.B. 900 will impact not only books vendors, but also school libraries and students across Texas. As library organizations, amici highlight the unique role of school libraries, which both the First Amendment and Texas law recognize.

### A.    Public school libraries are not merely extensions of the classroom but are havens for independent student inquiry.

More than 50 years ago, the U.S. Supreme Court famously observed that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."[8]   A student's right to read a book is an aspect of the "right to receive information and ideas," which is an "inherent corollary of the rights of

---

[8]  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969) (plurality op.).

free speech and press that are explicitly guaranteed by the Constitution."[9]

"[T]he principal locus of [that] freedom" is the public school library.[10] Far from a mere "public interest program," as Appellants contend,[11] the school library plays a "unique role" in the education of students.[12] "[B]eyond the compulsory environment of the classroom," the school library offers a "regime of voluntary inquiry," where students "must always remain free to inquire, to study, and to evaluate, to gain new maturity and understanding."[13] School libraries are not intended to "foster a homogenous people," but to expose students to diverse information and ideas that ready them to be the next generation of "an informed citizenry."[14] Thus, "[t]he special characteristics of the school

---

[9] *Id.* at 867; *see also Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) ("This Court has recognized that this right is 'nowhere more vital' than in our schools and universities."); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969) ("It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here.").

[10] *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 868-69 (1982) (plurality op.). Appellants do not dispute that in *Campbell v. St. Tammany Parish School Bd.*, 64 F.3d 184, 188-89 (5th Cir. 1995), this Court followed the plurality opinion in *Pico.* (*See* Appellants' Br. at 34.)

[11] Appellants' Br. at 33.

[12] *Pico*, 457 U.S. at 869.

[13] *Id.* at 868-69 (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

[14] *Id.* at 876-77 (Blackmun, J., concurring).

library make that environment especially appropriate for the recognition of the First Amendment rights of students."[15]

Texas law mirrors this understanding of the school library's "unique role." In 1995 the Texas Legislature directed the Texas State Library and Archives Commission, in conjunction with the Texas Education Agency, to adopt "Standards and Guidelines" for school library services.[16] First published in 1997 and revised as recently as 2017, these standards and guidelines clearly articulate the role of Texas school libraries: "essential interactive collaborative learning environments, ever evolving to provide equitable physical and virtual ***access to ideas, information, and learning tools for the entire school community***."[17]

### B.  Public school librarians are trained to facilitate this inquiry without state-imposed labels.

It is the professional duty of the public school librarian to create this environment of learning and inquiry. As recognized by the Texas

---

[15]  *Id.*

[16]  *School Library Programs: Standards and Guidelines for Texas*, Tex. State Library and Archives Comm'n, https://www.tsl.texas.gov/sites/default/files/public/tslac/ld/schoollibs/sls/Texas%20School%20Library%20Standards%20E-Version%20FINAL.pdf (revised Aug. 2017).

[17]  *Id.* at 5 (emphasis added).

8

"Standards and Guidelines," school librarians and staff should "nurture a culture of literacy *and inquiry* throughout the school community," while "maintain[ing] a professionally developed collection of . . . materials and assist[ing] learners in locating resources that match their *academic and personal* interests."[18]   Outside of classroom instruction, librarians facilitate "independent learning" and "leisure reading" by directing students to "a variety of fiction and non-fiction resources for personal and informational needs."[19]   In short, "librarians are teachers" and "[a]n integral part of instructional teams."[20]

### 1. School librarians must meet rigorous academic standards.

Librarians are specifically trained to carry out this important role. In Texas, for example, a professional librarian is defined as someone who holds a specialized degree in librarianship from an educational institution accredited by the American Library Association (ALA).[21]   The ALA accredits 68 programs at 64 institutions in the United States,

---

[18] *Id.* (emphasis added).

[19] 19 TEX. ADMIN. CODE § 239.55.

[20] *School Library Programs: Standards and Guidelines for Texas*, TEX. STATE LIBR. AND ARCHIVES COMM'N, supra n. 16, at 5.

[21] *See* 13 TEX. ADMIN. CODE § 1.84.

