No. 23-50668

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

**Book People, Incorporated, VBK, Incorporated doing business as Blue Willow Bookshop; Association of American Publishers; Authors Guild, Incorporated; Comic Book Legal Defense Fund; American Booksellers Association,**
*Plaintiffs-Appellees,*

v.

**Martha Wong, in her official capacity as the Chair of the Texas State Library and Archives Commission; Keven Ellis, in his official capacity as the Chair of the Texas State Board of Education; Mike Morath, in his official capacity as the Commissioner of the Texas Education Agency,**
*Defendants-Appellants*

_____

**On Appeal from the United States District Court
for the Western District of Texas, Austin Division,
Case No. 1:23-CV-00858-ADA, Judge Alan D Albright**

_____

## BRIEF OF AMICUS CURIAE PEN AMERICAN CENTER, INC.
## (PEN AMERICA) IN SUPPORT OF PLAINTIFFS-APPELLEES

Peter D. Kennedy
Texas Bar No. 11296650
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
Telephone 512-480-5674

*Counsel of Record for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fifth Circuit Rule 29.2, Amicus, PEN American Center (PEN America), hereby certifies that, in addition to those listed in the parties' briefs, the following persons have an interest in the outcome of this appeal:

**PEN American Center, Inc. (PEN America),** *Amicus Curiae*

Counsel for *amicus* certifies that *Amicus Curiae* PEN American Center, Inc., has no parent corporation and no publicly held corporation owns 10% or more of its stock.

*/s/ Peter D. Kennedy*
Peter D. Kennedy

# TABLE OF CONTENTS

Certificate of Interested Persons & Corporate Disclosure Statement .......................2

Table of Contents ..............................................................................................3

Table of Authorities ...........................................................................................5

Statement of Identity and Interest .......................................................................9

Source of Authority to File .................................................................................9

Fed. R. App. P. 29(A)(4)(e) Statement .................................................................9

Summary of Argument ......................................................................................10

Argument .........................................................................................................11

    I.    The rating system required by HB 900 will have a chilling effect on writers and reflects an understanding of literature and speech that is incompatible with the values of the First Amendment ............11

        A.    The ratings required by HB 900 will negatively impact writers' ability to reach their intended audiences .....................11

        B.    HB 900's vague and overbroad criteria may lead authors to abstain from writing age-appropriate material for their intended audiences ..................................................................15

        C.    HB 900's statutory criteria betray a facile understanding of literature and the artistic process and will create a barrier to authors' ability to freely express their ideas ............17

    II.    Defendants-Appellees' arguments rely on theories of speech that fail to account for the complexity of art and allow artistic censorship in contravention of fundamental First Amendment principles ............................................................................22

A.    The notion that HB 900 is subject to *Zauderer* scrutiny undermines writers' artistry and betrays a fundamental misunderstanding of the literary process ...................................22

B.    HB 900 compels private actors to convey the government's ideological message for censorial purposes antithetical to First Amendment principles..............................25

Conclusion ...................................................................................................27

Certificate of Compliance .........................................................................28

Certificate of Service ................................................................................28

## TABLE OF AUTHORITIES

**Cases**

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) (plurality). ..........................................................16

*Bleistein v. Donaldson Lithographing Co.*,
    188 U.S. 239 (1903) ............................................................................22

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ............................................................................22

*Cohen v. California*,
    403 U.S. 15 (1971) ................................................................. 20, 21, 25

*Free Speech Coalition, Inc. v. Colmenero*,
    No. 1:23-CV-917-DAE, 2023 WL 5655712 (W.D. Tex. Aug. 31, 2023) 15, 23

*Hannegan v. Esquire, Inc.*,
    327 U.S. 146 (1946) .................................................................. 10, 25

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) .................................................................. 21, 23

*Miller v. California*,
    413 U.S. 15 (1973). .............................................................. 18, 19, 20

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018). .......................................................................23

*Penthouse Intern., Ltd. v. McAuliffe*,
    610 F.2d 1353 (5th Cir. 1980) ..........................................................18

