No. 23-50668

# United States Court of Appeals for the Fifth Circuit

Book People, Incorporated; VBK, Incorporated, *doing business as* Blue Willow Bookshop; Association of American Publishers; Authors Guild, Incorporated; Comic Book Legal Defense Fund; American Booksellers Association,

*Plaintiffs-Appellees,*

v.

Martha Wong, *in her official capacity as the Chair of the Texas State Library and Archives Commission*; Kevin Ellis, *in his official capacity the Chair of the Texas State Board of Education*; Mike Morath, *in his official capacity as the Commissioner of the Texas Education Agency*,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Western District of Texas
Honorable Alan Albright

## BRIEF OF *AMICUS CURIAE* FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, CATO INSTITUTE, AND NATIONAL COALITION AGAINST CENSORSHIP IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

JOSHUA J. BENNETT*
CARTER ARNETT PLLC
8150 N. Central Expy, Ste 500
Dallas, Texas 75206
(214) 550-8188 (Telephone)
(214) 550-8185 (Facsimile)
*jbennett@carterarnett.com*

JT MORRIS
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave, SE, Ste 340
Washington, DC 20003
(215) 717-3473
jt.morris@thefire.org

*Counsel of Record

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that the following listed persons are entities as described in Local Rule 29.2 have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

Pursuant to <u>Federal Rule of Appellate Procedure 26.1</u>, counsel for *amicus* certifies that (1) *amici* do not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in any *amici*.

| Person or Entity | Connection to Case |
| --- | --- |
| Foundation for Individual Rights and Expression (FIRE) | *Amicus curiae* |
| Joshua J. Bennett | Counsel to *amici* |
| JT Morris | Counsel to *amicus* FIRE |
| Cato Institute | Amicus curiae |
| National Coalition Against Censorship | *Amicus curiae* |

/s/ Joshua J. Bennett
November 17, 2023

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF CONTENTS ............................................................ ii

TABLE OF AUTHORITIES ...................................................... iv

INTEREST OF *AMICUS CURIAE* ............................................ 1

SUMMARY OF ARGUMENT .................................................... 3

ARGUMENT ............................................................................ 7

I.  Because READER's Indeterminate Provisions Deprive the Public of Fair Notice and Invite Arbitrary Exercises of Majoritarian Power, They Are Void for Vagueness. ................... 8

    A.  READER's Regulation of "Sexually Explicit Material" Suffers From Vagueness and Violates Due Process. ............................................................... 9

        1. READER fails to provide clear standards and fair notice because it fails to say what "community standards" govern. ..................................... 10

        2. READER defies the settled meaning of "patently offensive." ........................................... 12

    B.  READER Provides No Standards for Discerning Whether a Book Is "Sexually Relevant," Rendering It Unconstitutionally Vague. ............................... 15

    C.  Because READER's Standardless Exemption Swallows All of Its Other Provisions, READER Is Unenforceable. ...................................................... 20

II.  READER Compels Speech, Violating the First Amendment ...................................................................... 23

III.  The Sharp Rise in Partisan Book Bans Highlights the Danger READER Poses to Free Expression. ............................... 24

CONCLUSION ......................................................................... 30

CERTIFICATE OF COMPLIANCE ......................................................... 32

CERTIFICATE OF SERVICE ................................................................. 33

# TABLE OF AUTHORITIES

*303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023) ........................... 8, 23

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002) ................................ 16

*Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*,
575 S.W.3d 357 (Tex. 2019) ....................................................................... 21

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) .............*passim*

*Garay v. State*, 954 S.W.2d 59
(Tex. App.—San Antonio 1997, pet. ref'd) .............................................. 16

*Jenkins v. Georgia*, 418 U.S. 153 (1974) ........................................... 13–14

*LaRue v. State*, 611 S.W.2d 63 (Tex. Crim. App. 1980) ................... 11–12

*Miller v. California*, 413 U.S. 15, 24 (1973) ...................................*passim*

*Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577
(6th Cir. 1976) .............................................................................................. 4

*Penny Saver Publ'ns, Inc. v. Vill. of Hazel Crest*, 905 F.2d 150
(7th Cir. 1990) ............................................................................................ 15

*Smith v. Goguen*, 415 U.S. 566 (1974) ................................................ 9, 12

*United States v. Arthur*, 51 F.4th 560 (5th Cir. 2022) .......................... 16

*Wooley v. Maynard*, 430 U.S. 705 (1977) .............................................. 25

**Other Authorities**

Tex. Educ. Code § 28.002 ...................................................................... 24–26

Tex. Educ. Code § 33.021 ......................................................................*passim*

Tex. Educ. Code § 35.001 ......................................................................*passim*

Tex. Educ. Code § 35.002 .............................................................................. 4

Tex. Educ. Code § 35.0021 ....................................................................*passim*

Tex. Educ. Code § 35.003 ........................................................ 3, 6, 10, 20

House Research Ctr., Bill Analysis, Tex. H.B. 900, 88th Leg.,
R.S. (2023) ............................................................................ 7, 10, 26

Tex. Penal Code § 43.21 ......................................................... 11

Tex. Penal Code § 43.25 ................................................... *passim*

**Other Authorities**

Alexandra Alter & Elizabeth A. Harris, *Attempts to Ban
    Books Doubled in 2022*, N.Y. Times (Mar. 23, 2023) ........................... 24

