# United States Court of Appeals for the Fifth Circuit

---

No. 23-50668

---

United States Court of Appeals
Fifth Circuit

**FILED**

January 17, 2024

Lyle W. Cayce
Clerk

BOOK PEOPLE, INCORPORATED; VBK, INCORPORATED, *doing business as* BLUE WILLOW BOOKSHOP; ASSOCIATION OF AMERICAN PUBLISHERS; AUTHORS GUILD, INCORPORATED; COMIC BOOK LEGAL DEFENSE FUND; AMERICAN BOOKSELLERS ASSOCIATION,

*Plaintiffs—Appellees*,

*versus*

MARTHA WONG, *in her official capacity as the Chair of the Texas State Library and Archives Commission*; KEVIN ELLIS, *in his official capacity the Chair of the Texas State Board of Education*; MIKE MORATH, *in his official capacity as the Commissioner of the Texas Education Agency*,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:23-CV-858

---

Before WIENER, WILLETT, and DOUGLAS, *Circuit Judges*.

DON WILLETT, *Circuit Judge*:

In an effort to keep material deemed inappropriate off Texas public-school bookshelves, the Texas Legislature in 2023 passed the Restricting Explicit and Adult-Designated Educational Resources Act (READER). In

No. 23-50668

short, the Act requires school book vendors who want to do business with Texas public schools to issue sexual-content ratings for all library materials they have ever sold (or will sell), flagging any materials deemed to be "sexually explicit" or "sexually relevant" based on the materials' depictions of or references to sex.

Plaintiffs—two Texas bookstores, three national trade associations (representing booksellers, book publishers, and book authors), and a legal-defense organization—sued for injunctive relief, alleging that READER violates their rights under the First and Fourteenth Amendments. The district court granted Plaintiffs' motion for a preliminary injunction. Texas immediately appealed.

The question presented is narrow: Are Plaintiffs likely to succeed on their claims that READER violates their First Amendment rights? Controlling precedent suggests the answer is yes.

We AFFIRM the district court's grant of the preliminary injunction as to Commissioner Morath. We VACATE the preliminary injunction against Chairs Wong and Ellis and REMAND to the district court with instructions to dismiss Plaintiffs' suit against them. We DENY AS MOOT the State's motion for stay pending appeal.

I

Texas has about 5.3 million schoolchildren and nearly 9,000 K–12 campuses. In 2023, the Texas Legislature passed READER, which regulates the sale and purchase of public-school library materials.[1] The Act's goals are to keep "sexually explicit" material out of school libraries and to require

---

[1] 88th Leg., R.S., ch. 808, 2023 Tex. Sess. Law Serv. 2539 (H.B. 900) (codified at Tex. Educ. Code §§ 33.021, 35.001–.008).

No. 23-50668

parental consent for any "sexually relevant" material.[2] It aims to accomplish these goals through (1) library-collection standards imposed on school districts, and (2) a rating system for all library materials, imposed on library-material vendors.[3] Only the rating system affects Plaintiffs, but we address both parts in turn.

## A

First, the library-collection standards. READER amends Chapter 33 of the Texas Education Code to require the Texas State Library and Archives Commission (the Commission), with approval by majority vote of the Texas State Board of Education, to "adopt standards for school library collection development."[4] The standards must, in relevant part, prohibit school districts from possessing, purchasing, or acquiring "(i) harmful material, as defined by Section 43.24, Penal Code; (ii) library material rated sexually explicit by the . . . vendor; or (iii) library material that is pervasively vulgar or educationally unsuitable as referenced in *Pico v. Board of Education*, 457 U.S. 853 (1982)."[5] School districts must follow these standards in "developing or implementing the district's library collection development policies."[6] The Commission must review and update its standards every five years.[7]

The district court did not enjoin enforcement of this chapter, and the library standards are not at issue on appeal.

---

[2] *See* Tex. Educ. Code §§ 33.021(d)(2)(A)(ii), 35.005.

[3] *See id.* §§ 33.021, 35.001–.008.

[4] *Id.* § 33.021(c).

[5] *Id.* § 33.021(d)(2)(A).

[6] *Id.* § 33.021(c).

[7] *Id.* § 33.021(d)(1).

No. 23-50668

B

What is instead at issue is READER's vendor-rating system. To comply with READER, library-material vendors "may not sell library materials to a school district . . . unless [they have] issued appropriate ratings" for library materials they have previously sold to a school district or open-enrollment charter school[8] and that remain in active use by a district or school.[9] The Act requires vendors to give all library material a rating of "sexually explicit," "sexually relevant," or "no rating."[10]

The Act defines "sexually explicit" and "sexually relevant" this way:

"Sexually explicit material" means any communication, language, or material, including a written description, illustration, photographic image, video image, or audio file, other than library material directly related to the curriculum required under Section 28.002(a), that describes, depicts, or portrays sexual conduct, as defined by Section 43.25, Penal Code, in a way that is patently offensive, as defined by Section 43.21, Penal Code.[11]

"Sexually relevant material" means any communication, language, or material, including a written description, illustration, photographic image, video image, or audio file, other than library material directly related to the curriculum required under Section 28.002(a), that describes, depicts, or

---

[8] The Act applies to both school districts and open-enrollment charter schools, but we will refer to school districts for simplicity.

[9] *Id.* § 35.002(a).

[10] *See id.* §§ 35.002(a), 35.003. "Library material" is not defined in the statute, but Plaintiffs submit that it could include books, magazines, newspapers, audio and audiovisual materials, and reference works.