Canada, and Puerto Rico.[22]  Accreditation "assures that . . . programs meet appropriate standards of quality and integrity."[23]

Moreover, "each candidate for the School Librarian Certificate" must be "of the highest caliber and possesses the knowledge and skills necessary to improve the performance *of the diverse student population of this state*."[24]  Therefore, school librarians must—"at a minimum"—hold a master's degree and have two years' teaching experience, as well as satisfy other requirements.[25]

### 2. School librarians must comply with canons of ethics.

As part of their training, librarians agree to adhere to canons of ethics, which encourage the cultivation of collections with diverse viewpoints and content. The ALA's Code of Ethics "guide[s] the work of librarians" with a focus on "the values of intellectual freedom that define the profession of librarianship."[26]  Chief among these ethical obligations

---

[22] *See Accreditation Frequently Asked Questions*, AM. LIBR. ASS'N, https://www.ala.org/educationcareers/accreditedprograms/faq (last visited Nov. 16, 2023).

[23] *Id.*

[24] 19 TEX. ADMIN. CODE § 239.40(a) (emphasis added).

[25] 19 TEX. ADMIN. CODE § 239.60.

[26] AM. LIBR. ASS'N CODE OF ETHICS, https://www.ala.org/tools/ethics (last visited Nov. 16, 2023).

is the librarian's duty not to limit access to information based on viewpoint:

>   1.  We provide the highest level of service to all library users through appropriate and usefully organized resources; equitable service policies; equitable access; and accurate, unbiased, and courteous responses to all requests.
>
>   2.  We uphold the principles of intellectual freedom and resist all efforts to censor library resources.
>
>   ***
>
>   6.  We do not advance private interests at the expense of library users, colleagues, or our employing institutions.
>
>   7.  We distinguish between our personal convictions and professional duties ***and do not allow our personal beliefs to interfere*** with fair representation of the aims of our institutions or the provision of access to their information resources.[27]

Librarians are also guided by the Library Bill of Rights, which sets forth the "basic policies [that] should guide [library] services."[28] Like the Code of Ethics, the Library Bill of Rights is unequivocal in its

---

[27] *Id.* ¶¶ 1-2, 6-7 (emphasis added).

[28] AM. LIBR. ASS'N LIBRARY BILL OF RIGHTS (preamble), https://www.ala.org/advocacy/intfreedom/librarybill (last visited Nov. 10, 2023).

condemnation of censorship and other attempts to limit information based on viewpoint or preference:

> Libraries should provide materials and information presenting **all points of view on current and historical issues**. Materials should not be proscribed or removed **because of partisan or doctrinal disapproval**.

> Libraries should challenge censorship in the fulfillment of their responsibility to provide information and enlightenment.[29]

These policies "apply equally to all libraries, including school libraries."[30]

The school library "serves as a point of voluntary access to information and ideas and as a learning laboratory for students as they acquire critical thinking and problem-solving skills needed in a pluralistic society."[31]  This is consistent with the views of the Supreme Court, this Court, and Texas law, as noted above. The criteria for selection of materials for school libraries should be "unfettered by . . . personal, political, social, or religious views" so that "[s]tudents and educators served by the school library have access to resources and

---

[29] *Id.* §§ II, III (emphasis added).

[30] *Access to Resources and Services in the School Library: An Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N, https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/accessresources#:~:text=The%20school%20library%20plays%20a,needed%20in%20a%20pluralistic%20society (last visited Nov. 10, 2023).

[31] *Id.*

services free of constraints resulting from personal, partisan, or doctrinal disapproval."[32]

In this vein, the American Association of School Libraries (AASL), an amicus curiae here, follows the National School Library Standards, which establish the librarian's role in teaching essential skills for students that are particularly appropriate to developing critical thinkers and learners, and emphasize the importance of the school library as an essential part of the learning community that prepares students for college, career, and life.[33]

Guided by these principles, school librarians are trained to curate collections in an inclusive, not exclusive, process.[34] School librarians do not exclude materials because they are controversial or represent a viewpoint with which they may disagree, but include books that reflect a diversity of political, economic, religious, and social issues.[35]

---

[32] *Id.*

[33] *AASL Standards Framework for Learners*, AM. ASS'N OF SCH. LIBRARIANS, https://standards.aasl.org/wp-content/uploads/2017/11/AASL-Standards-Framework-for-Learners-pamphlet.pdf (last visited Nov. 10, 2023).