*Pleasant Grove City, Utah v. Summum*,
    555 U.S. 460 (2009)...........................................................................26

*Pope v. Illinois*,
    481 U.S. 497 (1987) ................................................................... 10, 25

*U.S. v. Arthur*,
    51 F.4th 560 (5th Cir. 2022) ..............................................................20

*U.S. v. One Book Called "Ulysses"*, 5 F.Supp. 182, (S.D.N.Y. 1933),
    *aff'd sub nom.*, *U.S. v. One Book Entitled Ulysses by James Joyce*,
    72 F.2d 705 (2d Cir. 1934) ................................................................ 19, 20, 21

*U.S. v. One Book Entitled Ulysses by James Joyce*,
    72 F.2d 705 (2d Cir. 1934) ................................................................ 19, 20, 21

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ..................................................................................27

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ..................................................................................27

*Zauderer v. Off. of Disciplinary Couns. of the Supreme Ct. of Ohio*,
    471 U.S. 626 (1985)............................................................................. 22, 23, 25

**Statutes**

Tex. Educ. Code § 33.021...........................................................................18

Tex. Educ. Code § 35.002(e) ............................................................... 11, 12

Tex. Educ. Code § 35.003............................................................................12

Tex. Penal Code § 43.21(a)(4)......................................................................11

Tex. Penal Code § 43.25. ...................................................................... 11, 18

**Other Authorities**

*Author Tamara Ellis Smith & Illustrator Nancy Whitesides on Tackling Stories
    Close to the Heart*, Cynsations: Celebrating Children's & Young Adult
    Literature (November 2023), https://cynthialeitichsmith.com/2023/11/guest-
    post-author-tamara-ellis-smith-illustrator-nancy-whitesides-on-tackling-
    stories-close-to-the-heart/. ...................................................................13

Christopher Hooks, *Loathsome Dud: Jared Patterson's School-Library Bill Would
    Ban Larry McMurtry's Novel*, Texas Monthly (Mar. 22, 2023),

https://www.texasmonthly.com/news-politics/jared-patterson-lonesome-dove-book-bans/ ....................................................................................................24

John DeVore, *New Texas bill would ban 'Lonesome Dove' over 'explicit' content*, My San Antonio (Mar. 24, 2023), https://www.mysanantonio.com/news/local/article/lonesome-dove-texas-book-bans-17858111.php ...........................................................................................24

Michael Mooney, *Texas state representative suggests banning "Lonesome Dove"*, Axios Dallas (Mar. 24, 2023), https://www.axios.com/local/dallas/2023/03/24/texas-banning-lonesome-dove. ..................................................................................................................24

Jarret J. Krosoczka, *Difficult Truths in Life and on the Page*, Medium (November 14, 2021), https://medium.com/@studiojjk/difficult-truths-in-life-and-on-the-page-a8549e0f6492 ...........................................................................13

Scottie Andrew, *Book bans are surging—and taking an emotional toll on many authors*, CNN (Oct. 4, 2023), https://www.cnn.com/2023/10/04/style/book-bans-sales-authors-impact-cec/index.html ........................................................15

Tom Crann, *'Nothing about my book that is anything but love': Mpls. author responses to Texas book list*, MPR News (November 11, 2021), https://www.mprnews.org/story/2021/11/11/nothing-about-my-book-that-is-anything-but-love-mpls-author-responds-to-texas-book-list ...........................13

## STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE

The PEN American Center, Inc. (PEN America) is a nonprofit organization that represents and advocates for the interests of writers, both in the United States and abroad. PEN America is affiliated with more than 100 centers worldwide that make up the PEN International network. Its membership includes more than 5,000 novelists, poets, essayists, journalists, and other professionals. PEN America has two chapters in Texas, PEN America Austin and PEN America Dallas/Fort Worth with many Texas members. PEN America actively monitors the removal of books from school libraries and has a particular interest in opposing restrictions on literary expression. With this brief, PEN America explains the deleterious effects HB 900, if enforced, would have on its members' ability to reach their intended audience.