Andrew Lapin, *Not just 'Maus': A Missouri school district
    removed several Holocaust history books, too*, Jewish
    Telegraphic Agency (Nov. 16, 2022) ...................................... 27

Anne Lyon Haight & Chandler B. Grannis, *Banned Books:
    387 B.C. to 1978 A.D.* (1978) ................................................ 25

Annie Gowen, *Censorship battles' new frontier: Your public
    library*, Wash. Post (Apr. 17, 2022) ...................................... 25

Ashley White, *Louisiana attorney general creates 'protecting
    minors' tip line to report library books*, Daily Advertiser
    (Dec. 1, 2022) ......................................................... 25

*Banned & Challenged Classics*, Am. Libr. Assoc .................................. 26

Bill Chappell, *A Texas lawmaker is targeting 850 books that
    he says could make students feel uneasy*, Nat'l Pub. Radio
    (Oct. 10, 2021) ......................................................... 25

Eesha Pendharkar, *Why the Bible Is Getting Pulled Off
    School Bookshelves*, Ed. Week (Dec. 15, 2022) .................................. 28

Hannah Allam, *Culture war in the stacks: Librarians
    marshal against rising book bans*, Wash. Post (Mar. 4,
    2023) .................................................................. 24

Hannah Natanson, *School librarians face a new penalty in the banned-book wars: Prison*, Wash. Post (May 18, 2023) ................. 28

Harper Lee, *To Kill a Mockingbird* ......................................... 6, 18, 19, 26

Hillel Italie, *Book ban attempts hit record high in 2022, library org says*, Associated Press (Mar. 23, 2023) ............................. 25

Jeffrey Fleishman, *School librarians vilified as the 'arm of Satan' in book-banning wars*, L.A. Times (Jan. 27, 2023) .................. 27

Jessica Villagomez, *Chicago Public Library removing 6 Dr. Seuss books from the shelves while it determines long-term options*, Chi. Trib. (Mar. 8, 2021) ........................................... 26

Joseph Campbell, *The Hero of a Thousand Faces* ................................... 19

Kendall Tietz, *Anne Frank novel banned in Florida school over 'sexually explicit' content: 'Minimization of the Holocaust'*, Fox News (Apr. 13, 2013) .................................... 27

Larry McMurty, Lonesome Dove (2010) ..................................... 6, 14, 15,

*Minnesota high school bans Steinbeck, Watson novellas*, Wash. Times (Dec. 24, 2020) .................................................. 26

Morgan Phillips, *Conservative youth organization offers students books banned by their school district*, Fox News (Dec. 11, 2020) .................................................................... 26

Tyler Kingkade, *Conservative activists want to ban 400 books from a library — but they aren't even on shelves*, NBC News (Aug. 23, 2022) ................................................................. 27

Webster's Unabridged Third New International Dictionary (2002) ....................................................................................... 22

### INTEREST OF *AMICUS CURIAE*[1]

**The Foundation for Individual Rights and Expression**
(FIRE) is a nonpartisan, nonprofit organization dedicated to defending
the rights of all Americans to the freedoms of speech, expression, and
conscience—the essential qualities of liberty. Since 1999, FIRE has
successfully defended the rights of individuals through public advocacy,
strategic litigation, and participation as *amicus curiae* in cases that
implicate expressive rights under the First Amendment. *See, e.g.*,
*Villarreal v. City of Laredo, Texas*, No. 20-40359 (5th Cir. argued *en banc*
Jan. 25, 2023); Brief of FIRE as *Amicus Curiae* in Support of Plaintiff-
Appellee, *Rogers v. Smith*, No. 22-30352 (5th Cir. filed Jan. 27, 2023);
Brief of FIRE as *Amicus Curiae* in Support of Plaintiffs-Appellees, *Little
v. Llano County*, No. 23-50224 (5th Cir. filed June 2, 2023).

**The Cato Institute** is a nonpartisan public policy research
foundation founded in 1977 and dedicated to advancing the principles of
individual liberty, free markets, and limited government.  Cato's Robert

---

[1] No counsel for a party authored this brief in whole or part. Further, no person,
other than *amici*, their members, or their counsel contributed money intended to fund
the preparation or submission of this brief. All parties have either consented or are
unopposed to the filing of this brief.

A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and produces the annual *Cato Supreme Court Review*.

**The National Coalition Against Censorship** (NCAC) is an alliance of more than 50 national non-profit educational, professional, labor, artistic, religious, and civil liberties groups that are united in their commitment to freedom of expression. The positions advocated in this brief do not necessarily reflect the views of all of its member organizations. The Coalition was founded in 1974 in response to the landmark Supreme Court decision Miller v. California, which narrowed First Amendment protections for sexual expression and opened the door to obscenity prosecutions. NCAC has long recognized - and opposed - attempts to censor or limit access to reading material, including great works of literature and art, under the guise of labeling it as obscene, pornographic, or sexually explicit. For almost 50 years, the NCAC has engaged in direct advocacy and education to support free expression rights of authors, readers, publishers, booksellers, teachers, librarians,

artists, students and others. NCAC offers programs designed to prevent censorship in local communities, libraries, and schools, including the Kids' Right to Read Network, focused on countering the current increase in book challenges and book bans across the nation.