[11] *Id.* § 33.021; *id.* § 35.001 ("'Sexually explicit material' has the meaning assigned by Section 33.021.").

portrays sexual conduct, as defined by Section 43.25, Penal Code.[12]

The Penal Code, in turn, defines "sexual conduct" as "sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola."[13] And it defines "patently offensive" as "so offensive on its face as to affront current community standards of decency."[14]

Once the vendors have rated the material, they must then submit to the Texas Education Agency (TEA) a list of the material rated as sexually explicit or sexually relevant.[15] Material rated sexually explicit may not be sold to school districts and must be removed from library bookshelves.[16] And vendors must issue a recall for all material that is rated sexually explicit and in active use by a school district.[17] Material rated sexually relevant may not be "reserve[d], check[ed] out, or otherwise use[d] outside the school library" without written parental consent.[18]

Vendors must submit to TEA their list of ratings by April 1, 2024.[19] TEA must then post "each list submitted . . . in a conspicuous place on the

---

[12] *Id.* § 35.001(3).

[13] Tex. Penal Code § 43.25.

[14] *Id.* § 43.21.

[15] Tex. Educ. Code § 35.002(c).

[16] *Id.* § 35.002(b).

[17] *Id.*

[18] *Id.* § 35.005.

[19] *Id.* § 35.002(c).

No. 23-50668

agency's Internet website as soon as practicable."[20] The Act requires the vendors to conduct this review yearly, with updated ratings due September 1 of each year.[21]

1

READER provides the following "rating guidelines" for vendors to follow in determining whether material is sexually explicit or sexually relevant. First, a vendor "must perform a contextual analysis of the material to determine whether the material describes, depicts, or portrays sexual conduct in a way that is patently offensive."[22] There are three factors that "a vendor must consider" in performing the contextual analysis:

(1) the explicitness or graphic nature of a description or depiction of sexual conduct contained in the material;

(2) whether the material consists predominantly of or contains multiple repetitions of depictions of sexual or excretory organs or activities; and

(3) whether a reasonable person would find that the material intentionally panders to, titillates, or shocks the reader.[23]

In examining these factors, "a vendor must weigh and balance each factor and conclude whether the library material is patently offensive, recognizing that . . . each instance of a description, depiction, or portrayal of sexual conduct contained in a material may present a unique mix of factors."[24] And finally, in making the patently offensive determination, READER instructs

---

[20] *Id.* § 35.002(e).

[21] *Id.* § 35.002(d).

[22] *Id.* § 35.0021(a).

[23] *Id.* § 35.0021(b).

[24] *Id.* § 35.0021(c).

No. 23-50668

that a vendor "must consider the full context in which the description, depiction, or portrayal of sexual conduct appears, to the extent possible, recognizing that contextual determinations are necessarily highly fact-specific and require the consideration of contextual characteristics that may exacerbate or mitigate the offensiveness of the material."[25]

2

Once vendors submit their ratings, TEA "may review" the "material sold by a . . . vendor that is not rated or incorrectly rated by the vendor."[26] If TEA undertakes this review and determines that a different rating, or no rating at all, should be applied to certain material, "the agency shall provide written notice to the vendor," which "must include information regarding the vendor's duty under this section and provide the corrected rating required for the library material."[27]

After receiving notice, the vendor then has 60 days to "(1) rate the library material according to the agency's corrected rating; and (2) notify the agency of the action taken under Subdivision (1)."[28] "The agency shall post and maintain in a conspicuous place on [its] Internet website a list of library material vendors who fail to comply" after receiving notice.[29] School districts are prohibited from purchasing library materials from vendors on the noncompliance list.[30] Vendors on the list may petition the agency for removal

---

[25] *Id.* § 35.0021(d).

[26] *Id.* § 35.003(a).

[27] *Id.*

[28] *Id.* § 35.003(b).

[29] *Id.* § 35.003(c).

[30] *Id.* § 35.003(d).

No. 23-50668

from the list, and TEA may remove a vendor from the list only if it is satisfied that the vendor has rated the material according to TEA's corrected rating.[31]

## C

Plaintiffs are two Texas bookstores, three national trade associations, and a legal-defense organization.[32] The bookstores have sold and would like to continue selling library material to public-school libraries. In July 2023, before READER went into effect, Plaintiffs sued the State Defendants[33] and sought a preliminary injunction under 42 U.S.C. § 1983, alleging that READER violates the First and Fourteenth Amendments. Plaintiffs asserted various First Amendment theories, including that READER unconstitutionally compels private speech, is unconstitutionally vague and overbroad, is a prior restraint, and is an unconstitutional delegation of government authority. Plaintiffs sought to enjoin the State Defendants from enforcing READER in its entirety.

The State opposed the preliminary injunction and moved to dismiss the suit under Federal Rule of Civil Procedure 12(b)(1), arguing that Plaintiffs' claims were unripe, that Plaintiffs lacked standing, and that Defendants were entitled to sovereign immunity.[34]

---

[31] *Id.* § 35.003(e).

[32] Book People, Inc.; VBK, Inc. d/b/a Blue Willow Bookshop; American Booksellers Association (ABA); Association of American Publishers (AAP); Authors Guild, Inc.; and Comic Book Legal Defense Fund.

[33] Martha Wong, Chair of Texas State Library and Archives Commission; Kevin Ellis, Chair of the Texas Board of Education; and Mike Morath, Commissioner of Education.

[34] Plaintiffs also moved to dismiss under Rule 12(b)(6), but the denial of that motion is not before us on appeal.

The district court denied the motion to dismiss and entered a preliminary injunction prohibiting Defendants from enforcing §§ 35.001, 35.002, 35.0021, and 35.003 of READER. It did not, however, enjoin enforcement of the library-standards provision[35] or other provisions of Chapter 35 concerning the State's review and reporting of certain library materials.[36] Defendants sought a stay of the injunction in the district court, which the court denied from the bench.

On appeal, Defendants sought a stay pending appeal and, alternatively, an administrative stay. A different panel of this court granted the administrative stay and ordered that the motion to stay pending appeal be carried with the case. We now review the district court's rulings with respect to Defendants' sovereign immunity and Plaintiffs' preliminary injunction.

## II

We review the district court's standing and sovereign-immunity determinations de novo.[37] And "[w]e review the district court's grant of [Plaintiffs'] preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo."[38]

## III

We first address whether Plaintiffs have standing and, if so, whether their claims are ripe.[39]

---

[35] *Id.* § 33.021.

[36] *Id.* § 35.004–.008.