[34] *Diverse Collections: An Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N, https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/diverseco llections (last visited Nov. 10, 2023).

[35] *Id.*

It is this training that prepares school librarians to deliver on the promise of the First Amendment, providing students access to diverse, developmentally appropriate materials, without state-imposed labels excluding swaths of books based on amorphous and subjective criteria.

## II.    H.B. 900 negates the crucial role of school libraries and librarians.

In the name of protecting children, H.B. 900's rating system supplants the role of professional school librarians and drafts unwilling replacements: book vendors who lack the comprehensive education and training discussed above. As a result, the Texas school library will likely become a decidedly lesser "locus" for free intellectual and personal inquiry.

### A.    H.B. 900's vague labeling system violates the mission of the school library.

The imposition of a private rating system or content-based labeling system on books and other materials stands in sharp conflict with the historical function and mission of public school libraries—to provide a wide diversity of materials to students based on their developmental maturity.

As noted, H.B. 900 requires private vendors to rate books as "sexually explicit" or "sexually relevant."[36] Any materials that are labeled "sexually explicit" may not be sold to school libraries and librarians are required to obtain parental consent for students to read books rated "sexually relevant."[37] H.B. 900's definition of "sexually relevant" includes anything "that describes, depicts, or portrays sexual conduct. . . ."[38]

These vague criteria simply beg the question of what is sexually "explicit" or even "relevant." For example, both the decidedly adult novels of Henry Miller and certain novels by the children's author Judy

---

[36] TEX. EDUC. CODE §§ 35.001, 35.002. These terms are defined in part in the Texas Penal Code. *See* TEX. PENAL CODE §§ 43.21, 43.25(a)(2); *see also* TEX. EDUC. CODE § 33.021.

As the district court correctly noted, HB 900's definition of "sexually explicit" is not only vague, but also conflicts with the Supreme Court's definition of "obscenity" in *Miller v. California*, 413 U.S. 15 (1973). H.B. 900 "cherry-picks the definition of 'patently offensive' from [the *Miller*] test," but "notably excludes the third prong…whether the material 'taken as a whole, lacks serious literary, artistic, political, and scientific value.'" ROA.742-43 (Op. at 43-44 (quoting *Miller*, 413 U.S. at 24)).

H.B. 900's silence regarding these countervailing "value" criteria is telling. As discussed below, the First Amendment forbids most laws enacted "solely to protect the young from [non-obscene] ideas or images that a legislative body thinks unsuitable for them." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 (2011) (cleaned up).

[37] TEX. EDUC. CODE §§ 35.001, 35.005.

[38] *Id.* § 35.001(3).

Blume might meet the Texas Penal Code's definition of "sexual conduct."[39]

It is within the school librarian's proverbial wheelhouse to distinguish between such titles. Rather than consulting the Texas Penal Code, school librarians draw on their training and ethical canons to choose a particular book. So, while *The Tropic of Cancer* will likely not find a place on the shelf of a middle-school library (even though the U.S. Supreme Court has held that it is not obscene[40]), the librarian may determine that Judy Blume's novel should be available to students of the same age in that community. But a risk-averse vendor, reluctant to jeopardize their business with the Texas school libraries, might simply label both novels as "sexually explicit" or "sexually relevant," thereby eliminating them from the library.

The consequences of this regime are troubling. H.B. 900's rating system does not simply provide information. It constrains student access

---

[39] *See* TEX. PENAL CODE § 43.25(a)(2). *Compare generally* HENRY MILLER, THE TROPIC OF CANCER (1934) (sexuality-themed profanity and descriptions of sexual conduct), *with* JUDY BLUME, THEN AGAIN, MAYBE I WON'T (1971) (descriptions of puberty and adolescent sexuality).

[40] *See Grove Press, Inc. v. Gerstein*, 378 U.S. 577 (1964) (granting certiorari and reversing judgment enjoining book dealer from selling or distributing *The Tropic of Cancer* under Florida's obscenity laws, in accordance with *Jacobellis v. Ohio*, 378 U.S. 577 (1964)).

to books—which are neither obscene nor even "vulgar"—by restricting purchases of that book by school libraries or by restricting access through a parental-notification requirement, based solely on the judgment of a book vendor. And the basis for that labeling decision may not be a professional judgment about whether students of a certain age in a certain community are mature enough to have access to a particular book, but rather on whether applying a certain label will result in a loss of sales, now or in the future.