## SOURCE OF AUTHORITY TO FILE

Counsel for Plaintiffs-Appellees and Defendants-Appellants have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

No party's counsel authored the brief in whole or in part, no party or party's counsel contributed money intended to fund preparing or submitting this brief, and

no person other than the amicus curiae, its members, or its counsel, contributed money that was intended to fund preparing or submitting the brief.

## SUMMARY OF THE ARGUMENT

As a writer's organization, PEN America opposes governmental interference in the creative process and the dissemination of literature. HB 900 represents such a censorial effort. The U.S. Supreme Court has long recognized the right to creative free expression and rejected government attempts to dictate what is acceptable or meritorious expression. See, e.g., *Hannegan v. Esquire, Inc.*, 327 U.S. 146 (1946) *and Pope v. Illinois*, 481 U.S. 497 (1987).

In requiring vendors to review every publication offered to public schools and apply censorial and stigmatizing labels based on their understanding of extraordinarily vague and overbroad criteria, HB 900 suppresses writers' speech and imposes a pernicious scheme of delegated censorship that violates fundamental free speech values. HB 900, if implemented, will impede writers' ability to reach their intended audiences and potentially chill their expression in an effort to escape vendors stigmatizing their work with labels such as "sexually explicit" and "sexually relevant." The bill evinces a facile understanding of literature and a failure to acknowledge its value as a recognized First Amendment interest. Courts have held time and again that the government has no place restricting and evaluating art. HB 900 does just that.

# ARGUMENT

## I.    The rating system required by HB 900 will have a chilling effect on writers and reflects an understanding of literature and speech that is incompatible with the values of the First Amendment.

### A.    The ratings required by HB 900 will negatively impact writers' ability to reach their intended audiences.

HB 900 requires vendors to review any publications they offer to Texas public school libraries and determine, based on their own subjective judgments, whether the publications are "sexually relevant" or "sexually explicit" as defined by the statute.  "Sexually relevant" material is that which "describes, depicts, or portrays sexual conduct" under Texas law.[1]  The statute defines "sexually explicit" material as that which "describes, depicts, or portrays sexual conduct"[2] in a way that is "patently offensive," that is, "so offensive on its face as to affront community standards of decency."  Tex. Educ. Code. § 35.002(e).[3]  "Patently offensive" and "community standards of decency" are undefined, leaving every vendor rudderless in deciding how to label publications.  After making their subjective evaluation, each vendor must submit their ratings to the Texas Education Agency, which will publish them on its website.  The statute gives the TEA complete discretion to override

---

[1] "'Sexual conduct' means sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." Texas Penal Code § 43.25.

[2] Here "sexual conduct" has the same definition cited *supra* note 1.

[3] "Patently offensive" is defined in Tex. Penal Code § 43.21.

vendors' evaluations and require them to confirm their ratings to the state's assessment.  Tex. Educ. Code. § 35.002(e) *and* § 35.003.

Vendors may not sell books rated "sexually explicit" to school libraries, and they must "recall" any "sexually explicit" book they provided previously, no matter how long ago they were sold.  Texas Educ. Code § 35.002(b).  Public school students of any age or grade who wish to check out books rated "sexually relevant" need written parental consent.  Texas Educ. Code § 35.005.  HB 900 effectively creates a scheme of delegated, yet mandatory, censorship that would, if enforced, keep books out of readers' hands and pressure authors, such as PEN America's members, to self-censor to avoid their works being effectively banned by vendors or the TEA.

Children's and young adult writers often speak of their work with a sense of vocation, and reaching young readers is of paramount importance to them and is essential to fulfill their artistic purpose.  Children's authors write for different audiences, but HB 900 is a blunt instrument that treats all public-school students as if they were the same age.