*Amici* submit this brief to explain the serious threat the Restricting Explicit and Adult-Designated Educational Resources Act's vague, limitless standards and content-based regulation of speech present to the First Amendment.

## SUMMARY OF ARGUMENT

The Constitution demands that when states pass laws, they give Americans fair notice of what is required (or prohibited) with clear standards that prevent public officials from twisting the law to their predilections. And when laws that burden speech fail to provide Americans that necessary notice and clarity, they chill protected expression and open the door for government officials to impose their own personal views upon the marketplace of ideas by silencing others.

The Restricting Explicit and Adult-Designated Educational Resources Act ("READER"), Tex. Educ. Code § 35.001 et seq., poses that kind of chilling threat to free expression. The State enacted READER to

police and remove "obscene content" from public schools and their libraries (among other aims). But READER resolves no issues that current Texas statutes do not account for already. Instead, it imperils free expression through limitless and cryptic terms like "sexually relevant" that government officials can wield against publishers, booksellers, and libraries to blacklist protected expression.

READER conscripts private library vendors and public employees into the latest battleground in the war on free expression: the school library, that "mighty resource in the free marketplace of ideas." *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976). And READER imposes a daunting burden. *See* ROA.144–71. It demands that private vendors and school employees scrutinize every conceivable piece of school "library material" in "active use" (e.g., novels, audio books, reference books, periodicals, audio files, photographs, and "communications") and categorize them as "sexually relevant," "sexually explicit," or unclassified. Failing to categorize even one book "correctly"— as Texas declares it—will result in significant penalties, including placing booksellers on a conspicuously published list of transgressors and barring them from selling to schools. *See* Tex. Educ. Code § 35.003.

But READER's elements are so limitless, booksellers and others subject to the law face an impossible choice: over-categorize and censor, or risk economic penalty. For example, a bookseller's duty to conduct a product recall of "sexually explicit materials" hinges entirely on whether those materials are "patently offensive." For decades, courts have applied that term only to hardcore and explicit depictions of sex, as determined by "community standards," an essential element of the obscenity test under *Miller v. California*, 413 U.S. 15 (1973). Yet READER provides no guidelines about what set of "community standards" govern a statute in a state marked by as many regions and cultures as it has miles.

Nor is READER faithful to the scope and meaning of terms defined by a half-century of First Amendment jurisprudence, like "patently offensive," "community standards," "sexual conduct," and "lewd exhibition." For instance, READER tries to regulate literary depictions of "sexually relevant material"—a boundless term if ever there was one— by pointing to "sexual conduct, as defined by Section 43.25, Penal Code." Tex. Educ. Code § 35.001(2)–(3) (incorporating *id.* § 33.021(a)). But no ordinary person can tell if that definition applies to the countless library materials   READER   ensnares.   Indeed,   READER   provides   no

constitutionally compliant standard by which to determine when materials contain "sexually relevant material," placing at risk vast swaths of classic works like Homer's Odyssey or Shakespeare's *Romeo and Juliet*.

READER's failure to provide booksellers and public employees clear standards and fair notice of its reach suggests a more speech-chilling purpose: censoring content and views that Texas finds unworthy. Take how READER's sponsors and proponents identified several books describing minority or LGBTQ characters engaging in sexual intercourse as examples of those that should be deemed "sexually explicit," ROA.24 & n.10. But those same proponents didn't list *To Kill A Mockingbird*, with its false rape testimony, or the established Texas epic, *Lonesome Dove*, with its vivid discussions of sex.[2] *E.g.*, Larry McMurtry, *Lonesome Dove* 750–51 (2010) (e-book).

READER embodies the arbitrary and standardless exercise of legislative power that the Constitution forbids, especially when it chills protected expression. But even if READER were capable of any coherent

---

[2] Rep. Christin Bentley, Protect Childhood, "Sexually Explicit, Pervasively Vulgar, Educationally Unsuitable Booklist Oct 5 Update," https://tinyurl.com/yck7k5sx (last visited Nov. 16, 2023).

construction, the statute is a content-based prohibition that compels speech and fails strict scrutiny. On all counts, READER fails the Constitution, and the Court should affirm the preliminary injunction to protect free expression.

## ARGUMENT

"Following Governor Greg Abbott's letter to the Texas Association of School Boards directing the Texas Education Agency (TEA) to investigate obscene content in public schools," members of the Legislature hunted for and found what they deemed to be "graphic material" in multiple libraries. House Research Ctr., Bill Analysis, Tex. H.B. 900, 88th Leg., R.S. (2023). The Legislature then enacted H.B. 900, which became READER, "to resolve issues relating to library material with graphic content, library standards, and lack of parental control regarding library material by providing for the rating of library material that is sexually relevant or sexually explicit and for a list of such materials to be submitted to TEA and posted to the TEA website." *Id.* (emphasis added). But READER is riddled with fatal constitutional flaws.

Start with READER's vagueness, which violates the Fourteenth Amendment's due process guarantees. READER's standardless terms prevent the public from knowing how to apply its core provisions like "community standards" and "sexually relevant." And READER also deprives the public of notice as to what facts must be found or proved before library materials even become subject to READER's regulatory regime. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). What is more, as the district court found, READER typifies compelled speech that the First Amendment forbids, demanding that private booksellers voice the State's "correct" views on which materials are "sexually explicit" or "sexually relevant." ROA.731–36. That violates the First Amendment. *See, e.g., 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023).