[37] *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022). We also review ripeness de novo. *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 923 (5th Cir. 2023).

[38] *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022).

[39] *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 227 (5th Cir. 2023) ("[A]n injunction is always improper if the district court lacked jurisdiction."), *cert. granted sub*

No. 23-50668

A

Plaintiffs "bear[] the burden of establishing the three familiar elements of standing."[40] They "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[41] Plaintiffs seek injunctive relief, so they must show "a continuing injury or threatened future injury, not a past one."[42] To do so, Plaintiffs "must show that 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'"[43] "[T]he threat of future injury [must be] sufficiently likely."[44] Injuries that are predicated "'on a highly attenuated chain of possibilities' or that 'require guesswork as to how independent decisionmakers will exercise their judgment'" will not suffice.[45]

---

*nom. Danco Lab'ys, L.L.C. v. All. Hippocratic Med.*, No. 23-236, 2023 WL 8605744 (U.S. Dec. 13, 2023), *and cert. granted sub nom. FDA v. All. Hippocratic Med.*, No. 23-235, 2023 WL 8605746 (U.S. Dec. 13, 2023), *and cert. denied*, No. 23-395, 2023 WL 8605749 (U.S. Dec. 13, 2023).

[40] *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023) (internal quotation marks and citation omitted); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

[41] *Spokeo*, 578 U.S. at 338 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[42] *Missouri v. Biden*, 83 F.4th 350, 366 (5th Cir. 2023) (internal quotation marks and citation omitted), *stayed and cert. granted sub nom. Murthy v. Missouri*, 144 S. Ct. 7 (U.S. Oct. 20, 2023).

[43] *All. for Hippocratic Med.*, 78 F.4th at 227 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

[44] *Id.*; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (explaining that an injury must be "actual or imminent" meaning that it is "certainly impending").

[45] *All. for Hippocratic Med.*, 78 F.4th at 227 (quoting *Clapper*, 568 U.S. at 410, 413).

No. 23-50668

At this stage, Plaintiffs "must clearly show only that each element of standing is likely to obtain in the case at hand."[46] Our analysis will focus on the two booksellers' standing because "[t]he presence of any one plaintiff with standing to pursue injunctive relief . . . satisfies Article III's case-or-controversy requirement."[47]

We first consider injury in fact.

1

The Bookseller Plaintiffs allege that READER unconstitutionally compels their speech and that, if they comply with the law, they will suffer economic and reputational injuries.

In a pre-enforcement challenge, Plaintiffs can establish an injury in fact if they show that "(1) [they] ha[ve] an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) [their] intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial."[48] We conclude that Plaintiffs have met all three elements here.

*First*, Plaintiffs have alleged their intention to engage in a course of conduct arguably affected with a constitutional interest. They have alleged that they have sold books to public schools and that they intend to continue doing so. Selling books is arguably affected with a First Amendment

---

[46] *Missouri v. Biden*, 83 F.4th at 366–67 (quoting *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020)).

[47] *Id.* (emphasis omitted) (citing *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).

[48] *Speech First*, 979 F.3d at 330 (cleaned up) (quoting *Susan B. Anthony List*, 573 U.S. at 161–64).

No. 23-50668

interest.[49] And Plaintiffs have an interest in selling books without being coerced to speak the State's preferred message—the ratings.[50] The State's position is that READER does not implicate Plaintiffs' First Amendment rights at all, but as explained below,[51] we are unpersuaded. And for standing purposes, Plaintiffs must only prove that the conduct they intend to engage in is "arguably affected" with a constitutional interest.[52] They have done so.

*Second*, READER arguably proscribes Plaintiffs' continued sales to public schools. The two Bookseller Plaintiffs are indisputably "library material vendors" under the statute, so they are subject to its rating provisions.[53] By its plain terms, § 35.002 forbids library-material vendors from selling books to school districts until they provide the required ratings.[54]

---

[49] *See Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012) ("Government interference with one's attempts to sell or distribute written material unquestionably satisfies Article III's injury-in-fact requirement."); *see also id.* 212 n.3 ("In fact, *Bantam Books* took as its starting point that book distributors have standing to challenge censorship schemes." (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963))); *Genusa v. City of Peoria*, 619 F.2d 1203, 1218 (7th Cir. 1980) ("The freedom to operate a bookstore is unquestionably protected by the First Amendment. Preservation of freedom of expression requires protection of the means of disseminating expression."); *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) ("The right of freedom of speech and press . . . embraces the right to distribute literature, and necessarily protects the right to receive it." (alteration in original) (quoting *Martin v. Struthers*, 319 U.S. 141, 143 (1943))).

[50] *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) ("Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include.").

[51] *See infra* Part IV.A.1.

[52] *Speech First*, 979 F.3d at 330.

[53] A library-material vendor "includes any entity that sells library material to a public primary or secondary school in [Texas]." Tex. Educ. Code § 35.001(1).

[54] *Id.* § 35.002(a) ("A library material vendor *may not sell* library materials to a school district . . . *unless* the vendor has issued appropriate ratings . . . ." (emphasis added)).

No. 23-50668

Thus, the statute arguably "facially restrict[s]" Plaintiffs' intended future conduct.[55]

*Third*, we assume that Plaintiffs face a credible threat of enforcement because the State has provided no "compelling contrary evidence."[56] The State's main argument is that, despite READER's plain language, the Act doesn't actually prevent Plaintiffs from selling books because READER lacks a mechanism for Defendants to enforce the rating system or the library standards against these Plaintiffs. The State is half right.

True, the State cannot enforce the library-collection standards against Plaintiffs. Although *school districts* must adhere to Chapter 33's library-collection standards, no Plaintiff has any duty under that chapter.[57] No Plaintiff brings any claims under Chapter 33, and indeed, the district court did not enjoin its enforcement.

But Chapter 35 facially forbids Plaintiffs from selling books to public schools unless they comply with the statute and provide ratings.[58] Still, the State maintains that the rating system, too, can be enforced only against the school districts—not Plaintiffs. That the State enforces READER through school districts is not fatal to Plaintiffs' standing. Courts have found that

---

[55] *See Speech First*, 979 F.3d at 335.