**B.    H.B. 900's one-size-fits-all mechanism is incompatible with the informative and educational mission of school libraries across a large and diverse state.**

H.B. 900 also makes no allowances for the local needs and interests of different communities. Texas is a vast state, with over 1,100 public districts, incorporating more than 8,000 campuses.[41] And, just as the landscape of Texas varies greatly statewide, so too do the scope, needs, and interests of public school students. While more than half of Texas students attend school in large, urban districts boasting student

---

[41]    *Pocket Edition, 2021-22 Texas Public School Statistics*, TEX. EDUC. AGENCY, https://tea.texas.gov/about-tea/news-and-multimedia/2022teapocketedition.pdf (last visited Nov. 10, 2023).

populations greater than 25,000, the majority of school districts serve populations of fewer than 1,000 students.[42]

Throughout Texas, school librarians—with their direct, day-to-day contact with their students—use state-mandated training and expertise to tailor each library's collection to the needs and interests of the diverse communities they serve. As noted above, the Texas Legislature has recognized that an essential component of the school librarian is possession of "the knowledge and skills necessary to improve the performance *of the diverse student population of this state*."[43]

To cultivate "a culture of literacy and inquiry" and facilitate "access to ideas, information, and learning tools for the entire school community," librarians make professional judgments about which books may serve "the academic and personal interests" of the students in their community.[44]  Under the standards of the profession, a library's books and resources "should be provided for the interest, information, and enlightenment of all people in the community" it serves.[45]

---

[42] *Id.*

[43] 19 TEX. ADMIN. CODE § 239.40(a) (emphasis added).

[44] *School Library Programs: Standards and Guidelines for Texas*, TEX. STATE LIBR. AND ARCHIVES COMM'N, supra n. 16, at 5.

[45] LIBRARY BILL OF RIGHTS § I (emphasis added), *supra* n. 28.

Similarly, the AASL offers specific guidelines for school librarians, with the goal of encouraging students to "[c]onsider diverse and global perspectives in drawing conclusions" so that they can better "[m]ake sense of information gathered from diverse sources by identifying misconceptions, main and supporting ideas, conflicting information, and point of view or bias."[46]

What may be of academic and personal interest to students in a rural community may differ from those in a large, urban community. Again, librarians who work directly in these different populations are uniquely equipped to make these calls; book vendors are not. But by establishing a "ratings" standard that forces book access across the state to be identical, H.B. 900 erases the crucial role these librarians play in their communities. H.B. 900 substitutes the legislature's judgment over that of the trained librarians who use their expertise to determine the needs and interests—both academic and personal—of students in their own schools.

---

[46] *Crosswalk of the Common Core Standards and the Standards for the 21st-Century Learner* at 2 & 7, AM. ASS'N OF SCH. LIBRARIANS, https://www.ala.org/aasl/sites/ala.org.aasl/files/content/guidelinesandstandards/commoncorecrosswalk/pdf/ReadingLitSciAllStandards.pdf (last visited Nov. 10, 2023).

Through its rating system, H.B. 900 will deprive students of access to diverse collections—directly curated by trained educators in their community—and restrict students from encountering differing viewpoints and expanding their knowledge base, even in an extracurricular space. It is no answer to say that students may buy books elsewhere. School libraries exist in part so that students without transportation to other libraries or money to purchase books may still have access to a diverse collection of material.[47]

If the Texas Legislature can impose these restrictions on books before they are available to school libraries, there is seemingly little that would stop it from later imposing ratings on (and thus regulating) books dealing with other "controversial" topics, such as differing religious, cultural, or political ideologies. Mandates of this type directly contradict the intent of Texas school libraries, which are to serve as "***essential, safe, and inviting centers*** for teaching and learning," and to "support

---

[47] *See Pico*, 457 U.S. at 881 (Blackmun, J., concurring) ("surely difficult constitutional problems would arise if a State chose to exclude 'anti-American' books from its public libraries—even if those books remained available at local bookstores").

reading *for learning and pleasure*, which are essential skills for college and career readiness and life."[48]

## III.    Appellants' First Amendment analysis is flawed.

While Texas school students are not plaintiffs in this action, H.B. 900 will nonetheless impact their First Amendment rights, as well as those of the plaintiff-vendors.