Young children's book author Tamara Ellis Smith writes that "a book is not finished until the reader reads it.  If I've done my job, I've left enough space to let this alchemy happen between the reader and the story."[4]  Jarrett J. Krosoczka,

---

[4] *Author Tamara Ellis Smith & Illustrator Nancy Whitesides on Tackling Stories Close to the Heart*, Cynsations: Celebrating Children's & Young Adult Literature (November 2023),

National Book Award finalist for *Hey Kiddo*, wrote his middle-grade illustrated memoir to help young people feel less alone, based on his own experience. "Books are like life preservers," he writes. "I, along with my colleagues, write for the teenagers we once were. And we defend a students' right to read because we know these books would have made our lives that much easier growing up."[5]

Junauda Petrus, author of the young adult novel *The Stars and the Blackness Between Them*, writes that her work "is so love-filled and wants to affirm, and make people feel safe and included and like they exist," and echoes the sentiments of many children's and young adult authors who write because of what books meant to them when they were young. "There was just so much love that I put into [my book], because I was a kid who loved to read. To me books are where I went to feel safe."[6] Laws that prevent or hinder their books from reaching school libraries foreclose one of the most important ways writers find and engage with their audiences, thus thwarting their artistic goals.

Just as writers need readers, they also need vendors. Vendors, in turn, choose to sell books that they believe are worth distributing. But compelling vendors to rate

---

https://cynthialeitichsmith.com/2023/11/guest-post-author-tamara-ellis-smith-illustrator-nancy-whitesides-on-tackling-stories-close-to-the-heart/.

[5] Jarret J. Krosoczka, *Difficult Truths in Life and on the Page*, Medium (November 14, 2021), https://medium.com/@studiojjk/difficult-truths-in-life-and-on-the-page-a8549e0f6492.

[6] Tom Crann, *'Nothing about my book that is anything but love': Mpls. author responses to Texas book list*, MPR News (November 11, 2021), https://www.mprnews.org/story/2021/11/11/nothing-about-my-book-that-is-anything-but-love-mpls-author-responds-to-texas-book-list.

books in ways that could ban them from school libraries, as HB 900 does, implicates the vendors–against their will–in hampering writers' ability to reach their intended audiences.

The impact of a "sexually explicit" or "sexually relevant" rating (whatever that label will mean to people) extends far beyond Texas public schools. Those ratings, in the second-largest book market in the country, will be publicly available worldwide, creating a potentially misleading resource for parents as they assess books for their children. The ratings do not distinguish among age ranges, meaning a parent of a fifth grader and a parent of a high school sophomore will see the same "information" about a particular book without the context needed to make an informed decision. These categorizations will, undoubtedly, negatively impact writers' abilities to reach readers in Texas and beyond. For a writer intending to reach young audiences with age-appropriate material, a "sexually explicit" or "sexually relevant" label may be false and misleading, stigmatizing authors, their books, and their readers.

The U.S. District Court for the Western District of Texas recently held that a state requirement that pornographic websites post information for a mental health hotline was unconstitutional because it implied that these websites are "so associated with mental illness that those viewing it should consider seeking professional crisis help," recognizing that the government-mandated label "necessarily places a severe

stigma on both the websites and its visitors." *Free Speech Coalition, Inc. v. Colmenero*, No. 1:23-CV-917-DAE, 2023 WL 5655712 (W.D. Tex. Aug. 31, 2023). Slapping a "sexually explicit" or "sexually relevant" label on a book written for teenagers would stigmatize both writer and reader. Because checking out or reading a book labelled "sexually relevant" would embarrass many students, HB 900 will chill readers, not just writers. Writers whose books have been removed from libraries in other states report that these removals hurt their reputations and their earnings, making it harder to make a living.[7] These financial consequences may drive writers out of the business, preventing the creation of an incalculable number of potentially impactful and transformative books.

> **B.    HB 900's vague and overbroad criteria may lead authors to abstain from writing age-appropriate material for their intended audiences.**

HB 900 violates the First Amendment because it is vague and overly broad, imposing a chilling effect on authors. The definitions of "sexually explicit" and "sexually relevant" are vague and fail to account for the vast difference in student ages, maturity, experiences, interests, and reading comprehension of school-aged children. HB 900 incentivizes vendors to defer to the lowest common denominator and err on the side of over-labeling, potentially limiting the access of a huge

---

[7] Scottie Andrew, *Book bans are surging—and taking an emotional toll on many authors*, CNN (Oct. 4, 2023), https://www.cnn.com/2023/10/04/style/book-bans-sales-authors-impact-cec/index.html.

population of students to what is appropriate for kindergarteners. This in turn chills authors' speech, who are likewise incentivized to self-censor to avoid their works being stigmatized by a vendor's labeling decision.