## I.    Because READER's Indeterminate Provisions Deprive the Public of Fair Notice and Invite Arbitrary Exercises of Majoritarian Power, They Are Void for Vagueness.

A state statute violates the Constitution's due process requirement when, as here, it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Fox Television*

8

*Stations*, 567 U.S. at 253 (cleaned up). Contrary to Texas's claim, State's Br. 40, the void-for-vagueness doctrine applies with no less vigor to READER merely because it imposes no criminal penalties. Rather, when speech is involved like it is here, "rigorous adherence" to the void-for-vagueness doctrine is required "to ensure that ambiguity does not chill protected speech." *Id*. And the likelihood that READER will chill speech is especially pronounced because its standardless statutory language leaves READER's enforcement open to the personal predilections of its enforcers. *See Smith v. Goguen*, 415 U.S. 566, 575 (1974).

Although nearly every section of READER contains ill- or undefined language, it is READER's unbounded core provisions—"sexually explicit material" and "sexually relevant material"—that underscore its unconstitutional vagueness. *See id*. at 578.

## A.    READER's Regulation of "Sexually Explicit Material" Suffers From Vagueness and Violates Due Process.

Ridding schools of perceived "sexually explicit material" is READER's impetus. *See* House Research Ctr., Bill Analysis, Tex. H.B. 900, 88th Leg., R.S. (2023). Not only must schools cleanse their campuses of materials Texas and its enforcing agents consider "sexually explicit," booksellers must publicly recall all such materials from all schools

9

statewide. Tex. Educ. Code § 35.002(b). But the term "sexually explicit material," as used in READER, cannot give the fair notice of the statute's reach that the Constitution requires.

READER borrows its meaning of "sexually explicit material" from Tex. Educ. Code. § 33.021, which covers "material . . . that describes, depicts, or portrays sexual conduct . . . in a way that is patently offensive, as defined by Section 43.21, Penal Code." Tex. Educ. Code §§ 33.021, 35.001. "Patently offensive," however, renders READER void for vagueness for at least two reasons: READER fails to tell the public what "community standards" govern a vendor's categorizing decisions, and READER's text defies how courts have plainly defined "patently offensive" in the First Amendment context over decades.

> **1.** **READER fails to provide clear standards and fair notice because it fails to say what "community standards" govern.**

Under Tex. Penal Code § 43.21, "patently offensive" "means so offensive on its face as to affront current community standards of decency." Yet READER fails to specify which "community standards" apply. And that is fatal to its enforceability.

When used in its original context, "current community standards" are defined in discrete cases and in discrete locales by jury instructions shaped by evidence admitted at trial. *See LaRue v. State*, 611 S.W.2d 63, 64 (Tex. Crim. App. 1980). On the one hand, these standards cannot be defined as a "national community standard." *Id*. But neither can they be constitutionally limited to a single Texas county. *Id*. Between those two poles, the issue rests in the trial court's discretion as applied to a discrete set of materials in a discrete place. *Id*.

But READER lacks any means of implementing the legal meaning of "community standards," imposing what had been a conclusion reached in a courtroom onto booksellers. Unlike materials that courts and juries scrutinize under Section 43.21, READER lacks instructions defining the appropriate "community standards." Even the "contextual analysis" vendors must perform under READER to determine whether material is "patently offensive" (and thus "sexually explicit material") lacks *any* mention of what "current community standards" vendors should have in mind when weighing all the factors that section requires. Tex. Educ. Code § 35.0021. Vendors, many of which sell statewide, are left to guess whether they must pull a book in Odessa but not Austin, or rate a book

differently in Corpus Christi than it might in Dallas. In most cases, they will simply pull both—harming both their bottom lines and free expression in Texas.

Nor does READER provide school officials charged with keeping "sexually explicit material" out of their school libraries with any greater guidance about whose community standards bind their discretion in making that judgment. *See* Tex. Educ. Code § 33.021(d)(2)(A)(ii). Those officials must consider more than the county their schools serve. *LaRue*, 611 S.W.2d at 64. But beyond that, neither READER nor the term "patently offensive" provide any further guidance as to what community standards govern the official's inquiry in setting library standards under READER. Not only does that shortcoming leave everyone guessing as to what standards apply, but it also grants wide leeway to state officials to simply impose their own values by purging works they dislike, offending both due process and the freedom of speech. *See Smith*, 415 U.S. at 575.

### 2.    READER defies the settled meaning of "patently offensive."

It is clear from READER's text and purpose—and from the State's expressed views about READER's text and purpose—that READER isn't applying the settled meaning of "patently offensive." That flaw only

further renders READER's "sexually explicit" provision impermissibly vague because the public must now guess as to the term's actual meaning. *See Fox Television Stations*, 567 U.S. at 253–55.