[56] *Id.* (collecting cases) ("[In] pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." (citation omitted)).

[57] *See* Tex. Educ. Code § 33.021(b) (describing standards "that a *school district shall consider* in developing, implementing, or expanding library services" (emphasis added)); *id.* § 33.0021(c) (describing "standards for school library collection development that a *school district shall adhere to* in developing or implementing the district's library collection development policies" (emphasis added)).

[58] *Id.* § 35.002(a).

13

No. 23-50668

plaintiffs have standing to sue government entities that injure them through another entity.[59] Although an injury cannot be "'the result of the independent action of some third party not before the court,' that does not exclude injury produced by determinative or coercive effect upon the action of someone else."[60] The State admits that the Agency Commissioner is empowered to enforce the Act against school districts,[61] which means the school districts' purchasing decisions are determined or coerced by the State through READER.

We assume there is a credible threat of enforcement and conclude that Plaintiffs have sufficiently established an injury in fact under our pre-enforcement standing precedent.

Independent of its alleged constitutional injuries, Plaintiffs have also established an injury in fact by alleging an economic injury.[62] Plaintiffs allege that READER causes "significant economic damages" in four ways.

- First, Blue Willow alleges that it has already lost business. It has sold over $200,000 in books to Katy ISD in the past 5–7 years, but as a result of READER, Katy ISD has paused all purchasing, including from Blue Willow.

---

[59] *See Bennett v. Spear*, 520 U.S. 154, 169 (1997) (holding that ranchers had standing to challenge an agency's biological opinion, which caused a third party to reduce the water available to the ranchers; the injury of reduced water was fairly traceable to the biological opinion even though the third party retained responsibility for water allocation); *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 513 (5th Cir. 2017) (rejecting the defendants' argument that the plaintiffs could not prove traceability or redressability because the challenged statutory provision was "not directly 'enforced' against [the plaintiffs]").

[60] *Bennett*, 520 U.S. at 169 (cleaned up).

[61] *See* Tex. Educ. Code § 39.003(a), (d).

[62] Plaintiffs also allege reputational injury. We need not reach this issue, however, because we find that they have standing based on their constitutional and economic injuries.

No. 23-50668

- Second, Plaintiffs allege that they will lose money between September 1, 2023 (when the law goes into effect), and April 1, 2024 (when ratings are due), because READER prohibits vendors from selling *any* books to public schools until they have complied with the rating requirements.

- Third, Plaintiffs allege that complying with READER will require them to divert extensive time and resources from their normal operations. Blue Willow estimates that compliance will cost between $200 and $1,000 per book and estimates that the cost to rate books already sold will be between $4 million and $500 million. It alleges that compliance costs alone will put it out of business because its annual sales are just over $1 million.

- Fourth, Blue Willow alleges that 20% of its sales are to schools or related to school author visits and festivals. It alleges that, if schools are no longer able to buy from them, it will lose most of this revenue.

"[E]conomic harm—like damage to one's business interest—is a quintessential Article III injury."[63] We have found a "concrete injury" when a plaintiff is "forced to divert time and resources away from their regular [business]."[64]

The State contends that these economic injuries cannot confer standing because the vendors are not *required* to participate in the rating system and their alleged injuries are not imminent. We are not persuaded. Plaintiffs allege that they will be harmed if they comply with READER and harmed if they don't. If Plaintiffs try to comply, they have alleged that it will

---

[63] *All. for Hippocratic Med*, 78 F.4th at 235; *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (explaining that "monetary harms" are among the "[t]he most obvious . . . traditional tangible harms" that "readily qualify as concrete injuries under Article III").

[64] *All. for Hippocratic Med.*, 78 F.4th at 235.

cost them potentially millions of dollars to rate and review books. And if they don't comply, the law at least facially prohibits them from selling *any* books to schools—which would cost Blue Willow nearly 20% of its revenue. These are concrete, cognizable injuries sufficient to confer standing, and the fact that the vendors are not required to participate in the program does not change that.[65]

2

Next, we consider whether Plaintiffs' injuries are fairly traceable to Defendants' actions and redressable by the requested relief. To prove traceability, Plaintiffs must allege "a causal connection between the injury and the conduct complained of."[66] "Tracing an injury is not the same as seeking its proximate cause."[67] Where, as here, "a causal relation between injury and challenged action depends upon the decision of an independent third party . . . standing is not precluded, but it is ordinarily substantially more difficult to establish."[68] To meet its burden, Plaintiffs "must show at the least 'that third parties will likely react in predictable ways.'"[69] And to satisfy the redressability requirement, Plaintiffs must show that a "favorable

---

[65] That said, we agree with the State that Katy ISD's decision to pause purchasing due to "uncertainty surrounding [READER]" cannot confer standing. Katy ISD allegedly paused purchasing until the school board created a procedure for evaluating books. Thus, the decision was apparently based on the district's internal process for implementing READER and has no connection to Plaintiffs.

[66] *Lujan*, 504 U.S. at 560.

[67] *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) (citing *Bennett*, 520 U.S. at 168–69).

[68] *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (internal quotation marks and citation omitted).

[69] *Id.* (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019)).

No. 23-50668

decision will relieve a discrete injury to [themselves]."[70] It must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[71]

Plaintiffs' injuries are traceable to the State's enforcement of READER, but only to Commissioner Morath. Although Chairs Wong and Ellis are responsible for promulgating the library-collection standards, those standards are not enforceable against Plaintiffs, and Plaintiffs have not explained how their injuries are otherwise traceable to Chairs Wong or Ellis.[72]

To enforce READER, Commissioner Morath is required to collect ratings from vendors and post them on the Agency's website.[73] He has discretion to review vendors' ratings, and if he does, he must notify vendors of the updated ratings and their duty to conform their rating to the Agency's.[74] He must then post the names of the vendors that don't accept

---

[70] *Air Evac EMS*, 851 F.3d at 514 (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)).