### A.    State efforts to remove books from school library shelves must comply with the First Amendment.

By virtue of their "unique role," school libraries enjoy greater First Amendment protection from state intrusion than matters of school curriculum. As this Court has recognized, while "educators' decisions regarding curricular matters" are entitled to a "high degree of deference," any deference "diminishes when the challenged decision involves a noncurricular matter."[49]  So, state officials "may not remove books from their school libraries . . . 'simply because they dislike the ideas contained in those books.'"[50]

---

[48]  *School Library Programs: Standards and Guidelines for Texas* at 5, *supra* n. 16 (emphasis added).

[49]  *Campbell*, 64 F.3d at 188 (citing *Pico*, 457 U.S. at 868-70).

[50]  *Id.* (quoting *Pico*, 457 U.S. at 872)).

H.B. 900 strikes at the heart of the school library's mission by targeting the books on the library shelves, which are non-curricular materials.[51] The statute expressly exempts materials like textbooks that are "directly related to the curriculum" required by state law.[52] Thus, as discussed above, H.B. 900 seeks to place limitations on non-curriculum material based on two vague criteria—"sexually explicit material" and "sexually relevant material"—with the applicability of those labels determined not by experienced, trained professionals, but by third-party vendors.[53]

While the State "possesses legitimate power to protect children from harm," those children are also "entitled to a significant measure of First Amendment protection."[54] "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a

---

[51] *Id.* at 190 ("in light of the special role of the school library as a place where students may freely and voluntarily explore diverse topics," the removal of a book is a "non-curricular decision.").

[52] TEX. EDUC. CODE § 35.001(3).

[53] TEX. EDUC. CODE § 35.002(a).

[54] *Brown*, 564 U.S. at 794-95 (cleaned up).

legislative body thinks unsuitable for them."[55]  By imposing speech restrictions on book vendors, H.B. 900 threatens the First Amendment rights of both the plaintiff vendors who are selling the books and the end consumers of those books, the students.

### B.    H.B. 900's labeling system is not "government speech."

Appellants contend that H.B. 900 does not implicate the First Amendment because it mandates a book rating system that is "government speech."[56]  In doing so, Appellants no longer rely on this Court's opinion in *Chiras v. Miller*,[57] and instead argue that the H.B. 900 required labels are no different than "product labels" on movies, TV shows, or games.[58]

But H.B. 900's labels are not safety warnings to the public at large. Nor are they voluntary, non-government ratings like those for movies or television, as Appellees point out.[59]  Instead, the H.B. 900 labels are restrictions on whether books may be placed—or kept—on school library

---

[55] *Id.* at 794-95 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 213-214 (1975)).

[56] Appellants' Br. at 34-37.

[57] 432 F.3d 606 (5th Cir. 2005). In fact, Appellants do not cite *Chiras* at all; nor could they rely on *Chiras* since it applies to textbook purchases, which are for curriculum.

[58] Appellants' Br. at 35-36.

[59] Appellees' Br. at 51-52.

shelves at all. This labeling system is simply irreconcilable with the historic function of school libraries to provide access to a broad and diverse array of materials. And, as discussed, the system's inevitable removal of materials from library shelves, which are non-curricular materials, must comport with the First Amendment.[60]

### C. Forum analysis of school libraries is inapplicable because H.B. 900 imposes limitations on private vendors, not curriculum or student expression.

Appellants also miss the mark in arguing that H.B. 900 does not violate the First Amendment "because a public school library is a non-public forum to which the State is *allowed* to control access."[61]   To support this argument, Appellants rely on two U.S. Supreme Court rulings that are entirely distinguishable: *Bethel School District No. 403 v. Fraser* and *Hazelwood School District v. Kuhlmeier*.[62]

---

[60]  *See Campbell*, 64 F.3d at 191.

As Appellees note, the Supreme Court and other courts have held that government mandates imposing private ratings systems are unconstitutional. Appellants Br. at 50-51 (citing *Bantam Books v. Sullivan*, 372 U.S. 58, 71 (1963)); *see also Engdahl v. City of Kenosha*, 317 F. Supp. 1133 (E.D. Pa. 1970) (striking down as unconstitutional an ordinance prohibiting the admission of unaccompanied children to films rated "R" and "X").