Writing children's and young adult books requires tailoring the material for the age range of the writer's intended audience – what kind of language their readers can understand, what kind of subjects may hold their interest, and what content is appropriate for them to read. This is the heart of the important artistic work that authors do in writing books for young children, middle graders, and young adults.[8]

Freedom of expression and freedom of thought require young readers' access to the material that is appropriate for them. Limiting children to a narrow range of books denies them the chance to grow and mature, at their own pace, with literature. The plurality opinion in *Board of Education, Island Trees Union Free School District v. Pico* recognized the important "opportunity at self-education and individual enrichment" that school libraries afford students is of particular concern to First Amendment values. 457 U.S. 853, 869 (1982) (plurality). HB 900 may prevent writers from speaking to readers eager for this opportunity to learn and grow.

HB 900's definition is likely to lead to self-censorship by authors who may feel compelled to avoid certain topics and ideas that would be appropriate for their

---

[8] Publishers and booksellers have long recognized this work through voluntary, sensible rating systems designed to help parents and educators select appropriate materials for their children. *E.g., Reading Level Chart*, Booksource, https://www.booksource.com/reading-level-chart.

intended readers to ensure that their books remain accessible. Writers hoping to maximize their reach will be incentivized to avoid more complex topics that may be of critical importance to young readers. This chilling effect could be disastrous for children's and young adult literature, impeding writers' abilities to confront difficult ideas and truths and hampering students' abilities to grow and evolve as critical thinkers and readers.

**C.  HB 900's statutory criteria betray a facile understanding of literature and the artistic process and will create a barrier to authors' ability to freely express their ideas.**

HB 900's statutory criteria for deeming a book "sexually explicit" are vague and fail to account for the complexity of literature. This vagueness is inconsistent with First Amendment jurisprudence and free expression principles that protect the literary and artistic process.

HB 900 requires vendors to rate books using similar, but far more vague, legal standards used to determine whether a work is legally obscene. HB 900 draws from much of its language from principles of obscenity law but fails in fundamental ways to match the constitutional limits recognized in obscenity law requirements.

While HB 900's definition of "sexually explicit" draws on the legal definition for obscenity, it fails to incorporate key legal elements that courts have used to protect literary values and artistic freedom. Material may be deemed obscene only if (a) the average person, applying contemporary community standards would find

that the work taken as a whole appeals to the prurient interest, (b) the work depicts sexual conduct in a patently offensive way, and (c) the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. *Miller v. California*, 413 U.S. 15 (1973). *See also, Penthouse Intern., Ltd. v. McAuliffe*, 610 F.2d 1353 (5th Cir. 1980) (emphasizing the importance of holistic contextual analysis in determining whether a work is obscene). HB 900 defines sexually explicit material as any material that describes sexual conduct in a "patently offensive" way. Texas Educ. Code § 33.021. Material is considered "patently offensive" if it is "so offensive on its face as to affront current community standards of decency." Tex. Penal Code § 43.21(a)(4). However, HB 900 does not require that the material be considered as a whole, nor does it incorporate *Miller*'s third prong, which protects works with literary and artistic value.[9] Therefore, contrary to *Miller*'s teaching, HB 900 authorizes (indeed, may require) censorship of an entire publication based on a single sentence or word, no matter how valuable that work might be.

Courts have long recognized the importance of understanding how explicit material functions within a work to produce artistic meaning and value, and there is a long tradition of deference to artists in determining the meaning and value of artistic expression that precedes *Miller*. The opinion in *United States v. One Book*

---

[9] For ratings of "sexually relevant," HB 900 does not even include an "offensiveness" prong, limiting access to literature with absolutely no regard for context and artistic intent.