The scope and meaning of the term "patently offensive," and what materials may be called "patently offensive" without offending the First Amendment, has developed over a half-century's worth of jurisprudence, starting with *Miller*. 413 U.S. at 24. In addition, "current community standards" inform, but do not control, what qualifies as patently offensive. *Jenkins v. Georgia*, 418 U.S. 153, 160–61 (1974). "Substantive constitutional limitations, deriving from the First Amendment," fix which types of materials may even be scrutinized as "patently offensive"—if that term's legally established meaning applies. *Id*. And, under the First Amendment, only the most "hardcore" pornographic materials are subject to scrutiny as "patently offensive." *Id*. (reversing a movie theatre operator's obscenity conviction for showing the sex-driven film *Carnal Knowledge*, because the First Amendment precluded construing the film as "patently offensive"). Yet READER's text, its legislative history, and all that READER's proponents have said about its scope and application (Patterson Amicus Br. 2–9) prove that

READER—and the state agents who would enforce it—would declare materials well short of "hardcore" as "patently offensive," despite all that cases like *Miller* and *Jenkins* have done to settle the meaning of that term.

At bottom, READER doesn't incorporate the established public meanings of terms it professes to incorporate. Under READER, "patently offensive" means something else. And that "something else" isn't disclosed in READER's provisions. The public therefore lacks fair notice of what facts even make material "patently offensive" under READER. *See Fox Television Stations*, 567 U.S. at 253–55.

Indeed, Texas's view of "patently offensive" reveals a meaning very different from its well-settled one. READER's sponsors and proponents point to any number of books they say READER was meant to reach as "sexually explicit" and thus patently offensive, many centering on books related to the LGBTQ community. Patterson Br. 3–9.[3] Meanwhile, established works long regarded as classics, like *Lonesome Dove*, have

---

[3] For a more fulsome list, see Rep. Christin Bentley, Protect Childhood, "Sexually Explicit, Pervasively Vulgar, Educationally Unsuitable Booklist Oct 5 Update," https://tinyurl.com/yck7k5sx (last visited Nov. 16, 2023).

escaped scrutiny,[4] despite their describing, depicting, or portraying sexual conduct that meets or exceeds much of what is found in the materials READER's proponents have already scrutinized. Larry McMurtry, *Lonesome Dove* 750–51 (2010) (e-book) (recounting a cowboy's sexual encounter). By conflicting directly with the established meaning of "patently offensive," these efforts stand as additional grounds for finding READER unconstitutionally vague. *See Penny Saver Publ'ns, Inc. v. Vill. of Hazel Crest*, 905 F.2d 150, 155 (7th Cir. 1990) (holding that a local advertising ordinance that failed to clearly define its boundaries was failed unconstitutionally vague as proven by how the government enforced its text).

## B.   READER Provides No Standards for Discerning Whether a Book Is "Sexually Relevant," Rendering It Unconstitutionally Vague.

READER's indeterminate "sexually relevant material" standard fares no better. Tex. Educ. Code § 35.001(3). That term turns on "sexual conduct as defined by 43.25, Penal Code. *Id*. But, as with "patently offensive," READER isn't using the public meaning of "sexual conduct"

---

[4] See, for example, where Representative Christin Bentley publicly declared that *Lonesome Dove* "is not sexually explicit." Christin Bentley ("Filthy Books Found in Schools), https://tinyurl.com/3e66yaae (last visited Nov. 15, 2023).

(as defined by Section 43.25). And at the same time, it provides no guidance about how to apply that previously narrow term in READER's new and much broader context. Both flaws again render READER unlawfully vague.

To start, over Section 43.25's long existence, its established legal meaning has, until now, been applied only to *visual* depictions of real people engaged in real sexual activity. *See id*. § 43.25(b); *see also Garay v. State*, <u>954 S.W.2d 59, 63</u> (Tex. App.—San Antonio 1997, pet. ref'd) (rejecting a vagueness challenge to "lewd exhibition"—a form of sexual conduct—as unconstitutionally vague because, by tying lewd exhibition to actual conduct, the public has sufficient notice). Indeed, in the realm of laws like Section 43.25, real conduct by real people is a constitutional requirement. *See Ashcroft v. Free Speech Coal.*, <u>535 U.S. 234, 249</u>–50 (2002).[5] Thus, determining whether a film or photograph depicts "sexual contact" under Section 43.25, for example, is generally straightforward when applying Section 43.25's established legal meaning of "sexual

---

[5] That said, material that doesn't involve real sex acts between real people (or, in Section 43.25's context, real children) may still be criminalized consistent with the First Amendment if obscenity is proven under *Miller*. *E.g.*, *United States v. Arthur*, <u>51 F.4th 560</u> (5th Cir. 2022).

conduct." In those cases, the conduct is generally self-evident on the face of the challenged material.[6]

With this backdrop in mind, READER's text makes clear that Section 43.25's established meaning of "sexual conduct" is not READER's meaning. Instead, READER stretches "sexual conduct" to reach materials the term doesn't reach under Section 43.25—material that merely "describes, depicts, or portrays sexual conduct" qualifies as "sexually relevant material." Tex. Educ. Code § 33.021(a). And there is no exception for fictional material or anything else that does not include real conduct by real people. That dramatic shift of "sexual conduct" and its scope and application renders READER's own scope and application incapable of fair notice, as "sexual conduct" is its touchstone for "sexually relevant material." *E.g.*, Tex. Educ. Code § 35.003.