[71] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

[72] The State also argues that Chairs Wong and Ellis are entitled to sovereign immunity. Although we need not reach this question, we note that we would reach the same conclusion because Plaintiffs have not shown that either Wong or Ellis have the required connection to READER's enforcement. They are responsible for formulating the library standards for public schools, but "authority to promulgate [policy], standing alone, is not the power to enforce that policy" under *Ex parte Young*. *Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021) (per curiam). And the policies that Wong and Ellis are responsible for promulgating are enforceable only against school districts, not Plaintiffs. *See* Tex. Educ. Code § 33.021(b), (c).

[73] Tex. Educ. Code § 35.002(e) ("The agency *shall* post each list submitted under Subsection (c) or (d) in a conspicuous place on the agency's Internet website as soon as practicable." (emphasis added)).

[74] *Id.* § 35.003(a) ("*If* the agency determines that the library material is required to be rated as sexually explicit material or sexually relevant material or to receive no rating at

the Agency's updated ratings on the Agency's website.[75] As the State explained at the hearing before the district court, Commissioner Morath also has the authority to enforce § 35.003(d), which prohibits school districts from purchasing books from vendors who are on the noncompliance list, through a special investigation and sanctions.[76] Because Commissioner Morath "oversee[s] the [challenged] process"[77] and because his actions are "among those [that] would contribute to Plaintiffs' harm,"[78] Plaintiffs' injuries can be traced to the Commissioner's enforcement of READER.[79] If Commissioner Morath is enjoined, he cannot prohibit school districts from purchasing books from any vendors, either because the vendors did not initially provide ratings or because they refused to accept the Agency's updated ratings. The ACLU of Texas and Constitutional Law Scholars, as *amicus curiae*, make the good point that enjoining the Commissioner from enforcing READER would free Plaintiffs from the injurious dilemma that READER creates: either submit unconstitutionally compelled ratings to the Agency at great expense or refuse to comply and lose customers and revenue.

---

all under that subsection, the agency *shall provide* written notice to the vendor." (emphases added)).

[75] *Id.* § 35.003(c) ("The agency *shall* post and maintain in a conspicuous place on the agency's Internet website a list of library material vendors who fail to comply with Subsection (b)." (emphasis added)).

[76] *Id.* § 39.003(a), (d).

[77] *Air Evac EMS*, 851 F.3d at 514 (finding traceability satisfied where "state defendants oversee the [challenged] process," reasoning that the "state defendants' oversight" of the challenged program "places state defendants among those who cause [the plaintiff's] injury").

[78] *K.P.*, 627 F.3d at 123.

[79] *See Missouri v. Biden*, 83 F.4th at 370 ("The dispositive question is whether the Individual Plaintiffs' censorship can also be traced to government-coerced enforcement of those policies. We agree with the district court that it can be." (emphasis omitted)).

No. 23-50668

Plaintiffs' claims are traceable to the Commissioner and redressable by an injunction against him.

## B

Plaintiffs have standing, but this alone does not earn them their day in court. Their claims must also be ripe. In determining whether a claim is ripe, we must consider two factors: "(1) 'the fitness of the issues for judicial decision' and (2) 'the hardship to the parties of withholding court consideration.'"[80] "[A] claim is 'fit for judicial decision' if it presents a pure question of law that needs no further factual development."[81] "[I]f a claim is 'contingent [on] future events that may not occur as anticipated, or indeed may not occur at all,' the claim is not ripe."[82]

Plaintiffs' claims are fit for our review. No other factual or legal developments are required for us to decide this case. The State, however, argues that READER's regulatory scheme is not yet established. It points to § 35.007, which allows the Education Commissioner to "adopt rules as necessary to administer this chapter," and § 33.021, which requires TEA to promulgate its implementing rules for library-collection standards. On October 27, the Commission published its first proposed rule governing the implementation of the library-collection standards.[83] The State says that this rule vests school districts with responsibility for implementing the standards, provides additional evaluation and selection criteria for school districts, and

---

[80] *Braidwood Mgmt.*, 70 F.4th at 930 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

[81] *Id.*

[82] *Id.* (alteration in original) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).

[83] *See* 48 Tex. Reg. 6291, 692 (to be codified at 13 Tex. Admin. Code § 4.2) (proposed Oct. 27, 2023).

No. 23-50668

may obviate Plaintiffs' constitutional concerns. But the State does not explain how the proposed rule affects the rating system or the standards by which vendors are to rate library materials. Indeed, it can't because this rule only affects the library-collection standards.

The State also argues that because READER doesn't penalize the absence of an initial rating for a particular book, any harm that might come from a dispute about a hypothetical future rating hinges on future events that may or may not occur. According to the State, Plaintiffs will not be injured until the vendors either refuse to comply with the rating system or rate books in the wrong categories and then refuse to adopt the Agency's corrected ratings and land themselves on the noncompliance list. But the State ignores Plaintiffs' immediate economic injury of having to assign ratings to library material *at all*. Plaintiffs' First Amendment challenges to READER are "pure question[s] of law" that need no further factual or legal development.[84]

Finally, if we withheld our consideration of Plaintiffs' claims, the hardship to Plaintiffs would not be minimal, as the State contends. As explained above, Plaintiffs allege that complying with the law will cost valuable time and resources. For example, Blue Willow alleged that the compliance costs alone could put it out of business.

Plaintiffs' claims are ripe.

## C

Having concluded that Plaintiffs have standing to assert their First Amendment claims and that their claims are ripe for review, we turn to the

---

[84] *See Braidwood Mgmt.*, 70 F.4th at 930.

No. 23-50668

final jurisdictional question: whether Commissioner Morath is entitled to sovereign immunity.

Generally, "sovereign immunity bars private suits against nonconsenting states in federal court."[85] This bar also applies to suits like this one "against state officials or agencies that are effectively suits against a state."[86] Under the *Ex parte Young* exception to sovereign immunity, however, a plaintiff can seek prospective injunctive relief "against individual state officials acting in violation of federal law."[87] These state officials must "have some connection with the enforcement of the allegedly unconstitutional law."[88] Here, Plaintiffs sued for injunctive relief based on an ongoing violation of the First Amendment. The question is whether Commissioner Morath has the required connection to READER's enforcement.