[61]  Appellants' Br. at 37 (emphasis in original).

[62]  *Bethel*, 478 U.S. 675 (1986)*; Hazelwood*, 484 U.S. 260 (1988).

In *Bethel*, the Supreme Court held that a school district had authority to punish a student for his conduct, which involved him giving an offensive speech at a school assembly, which the court deemed to be a school-sponsored activity.[63] And in *Hazelwood,* the Supreme Court held that the removal of student-written articles from a school newspaper by faculty due to concerns over the nature of the content was permissible, because the student newspaper was a curriculum-based activity.[64] Appellants argue this means that educators are permitted to "'exercise greater control over' speech in a school environment."[65] But Appellants stop short of providing the full quotation from the Court in *Hazelwood*, which states that "[e]ducators are entitled to exercise greater control over this [] form of ***student expression***."[66]

The book labeling imposed by H.B. 900 is neither a matter of student expression at a school-sponsored activity nor a curriculum-based activity. H.B. 900 imposes limitations on private vendors by compelling them to label the books they wish to sell to school libraries. And H.B. 900

---

[63] *Bethel*, 478 U.S. at 685-86.

[64] *Hazelwood*, 484 U.S. at 269-70.

[65] Appellants' Br. at 38 (quoting *Hazelwood*, 484 U.S. at 271-72).

[66] *Hazelwood*, 484 U.S. at 271 (emphasis added).

applies only to non-curriculum materials—the materials on the school library shelves.[67]  By its terms, H.B. 900 seeks to place limitations on non-curriculum material based on its content—the vaguely defined "sexually explicit material" and "sexually relevant material."[68]

While the government has broad discretion to select private entities to communicate its message through curriculum (such as controlling the content of textbooks), the government ***cannot*** impose viewpoint-based limitations on private entities simply because public funds are used to subsidize private entities' messages—or, in this case, to purchase books from a school library.[69]  And viewpoint discrimination is impermissible in any forum.[70]

In short, because neither curriculum nor student expression is at issue in H.B. 900's imposition of labeling requirements, forum analysis is inapplicable.

---

[67] TEX. EDUC. CODE § 35.001(3).

[68] *Id.* §§ 35.001(2)-(3), 35.002(a).

[69] *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) (holding that public university could not withhold funds for printing of a student publication based on the publication's content).

[70] *Hobbs v. Hawkins*, 968 F.2d 471, 481 (5th Cir. 1992).

## CONCLUSION

For the foregoing reasons, amici curiae respectfully pray that the district court's preliminary injunction be AFFIRMED.

Dated: November 17, 2023    Respectfully submitted,

*s/ Thomas F. Allen, Jr.*
Thomas F. Allen, Jr.
Benjamin A. West
FROST BROWN TODD LLP
2101 Cedar Springs Rd., Suite 900
Dallas, Texas 75201
T:  (214) 545-3472
F:  (214) 545-3473
tfallen@fbtlaw.com
bwest@fbtlaw.com

Kevin Shook
FROST BROWN TODD LLP
10 W. Broad Street
Suite 2300
Columbus, Ohio 43215
T: (614) 464-1211
F: (614) 464-1737
kshook@fbtlaw.com

Ryan W. Goellner
FROST BROWN TODD LLP
3300 Great American Tower
301 E. Fourth Street
Cincinnati, Ohio 45202
T:  (513) 651-6800
F:  (513) 651-6981
rgoellner@fbtlaw.com

*Counsel for Amici Curiae*
*Freedom to Read Foundation and*
*American Association of School*
*Librarians*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of FED. R. APP. P. 29(a)(5) and 32(a)(7)(b) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 4,747 words.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font, with the exception of footnotes, which are in 12-point Century Schoolbook font pursuant to 5TH CIR. R. 32.1.

*s/ Benjamin A. West*
Benjamin A. West

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2023, the foregoing brief of amici curiae was electronically submitted to the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the Court's ECF system, which sent a Notice of Electronic Filing to all registered counsel.

*s/Benjamin A. West*
Benjamin A. West