*Called Ulysses* is helpful here.  This case acknowledged the necessity of a sophisticated understanding of literature in making determinations about obscenity. Judge Woolsey describes James Joyce's technique as an attempt "to show how the screen of consciousness with its ever-shifting kaleidoscopic impressions carries ... not only what is in the focus of each man's observation of the actual things about him, but also in a penumbral zone residua of past impressions."  *U.S. v. One Book Called "Ulysses,"* 5 F.Supp. 182, 183 (S.D.N.Y. 1933), *aff'd sub nom.*, *U.S. v. One Book Entitled Ulysses by James Joyce*, 72 F.2d 705 (2d Cir. 1934).  Judge Woolsey uses this interpretation of Joyce's technique to assess how the explicit passages function in the book, with deference to Joyce's authorial intent and artistry. "To convey by words an effect which obviously lends itself more appropriately to a graphic technique ... [explains] Joyce's sincerity and his honest effort to show exactly how the minds of his characters operate." *Id*. Judge Woolsey's legal theory relies on a sophisticated evaluation of the narrative technique and a keen understanding of the relationship between the form and substance of the novel.[10]

---

[10] Judge Learned Hand's affirmation in the Second Circuit reiterates Judge Woolsey's insistence on a holistic literary interpretation in evaluating artistic merit. "The erotic passages are submerged in the book as a whole and have little resultant effect. If these are to make the book subject to confiscation, by the same test Venus and Adonis, Hamlet, Romeo and Juliet . . . as well as many other classics, would have to be suppressed. Indeed, it may be questioned whether the obscene passages in Romeo and Juliet were as necessary to the development of the play as those in the monologue of Mrs. Bloom are to the depiction of the latter's tortured soul." *U.S. v. One Book Entitled Ulysses by James Joyce*, 72 F.2d 705, 707 (2d Cir. 1934).

In an opinion by Judge Learned Hand, *Ulysses* was affirmed on appeal. While the opinions predate the current definition of obscenity articulated by the Supreme Court in *Miller v. California*, they demonstrate the values on which the Court premised its decision and articulated in its formulation of the test for legal obscenity.

Language can convey a multiplicity of meanings and courts must consider the ways in which language is "infused with intentional expression on many levels." *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 440 (5th Cir. 2001). In *United States v. Arthur*, this Court acknowledged the importance of recognizing artistic intent and method, holding that comparing "literary and artistic devices" used in challenged works to other works a "reasonable person would understand as having literary or artistic value" is a valid method in evaluating the third prong of the *Miller* test. 51 F.4th 560 (5th Cir. 2022).

In *Cohen v. California*, the Supreme Court articulated the importance of understanding layered meaning that may not be readily apparent at first blush, holding that:

> [O]ne man's vulgarity is another's lyric. ... . [I]t is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual….[M]uch linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well.

*Cohen v. California*, 403 U.S. 15, 25-26 (1971). HB 900 fails to recognize this dual communicative function of language, instead incentivizing overly simplistic – and ultimately, harmful – evaluations of literature.

Writers count on robust First Amendment freedoms and the value that our culture places on free expression when writing about new ideas and experimenting with form and style. For example, Judge Woolsey recognized Joyce's formal and stylistic innovation and the role that the explicit material at issue in the case played in those techniques. *U.S. v. One Book Called "Ulysses,"* 5 F.Supp. at 183. ("If Joyce did not attempt to be honest in developing the technique which he has adopted in 'Ulysses,' the result would be psychologically misleading and thus unfaithful to his chosen technique. Such an attitude would be artistically inexcusable."). Writers also rely on courts' recognition that art and literature often contain ineffable meaning. *See, e.g. Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995) ("[A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll.") (internal citations omitted)).[11]

---

[11]*Cf. Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239 (1903), which makes a similar point about visual art ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations…some works of genius would be sure to miss appreciation.") *and Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569

The restriction of writers' work on the basis of vague criteria that fails to account for authorial intent is a gross violation of artistic freedom and has a chilling effect on literary imagination. Writers who feel restricted from writing about ideas in novel and complex ways for fear of censorship may shy away from formal innovation and bold exploration of challenging topics.