Imagine the impossible task that awaits any vendor—on pain of losing substantial sales and public blacklisting—trying to discern

---

[6] An exception is the meaning of "lewd exhibition of the genitals" under the sexual conduct definition. *See, e.g.,* Tex. Penal Code § 43.25(a)(2). In any event, the scope and meaning of this form of visible "sexual conduct" has vexed jurists, suggesting it likewise presents vagueness problems, particularly in READER's broad context. *See generally* Amy Adler, *Inverting the First Amendment*, 149 U. PA. L. REV. 921, 947 (2001) (reviewing caselaw and noting "the increasingly hazy definition of 'lascivious' or 'lewd'").

whether any non-visual work they sell "describes, depicts, or portrays" sexual conduct. READER, for example, provides no standard to discern how explicit a reference must be to qualify as "sexual conduct." Is a single mention of a single sexual act on a single page, no matter how benign or important to a literary or artistic purpose, an act of "sexual conduct" that renders a work "sexually relevant" and thus subject to READER's rigors? If so, the archetype of "library materials"—the dictionary—may qualify as "sexually relevant." Anyone who attended grade school knows students peruse its pages for "descriptions" (i.e., definitions) of many sex acts listed in Section 43.25. One would imagine Texas did not intend to place vendors in fear of selling dictionaries to public schools. But READER's text and legislative history casts serious doubt—and leaves those booksellers guessing under the threat of penalty.

Consider next renowned classics, like Harper Lee's *To Kill a Mockingbird*, the plot of which revolves around false accusations of rape—a form of "sexual conduct" under Section 43.25. During the criminal trial at the heart of the novel's plot, the alleged victim's father testifies falsely to seeing the innocent defendant "yonder ruttin' on my Mayella!"—"rutting" (or "ruttin'") is a crude reference to animalistic

sexual intercourse, and, in this context, rape. New Oxford American Dictionary 1992 (3d ed.). But does that one statement, or that entire plotline, imbue *To Kill a Mockingbird* with "sexual conduct" and thus render it subject to READER's restrictions as at least "sexually relevant"?

Or take Joseph Campbell's *Hero with a Thousand Faces*, one of the modern era's most influential works. Available—for now—at Texas high schools like McCallum High School in Austin,[7] Campbell's work leverages world mythology—which often "describes, depicts, or portrays" sex acts—to illustrate how human beings share many similar beliefs across time and culture (among many other insights). This includes Campbell's insights about the Minotaur myth: the monstrous half-man, half-bull conceived by King Minos's queen after she succumbed to "an ungovernable passion" for an enchanted white bull and had mythical Daedalus "frame for her a wooden cow that would deceive the bull—into which she eagerly entered; and the bull was deceived." Campbell, *The*

---

[7] Austin ISD Libraries, Online Catalog, "The hero with a thousand faces," available at https://tinyurl.com/bde7a2mf ("Joseph Campbell's classic cross-cultural study of the hero's journey has inspired millions and opened up new areas of research and exploration.") (last visited Nov. 13, 2023).

*Hero with a Thousand Faces* 33–34 (2020) (e-book) (cleaned up). Under READER, Campbell's enlightening but tame exposition of this mythical act of "sexual bestiality" could mean the work is "sexually relevant," and thus subject to READER's restrictions. Or maybe not. But confronting the possibility of a serious penalty, booksellers will rationally choose to rate the book as "sexually relevant," casting a shadow on the book and its availability.

READER does provide broad standards for discerning when "library material is sexually explicit." Tex. Educ. Code § 35.021. But those standards presuppose "sexual conduct"; they don't define it, nor explain how to discern when it is present. *Id*. § 35.021(a). The due process clause demands more than what READER provides. Thus, its "sexually relevant material" term, and any other portion of READER that rests on the definition of "sexual conduct," is unconstitutional. *See Fox Television Stations*, 567 U.S. at 253–55.

## C. Because READER's Standardless Exemption Swallows All of Its Other Provisions, READER Is Unenforceable.

If understanding READER weren't hard enough already, the public and vendors burdened by READER face another impossible hurdle— divining the meaning of material "directly related to the curriculum

required under Section 28.002(a) [of the Texas Education Code]." *Id.*
§ 35.001(2–3) ("other than"). Material that meets this exemption isn't
subject to READER's regime. *Id.* But like its other core provisions,
READER provides no clear standard to the public for determining
whether, on a wide scale, material is exempt from READER.

While READER doesn't define "directly related," the phrase is
generally understood to mean "an uninterrupted, close relationship or
link between the things being considered." *Baylor Scott & White,
Hillcrest Med. Ctr. v. Weems*, <u>575 S.W.3d 357, 365</u> (Tex. 2019). And
although Section 28.002(a) does define the curriculum the State requires,
that curriculum consists of more than 20 distinct areas of learning that
is defined broadly. Just to list a few: "English language arts"; "social
studies"; "languages other than English"; "physical health"; "mental
health" (including "establishing and maintaining positive relationships");
"suicide prevention" (including recognizing risk factors and warning
signs); and "religious literature, including the Hebrew Scriptures (Old
Testament) and New Testament, and its impact on history and
literature." *Id.* § 28.002.(a)(1)–(2). READER provides nothing, however,
that would tell a bookseller why a critically acclaimed, award-winning

novel that "describes" sex is not exempt because it shares an "uninterrupted, close relationship or link" to "English language arts." *Id.* § 28.002(a)(1)(A). Nor does READER make certain for vendors that a book, for example, discussing human sexuality and written expressly to prevent related teen suicides is also "directly related to" "suicide prevention" or "establishing maintaining positive relationships." Tex. Educ. Code § 28.002(a)(2)(B)(ii). On the other hand, the legislative record for READER clearly references such a book. House Research Ctr., Bill Analysis, Tex. H.B. 900, 88th Leg., R.S. (2023). Neither *READER* nor Section 28.002(a) provide anything that would tell a vendor such a conclusion would be "incorrect" and that READER covers that book under subject of penalty.