To satisfy the required enforcement connection, the state official must have a duty beyond "the general duty to see that the laws of the state are implemented."[89] Rather, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty."[90] This analysis is "'provision-by-provision': The officer must enforce 'the particular statutory provision that is the subject of the

---

[85] *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019).

[86] *Id.*

[87] *Id.* (citation omitted).

[88] *United States v. Abbott*, 85 F.4th 328, 337 (5th Cir. 2023) (internal quotation marks and citation omitted).

[89] *City of Austin*, 943 F.3d at 999–1000 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)).

[90] *Id.* at 1000 (quoting *Morris*, 739 F.3d at 746).

litigation.'"[91] We have defined "enforcement" as "compulsion or constraint,"[92] so "[i]f the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation."[93] Plaintiffs need only show a "scintilla of enforcement by the relevant state official."[94] We have noted that the "Article III standing analysis and *Ex parte Young* analysis 'significantly overlap,'"[95] such that "a finding of standing tends toward a finding" that a plaintiff may sue the official under the *Ex parte Young* exception.[96]

Plaintiffs have shown that Commissioner Morath has a sufficient connection to READER's enforcement. The State again urges that Commissioner Morath's only enforcement authority is over school districts and, if Plaintiffs are compelled to or constrained from doing anything, it is by school districts, not the State.

True, the enforcement here "is not the same type of direct enforcement found in *Ex Parte Young*, for instance, where the attorney general threatened civil and criminal prosecution."[97] But "such enforcement is not required."[98] Plaintiffs have identified specific actions that this court can enjoin: Commissioner Morath is ultimately responsible for collecting and

---

[91] *Tex. All. for Retired Ams.*, 28 F.4th at 672 (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020)).

[92] *Id.* (quoting *City of Austin*, 943 F.3d at 1000).

[93] *Id.*

[94] *Tex. Democratic Party*, 978 F.3d at 179 (internal quotation marks and citation omitted).

[95] *City of Austin*, 943 F.3d at 1002 (quoting *Air Evac EMS*, 851 F.3d at 520).

[96] *Id.*

[97] *Air Evac EMS*, 851 F.3d at 519.

[98] *Id.*; *see also City of Austin*, 943 F.3d at 1001.

posting the vendors' lists of ratings, reviewing those ratings to determine whether a corrected rating is required, notifying vendors when their ratings are overridden, and posting lists of noncompliant vendors on TEA's website. And he is responsible for ensuring that school districts comply with READER's prohibition on buying material from vendors that violate this statute. [99]

We agree with Plaintiffs that these acts "compel[] them to submit ratings with which they disagree," and "constrain[] them from continuing to do business with school districts if they fail to submit the required ratings or decline to acquiesce in the State's revised ratings." That Commissioner Morath enforces the law through the school districts doesn't change our analysis.[100]

Because Commissioner Morath has a sufficient connection to the statute's enforcement, Plaintiffs can sue him under *Ex parte Young*.

## IV

Satisfied that we have jurisdiction, we now turn to the merits of the preliminary injunction. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[101]

---

[99] *See also supra* Part III.A.2; *Air Evac EMS*, 851 F.3d at 513–14 ("[T]here is significant overlap between standing and *Ex Parte Young*'s applicability.").

[100] *See supra*, Part III.A.1.

[101] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

No. 23-50668

A

We first consider whether Plaintiffs have shown a likelihood of success on the merits of their First Amendment claims. Plaintiffs assert that READER violates the First Amendment in three ways. They argue that it unconstitutionally compels their speech, is unconstitutionally vague, and is an unconstitutional prior restraint.[102] The State believes that Plaintiffs are unlikely to succeed on any of these claims because (1) READER does not affect Plaintiffs' First Amendment rights at all because the ratings are government speech, and (2) even if READER compels speech, the government operations and commercial-speech exceptions to the compelled-speech doctrine apply.

1

Before turning to the merits of Plaintiffs' First Amendment claims, we address the State's argument that READER involves government speech and thus does not affect Plaintiffs' First Amendment rights at all.[103]

---

[102] In their complaint, Plaintiffs also alleged that READER was an unconstitutional delegation of government authority. The district court apparently agreed, although it didn't make an express holding or provide any analysis on this argument. Plaintiffs do not address this argument on appeal. Because they are likely to prove a First Amendment violation on other grounds, we need not address this argument anyway.

[103] The State also briefly argues for the first time on appeal that under *Rust v. Sullivan*, 500 U.S. 173, 193 (1991), the State "is free to expend public funds on public interest programs, or not," so it can "lawfully consider whether a children's book is sexually explicit or relevant when deciding how to expend public funds on school library material." "As we have consistently held, 'arguments not raised before the district court are [forfeited] and cannot be raised for the first time on appeal.'" *Sindhi v. Raina*, 905 F.3d 327, 333 (5th Cir. 2018) (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007)).

No. 23-50668

"When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."[104] When "the State is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply."[105] Whether speech is government speech or private speech requires "a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression."[106] Three types of evidence "guide the analysis": "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression."[107] "Our review is not mechanical; it is driven by a case's context rather than the rote application of rigid factors."[108] Applying this framework, we conclude that the ratings are not government speech.

*First*, the State does not point to any history of book ratings, and we haven't found any ourselves. Instead, the State directs us to the "abundant history" of other labels and media ratings, such as ratings for movies and video games, and warning labels on cigarettes. In its view, those labels operate largely the same as READER's rating system. But READER's rating system is different from these examples in two important ways. One, as Plaintiffs note, movie and video game ratings are entirely voluntary.[109] There

---

[104] *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

[105] *Id.* at 215.

[106] *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022).