## II.    Defendants-Appellees' arguments rely on theories of speech that fail to account for the complexity of art and allow artistic censorship in contravention of fundamental First Amendment principles.

### A.    The notion that HB 900 is subject to *Zauderer* scrutiny undermines writers' artistry and betrays a fundamental misunderstanding of the literary process.

Defendants-Appellants also claim that the ratings are subject to mere rational review under *Zauderer v. Off. of Disciplinary Couns. of the Supreme Ct. of Ohio*, 471 U.S. 626 (1985). In *Zauderer*, the Supreme Court held that the government may require an advertiser to disclose certain information as long as disclosure requirements are "reasonably related to the state's interest in preventing deception of consumers." *Id.* at 651. In order for *Zauderer*'s standard of review to apply, the compelled disclosures must concern "purely factual and uncontroversial information," justified "principally by the value to consumers of the information such speech provides." *Id. See also. Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) (holding that the State may not compel affirmance

---

(1994). Copyright law's transformative use doctrine rests in part on the idea that the artistic intent behind the use of copyrighted material can produce "new expression, meaning, or message."

of a belief with which the speaker disagrees outside the context of "purely factual and uncontroversial" information).

In *NIFLA v. Becerra*, the Supreme Court distinguished the required disclosure of factual and uncontroversial information in *Zauderer* from a California state law that required pro-life crisis pregnancy centers to include information about the availability of and phone numbers for free or low-cost services, including abortion. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018). This information was purely factual, but the Court found that it failed to meet the "uncontroversial" prong of the *Zauderer* standard. That these services are available is not controversial in the sense that there is a dispute of fact; rather, the information is controversial because abortion itself is a highly controversial subject. Like abortion, accusations that works of literature are pornographic is hardly "uncontroversial."[12]   In the hearings surrounding the passage of HB 900, state representative James Talarico asked state representative Jared Patterson if *Lonesome Dove*, a classic novel frequently assigned in Texas classrooms that earned its author, Larry McMurty, the Pulitzer Prize, would be banned under the statute. Representative Patterson responded that they "might need to ban *Lonesome Dove.*" This exchange caused a firestorm in the media, reflecting the controversial nature of

---

[12] *See also Free Speech Coalition, Inc. v. Colmenero*, No. 1:23-CV-917-DAE, 2023 WL 5655712 (W.D. Tex. Aug. 31, 2023), discussed *supra* section IA.

Representative Patterson's claim.[13]

Yet if applied consistently, the broad grounds for finding *Lonesome Dove* "sexually explicit" could easily lead to a raft of literary classics being given the same rating. Such texts include many works by Shakespeare, *The Great Gatsby*, *The Catcher in the Rye*, *The Lord of the Flies*, *Atlas Shrugged*, *The Giver*, *A Separate Peace*, and *The Grapes of Wrath*. It is hardly uncontroversial to claim that these books, which have been staples of school curricula for decades, are harmful enough to young people to warrant denying them independent access to them through their school libraries.

Furthermore, to call these ratings factual and objective betrays a facile understanding of literature and does a disservice to writers. As discussed in section IC *above*, writers' use of graphic language in their work often serves an artistic and literary purpose, and an evaluation of how that language operates cannot be deemed "purely factual." The lack of clarity with respect to what the rating system requires is not simply a result of poor drafting. It also speaks to the difficulty of making categorical assessments about how content functions in art. The subjective

---

[13] *See, e.g.,* Christopher Hooks, *Loathsome Dud: Jared Patterson's School-Library Bill Would Ban Larry McMurtry's Novel*, Texas Monthly (Mar. 22, 2023), https://www.texasmonthly.com/news-politics/jared-patterson-lonesome-dove-book-bans/; John DeVore, *New Texas bill would ban 'Lonesome Dove' over 'explicit' content*, My San Antonio (Mar. 24, 2023), https://www.mysanantonio.com/news/local/article/lonesome-dove-texas-book-bans-17858111.php; Michael Mooney, *Texas state representative suggests banning "Lonesome Dove"*, Axios Dallas (Mar. 24, 2023), https://www.axios.com/local/dallas/2023/03/24/texas-banning-lonesome-dove.