Texas fails to fairly set out in READER how it works or how its provisions apply. Indeed, despite READER's many provisions, Texas has proven incapable of explaining how the law applies in its most basic and concrete ways. *E.g.*, ROA.783–84, 792–98, 808–09, 812–16, 846–58, 870, 881–84, 900–01, 947–48. What's left is a statute that permits and effectively encourages the arbitrary exercise of government power to chill expression and compel speech, based on the whims of the public officials

22

enforcing it. The district court was therefore right to enjoin READER, and this Court should affirm.

## II.     READER Compels Speech, Violating the First Amendment.

The First Amendment protects more than the right to speak. It protects also "the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The government is thus barred from compelling citizens to express the government's preferred message. *E.g.*, *303 Creative*, 143 S. Ct. at 2312. READER violates that core First Amendment principle.

As shown above, whether material is "sexually relevant" or "sexually explicit" is an inherently subjective and value-based judgment—especially because READER fails to provide objective standards by which to evaluate applicable materials. READER's own scheme for conducting a "contextual analysis" concedes this fact on its face. *Id.* § 35.0021(b) (requiring vendors to consider whether material is explicit, graphic, titillates, or "shocks the reader"). Thus, by requiring vendors to publish lists voicing value judgments they do not share about hundreds or even thousands of "library materials," READER is a

textbook case of compelled speech. ROA.735–36 (collecting cases). *Id.*
That is just another reason to affirm the district court's injunction.

## III. The Sharp Rise in Partisan Book Bans Highlights the Danger READER Poses to Free Expression.

As the record and READER's text make clear, the law exemplifies
a broader threat to free expression: Politicians of all ideological stripes
attempting to control the public mind. Indeed, partisans nationwide are
banning books from library shelves with a ferocity librarians deem
unprecedented.[8] The American Library Association reports that efforts
to ban books doubled in 2022 over the previous year, spiking to the
highest level recorded since the professional organization began tracking
attempts to censor.[9]

---

[8] Hannah Allam, *Culture war in the stacks: Librarians marshal against rising book bans*, Wash. Post (Mar. 4, 2023), https://www.washingtonpost.com/national-security/2023/03/02/culture-war-stacks-librarians-marshal-against-rising-book-bans.

[9] Alexandra Alter & Elizabeth A. Harris, *Attempts to Ban Books Doubled in 2022*, N.Y. Times (Mar. 23, 2023), https://www.nytimes.com/2023/03/23/books/book-ban-2022.html.

Activists and politicians on all sides have worked in tandem to remove hundreds of works from libraries across the country because they dislike the ideas they contain.[10] Lawmakers have targeted books they claim may make readers "feel discomfort, guilt, anguish, or any other form of psychological distress because of their race or sex."[11] Some lawmakers have even established citizen hotlines for reporting books and librarians to the state, all to "to protect the children."[12] And many more have targeted books about race or sexuality.[13]

One faction's classic is the other's target.[14] For example, censors have made John Steinbeck's *Of Mice and Men* a target; one Minnesota

---

[10] *See, e.g.*, Annie Gowen, *Censorship battles' new frontier: Your public library*, Wash. Post (Apr. 17, 2022), https://www.washingtonpost.com/nation/2022/04/17/public-libraries-books-censorship.

[11] Bill Chappell, A Texas lawmaker is targeting 850 books that he says could make students feel uneasy, Nat'l Pub. Radio (Oct. 10, 2021), https://www.npr.org/2021/10/28/1050013664/texas-lawmaker-matt-krause-launches-inquiry-into-850-books.

[12] Ashley White, Louisiana attorney general creates 'protecting minors' tip line to report library books, Daily Advertiser (Dec. 1, 2022), https://www.theadvertiser.com/story/news/2022/12/01/louisiana-attorney-general-tip-line-report-library-banned-books/69690230007.

[13] Hillel Italie, *Book ban attempts hit record high in 2022, library org says*, Associated Press (Mar. 23, 2023), https://apnews.com/article/book-bans-american-library-association-f84ac6fe3f8e3238fc54931bc1a5e054.

[14] *See, e.g.*, Anne Lyon Haight & Chandler B. Grannis, *Banned Books: 387 B.C. to 1978 A.D.* 120–22 (1978) (documenting efforts to censor books "that could, conceivably, incite or sustain racial, religious, or ethnic prejudice.").

district banned it in 2020 for "racist stereotypes and slurs."[15] That same year, Burbank, California, schools banned Harper Lee's *To Kill a Mockingbird* after complaints about "racism," along with *Huckleberry Finn*; *Of Mice and Men*; *Roll of Thunder, Hear My Cry;* and *The Cay*— prompting the Young America's Foundation to offer readers in the district free copies of the books.[16] These pillars of the American canon have weathered bans and challenges for years, and they are in good company: George Orwell's *1984*, Richard Wright's *Native Son*, Truman Capote's *In Cold Blood*, and Kurt Vonnegut's *Slaughterhouse Five* all appear on the American Library Association's list of banned classics.[17] Even Dr. Seuss has been banned from public libraries over concerns about racially offensive content.[18]

---

[15] *Minnesota high school bans Steinbeck, Watson novellas*, Wash. Times (Dec. 24, 2020), https://www.washingtontimes.com/news/2020/dec/24/minnesota-high-school-bans-steinbeck-watson-novell.