[107] *Id.*

[108] *Id.*

[109] *See* Douglas Dow, *Motion Picture Ratings*, MTSU: Free Speech Ctr., https://firstamendment.mtsu.edu/article/motion-picture-ratings (last updated Sept. 19, 2023) ("The *ratings system is voluntary*, and there is no legal requirement that filmmakers submit their films for rating." (emphasis added)); *Frequently Asked Questions*, Ent.

are no legal requirements that any entity submit ratings before sale. By contrast, READER's rating system *requires* third-party sellers to rate library materials before they can sell them to public schools. And two, READER does not require vendors to apply a government-created warning label on library material before sale, like tobacco or alcohol warnings. As explained in Part IV.B.2, the Supreme Court has approved these kinds of warning labels because they are "purely factual and uncontroversial."[110] We cannot say the same for READER's ratings.

*Second*, we agree with Plaintiffs that the public is not likely to attribute the ratings to the Agency. READER does not clearly state how TEA will post the initial rating lists on its website, and the State's representations on this issue have been conflicting. In its brief, it says that the law does not require TEA "to identify or otherwise associate any vendor with any book or any rating." But at the hearing before the district court, the State conceded that the lists would be posted under each vendor's name. It explained that this would be necessary because otherwise, "[t]here would be no other way for the school district[s] to know who they can purchase from." We think that the State's representation to the district court is most consistent with READER's text.[111] So although the ratings will be posted on TEA's website, the public will be able to see how each vendor rated material and will attribute the ratings to the vendor—not TEA.

---

Software Ratings Bd., https://www.esrb.org/faqs (noting that the rating system for video games is voluntary).

[110] *See Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985).

[111] *See* Tex. Educ. Code § 35.002(e) (requiring the Agency to post "each list" submitted by vendors).

No. 23-50668

We are not persuaded by the State's characterization of the ratings as a "form of consistency review" that is a "purely ministerial task" instead of an expression of the vendors' opinion on the subject matter being rated. An act is ministerial "[w]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment."[112] Here, the statute requires vendors to undertake a fact-intensive process of weighing and balancing factors to rate library material. This process is highly discretionary and is neither precise nor certain.[113]

*Third*, and finally, the State argues that the ratings are TEA's speech because the Act allows TEA to review the vendors' ratings and issue corrected ratings. This argument, however, can't be squared with the text. Section 35.003 allows TEA to notify the vendors that a corrected rating is needed. It is the *vendor* that must issue the corrected rating—not the agency. The corrected rating is again put on TEA's website and attributed to the vendor. And, as the district court concluded, although TEA *may* review ratings, it doesn't have to. So as the district court noted, if TEA decided not to review the ratings, "the only government action involved would be limited to placing an unedited list, prepared exclusively by the vendors, online."

In sum, the district court was correct that the government-speech doctrine does not apply. The ratings are the vendor's speech, not the government's.

---

[112] *Morris v. Dearborne*, 181 F.3d 657, 674 (5th Cir. 1999) (alteration in original) (quoting *Downing v. Brown*, 935 S.W.2d 112, 114 (Tex. 1996)).

[113] *See generally Jacobellis v. Ohio*, 378 U.S. 184, 187 (1964) (describing the "'dim and uncertain line' that often separates obscenity from constitutionally protected expression").

No. 23-50668

2

Because READER affects Plaintiffs' First Amendment rights, we turn to the merits of Plaintiffs' First Amendment claims. We start and end with their compelled-speech claim because we conclude that Plaintiffs are likely to succeed on the merits of that claim.

Plaintiffs allege that READER is "textbook compelled speech" in two ways. First, they argue that it coerces them to review library material and issue ratings as a condition to selling books to public schools. TEA then posts those ratings on its website, attributing them to Plaintiffs. Second, if TEA disagrees with one of Plaintiffs' ratings, the law requires Plaintiffs to adopt TEA's "corrected" rating. TEA then attributes the corrected rating to the vendors on its website. If Plaintiffs do not comply with either provision, they are prohibited from selling to school districts.

"[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."[114] Here, Plaintiffs "wish to stay silent and not express any public view on the appropriateness of various books." But the law requires Plaintiffs to "either speak as the State demands" or suffer the consequences.[115]

In response to Plaintiffs' compelled speech claim, the State argues that two exceptions to the compelled-speech doctrine apply: (1) the government-operations exception and (2) the commercial-speech exception.

---

[114] *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *see also 303 Creative*, 600 U.S. at 586.

[115] *See 303 Creative*, 600 U.S. at 589.

No. 23-50668

a

First, government operations. We have recognized that "[t]here is no right to refrain from speaking when 'essential operations of government require it for the preservation of an orderly society.'"[116] This exception has been applied to sex offender registration requirements,[117] disclosures on IRS forms,[118] and demographic information for the census.[119] But we have noted that there is "limited" precedent on the exception.[120] Even assuming that READER's rating system is part of an essential government operation, the ratings are unlike any information to which courts have applied the exception. READER requires vendors to decide whether library materials are sexually explicit or sexually relevant according to guidelines that require them to undertake a contextual analysis of material, weighing and balancing several factors. This goes beyond a mere disclosure of demographic or similar factual information. We therefore conclude that the exception does not apply.

b

Second, commercial speech. "Commercial speech is '[e]xpression related solely to the economic interests of the speaker and its audience.'"[121]

---

[116] *United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014) (quoting *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995)).

[117] *Id.*

[118] *Sindel*, 53 F.3d at 878.

[119] *Morales v. Daley*, 116 F. Supp. 2d 801, 816 (S.D. Tex. 2000); *see also Fowler v. Stitt*, No. 22-CV-115-JWB-SH, 2023 WL 4010694, at *8 (N.D. Okla. June 8, 2023) (holding that an Oklahoma policy forbidding gender changes on birth certificates was not government-compelled speech).

[120] *Arnold*, 740 F.3d at 1035 (noting "[o]ur limited sister-court precedent").

[121] *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 487 n.2 (5th Cir. 2019) (alteration in original) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980)).