evaluations required by HB 900 are a far cry from the compelled disclosures at issue in *Zauderer* that were intended to shield consumers from deceptive advertising practices. The recognition in First Amendment jurisprudence of the multiplicity of meaning inherent in much artistic expression and the subjectivity of interpretation is incompatible with the idea that evaluations of how language operates in literature can be "purely factual" and objective assessments. HB 900 deviates from courts' longstanding commitment to considering artistic meaning and value and fails to consider authorial intent.

**B.     HB 900 compels private actors to convey the government's ideological message for censorial purposes antithetical to First Amendment principles.**

Courts have repeatedly held that the government has no place restricting and evaluating art. *See, e.g., Cohen v. California*, 403 U.S. 15 (1971); *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 158 (1946) ("[A] requirement that literature or art conform to some norm prescribed by an official smacks of an ideology foreign to our system."); *Pope v. Illinois*, 481 U.S. 497 (1987) ("For the law courts to decide 'What is Beauty' is a novelty even by today's standards." (Scalia, J., concurring)). HB 900's attempt to restrict students' access to literature flies in the face of First Amendment values and sets a dangerous precedent for the suppression of art and thought.

Defendants-Appellants claim that the ratings are not subject to First Amendment scrutiny because they constitute government speech, which is not protected by the First Amendment. *See, e.g., Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009).

But the "government" isn't speaking – it is not taking on the difficult work of reviewing, judging, and labelling books itself.  Instead, it has delegated that censorious task to (unwilling) vendors, who would be required under HB 900 to review every single publication offered for sale to schools; to apply their own interpretation of HB 900's vague standards to each and every such publication; and then slap a government-mandated warning label – "sexually explicit," "sexually relevant," etc., to every publication they conclude is warranted under their understanding of that law.  Given HB 900's vague standards, it is a certainty that different vendors would reach different conclusions about the same publications. The labels, although mandated by the State, are manifestly not "government speech" when applied to publications based on a private actor's judgment of their content. And of course, PEN America's members – the authors of these publications – have no say over how their publications are labeled – they are powerless to control how their works are labeled by vendors.  Even if the vendor-applied labels were considered "government speech," requiring private actors to further the government's message that they fundamentally disagree with violates the First

Amendment. *See, e.g., Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015) (holding that the government may not "compel private persons to convey the government's speech") *and Wooley v. Maynard*, 430 U.S. 705 (1977) (holding that the government may not compel private individuals to promote the State's ideological message).

A rating system designed by the government for the express purpose of restricting access to literature is antithetical to fundamental free speech values. Defendants-Appellees are using the government speech doctrine as a smokescreen for what it really is—censorship of literature and the artistic process. Government interference in art and literature is a hallmark of the kind of tyranny the First Amendment is meant to repel.

## CONCLUSION

To preserve First Amendment values and protect writers' creative freedom and autonomy, the Court should affirm the District Court's preliminary injunction.

Dated: November 17, 2023                Respectfully submitted,

*/s/ Peter D. Kennedy*
Peter D. Kennedy
Texas Bar No. 1129650
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
Telephone 512-480-5674

*Counsel of Record for Amicus Curiae*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Fed. R. App. 29(a)(5) and Fed. R. App. P. 32(a)(7) because it contains 4,523 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: November 17, 2023                    */s/ Peter D. Kennedy*
                                            Peter D. Kennedy


## **CERTIFICATE OF SERVICE**

I certify that on November 17, 2023, I caused the foregoing Brief of PEN American Center as Amicus Curiae in support of Plaintiffs-Appellees to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notice of such filing to all counsel of record.

Dated: November 17, 2023                    */s/ Peter D. Kennedy*
                                            Peter D. Kennedy