[16] Morgan Phillips, Conservative youth organization offers students books banned by their school district, Fox News (Dec. 11, 2020), https://www.foxnews.com/politics/conservative-youth-organization-students-books-banned.

[17] *Banned & Challenged Classics*, Am. Libr. Assoc., https://www.ala.org/advocacy/bbooks/frequentlychallengedbooks/classics (last visited May 21, 2023).

[18] Jessica Villagomez, Chicago Public Library removing 6 Dr. Seuss books from the shelves while it determines long-term options, Chi. Trib. (Mar. 8, 2021), https://www.chicagotribune.com/news/breaking/ct-dr-seuss-chicago-public-library-20210308-gibelvfs7fhrbpwlbitxdyalbm-story.html.

Provoked by partisan fervor,[19] the resulting crush of censorship—facilitated by government officials like Defendants here—has yielded absurd results. A graphic-novel adaptation of Anne Frank's *The Diary of a Young Girl*, for example, was removed from Florida bookshelves for "minimizing the Holocaust."[20] In Missouri and elsewhere, Art Spiegelman's Pulitzer Prize-winning *Maus* was banned, as were other books about the Holocaust, for being "sexually explicit."[21] And librarians themselves have become targets. Across the country, the push to purge books has produced not only empty shelves, but harassment,[22] death

---

[19] Tyler Kingkade, Conservative activists want to ban 400 books from a library — but they aren't even on shelves, NBC News (Aug. 23, 2022), https://www.nbcnews.com/news/us-news/conservative-activists-want-ban-400-books-library-arent-even-shelves-rcna44026.

[20] Kendall Tietz, Anne Frank novel banned in Florida school over 'sexually explicit' content: 'Minimization of the Holocaust', Fox News (Apr. 13, 2013), https://www.foxnews.com/media/anne-frank-novel-banned-florida-school-sexually-explicit-content-minimization-holocaust.

[21] Andrew Lapin, Not just 'Maus': A Missouri school district removed several Holocaust history books, too, Jewish Telegraphic Agency (Nov. 16, 2022), https://www.jta.org/2022/11/16/united-states/several-holocaust-books-including-maus-have-been-yanked-from-some-missouri-schools-amid-state-law.

[22] See, e.g., Jeffrey Fleishman, School librarians vilified as the 'arm of Satan' in book-banning wars, L.A. Times (Jan. 27, 2023), https://www.latimes.com/politics/story/2023-01-27/school-librarians-vilified-as-the-arm-of-satan-in-book-banning-wars.

threats,[23] and the specter of criminal prosecution.[24] With the READER act, Texas has entangled booksellers in this troubling censorship trend.

Banning books or compelling publishers and public librarians to become state mouthpieces is directly at odds with the spirit and letter of the First Amendment. In the context of school libraries, banning books because of partisan or ideological hostility to the ideas they contain teaches students the wrong lesson about their rights as Americans and the limits on the government's power. Federal courts are well-equipped to vindicate constitutional guarantees that demand government neutrality and keep the marketplace of ideas open, instead of a distorted market where the state demands all favor its preferred values and views.

## CONCLUSION

Due process and the First Amendment demand more than what READER provides. Its standardless provisions provide no meaningful

---

[23] See, e.g., Eesha Pendharkar, *A School Librarian Pushes Back on Censorship and Gets Death Threats and Online Harassment*, Ed. Week (Sept. 22, 2022), https://www.edweek.org/policy-politics/a-school-librarian-pushes-back-on-censorship-and-gets-death-threats-and-online-harassment/2022/09.

[24] In the last two years, seven states passed legislation subjecting librarians to serious criminal penalties, including imprisonment and heavy fines, for providing young readers "harmful" books. Hannah Natanson, *School librarians face a new penalty in the banned-book wars: Prison*, Wash. Post (May 18, 2023), https://www.washingtonpost.com/education/2023/05/18/school-librarians-jailed-banned-books.

guidance to those burdened by its strictures about how it applies and grants ill-defined power to those enforcing it, leaving scant protection against arbitrary or viewpoint-based enforcement. That the statute also compels speech makes the conclusion only clearer: READER is unconstitutional. The Court should therefore affirm the district court's preliminary injunction.

Dated: November 17, 2023

*/s/ Joshua J. Bennett*
Joshua J. Bennett*
Texas Bar No. 24059444
CARTER ARNETT PLLC
8150 N. Central Expy, Ste. 500
Dallas, Texas 75206
(214) 550-8188
jbennett@carterarnett.com
*Counsel of Record*

JT MORRIS
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE
Suite 340
Washington, DC 20003
(215) 717-3473
jt.morris@thefire.org

## Certificate of Compliance With Type-Volume Limit

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f): this document contains 5,432 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook, and 12-point Century Schoolbook for footnotes.


Date: November 17, 2023          /s/ Joshua Bennett
                                 JOSHUA BENNETT

30

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 17, 2023, an electronic copy of this Brief of *Amicus Curiae* was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: November 17, 2023      /s/ Joshua J. Bennett
                                            JOSHUA J. BENNETT