No. 23-50668

It has also been defined as "speech which does 'no more than propose a commercial transaction.'"[122] The "commercial speech doctrine rests heavily on 'the common-sense distinction between speech proposing a commercial transaction . . . and other varieties of speech.'"[123]

Assuming the ratings are commercial speech, we must decide whether they unconstitutionally compel Plaintiffs' speech. In *Zauderer*,[124] the Supreme Court explained that "the State may at times 'prescribe what shall be orthodox in commercial advertising' by requiring the dissemination of 'purely factual and uncontroversial information.'"[125] But "outside that context[,] it may not compel affirmance of a belief with which the speaker disagrees."[126]

According to the State, *Zauderer* applies here because the library-material ratings are "purely factual and uncontroversial" like a nutrition label; they simply tell the buyer what they are receiving rather than pass

---

[122] *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (quoting *Pittsburgh Press Co. v. Human Rels. Comm'n*, 413 U.S. 376, 385 (1973)); *see also Gibson v. Tex. Dep't of Ins.—Div. of Workers' Comp.*, 700 F.3d 227, 235 (5th Cir. 2012) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983), for the same definition).

[123] *Zauderer*, 471 U.S. at 637 (alteration in original) (some internal quotation marks omitted) (quoting *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455–56 (1987)).

[124] "*Zauderer* is best read simply as an application of *Central Hudson*, not a different test altogether." *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 20–21 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring). It "tells us what *Central Hudson*'s 'tailored in a reasonable manner' standard means in the context of compelled commercial disclosures: The disclosure must be purely factual, uncontroversial, not unduly burdensome, and reasonably related to the Government's interest." *Id.*

[125] *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (quoting *Zauderer*, 471 U.S. at 651); *see also Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2372 (2018) (collecting cases).

[126] *Hurley*, 515 U.S. at 573.

judgment or express a view on the material's appropriateness for children. We disagree. The ratings READER requires are neither factual nor uncontroversial. The statute requires vendors to undertake contextual analyses, weighing and balancing many factors to determine a rating for each book. Balancing a myriad of factors that depend on community standards is anything but the mere disclosure of factual information. And it has already proven controversial.[127]

We conclude that neither exception applies. Plaintiffs are thus likely to succeed on their compelled speech claim.[128] Accordingly, we need not address whether they are also likely to succeed on their claims that READER is a prior restraint or unconstitutionally vague.

## B

Finally, we turn to the remaining preliminary-injunction factors. We first consider whether Plaintiffs are likely to suffer irreparable harm absent

---

[127] *See NIFLA,* 138 S. Ct. at 2372 (holding that *Zauderer* had no application because the compelled notice required plaintiffs to disclose information about state-sponsored services, including abortion, which was "anything but an 'uncontroversial' topic"). In fact, one potential application of READER's ratings has already caused controversy. During legislative hearings, a state representative testified that READER might require vendors to ban a Pulitzer Prize winning novel, which garnered media attention. And the availability of certain books in public-school libraries has been a controversial topic of debate throughout the country.

[128] The State also broadly argues that a school library is a nonpublic forum, so Plaintiffs' First Amendment rights "are necessarily limited." It relies on two student-speech cases for this proposition, *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), and *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988). True, these cases speak to public schools' ability to limit student speech at school, especially "where the speech is sexually explicit and the audience may include children." *Fraser*, 478 U.S. at 684. But the State does not explain how these student-speech cases affect Plaintiffs' compelled speech claim, and we find nothing in the caselaw that suggests how one might inform the other. If anything, a school is just as improper as any other place for compelled speech. *See W.V. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

No. 23-50668

the injunction, and if so, we must "balance the equities and consider whether an injunction serves the public interest."[129]

1

We have already concluded that Plaintiffs are likely to sustain economic and constitutional injuries. We now consider whether those injuries are irreparable. "An irreparable harm is one 'for which there is no adequate remedy at law.'"[130]

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."[131] Indeed, the Supreme Court has said that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[132] Because READER threatens Plaintiffs' right to be free from compelled speech, Plaintiffs have shown an irreparable injury.

They have also shown that they will suffer irreparable economic injury. We have explained that although compliance costs are not always recoverable,[133] "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs."[134] Even

---

[129] *All. for Hippocratic Med.*, 78 F.4th at 251.

[130] *Id.* (quoting *Louisiana v. Biden*, 55 F.4th 1017, 1033–34 (5th Cir. 2022)).

[131] *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)).

[132] *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

[133] *See Louisiana v. Biden*, 55 F.4th at 1034.

[134] *Texas v. EPA*, 829 F.3d 405, 433 (2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)).

No. 23-50668

if the bookstores could pass along some costs to their customers, Blue Willow has alleged here that the compliance costs alone "threatens the very existence of [its] business."[135] Recovering costs won't resurrect Blue Willow if compliance costs put it out of business.

2

Plaintiffs' risk of irreparable harm must be weighed against any injury the State would sustain.[136] Where the State is appealing an injunction, its interest and harm merge with the public interest.[137]

"When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."[138] We agree with the State that it has an interest in protecting children from harmful library materials. But "neither [the State] nor the public has any interest in enforcing a regulation that violates federal law."[139] Indeed, "[i]njunctions protecting First Amendment freedoms are always in the public interest."[140] Because Plaintiffs are likely to succeed on the merits of their First Amendment claim, the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment.

---

[135] *Id.* at 434 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

[136] *See All. for Hippocratic Med.*, 78 F.4th at 251.

[137] *See Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam); *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[138] *Veasey*, 870 F.3d at 391; *see also All. for Hippocratic Med.*, 78 F.4th at 251.

[139] *All. for Hippocratic Med.*, 78 F.4th at 251.

[140] *Opulent Life Church*, 697 F.3d at 298 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).

No. 23-50668

V

For these reasons, we AFFIRM the district court's grant of the preliminary injunction as to Commissioner Morath. We VACATE the preliminary injunction against Chairs Wong and Ellis and REMAND to the district court with instructions to dismiss Plaintiffs' suit against them. We DENY AS MOOT the State's motion for stay pending appeal.